# In the Matter of:

*KIMBERLY BARUS*

*vs*

*THE CITY OF JACKSONVILLE, FLORIDA, et al.*

*Case No. 3:24-CV-01358-MMH-SJH*

*ERICA WEBER*

*April 02, 2026*



2442 Atlantic Boulevard, Jacksonville, FL 32207
(904) 396-1050    www.firstcoastcr.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
(Jacksonville Division)

CASE NO.: 3:24-CV-01358-MMH-SJH


KIMBERLY BARUS,

    Plaintiff,

 v.

THE CITY OF JACKSONVILLE, FLORIDA,
et al.,

    Defendants.
--------------------------------


        Deposition of City of Jacksonville/Chief

Erica Weber, taken on behalf of the Plaintiff, pursuant

to Plaintiff's Amended Notice of Rule 30(b)(6)

Deposition, in the above-entitled action, on Thursday,

April 2, 2026, at 9:00 a.m., at First Coast Court

Reporters, 2442 Atlantic Boulevard, Jacksonville,

Florida, before Diane M. Tropia, FPR, a Notary Public in

and for the State of Florida at Large.



First Coast Court Reporters
2442 Atlantic Boulevard
Jacksonville, FL 32207
(904) 396-1050


-  -  -

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 2

APPEARANCES:

        MARCY I. LAHART, Esquire, Marcy I. LaHart, PLLC, 861 S. 40th Street, Tacoma, WA 98418, Attorney for Plaintiff.

        DENESE VENZA, Esquire, Venza Law, PLLC, 12161 Mercado Drive, Suite 227, Venice Beach, FL 33409, Attorney for Plaintiff.

        SONYA HARRELL, Deputy General Counsel, City of Jacksonville, Office of General Counsel, 117 West Duval Street, Suite 480, Jacksonville, FL 32202, Attorneys for Defendant Karl D. Lampkin.

        PAUL E. BUEKER, Assistant General Counsel, City of Jacksonville, Office of General Counsel, 117 West Duval Street, Suite 480, Jacksonville, FL 32202, Attorneys for City of Jacksonville.

                        -   -   -

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 3

I N D E X

WITNESS

  CITY OF JACKSONVILLE/CHIEF ERICA WEBER

     DIRECT EXAMINATION BY MS. LAHART . . . . PAGE   4

               - - -

E X H I B I T S

FOR IDENTIFICATION

    PLAINTIFF'S EXHIBIT  1 . . . . . . . . . . . PAGE    7

    PLAINTIFF'S EXHIBIT  2 . . . . . . . . . . . PAGE   20

    PLAINTIFF'S EXHIBIT  3 . . . . . . . . . . . PAGE   26

    PLAINTIFF'S EXHIBIT  4 . . . . . . . . . . . PAGE   42

    PLAINTIFF'S EXHIBIT  5 . . . . . . . . . . . PAGE   63

    PLAINTIFF'S EXHIBIT  6 . . . . . . . . . . . PAGE   65

    PLAINTIFF'S EXHIBIT  7 . . . . . . . . . . . PAGE   80

    PLAINTIFF'S EXHIBIT  8 . . . . . . . . . . . PAGE   94

    PLAINTIFF'S EXHIBIT  9 . . . . . . . . . . . PAGE  102

    PLAINTIFF'S EXHIBIT 10 . . . . . . . . . . . PAGE  103

    PLAINTIFF'S EXHIBIT 11 . . . . . . . . . . . PAGE  105

    PLAINTIFF'S EXHIBIT 12 . . . . . . . . . . . PAGE  107

    PLAINTIFF'S EXHIBIT 13 . . . . . . . . . . . PAGE  112

    PLAINTIFF'S EXHIBIT 14 . . . . . . . . . . . PAGE  117

               - - -

- - -

CITY OF JACKSONVILLE
CHIEF ERICA WEBER


having been produced and first duly sworn as a witness,

testified as follows:

DIRECT EXAMINATION

BY MS. LAHART:

Q.    Good morning.

A.    Hi.

Q.    Would you please state your name for the record.

A.    Erica Weber, E-r-i-c-a, W-e-b-e-r.

Q.    Ms. Weber, how are you employed?

A.    I am employed by the Jacksonville Sheriff's Office.

Q.    How long have you been with JSO?

A.    May will be 20 years.

Q.    Wow.

A.    Uh-huh.

Q.    Congratulations.

A.    Thank you.

Q.    What is your current position?

A.    I am the chief of Professional Standards.

Q.    What other positions have you held with JSO in your 20-year career?

A.   Prior to being the chief, I was the commander at our training academy.  Prior to that, it was the assistant chief -- which is the same thing as commander, they've just changed the title --

Q.   Okay.

A.   -- over communications.  Before that, it was lieutenant in special assault.  Before that, lieutenant in the risk protection and civil units.  Before that, I was a lieutenant in patrol.  Before that, I was the sergeant over the internet crimes against children.  Before that, I was a sergeant over secondary employment.  And before that, I was a sergeant in special events -- I'm sorry, special assault.  I'm sorry.  Secondary and special events go together.  I'm sorry.  So sergeant in special assault.  Before that, I was a sergeant in burglary.  Before that, I was a sergeant in patrol.  Before that, I was a detective in special assault.  Before that, it was -- I spent some time in homicide also, as a detective, and then bike unit patrol and basic patrolman and the academy.

Q.   Wow.

A.   That's a lot.

Q.   I am very impressed with your ability to remember -- remember that.

     Should I call you Lieutenant Weber?

A.    It's Chief now, but --

Q.    **Chief.  I'm sorry.**

A.    -- whatever you wish to call me, I'll answer.

MR. BUEKER:  As long as it's nice?

A.    Ah.

BY MS. LAHART:

Q.    Chief Weber, you understand that you're here to testify on behalf of the City of Jacksonville?

A.    Yes.

Q.    You understand that your answers are to be based not only on your personal knowledge, but on all the information that is known or available to the City of Jacksonville?

A.    Yes.

Q.    Is it okay if I shorten the City of Jacksonville to "the City" for purposes of our deposition?

A.    Yes.

Q.    Your attorney is on a short time frame, so that will save us some time.

So you understand that if I refer to "the City" during this deposition, I'm referring to the City of Jacksonville?

A.    Yes.

Q.    And you understand that your answers today will

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 7

be binding on the City?

A.   Yes.

MS. LAHART:  I apologize, but no matter how organized I try to be, I always end up shuffling through papers.

(Brief discussion held off the record.)

MS. LAHART:  I am going to hand you what we'll mark as Plaintiff's Exhibit 1.  You can share that with your counsel because I don't have two copies.

THE WITNESS:  Yes, ma'am.

(Plaintiff's Exhibit Number 1 was marked for identification.)

BY MS. LAHART:

Q.   Have you ever seen that document before?

A.   Yes.

Q.   And are you prepared to testify about the subjects on Schedule -- identified under Schedule A?

A.   Yes.  I'm hopeful that you have copies when it comes to very specific things of what you're looking for in these items.

Q.   I hope so too.

(Brief discussion held off the record.)

BY MS. LAHART:

Q.   Chief Weber, can you think of anything about

your physical, emotional, or mental condition that would affect your ability to proceed today?

A.   No, ma'am.

Q.   Is there any reason you can think of that you're not ready to testify on behalf of the City?

A.   No.

Q.   Prior to being designated the corporate representative, what was your involvement in this matter?

MS. HARRELL:  I'm going to object.  That goes beyond her 30(b)(6) deposition.  She's here as the designated City representative, so her personal involvement is beyond the scope of this.

MS. LAHART:  Okay.  You've made your objection for the record.

You can answer.

MR. BUEKER:  I'll join that objection.

But you can answer.

A.   I had no involvement with this incident.

BY MS. LAHART:

Q.   When was the first time that you learned of this incident?

A.   When I received the request from the Office of General Counsel related to the suit that was filed.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 9

Q.   What request did you receive?

A.   For items to be produced pursuant to the sheet with the information requested.

Q.   This sheet of information?  I'm referring to Exhibit 1.

A.   Really, I -- this is an amended version.

Q.   Right.

A.   I believe the first version I saw still had information as far as trying to find the policies and information that related to the items that you were looking for.

Q.   Okay.  Could it possibly have been a response to a request for production?

MS. HARRELL:  Object to form.

MR. BUEKER:  Join.

A.   Potentially.  Ultimately, it was a request that I received from OGC, the Office of General Counsel, related to the suit that was filed and the information that was requested by, I assume, you.

BY MS. LAHART:

Q.   Can you tell me what your duties are as the chief of Professional Standards?

A.   Yes, ma'am.  I oversee the academy, the gun range, the field training office, our Professional Oversight Unit, internal affairs, accreditation,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 10

inspections, and the auto unit.

Q.    What does the Professional Oversight division do?

A.    That is a unit within the agency that directs and implements changes to our processes and sometimes policies.  We handle all of the demos.  If there's a new software being checked out or a new drone, for instance, we're involved in that process.  But there's also a component that reviews all of our vehicle crashes, all of our Response to Resistance Review Boards, all of our Response to Resistance reports.  It's -- it's a very broad scope.

Q.    Sorry.  I'm having a little technical difficulty here.

Do you know why you were designated as the corporate representative?

MS. HARRELL:  Objection.  That goes into work product --

MR. BUEKER:  I join.

MS. HARRELL:  -- privilege.

BY MS. LAHART:

Q.    I noticed that the City --

MR. BUEKER:  Attorney-client, too.

MS. HARRELL:  Yeah.

BY MS. LAHART:

Q.   I noticed the City interrogatory answers were signed by Mark Romano, director of patrol and enforcement for JSO.  Do you know why he was not designated?

MR. BUEKER:  Objection.

MS. HARRELL:  Same objection.  Privileged.  It's work product.

MR. BUEKER:  And attorney-client.

BY MS. LAHART:

Q.   Do you know Mr. Romano?

A.   Yes.

Q.   Did you talk to him about this case?

A.   No, ma'am.

Q.   Who have you discussed this case with?

A.   Our Office of General Counsel; the Professional Oversight Unit, when I was seeking documents for production; and my supervisor knows I'm here.

Q.   Have you ever spoken with Officer Lampkin regarding this case?

A.   No, ma'am.

Q.   Do you know of anyone better qualified to be the corporate representative to testify on behalf of the City of Jacksonville?

MS. HARRELL:  Objection.

MR. BUEKER:  Objection.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 12

MS. HARRELL: That gets into work product.

MS. LAHART: No, I'm asking what she knows.

MS. HARRELL: You're asking the City of Jacksonville what they know as far as, like, making a legal determination as to who is qualified to be the 30(b)(6) representative.

MS. LAHART: Are you directing her not to answer the question?

MS. HARRELL: Yeah.

MS. LAHART: Okay.

BY MS. LAHART:

Q. **What did you do to prepare for your testimony today?**

A. I reviewed the documents that were produced in response to the amended notice for deposition.

Q. **Uh-huh.**

A. I reviewed the body-worn camera from Officer Lampkin's 2022 incident. I believe that's the extent of it.

Q. **Okay. The City produced 33 videos, body-worn camera; did you review all of those?**

A. No, ma'am.

Q. **Which ones did you review?**

A. I reviewed the actual shooting on -- from April

the 11th, 2022, from Officer K. Lampkin.

Q.    What do you know about Officer Lampkin?

A.    He is an officer with our agency.  He actually was from my academy class 20 years ago.

Q.    Uh-huh.

A.    He's been a patrol.  I believe he's been promoted to sergeant.

Q.    Have you ever worked with him?

A.    No, ma'am, other than time at the academy as a recruit together.

Q.    I'm going to ask you a few questions about body-worn camera video.  How is body-worn camera video typically retrieved from the police officer?

A.    It depends on the circumstance.  The -- the cameras themselves are docked in a -- like a plastic container with all these computer things.  Anyway, they plug the body-worn camera into the docking station, and things upload to Axon, which is the company we pay for body-worn camera services.

Q.    Okay.  Where is the docking station?

A.    There's multiple.  They are in our district substations.  They're also in the Police Memorial Building.  There's some at the academy.  They're basically anywhere that the officers frequent and they show up for -- for work on a daily basis.

Q.    Okay.  And are they downloaded on a daily basis?

A.    They are downloaded after a shift, yes.

Q.    After every shift?

A.    Do you have the body-worn camera policy with you that I might refer to from that time period? Because it has changed over the years, and I don't want to give you information that is current versus what was in policy at that time.

MS. LAHART:  I don't know.  Do we have that?

MS. VENZA:  I do, but it will take me a minute to get it out.

MS. LAHART:  Okay.

MS. VENZA:  I do have it.

BY MS. LAHART:

Q.    We can -- we can circle around back to that.

So after it goes to the docketing [sic] station, what happens to it?

A.    It's in our Axon storage that we do pay for from the Sheriff's Office, and it's retrievable by folks -- lieutenants, specifically, and above -- who have a need to review it for whatever purposes.

Q.    Okay.  And if somebody makes a public records request for body-worn camera, who is the person or

persons that retrieve the body-worn camera video in response to a public records request?

A.    Public records requests receives -- the public records unit receives the request and they forward it to the body-worn camera unit --

Q.    Uh-huh.

A.    -- and within that body-worn camera unit, there are several individuals who work and provide the requested information back to the public records unit who releases it to whomever is making the request.

Q.    I understand that there's about a six-month wait for a person who asks to see -- asks -- makes a public records request to receive the video.  Can you explain to me why it takes so long?

MR. BUEKER:  Objection.  That is not within the scope of this.  Public -- public records requests and response is not within the scope of the notice --

MS. LAHART:  Well --

MR. BUEKER:  -- so, you know, not only do I not think she's probably prepared to answer that, I would also object on the grounds that -- form, and you're assuming things that may not be correct.

I know body-worn camera -- let's see.  If

we're going to do this, let's make sure I --

(Document examined.)

Okay.  So Number 4, your topic was Lampkin body-worn camera video.

I don't know if there was another specific policy/procedure regarding PRR.

There was one -- I think there was one, Number 16 is the City's policies, procedures, and practices for retaining and recording and documenting body-worn camera videos, which doesn't include public records requests.

So I think this is outside the scope of --

MS. LAHART:  The City's policies, procedures, and practices for receiving, processing, dispatching, recording, documenting and retaining 9-1-1 calls and body-worn camera videos.

MR. BUEKER:  Yeah, I don't --

MS. LAHART:  Why -- why is that not covered?

MR. BUEKER:  It's not, because it doesn't say anything about public records requests.

MS. LAHART:  Well, practice --

MS. HARRELL:  The question is --

MS. LAHART:  -- practices for receiving,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 17

processing, dispatching, all of those things are done in response to a public records request, are they not?

MS. HARRELL:  No.  I mean, they are done in the normal course of business.

MS. LAHART:  Okay.  Are you directing the witness not to answer my question?

MR. BUEKER:  I mean, I guess she can answer the question.  I think it's outside the scope and I'd make an objection that it's outside the scope.

MS. LAHART:  Okay.

MS. HARRELL:  And I will join the objection, and it will not be binding on the City of Jacksonville.

BY MS. LAHART:

Q.    Do you know why it takes so long for a citizen that requests body-worn camera video to receive it?

A.    There typically, when it comes to the body-worn camera, are things that must be redacted.  The requests go into a queue for the body-worn camera unit, and they are going request by request, looking through to make sure that we are adhering to all of the public records laws and we're not releasing something that would otherwise be prohibited.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 18

Q.   Okay.

MR. BUEKER:  Can we take a break?

I want to talk to you.

(Ms. Harrell and Mr. Bueker exit the proceedings.)

(Brief pause in the proceedings.)

MR. BUEKER:  All right.  Sorry about that.

BY MS. LAHART:

Q.   When Officer Lampkin was dispatched, what complaint was he responding to?

A.   The original complaint was under -- I believe it was CCR 209409.

Q.   Too -- too fast.

A.   Okay.  It was referenced to a young man that was being held, I guess, on top of the back of a vehicle because a dog was chasing him.

Q.   And who called about that?

A.   The original report -- the computer-aided dispatch information referred to a Mr. -- I think it was Allenton, which is incorrect as far as the spelling of his name, but I believe it was the young man that called.

Q.   Do you know how many calls were received?

A.   No, ma'am.

MS. HARRELL:  Let me just note that that

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 19

would be reflected in documents that you have,
I believe.  So --

MS. LAHART:  Thank you.

MS. HARRELL:  And the knowledge of the
witness -- of the City of Jacksonville is in
documented form.  There's no collective memory.
So it might be helpful if you're asking about
reports, documents --

MS. LAHART:  I'll get to that.

MS. HARRELL:  Okay.  I just don't want you
to think the entity doesn't know something that
they have to look at the document to see.

MS. LAHART:  The witness can prepare
before a deposition that they know they are
going to be asked about certain topics, as
well.

MS. HARRELL:  The witness is not expected
to memorize what's in documents.

THE WITNESS:  I would be able to answer
your question succinctly with the event recap
that you have in front of you.

MS. LAHART:  Okay.

MS. HARRELL:  Because -- and again, just
to clarify Denese's point, the knowledge of the
entity is in a document form.  There's no --

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 20

there's no memory.

MS. LAHART:  Denese, could I have a copy of this?

MS. VENZA:  (Tenders documents.)

I have multiple copies.

MS. LAHART:  Thank you very much.

Chief Weber, I'm going to hand you what will -- we will mark as Exhibit 2.  And I actually do have copies for your counsel.

(Brief discussion held off the record.)

MS. VENZA:  Would you give him one?

MS. LAHART:  He didn't want one.

MR. BUEKER:  I'll take one.

(Plaintiff's Exhibit Number 2 was marked for identification.)

BY MS. LAHART:

Q.    All right.  Can you identify this document for the record, please?

A.    Yes.

Q.    What is it?

A.    It is the event recap, which is a document that's created by our computer-aided dispatch system that includes caller information and concerns shared to our Communications Center.

Q.    Okay.  Can you walk me through this?

A.   Yes.  Is there something specific that you are looking for?

Q.   Well, it says, April 11th, 2022, 6:22, Incident Initiated.

A.   Yes.  That is the time of the call to our Communications Center.

Q.   And can you tell me who made that call by looking at this?

A.   The caller information was recorded by our dispatch --

Q.   Uh-huh.

A.   -- area or call taker as Mr. Allenton.

Q.   Okay.

MS. VENZA:  Where is that?

THE WITNESS:  It's the third line down, Caller, on the first page.

MS. VENZA:  Okay.  Thank you so much.

BY MS. LAHART:

Q.   What does SIG 56 mean?

A.   That is our ten code for a juvenile.

Q.   Okay.

And where does it say that Mr. Allenton was the -- oh, it says -- advised he is on top.  Okay.

And then it says, Incident Initiated, a second time; why is that?

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 22

A.   In our CAD system, there is a key.  It's just as information is being updated, they're hitting the key.

Q.   Okay.  So when it says Caller Information Updated, would you be able to tell me what was updated?

A.   No, ma'am.

Q.   Okay.  The top of Page 2 of 12, Primary Unit Changed to M19 [sic] -- M319, can you tell me what that means?

A.   That is the officer that was dispatched to -- the -- to handle this.

Q.   So the M319 is associated with Karl Lampkin?

A.   If you flip to Page 12 of 12, all of the unit IDs and call signs are listed, and Mike 319 is Karlous D. Lampkin.

Q.   Okay.  Do you know why Officer Lampkin was chosen?  Was it -- how does -- how does that work?

A.   Our dispatch, as they are sending out information, tries to find the officer they believe to be the closest.

Q.   Uh-huh.

A.   But also, it's related to just what -- who is available and when the call came in, and then the priority of the call.

Q.   I'm in the middle of Page 2 of 12, Comments,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 23

CMP --

And I assume that's complainant?

A.    Yes, ma'am.

Q.    -- on Top of White Honda Civic, the Dogs Have Him Trapped, Can Hear Them Barking.

Who -- who is it that can hear them barking?

A.    That's -- that is Mr. Allenton.  He is listed still as the complainant.

Q.    So he's reporting that he can hear the dogs barking?

A.    Yes.

Q.    And at -- further down the page, Unit Status For M319 Changed to AR.

What does that mean?

A.    Where are you specifically?  At six forty -- I'm sorry, I found it.  Four twelve -- 4/11/22, 6:48.

Q.    Uh-huh.

A.    That is, unit status for Mike 319, again, Officer Lampkin --

Q.    Uh-huh.

A.    -- changed to, the arrows, and AR is arrived.

Q.    Okay.  And at 7:24, Unit Status For M229 Changed to NA.

What does that mean?

A.    Unit status for Mike 229, which is listed as

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 24

Kelsey Pittman, was changed to not arrived -- I'm sorry, not acknowledged.

Q.    Okay.  So the reason that Officer Lampkin was dispatched is because he was in the vicinity?

MS. HARRELL:  Object to the form.

You can answer.

A.    The dispatch crew that was working at that time chose him as the available unit.  And I -- I can't assume why they selected him, other than typically that decision is made based on who is available and who the dispatch group believes to be the closest.

BY MS. LAHART:

Q.    So it looks -- and correct me if I'm misreading that -- starting at 7:24 -- one, two, three -- four more units were dispatched, four more officers were dispatched -- sent to the scene, I guess?

A.    So we mentioned Kelsey Pittman.

Q.    Uh-huh.

A.    That's Mike 229.

Mike 121, Lucretia Yates received a screen on it, meaning she either dispatched or was self-initiated. I can't tell from looking at this.

Q.    Okay.

A.    Mike 121, that's Ms. Yates.

Unit status for 632, that's going to be a

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 25

supervisor.  That's Randy Crews.  He was a sergeant at the time.

Yes, they added additional units.

Q.    Who -- who was M229?

A.    Kelsey Pittman.

Q.    Okay.  So we had Pittman, Yates, Randy Crews. Did I miss anybody?

A.    No.

Q.    So further down that page, when its status is changed to EN, what does that mean?

A.    En route.

Q.    Looking at Page 4 of 12, kind of in the middle of that page, next to 7:27, Comments, DUP, ADV down the street.

What does that mean?

A.    It's a duplicate call, meaning our officers were already on scene --

Q.    Okay.

A.    -- and they're receiving another call at a very similar location.

Q.    Okay.

A.    They're advising down the street, subjects are having a dispute, that's the 63, then heard 33s, that's gunshots, no other information.

Q.    Okay.  And there's no way to tell from this who

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 26

the caller was?

A.    I cannot tell from looking at it.

Q.    Okay.  Did you review the City's Answers to Interrogatories?

A.    I don't recall.

Q.    This is my only copy of this, so it's not yours to keep.

A.    Fair.

MS. LAHART:  I'll mark this Exhibit 3.

(Plaintiff's Exhibit Number 3 was marked for identification.)

BY MS. LAHART:

Q.    Have you seen this document before today?

A.    Yes.

Q.    Okay.  The response to the question regarding the identity of the officers that responded -- one, two, three, four, five, six, seven, eight, nine, ten, eleven -- 11, plus an animal control officer.  Why were all of those police officers -- why did they all go the to scene?

MR. BUEKER:  I'm going to object.

Can we take a look at the Answers to Interrogatories?  Let me take the staple out.

(Document tendered.)

MR. BUEKER:  All right.  Just for the

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 27

record, the question is, Identify by name,

et cetera, including animal control

professionals that were present during the

incident and the aftermath.

A.    Could you ask your question again?

BY MS. LAHART:

Q.    Yeah.  Why were all of those officers there?

MR. BUEKER:  Sorry.

MS. HARRELL:  Object to form.

A.    Obviously --

MS. HARRELL:  You can answer.

A.    Obviously, Lampkin went based on the original call.

BY MS. LAHART:

Q.    Uh-huh.

A.    Once the shooting occurred, the situation obviously was charged, and other officers were dispatched to help try to resolve the situation, as well as the supervisors were dispatched and the lieutenant was dispatched, because it's required by policy.

Q.    Okay.  Do you know why two sergeants were dispatched?

A.    No, ma'am, I don't.

Q.    Going back to Exhibit 2, middle of -- well, actually, not in the middle, towards the end of Page 5,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 28

next to 7:38, Comments, T66 T33 0738 HRS.

Can you tell me what that means?

A.    Yes, ma'am.  T66 is cancel.  T33 is emergency radio traffic.  0738 is the time.  HRS is the hours.

Q.    So what exactly does that mean?  What -- what happened here?  Why is that -- what does that comment tell you?

A.    Emergency radio traffic was given because of the shooting, meaning other officers are not supposed to transmit, the radio belongs to the officer that's in the situation.

Q.    Okay.

A.    And then at 7:38 hours, the CAD entry reflects that the emergency radio traffic was canceled so that the radiofrequency is back available to all officers working in that district.

Q.    Okay.  On the next page, Page 6 of 12, Comments, T67 Bit in Hand and Lower Leg.

What does T67 mean?

A.    T67 means requesting rescue, and it's not an emergency situation with a major loss of blood or potential loss of life.

Q.    Okay.

A.    Bit in the hand and lower leg is, obviously, someone was bit in the hand and lower leg.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 29

Q.   Right.

And then the next entry is, Comments, JFRD T51. What does that mean?

A.   JFRD is Jacksonville Fire and Rescue Department.

Q.   Uh-huh.

A.   T51 is en route.

Q.   Okay.  Is unit -- 632, is that the evidence technician?

A.   Are you at -- you're at 7:49?

Q.   Yes.

A.   Unit status for 632 changed to arrived.  632 is reflected as Sergeant Crews.

Q.   When it says Unit Status Changed to CL, does that mean closed?

A.   Where are you?

Q.   I'm --

A.   7:56?

Q.   -- one, two, three -- four from the bottom on Page 6.

A.   Okay.  Yes, ma'am.

Unit status for Oscar 226, which was Martin Prinzi, changed to closed, yes.

Q.   Okay.  Then at -- on the next page, at 8:07 a.m., Primary Unit Changed From 319 [sic] to -- I'm

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 30

sorry, M319 to M229.

Who is M229, again?

A.    M229 is Kelsey Pittman.

Q.    **Why was the primary unit changed?**

A.    Because the officer involved in a shooting is not expected to write that report.

Q.    **Further down on the page, it says, Driver's License Query Executed.**

**Do you know whose driver's license?**

A.    I do not.

Q.    **Is M121 the evidence technician?**

A.    No.  M121 is Lucretia Yates.

MS. HARRELL:  If you want to, I can give you my Page 12, if it's easier for you to reference the list.

MS. LAHART:  I'm good, thank you.  The less paper I have, the better.

BY MS. LAHART:

Q.    **And do you know why Officer Yates arrived?**

A.    No, ma'am.  Again, other than it was a situation with a shooting, and typically officers will respond to be of assistance when that happens.

Q.    **Okay.  Looking at Page 9 of 12, at 12:45, Disposition RTR Recorded For 186.**

**Can you tell me what that means?**

A.    Where are you, again?

Q.    **Page 9 of 12.**

A.    Yes, ma'am.

Q.    **At 12:35.**

A.    35.   Okay.   Disposition RTR Recorded For 186.

So I think -- the disposition was an RTR was -- was being completed by 186, which was Lieutenant Sircar.

Q.    **And RTR is?**

A.    The Response to Resistance report.

Q.    **The very last entry on Page 9 of 12, Comments, Occupational Health JSO/M9 [sic] -- 319.**

**What does that mean?**

A.    In order to answer that, the line above must be considered.  So 4/11/2022, 12:43, second line from the bottom, Unit Status for Mike 319 Changed to AO, that's at other, and the comments he entered was that he went to occupational health.

Q.    **What is occupational health?**

A.    Seeking medical treatment for whatever has occurred.

Q.    **And would it be his discretion where to seek that medical treatment or is there somebody associated with JSO?**

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 32

Don't to have to -- either it was -- I'll also make an objection that that is not a topic listed in the notice.

MS. LAHART:  This report was a topic listed, and I'm just trying to get to the details of the report.

MR. BUEKER:  I know, but your question was about policies of where the officers go to seek medical treatment.

You can answer the question, but knowing that it's outside the scope, if you know the answer.

A.   There are contracted health providers with the City.  They change frequently.  I can't tell you who was our contracted provider in 2022, but yes, there are specific locations we are expected to go.

BY MS. LAHART:

Q.   Okay.

All right.  Page 11 of 12 -- one, two -- third entry, Disposition BC7 Recorded For M319.

What does that mean?

A.   That is Officer Lampkin making an entry to keep his -- his body-worn camera for seven years.

Q.   Okay.  And what's the next entry below that?

A.   Disposition K, which is kilo, assisted another

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 33

unit, recorded for Mike 319.

Q.    I'm sorry.  Can you say that in English?

A.    Disposition, he assisted another unit, and that was entered by Mike 319.

Q.    Okay.  So he assisted another unit.  Is he on to another call now?

A.    No, he is closing the call that he was originally sent to --

Q.    Okay.

A.    -- but he is not considered the primary unit at that point, so he is checking back that he assisted the primary unit.

Q.    Okay.  Thank you.

A.    Yes.

Q.    Incident Status Stacked, what does that mean?

A.    There was another call stacked to him, meaning it was in his queue of things that he needed to handle.

Q.    Okay.  I'm going further down the page, Disposition -- I'm looking at 16:45.

A.    Yes, ma'am.

Q.    Disposition 1 Recorded, what does that mean?

A.    A report was written.

Q.    And the entry below that?

A.    BC5 is keeping his body-worn camera for five years.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 34

Q.   Okay.   You reviewed the video of Officer Lampkin shooting Lucy, correct?

A.   Yes.

Q.   We're going to go through that video.  I have a few questions I need to ask you.

(Brief discussion held off the record.)

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Is your mother or father at home?  Tell your mother and father police is at the door.

CHILD:  (Inaudible.)

OFFICER LAMPKIN:  Good morning, ma'am.

MS. BARUS:  Hey.

OFFICER LAMPKIN:  How you doing this morning?

MS. BARUS:  Just fine.

OFFICER LAMPKIN:  Okay.  The reason why I'm out here -- I'm Officer Lampkin.  I got a call about a kid on your -- on your car being chased by dogs and your husband pulling a gun on him.

MS. BARUS:  We don't even own a gun, for one.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 35

OFFICER LAMPKIN:  Okay.

MS. BARUS:  Two, my husband never it made it out of the house.  My -- I got woke straight up from my dogs raising hell.

OFFICER LAMPKIN:  Uh-huh.

MS. BARUS:  I opened the door, my gate was open.

OFFICER LAMPKIN:  Uh-huh.

MS. BARUS:  There's no way for my gate to get open if somebody don't open my gate.

OFFICER LAMPKIN:  Uh-huh.

MS. BARUS:  So I go out in my underwear, shut the gate.  I turn around and come back in the house, and he's sitting on the back of the car.

OFFICER LAMPKIN:  Uh-huh.

MS. BARUS:  I said, get off the car.

No, your dogs are chasing me.

I said, my dogs are in this fence.  Get off the car.

OFFICER LAMPKIN:  Uh-huh.

MS. BARUS:  He refused to get off the car.

OFFICER LAMPKIN:  Okay.

MS. BARUS:  So I told him it was about to be a bad day for him, and I come back in the

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 36

back door.  And when I did, he took off running up the road.  That's the last we seen of him.

OFFICER LAMPKIN:  Okay.

MS. BARUS:  I was hoping his mamma would come back down here.  You don't send a kid out at 6:30 in the morning to somebody's house, opening a gate in their backyard.

OFFICER LAMPKIN:  So is he in your backyard?

MS. BARUS:  He was.  He had to have been.  The gate was open.

OFFICER LAMPKIN:  Did --

MS. BARUS:  My dogs would have been out.

MR. J. BARUS:  Our dogs surprised him when he stepped in --

MS. BARUS:  Yeah.

MR. J. BARUS:  -- that gate.

MS. BARUS:  That's what happened.

OFFICER LAMPKIN:  Uh-huh.

MR. J. BARUS:  And --

(Simultaneous speaking.)

OFFICER LAMPKIN:  And why --

MS. BARUS:  -- my heat pump stolen out here.  I've had a table stolen out here.  That's why those dogs are back there.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 37

OFFICER LAMPKIN:  And was he -- was he standing on the top of your car?

MR. J. BARUS:  Yes.

MS. BARUS:  On the back of the car.

MR. J. BARUS:  On the trunk of the car.

OFFICER LAMPKIN:  Okay.

MS. BARUS:  And would not leave.

OFFICER LAMPKIN:  And was his mother on the phone at any time?

MS. BARUS:  I don't know.  I do not know. He wouldn't -- I don't know.  He got down and ran, and that's all we know, is he ran around that corner --

OFFICER LAMPKIN:  And where were your dogs?

MS. BARUS:  -- and up that road.

MR. J. BARUS:  In the fence.

MS. BARUS:  In the backyard.

OFFICER LAMPKIN:  Do your dogs ever come outside?

MR. J. BARUS:  No.

MS. BARUS:  No.

MR. J. BARUS:  You can go back there and open that gate --

MS. BARUS:  You can -- I'll go open it

right now, and they will not come out of that fence on you.

OFFICER LAMPKIN:  Okay.  Well, let me see them.

How are you doing, sir?

MR. J. BARUS:  I'm doing great.

MS. BARUS:  Come on.

(Video playback ends.)

BY MS. LAHART:

Q.    **I'm going to stop right now.**

**Why did Officer Lampkin need to see the dogs?**

MR. BUEKER:  Object to form.

MS. HARRELL:  Objection.

MR. BUEKER:  And -- it's not within the scope of this, and she doesn't have personal knowledge of this, so -- and she's not -- she has already established she has not talked to Officer Lampkin about it.  We've already gone over in our pre-depo discussions that she can't sit here and testify about why people did things.

BY MS. LAHART:

Q.    **Okay.  Is it consistent with the JSO policy for an officer to demand to see somebody's dogs --**

MS. HARRELL:  Objection --

BY MS. LAHART:

Q.    -- after --

MS. LAHART:  Let me finish my question.

MS. HARRELL:  I thought you were finished.

I'm sorry.

BY MS. LAHART:

Q.    -- after there has been a call concerning those dogs?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Object to form.

BY MS. LAHART:

Q.    The answer?

MR. BUEKER:  Yes.  Answer, yes.

A.    There is not a specific policy requiring an officer to see a dog; however, from that video, there was not a demand made to see the dogs.

BY MS. LAHART:

Q.    No?

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  -- he ran around that corner --

OFFICER LAMPKIN:  And where were your dogs?

MS. BARUS:  -- and up that road.

MR. J. BARUS:  In the fence.

MS. BARUS:  In the backyard.

OFFICER LAMPKIN:  Do your dogs ever come outside?

MR. J. BARUS:  No.

MS. BARUS:  No.

MR. J. BARUS:  You can go back there and open that gate --

MS. BARUS:  You can -- I'll go open it right now, and they will not come out of that fence on you.

OFFICER LAMPKIN:  Okay.  Well, let me see them.

(Video playback ends.)

BY MS. LAHART:

**Q.   "Let me see them."  Is that not a -- a request to see the dogs?**

MS. HARRELL:  Object to the form.

MR. BUEKER:  Again, objection, form.

A.   As an officer, my opinion on this scenario is they both offered to show him the dog.

MR. BUEKER:  All right.  And I'm going to --

BY MS. LAHART:

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 41

Q.    Okay.  And he said --

MR. BUEKER:  Let me just stop you there.

You just said, "my opinion."  You're not here to offer your opinions.

THE WITNESS:  Correct.

MR. BUEKER:  So -- and that's what she's asking you to do, is give your opinions.

A.    I cannot give you a corporate representative answer to your question.

BY MS. LAHART:

Q.    Okay.  Is there any policy that required Officer Lampkin to see the dogs?

A.    No.

Q.    How does JSO typically respond to a -- a call regarding a dog at large?

MR. BUEKER:  Object to form.

You can answer.

A.    Do you have Order 212 in front of you, Animal Complaints?

BY MS. LAHART:

Q.    I do not have it in front of me, no.

MS. VENZA:  (Tenders document.)

BY MS. LAHART:

Q.    Would you like a copy?

A.    Yes, ma'am.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 42

MS. LAHART:  Mark this as Exhibit 4.

(Plaintiff's Exhibit Number 4 was marked for identification.)

THE WITNESS:  For purposes of making sure I have the -- what you need order wise, is there anything I need to do with these to keep them separate?

THE REPORTER:  Just keep them in a pile, please.

THE WITNESS:  Okay.

MR. BUEKER:  And she --

(Simultaneous speaking.)

THE WITNESS:  So we put 3 back.

BY MS. LAHART:

Q.    Would you identify this document for the record, please?

A.    Yes.  This is Order 212, Animal Complaints, which was effective 3/17 of 2020.

Q.    Okay.  Can you show me in here where it says how officers respond to complaints regarding dogs at large?

A.    Page 4 of 6, Item 8 speaks to animals running loose; other than livestock or animal bite cases, the officer should refer this type of call to ACPS -- Animal Care and Protective Services -- by calling 630-CITY or

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 43

by submitting an online report on the COJ website by using the government link 630 CITY.

It goes on to say, Number 9, if the animal is not presenting an immediate danger, the officer should request the complainant to call ACPS Monday through Friday, 8:00 a.m. to 1700 hours, Saturday from 8:00 to 1200 hours, at the same number, and lists the COJ website.

It goes on to say, Number 10, if the animal is running loose -- I'm sorry, if the animal running loose is a dog, the officer can locate the owner, and the elements of an animal control offense are present, a civil citation under Municipal Ordinance 462.303 should be issued as warranted.  For enforcement purposes, ownership includes any person having custody or charge of the animal.

Number 11 --

Q.   Okay.  We're good.  Thanks.

A.   I think Number 11 actually speaks to this incident.  I would like to provide it.

Q.   Okay.

A.   If the animal is creating a problem that needs immediate attention, officers shall contact -- if the animal is creating a problem that needs immediate attention, officers shall contact ACPS in accordance of

this order for response to the scene.

Q.    Would you agree with me that there was no need for immediate attention to the Barus dogs on --

MR. BUEKER:  Object to form --

BY MS. LAHART:

Q.    -- April 11th?

MR. BUEKER:  Okay.  Object to form.

MS. HARRELL:  Object to form.

MR. BUEKER:  It's outside the scope of a corporate representative deposition.

MS. HARRELL:  Join.

MS. LAHART:  She was produced to explain these orders.  I'm asking her about the order as it applies to this case.

MR. BUEKER:  You're asking her for her personal opinion.

A.    I agree.  That's an opinion statement, and I'm not prepared to answer it.

BY MS. LAHART:

Q.    So you can't tell me whether or not immediate attention was needed when Officer Lampkin responded on April 11th of 2022?

MR. BUEKER:  Same objection.

MS. HARRELL:  Same objection.

A.    As an opinion, sure, but not as a cooperate

representative.

BY MS. LAHART:

Q.    All right.  What's your opinion?

MR. BUEKER:  Same objection.

MS. LAHART:  Yeah, we know.

A.    If a dog has somebody trapped or is a potential threat to the neighborhood, there is an obligation for an officer to respond and to address the situation.

BY MS. LAHART:

Q.    Was anybody trapped when Officer Lampkin arrived?

A.    No.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  How are you doing, sir?

MR. J. BARUS:  I'm doing great --

MS. BARUS:  Come on.

MR. J. BARUS:  Yourself?

OFFICER LAMPKIN:  No, go ahead.  You go open the gate.  I'll be there.

MR. J. BARUS:  Besides getting woke the hell up.

OFFICER LAMPKIN:  Okay.  Did you pull --

(Video playback ends.)

BY MS. LAHART:

Q.    **Is there any policy that would have required or even allowed Officer Lampkin to direct Kim Barus to open the gate?**

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

You can answer.

A.    No.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  -- did you have something in your hand?

MR. J. BARUS:  Oh, no, sir.  I had my fist, and that's what I intended to use when I got to him.

OFFICER LAMPKIN:  Uh-huh.  Did you see him in your backyard or anything?

MR. J. BARUS:  No.

OFFICER LAMPKIN:  Okay.

MR. J. BARUS:  But what my wife says is true.

OFFICER LAMPKIN:  Okay.

MR. J. BARUS:  My dogs don't go outside that damn fence if it's open.  It can be wide

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.  
Weber, Erica on 04/02/2026

30(b)(6)  
Page 47

open --

OFFICER LAMPKIN:  Uh-huh.

MR. J. BARUS:  -- and they don't go outside that fence.

OFFICER LAMPKIN:  Okay.  Stay right here.

MR. J. BARUS:  Yes, sir.

OFFICER LAMPKIN:  Did you -- what did you say to him?

MR. J. BARUS:  I told him, you son of a bitch, you better run.

OFFICER LAMPKIN:  Okay.

MR. J. BARUS:  That's all I said.

OFFICER LAMPKIN:  Where were you when you said that?

MR. J. BARUS:  Standing right here.

OFFICER LAMPKIN:  Okay.  So you never came over here?

MR. J. BARUS:  No.  Didn't make it that far.  He was coming around the corner.

OFFICER LAMPKIN:  Uh-huh.

(Electronic notification in video playback.)

(Video playback ends.)

BY MS. LAHART:

Q.    Could I ask you what that beeping noise is?

A.    That is the body-worn camera beeping.

Q.    **Why does it beep?**

A.    As an alert to citizens that we are recording, as an alert to the officer that the recording is active, just general awareness.

Q.    **Do you know how often it beeps?**

A.    I don't.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Well, he's out the gate.

Hey, bud.

(Dog vocalizing.)

OFFICER LAMPKIN:  Hey.

MS. BARUS:  Come on.

OFFICER LAMPKIN:  Get back.

(Gunshots heard on video.)

MS. BARUS:  No.  No.  No.

OFFICER LAMPKIN:  Get down.

(Video playback ends.)

BY MS. LAHART:

Q.    **Was that shooting of Lucy consistent with the City's policies?**

A.    If an animal is presenting an immediate threat, yes.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 49

Q.   Okay.   Has to be an immediate threat of serious bodily harm, correct?

A.   Yes.

Q.   Okay.   Have you seen the -- the pictures of Officer Lampkin's injuries?

A.   Yes.

Q.   Would you agree with me that he suffered nips?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Just object to the form.

You can answer.

BY MS. LAHART:

Q.   Was he seriously injured?

MS. HARRELL:  Object to form.

A.   No.

BY MS. LAHART:

Q.   Is it the City's position that Lucy was a threat to anyone other than Officer Lampkin?

MS. HARRELL:  Object to form.

MR. BUEKER:  Join.

You can answer.

A.   There is not a policy that I can cite.  It would be my personal opinion, which I've been asked not to give.

BY MS. LAHART:

Q.   Is it the City's position that Lucy was

creating a clear and imminent danger to Officer Lampkin?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Asked and answered.

MS. HARRELL:  Calls for a legal conclusion.

MR. BUEKER:  You can answer.

A.    The dog had a man on the back of a car.  The dog came out of the gate and, your words, nipped Officer Lampkin.  Animals are unpredictable.  Officer Lampkin acted.

There's not a policy that can tell you a dog will do x, y, and z.  Based on the information available, Officer Lampkin made a decision to act as he did, in protecting himself and the rest of the community.

BY MS. LAHART:

Q.    Okay.  The dog didn't have anyone on the car when Officer Lampkin was there, correct?

A.    Correct.

Q.    And the only reason that the dog was outside of the gate was because my client had been told to go open the gate, correct?

MS. HARRELL:  Object to form.

MR. BUEKER:  Object to form.

MS. HARRELL:  You can answer.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 51

A.   The video reflects that the male and female in the video -- which has a new title on it from what our body-worn camera is, the WTF that appears in the lower left corner is not body-worn camera footage -- your pink shirt female and the white male at the door offered to show the dogs to Officer Lampkin.

BY MS. LAHART:

Q.   **And Officer Lampkin told her, go open the gate --**

A.   Yes.

Q.   **-- did he not?**

MR. BUEKER:  Object to the form.

MS. HARRELL:  Object to the form.

MR. BUEKER:  Asked and answered.

MS. HARRELL:  All right.  Are you going to be attaching this video as an exhibit?

MS. LAHART:  Absolutely.

MS. HARRELL:  Okay.  I'm going to object because we don't know where that WTF in the lower corner came from.

MS. LAHART:  I'll tell you.  I saved it as that this morning because we have 33 different videos and we needed to know which one to look at.

MS. HARRELL:  Okay.  And what does WTF

stand for?

MS. LAHART:  World wrestling federation.
I don't know.

MS. HARRELL:  Those letters don't even
match.  I'm going to object to the use of this
as an exhibit.  It's inappropriate.  It's been
improperly edited by Counsel for plaintiffs.

MS. LAHART:  It's been renamed.

MR. BUEKER:  I join.

MS. HARRELL:  The name is showing up on
the screen on the video.

MS. LAHART:  Okay.  Your objection is
noted for the record.

(Brief pause in the proceedings.)

MS. LAHART:  Back on the record.

(Video playback begins.)

(Whereupon, the following dialog was
transcribed from video:)

OFFICER LAMPKIN:  Get back.

(Video playback ends.)

BY MS. LAHART:

Q.  **Would you agree that when Officer Lampkin is drawing his firearm that Kim Barus is trying to control her dog, she's trying to get the dog back to her?**

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

A.    I think the video speaks for itself.

BY MS. LAHART:

Q.    **Okay.**

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

(Gunshots heard on video.)

MS. BARUS:  No.  No.

(Video playback ends.)

BY MS. LAHART:

Q.    **How was Lucy an imminent threat or danger to Officer Lampkin, as the dog is running away?**

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

A.    Officer Lampkin had been bitten.

BY MS. LAHART:

Q.    **That doesn't answer my question.  How is the dog a threat to him, as the dog was running away?**

A.    I believe you're asking --

MS. HARRELL:  Object to the form.

MR. BUEKER:  Object to form.

MS. HARRELL:  Asked and answered.

A.    You're asking me for an opinion that Officer Lampkin should have been able to give you.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 54

BY MS. LAHART:

Q.    You did tell me that it was the City's position that Lucy was a clear and imminent danger to Officer Lampkin when he drew his pistol, correct?

MS. HARRELL:  Object to the form.  Misstates the answer.  Asked and answered.

MR. BUEKER:  Join.

BY MS. LAHART:

Q.    Chief Weber, I want to make clear to you that I am never intentionally misrepresenting an answer that I -- that you have given.  So if I misstate something, please correct me.  Okay?

A.    Yes.

Q.    Okay.  Is it the City's position that Lucy was a clear and immediate danger to Officer Lampkin when he pulled his pistol --

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

BY MS. LAHART:

Q.    -- his Glock?

A.    To Officer Lampkin and the community at large.

Q.    How is the dog a threat to the community at large when it is on its own property running towards his front door?

MS. HARRELL:  Object to the form.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 55

MR. BUEKER:  Join.

A.   An opinion is what I can offer you.  There is not a policy that says why that, in fact, is a threat to the community.

BY MS. LAHART:

Q.   **Can the City identify any person in the community that the dog was posing a threat to when the second, third, fourth, and fifth shots were fired?**

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

A.   In that specific frame of body-worn camera, no; however, it is 7:00 in the morning, and people are frequently coming and going.  It's obviously a school day.  The ability for Officer Lampkin on that property to manage every other member of the community is impossible.

BY MS. LAHART:

Q.   **Do you see any other members of the community in this video?**

MS. HARRELL:  Object to the form.

MR. BUEKER:  (Inaudible.)

Join.

A.   No, ma'am.

BY MS. LAHART:

Q.   **And we have 25, 30 minutes of -- of video.  At**

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 56

any point, do you see any other member of the community in the video?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

You can answer.

A.   No.

BY MS. LAHART:

Q.   Would you agree with me that Lucy was not at large when Officer Lampkin arrived at the Barus household?

A.   Yes.

Q.   What actions -- action or actions was Officer Lampkin authorized to take in response to Jaivon's statement that he had been chased by dogs?

A.   I don't understand your question.

Q.   What actions was Officer Lampkin allowed to take when he arrived at the Barus property in regards to the Barus dogs?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.   Officer Lampkin should have completed an investigation.  And how that investigation was completed is discretion, as long as it's within policy.

BY MS. LAHART:

Q.   Okay.  Is it within policy to direct somebody

to allow a dog that has supposedly been accused of being aggressive just to open a gate and let that dog out?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Object to form.

MS. HARRELL:  Asked and answered.

BY MS. LAHART:

Q.  Or see if that dog will go out?  Is that consistent with policy?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Asked and answered.

A.  I believe we've answered that.

BY MS. LAHART:

Q.  What was the answer?

A.  The homeowners offered to show Officer Lampkin that dog, offered to open the gate.  Officer Lampkin simply went with them.

Q.  Is it within policy to -- for him to have gone with them?

A.  Yes.

Q.  What policy is that?

A.  Again, officer discretion.  We cannot put every single thing an officer might do into policy.

Q.  Having responded to a call from an individual who claimed to be trapped on a car by these dogs, do you think Officer Lampkin had reason to know or to think

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 58

that the dogs might behave aggressively?

MR. BUEKER: Object to form.

MS. HARRELL: Join.

MR. BUEKER: Outside of the scope of a corporate representative deposition.

You can answer.

A. I don't have an answer for you on that. There's not a policy that specifically says how to address that.

BY MS. LAHART:

Q. Was Officer Lampkin required to test the veracity of Kim Barus's statement that her dogs would not leave the yard even if the gate was open?

MR. BUEKER: Object to form.

MS. HARRELL: Join.

A. Officer Lampkin was there to investigate the call for service we received. The municipal ordinance does authorize the Jacksonville Sheriff's Office and Animal Control to enforce any animal-related complaints. So he was within his scope to arrive at the house and question the dog owners about what happened.

BY MS. LAHART:

Q. Okay. Was he required to test the veracity of the statement that the dogs won't come out of the gate?

MS. HARRELL: Object to form.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 59

MR. BUEKER:  Object to form.

You can answer.

A.   No.

BY MS. LAHART:

Q.   **Having heard a report that Kim Barus's dogs were allegedly aggressive to Jaivon Ellington, shouldn't Officer Lampkin have been better prepared to deal with a possible dog encounter?**

MR. BUEKER:  Object to form.

MS. HARRELL:  Object to the form.

MR. BUEKER:  Outside the scope of a corporate rep deposition.  You're asking for a personal opinion.

MS. HARRELL:  Join.

A.   I'm not going to offer you a personal opinion.

BY MS. LAHART:

Q.   **Okay.  Is it a policy of the City of Jacksonville to use nonlethal options in dealing with dogs whenever possible?**

MS. HARRELL:  Object to the form.

A.   Whenever possible, sure.

BY MS. LAHART:

Q.   **And what nonlethal options are at an officer's disposal?**

A.   In accordance with policy?

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 60

Q.   Yes.

A.   The OC spray, so oleoresin capsicum.  And calling ACPS, Animal Care and Protective Services.

Q.   **Is using a baton an acceptable alternative to lethal force under the City's policy?**

A.   A baton is considered less lethal.

Q.   **Is using a Taser less lethal?**

A.   It is; however, there is a caveat in our policy that does not allow a Taser to be used on animals unless it's a preplanned event.

Q.   **Is there any such policy that applies to the use of a baton?**

A.   No.

Q.   **Is there any such policy that applies to the use of OC spray?**

A.   No.

Q.   **Is there any policy that would have prevented Officer Lampkin from kicking Lucy instead of shooting her?**

A.   No.

Q.   **Is it reasonable for an officer to create the situation that he claimed required him to use lethal force?**

MS. HARRELL:  Object to form.

MR. BUEKER:  Object to the form.  Outside

the scope of a corporate rep deposition.

You're asking the witness to testify as to personal opinion as to reasonableness.

You can answer.

A.   I don't have an answer for you.

BY MS. LAHART:

Q.   **Okay.  Does the City policy state that officers should not needlessly place themselves in or remain in situations of great danger and use this as justification for the use of deadly force?**

A.   Yes.

MS. HARRELL:  Object to the form.

MS. LAHART:  What's wrong with the form of that question?

MS. HARRELL:  This is not a deadly force situation.

MS. LAHART:  Well, it was definitely --

MS. HARRELL:  (Inaudible.)

MS. LAHART:  It was deadly to Lucy.

MS. HARRELL:  It's a legal issue about your interpretation of the policy.  I objected to the form.  She's answered it.  We're on a time limit.  We can move on.

BY MS. LAHART:

Q.   **Did Officer Lampkin need to encounter Lucy**

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 62

outside of the fenced yard where she was confined when he arrived in order to complete his investigation?

A.    No.

MS. HARRELL:  Object to form.

MR. BUEKER:  Object to form.  Outside the scope of a corporate rep deposition.

BY MS. LAHART:

Q.    Does the City's Response to Resistance policy contemplate using specialty impact weapons to subdue vicious animals?

MS. HARRELL:  Objection.  If you're asking about a specific policy, you probably need to let her see it.

MR. BUEKER:  You can answer.

A.    Yes.

BY MS. LAHART:

Q.    And what policy is that?

A.    551, Response to Resistance.  And there's 552, Weapons.  If you have those, I would like to get to the specific area that you're asking about.

Q.    Sure.

(Tenders document.)

All right.  I think we're up to Exhibit 5.  I'm going to hand you what we will mark for purposes of identification Exhibit 5.

(Plaintiff's Exhibit Number 5 was marked for identification.)

MR. BUEKER:  And for the record, this is General Order 551.

BY MS. LAHART:

Q.    **Chief Weber, can you tell me what a specialty impact weapon is?**

A.    Yes.

Q.    **What?**

A.    That is a beanbag round or a gas-powered round that our SWAT unit has.

Q.    **Was Officer Lampkin prepared to use any nonlethal option?**

MS. HARRELL:  Object to the form.

MR. BUEKER:  Object to form.

MS. HARRELL:  Beyond the scope.

A.    I believe that would be a question for Officer Lampkin.

BY MS. LAHART:

Q.    **Is the City aware of Officer Lampkin being prepared to use any nonlethal option when he encountered Lucy?**

A.    Officer Lampkin has received training in less lethal response.  I cannot guess as to -- to what his thought process was when he arrived at that call.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 64

Q.   Do you know what was on his person?

A.   I believe there's a photograph from our crime scene technician of the injury to his hand and his leg. I don't recall whether there was an image of him with a duty belt.

Q.   What would an officer typically have on his or her duty belt?

A.   The requirement is a Taser.  If the baton is not carried, it must be in the car.  Gun, magazine, handcuffs.  What else do we have?  A radio must be with them; we typically carry it on our belt.  And then the keepers, the leather straps that hold a belt to an under-belt.

Q.   Do you know if Officer Lampkin had pepper spray with him?

A.   I'm not sure.  That is a requirement to be on the belt also.  I think I forgot that.  It is -- and a flashlight.

Q.   You said it's a requirement.  Do you know if Officer -- excuse me, does the City know whether Officer Lampkin had pepper spray on him?

A.   Do you have an image from the crime scene technician?

MS. LAHART:  Do you have a copy of this?

(Brief discussion held off the record.)

THE WITNESS:  I ask because there typically is an image of the officer as they appeared that day.

MS. LAHART:  Okay.  I'm going to hand you what we will mark as Petitioner's [sic] Exhibit 6.

(Plaintiff's Exhibit Number 6 was marked for identification.)

BY MS. LAHART:

Q.  **Can you identify this document for the record, please?**

A.  Yes, ma'am.  This is the Interdepartmental Correspondence to Director Schmitt from Lieutenant Eason of the Professional Oversight Unit, dated 5/4 of '22; reference, a Response to Resistance Incident Review involving case RTR22-0008.  The referenced CCR number is 2022-209485.

Q.  **Where are you reading that number?  I'm sorry.**

A.  Bold, first paragraph --

Q.  **Oh.**

A.  -- under the subject.

Q.  **Sorry.  Gotcha.**

**All right.  What does Case Number RTR22-0008 refer to?**

A.  That is the eighth Response to Resistance

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 66

incident that was reviewed involving discharge of a

firearm by our Professional Oversight Unit.

Q.    In the year 2022?

A.    Yes, ma'am.

Q.    And what does CCR Number 2022-209485 refer to?

A.    Central Communications Report, and it is the

number that was assigned to the shooting.

Q.    So is there actually a Central Communications

Report regarding this incident?

A.    The dispatch unit -- or the Communications

Center dispatchers create a new 1099 [sic] -- I'm sorry,

CCR number to document the actual shooting and separate

it from the original call, which was the

CCR 2022-209409.

Q.    What is the Professional Oversight Unit?

A.    I think we talked about that earlier.  It is a

unit of individuals that assist with demonstrations for

the agency when it comes to new technology, new

software.  We also assist with any policy updates that

affect multiple units across the agency.

There is a detective within the unit assigned

to our crashes, our JSO-involved crashes, and does an

investigation to determine what -- what contributing

factors existed and potential discipline.  There is a

detective assigned to the Response to Resistance Review

Boards to put information together, collect information, and provide information to the chain. There's also a detective that is assigned to the Response to Resistance reports themselves, to look through them and look for policy violations and ensure that we are keeping up with the standards that we are expected to adhere to by CALEA and CFA.

Q. Would you agree with me that there is not a picture of Officer Lampkin?

A. Yes, ma'am.

Q. Okay. And based on the fact that there's no picture, are you not able to tell me whether or not he had his pepper spray on him?

A. I cannot tell you, ma'am.

Q. Okay. Thank you.

Whose actual signature is on Page 1 of this document?

A. That is Director Schmitt.

Q. Was it Director Schmitt's determination that the Response to Resistance is within policy?

A. Yes.

Q. Who was resisting?

MR. BUEKER: Object to form.

MS. HARRELL: Join.

MR. BUEKER: You can answer.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 68

A.   The Response to Resistance report is written any time we use force, any time an injury results or a firearm is discharged.

BY MS. LAHART:

Q.   So was Lucy resisting?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.   Lucy is a dog.  I don't know how to answer that question.

BY MS. LAHART:

Q.   Fair.

The box that's checked is Discharge of a Firearm At an Animal, but it was more than just discharge of a firearm, wasn't it?  It was killing the animal?

MR. BUEKER:  Okay.  Object to form.

MS. HARRELL:  Join.

MR. BUEKER:  You can answer.

A.   Unfortunately, Lucy did die as a result of this incident.

BY MS. LAHART:

Q.   And that wouldn't be considered an "other" by the Professional Oversight Unit?

A.   No, ma'am.

Q.   So is the discharge of a firearm at an animal

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 69

reviewed the same way regardless of whether the animal was killed?

A.   Yes.

Q.   Is there a different policy that applies to the use of force against wildlife as opposed to domestic animals?

A.   The Animal Complaints Order 212 does separate out different types of animals; however, the officer has to make a decision on scene about whether or not force is necessary.

Q.   There's an "X" next to, "No further action is necessary, the Response to Resistance is within policy."

Is -- do you know which policy is being referred to?

A.   Director Schmitt signed this form.  He would have to answer your question directly.  I can offer you an assumption, but it's an assumption.

Q.   Well, typically, the Professional Oversight Unit reviews a Response to Resistance report to determine whether it was consistent with the Response to Resistance policy, correct?

MS. HARRELL:  Object to form.

MR. BUEKER:  Objection.

A.   The Professional Oversight Unit does review Response to Resistance incidents; however, they are also

held to all of our policies.  It's not just the Response to Resistance order, which is 551, it is anything and everything that JSO has in policy.

BY MS. LAHART:

Q.   Can we look at the Animal RTR Incidents portion of the policy, Order Number 551?

A.   Yes, ma'am.

Q.   That's Part O.

A.   (Examines document.)

Q.   When handling an aggressive or dangerous animal, officers are required to use nonlethal options when feasible, including, but not limited to, retreating from the animal.

Was it feasible for Officer Lampkin to retreat from Lucy?

A.   That's a question --

MR. BUEKER:  Object to form.

A.   -- for Officer Lampkin.

MS. HARRELL:  Join.

BY MS. LAHART:

Q.   Okay.  But you would agree with me that if he could have just gotten away from the dog, he was required to do that?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 71

A.   That is an option.

BY MS. LAHART:

Q.   That's what the policy requires, isn't it?

A.   Yes, it -- the policy requires officers to use nonlethal options when feasible.

Q.   Correct.

Obtaining assistance from the owner is another option that is listed, correct?

A.   Yes.

Q.   And before Lucy was shot, Lucy's owner was trying to contain her, correct?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.   (No response.)

BY MS. LAHART:

Q.   Would you agree with me that Kim Barus was trying to get to her dog before Officer Lampkin shot Lucy?

MR. BUEKER:  Object to form.

A.   The video reflects --

BY MS. LAHART:

Q.   Do you want to go back over that?

A.   The video reflects her bending down towards the dog.  I don't know what she was doing.

Q.   Using intermediate weapons or pepper spray is

also listed as an option, correct?

A.    Yes.

Q.    Going on to the next page, under 4, it talks about what happens after an officer uses deadly force on an animal.

Number 5 is, Ensure an Animal Investigation Report is completed in ARMS.

What is ARMS?

A.    ARMS is our reporting.  It's Agency Reporting Management System.

Q.    Do you know if that was done in this case?

A.    (Peruses documents.)

I do not see it, but I will also caution that application, because the preceding caveat is that after an officer uses deadly force on an animal, the commanding officer who authorized the use of deadly force, or the most appropriate patrol commanding officer, shall immediately respond.

In this incident, a lieutenant or a supervisor did not authorize Lampkin because the -- of how quickly the incident unfolded.

MR. BUEKER:  And just for the record, the witness said, I don't see it, and she was reviewing the documents that she's been provided.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 73

BY MS. LAHART:

Q. Okay. Going back to what you just read, After an officer uses deadly force on an animal, the commanding officer who authorized the use of deadly force, or the most appropriate patrol commanding officer, shall immediately respond to the scene and conduct an administrative investigation.

So there's going to be an administrative investigation regardless of whether the use of force was authorized, correct?

A. Yes.

Q. Under this policy?

A. Yes.

Q. So are you saying that there was no requirement to produce an animal investigative report because the use of deadly force had not been authorized?

A. No.

Q. So pursuant to the City's policy, an animal investigative report should have been prepared?

A. Could you restate your question? I don't -- I think you asked about an RTR report and an ARMS Animal Investigation Report in the same question.

Q. Well, if I did, that was not intentional.

My question is, pursuant to the City's policy, should an Animal Investigation Report have been

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 74

completed regarding the shooting of Lucy?

A.    No.

Q.    Why not?

A.    The animal investigative report is specifically referenced when an officer -- a commanding officer gives authorization to shoot an animal.

The RTR, Response to Resistance report, documents the fact that the shooting occurred.

Q.    Okay.  I'm just not understanding this.

4, after an officer uses deadly force on an animal, the commanding officer who authorized the use of deadly force -- we don't have one of those, so I'm just going to cross that part out -- the officer uses deadly force on an animal, the most appropriate patrol commanding officer shall immediately respond to the scene and conduct an administrative investigation.

Did that happen in this case?

A.    No.  And I see your point.  I don't see an Animal Investigation Report.  The officer who did respond, Sircar -- Lieutenant Sircar completed the Response to Resistance report and did not complete an Animal Investigation Report.

Q.    Okay.  Paragraph 5 says that one shall be completed, right, or that the commanding officer shall ensure an Animal Investigation Report is completed?

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 75

A.   Yes.

Q.   And you haven't seen one?

A.   No, ma'am.

Q.   Number 6, place the disposition code RTR in the MCAD primary disposition block and all other applicable disposition codes in the subsequent blocks.

Can you tell me what that means?

A.   Yes.  Place the disposition RTR, which is a code for a Response to Resistance report having been written, in the MCAD, which is the mobile computer-aided dispatch, primary disposition block and all other applicable disposition codes in the subsequent blocks.

So all of the -- we talked about the kilo, the "K" that was in the -- the arrows.  Any of those check boxes should have been RTR.  Kilo, k-i-l-o.

Q.   Could you find Officer Sicar's [sic] report for me?

A.   Sircar?

Q.   Sircar.

A.   Lieutenant?  Yes.

Q.   That's part of what we called Exhibit 6, correct?

A.   Correct.

MR. BUEKER:  It -- if it is complete.

A.   (Peruses documents.)

In the Exhibit 6 I have in front of me --

BY MS. LAHART:

Q.    Uh-huh.

A.    -- RTR report 2022-209485, these are front and back pages, I'm going to refer to it as Page 3, which is the third face --

Q.    Okay.

A.    -- that you can see as you get into the packet.

Q.    And under Additional Comments, Page 2 of 3 of that report, Officer Lampkin arrived at 3504 Rockwood Drive to investigate an animal complaint where a female complainant stated her son was chased by a dog while walking to school at that address.  CCR Number 209409. The attack caused the child to jump on the car to save himself.

This refers to a complaint from a female complainant.  Are you able to show me in the event recap where -- where that call came in?

A.    No, ma'am.

Q.    The bullets from the scene were collected by someone, correct?

A.    Are you asking about the casings?

Q.    Yes, that's what I mean.

A.    Yes.

Q.    Was there more than one picture of Lucy taken?

A.    I only have one picture in the exhibit.

Q.    Do you know of any other pictures?

A.    No, ma'am.

Q.    Does this picture show the points of entry of the bullets?

A.    No.

Q.    Are you able to determine from looking at this picture how many times Lucy was hit?

A.    No.

Q.    Was that not relevant evidence?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.    You're asking about my opinion?

BY MS. LAHART:

Q.    Let me put it a different way.

When a deputy sheriff shoots a dog in the city of Jacksonville while on the job, is it consistent with City policy not to examine the dog to find out how many bullets shot the dog or where the dog was hit?

MR. BUEKER:  Object to form.

MS. HARRELL:  Object to form.

MR. BUEKER:  That was a request for policy regarding evidence technicians.

But yes, you can go ahead.

A.    Unfortunately, Lucy is property, and it

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 78

would -- I don't mean to compare her to a vehicle, I don't mean to compare her to a building, I don't mean to compare her to something that isn't important to the family, but the fact that she was shot was what was photographed.

Q.   And anything in the City's possession that indicates that the evidence technician asked if she could further examine the dog's body or take more pictures?

A.   I don't have that information.

Q.   What happens after an RTR report is written?

A.   Are you asking about the process and next steps for the agency?

Q.   Yes.

A.   The -- whoever has written the RTR sends it to a supervisor for approval.  Once approved by the supervisors, it is routed electronically to our Professional Oversight Unit for review.  The Professional Oversight Unit looks at the report that was written, compares it to the body-worn camera that's available, looking, again, for policy violations or just general information that aligns with -- with, again, our policy, and forwards it to wherever it needs to go next, depending on what the incident itself is.

Q.   Does the City have a policy of investigating

incidents where an officer withdraws his weapon but doesn't discharge it?

A.    No.

Q.    Does the City have a policy of examining incidents when an officer pulls his or her weapon and points it at an individual?

A.    There is not a requirement for the Professional Oversight Unit to look at those incidents, if that's your question.

Q.    That is my question.  Thank you.

MS. HARRELL:  Would this be a good time for a break?

MS. LAHART:  Absolutely.

(Whereupon, a brief recess was taken.)

MS. LAHART:  Back on the record.

BY MS. LAHART:

Q.    Chief Weber, could we go back to the -- to policy -- or, I'm sorry, Order Number 551?

A.    Yes.

Q.    Back to the portion regarding Animal RTR Incidents?

A.    Yes.

Q.    Number 1, under the Animal RTR Incidents, says, When handling an aggressive or dangerous animal, officers are required to use nonlethal options when

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 80

feasible, including -- and it goes on to list some.

A.    Yes.

Q.    Is it the City's policy that an officer should be prepared to use nonlethal force when anticipating an animal encounter?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Object to form.

You can answer.

A.    Officers should be aware.

BY MS. LAHART:

Q.    You would agree with me that you can't use nonlethal force if -- if you can't access it?

A.    I don't understand the question.

Q.    For example, you can't spray your pepper spray if you don't have it on you?

A.    Sure.

Q.    And you can't use a baton if you're not carrying a baton?

A.    Correct.

Q.    I need to ask you some questions about policy number [sic] 552 -- Order Number 552, I apologize.

A.    Order 552, Weapons Policy.

MS. LAHART:  That's going to be Exhibit 7.

MR. BUEKER:  7.

(Plaintiff's Exhibit Number 7 was marked for

identification.)

BY MS. LAHART:

Q.    What is a CEW?

A.    Conducted energy weapon, a/k/a, also known as, Taser.

Q.    Okay.  Under the category of Intermediate Weapons, it says, Batons and Flashlights, B.

Do you see that?

A.    Yes, ma'am.

Q.    Going down to Number 5, it says, Officers successfully completing training and issued a CEW may elect not to carry their immediate weapon on their duty belt; however, they must have it in their assigned vehicle in an easily accessible area and must continue to train according to prescribed training schedules with their intermediate weapon.

Does this mean that Officer Lampkin should have had a Taser in his vehicle that was easily accessible?

MS. HARRELL:  Object to form.

MR. BUEKER:  Object to form.

A.    No.  Are you asking for my interpretation of that -- that Number 5, B5?

BY MS. LAHART:

Q.    I'm asking for the City's interpretation of that.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 82

A.    Officers successfully completing training and issued a CEW may elect not to carry their intermediate weapon on their duty belt.

I think your question was whether or not he had to have his CEW on his duty belt?

Q.    No, my question was whether he had to have it in his car in an accessible area.

A.    The CEW had to be on his duty belt.

Q.    Doesn't it say that they may elect not to carry their intermediate weapon?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.    The intermediate weapon is defined in B, Batons and Flashlights, so they are referring to the batons and flashlights.

BY MS. LAHART:

Q.    Thank you.

Does JSO have a policy requiring deputies to use deescalation techniques before using force?

A.    When feasible, yes.

Q.    Back to the video.

(Brief discussion held off the record.)

BY MS. LAHART:

Q.    Officer Weber, if you'd give me just a minute.

If I play this on my laptop, are you able

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 83

to see it?

A.    Yes.

(Still frame of video displayed.)

BY MS. LAHART:

Q.    **And do you recognize this video that I'm showing?**

A.    Yes.

Q.    **Okay.  And I'm going to fast forward.**

(Video frames advanced.)

MR. BUEKER:  And just for the record, I'm just -- going to just put on there that it's -- does it have an X?  She doesn't have the name of the video on it, but that's fine.  I think it is Officer Lampkin's body-worn camera.

MS. LAHART:  Could I get my mouse back, please?

(Brief discussion held off the record.)

(Video playback begins.)

MS. HARRELL:  Is this the same video that we were watching earlier?

MS. LAHART:  Absolutely.

MS. HARRELL:  Okay.

THE WITNESS:  This one actually, I think, has the name from the Axon itself.  I don't think this one has been renamed.

(Video playback continues.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  You shot my fucking dog.

Oh, no.  Don't.

MR. K. BARUS:  You motherfucker.

OFFICER LAMPKIN:  You will -- you will --

MR. K. BARUS:  You motherfucker.

MS. BARUS:  He's a policeman.  Don't.

MR. K. BARUS:  Where's my fucking dog?

MS. BARUS:  He killed her.  He killed her.  Don't --

MR. K. BARUS:  Where's my fucking dog?

MS. BARUS:  He killed her.

OFFICER LAMPKIN:  Step back.

MR. K. BARUS:  You motherfucker.

MS. BARUS:  He killed her.

MR. K. BARUS:  Why did you kill my fucking dog?

MS. BARUS:  Stop.

OFFICER LAMPKIN:  Let him loose.

MR. K. BARUS:  You son of a bitch.

OFFICER LAMPKIN:  Let him loose.

MR. K. BARUS:  I will fuck you up.

MS. BARUS:  Stop.

OFFICER LAMPKIN:  Let him loose.

MS. BARUS:  Help me up.

(Video playback ends.)

BY MS. LAHART:

Q.    **Is directing Kim Barus to let loose of her son deescalating the situation?**

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.  Beyond the scope of form 30(b)(6).

MS. LAHART:  She's here to testify about this video --

MR. BUEKER:  Well --

MS. LAHART:  -- that's listed as a topic.

MR. BUEKER:  (Inaudible.)

MS. LAHART:  Okay.

A.    That's a question for Officer Lampkin.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MR. K. BARUS:  No.  I'll god damn kill you.

OFFICER LAMPKIN:  Mike 319 --

MS. BARUS:  You hurt me.

OFFICER LAMPKIN:  -- give me a 10-33 --

MR. K. BARUS:  I'm sorry.

OFFICER LAMPKIN:  -- send me a unit.  And send a sergeant.

(Video playback ends.)

BY MS. LAHART:

Q.    What is he calling for there?

A.    He is asking for emergency radio traffic, the 10-33, and asking for a sergeant.

Q.    Okay.  What reason did Officer Lampkin have to remain in that area -- by "that area," I'm referring to the area in front of the fence -- at that point?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

MS. HARRELL:  Also beyond the scope.

A.    That seems like a question for Officer Lampkin.

BY MS. LAHART:

Q.    Okay.  Is there any reason Officer Lampkin couldn't have gone and sat in his vehicle until the sergeant arrived?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

MS. HARRELL:  Beyond the scope.

A.    That's also a question for Officer Lampkin.

BY MS. LAHART:

Q.    Does the City have any policy regarding pulling firearms on unarmed citizens?

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 87

MS. HARRELL:  Object to the form.

A.  Our firearms can be pulled whenever there is an apparent officer safety -- officer safety concern.

BY MS. LAHART:

Q.  **Did you watch this entire video?**

A.  Yes.

Q.  **At any point did you see Kyle Barus having any sort of weapon?**

A.  No.

Q.  **What?**

A.  No.

(Video playback resumes.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Buddy, you're going to get yourself --

MR. K. BARUS:  You stupid --

OFFICER LAMPKIN:  -- into trouble.

MR. K. BARUS:  -- motherfucker.  You better get the fuck out of here.

OFFICER LAMPKIN:  No, sir.

MS. BARUS:  You killed my dog.

MR. K. BARUS:  Get the fuck --

MS. BARUS:  You killed my dog.  Why would you do that?  Oh, my god.

OFFICER LAMPKIN:  Hey --

MR. K. BARUS:  Where the fuck is she at?

OFFICER LAMPKIN:  Dude, you're going to get yourself into trouble.  I'm trying to save you.

MR. K. BARUS:  No.  You better leave my god damn house --

MS. BARUS:  Oh, no.

OFFICER LAMPKIN:  Get back.  Taser. Taser.  Taser.

MR. K. BARUS:  -- right fucking now.

OFFICER LAMPKIN:  Ma'am, get back.

MR. K. BARUS:  Leave my god damn house --

OFFICER LAMPKIN:  No, I'm not.

MR. K. BARUS:  -- right now.

(Video playback ends.)

BY MS. LAHART:

Q.    Is it consistent with City of Jacksonville policy for him to have pointed his firearm at Kyle Barus under these circumstances?

MS. HARRELL:  Object to form.

MR. BUEKER:  Join.

A.    I heard him say "Taser."

BY MS. LAHART:

Q.    Is that what he has in his hands?

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 89

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  -- dog.  Why would you do that?  Oh, my god.

OFFICER LAMPKIN:  Hey --

MR. K. BARUS:  Where the fuck is she at?

OFFICER LAMPKIN:  Dude, you're going to get yourself into trouble.  I'm trying to save you.

MR. K. BARUS:  No.  You better leave my god damn house --

MS. BARUS:  Oh, no.

OFFICER LAMPKIN:  Get back.  Taser. Taser.  Taser.

MR. K. BARUS:  -- right fucking now.

OFFICER LAMPKIN:  Ma'am, get back.

MR. K. BARUS:  Leave my god damn house --

OFFICER LAMPKIN:  No, I'm not.

(Video playback continues.)

BY MS. LAHART:

Q.    **What did he have in his hands?**

(Video playback continues.)

(Whereupon, the following dialog was transcribed from video:)

MR. K. BARUS:  -- right now.

(Video playback continues.)

MR. BUEKER:  What did we just look at?

A.    The --

(Video playback continues.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  (Inaudible).  It's okay.  It's okay.

(Video playback ends.)

A.    If you'll roll it back, are you able to stop it?

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  -- dog.

(Video playback continues.)

BY MS. LAHART:

Q.    I'll try.

(Video playback continues.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  Why would you do that?  Oh, my god.

OFFICER LAMPKIN:  Hey --

MR. K. BARUS:  Where the fuck is she at?

OFFICER LAMPKIN:  Dude, you're going to get yourself into trouble.  I'm trying to save you.

MR. K. BARUS:  No.  You better leave my god damn house --

MS. BARUS:  Oh, no.

OFFICER LAMPKIN:  Get back.  Taser.  Taser.  Taser.

(Video playback ends.)

BY MS. LAHART:

Q.   **What -- what did he have in his hand?  Can you tell?**

A.   I cannot tell from looking at that.

Q.   **Okay.**

A.   We do train at the academy, "Taser, Taser, Taser" is the warning to anybody in the area that a Taser is imminently being deployed.

I -- I would like to go back.  You asked a question about Kyle Barus.

Q.   **Uh-huh.**

A.   I may have missed something.  I have him as Jonathan.

Q.   **His name is Jonathan.  He goes by Kyle.**

A.   Got it.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 92

Q.   Would reengaging with Kyle Barus be consistent with the City's deescalation policy?

MS. HARRELL:  Object to form.

MR. BUEKER:  Join.

A.   I would only be offering you an opinion.  I think that's a question for -- policywise, the policy follows our training, and our training is simply that situations will ebb and flow.  There are times where people will be very upset, and there's times where they will come back and be able to converse cordially.

Unfortunately, there's not a very -- a linear way to get from one to the other sometimes, and situations can be volatile, and people will be upset one second and calm the next.  And it -- it can vacillate, so it's not out of policy to try to speak to him.

BY MS. LAHART:

Q.   Okay.  Is there any policy that required him to speak with Kyle Barus?

A.   No.

(Video advanced.)

(Still frame of video displayed.)

BY MS. LAHART:

Q.   Can you identify the officers in this frame?

A.   Martin Prinzi is the one closest on the left-hand corner with his -- it looks like his right

hand out.

Kelsey --

Q.   Prinzi, P-r-i-n- --

A.   -z-i.

Q.   Okay.

A.   Kelsey Pittman is the female officer with her hand behind her back.

And I am not sure on the tall white male in the back.  I -- he does work for us.  I've seen him several times.  But there are 1,840-plus JSO officers.

Q.   Okay.  Fair enough.

(Video advanced.)

(Still frame of video displayed.)

Q.   So you don't know that officer?

A.   Not by name, no, ma'am.

Q.   Fair enough.

All right.  I think everybody will be happy to know I think I am done with the video.

(Brief pause in the proceedings.)

BY MS. LAHART:

Q.   I'm going to move on to another topic.

Was Officer Lampkin required to carry a Taser on his belt on April 11th, 2022?

A.   Yes.

(Brief discussion held off the record.)

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 94

MS. LAHART:  I'm going to hand you what is going to be marked as Petitioner's Exhibit 8.

(Plaintiff's Exhibit Number 8 was marked for identification.)

BY MS. LAHART:

Q.    Are you familiar with this document?

A.    Yes.  This is the Firearm RTR Reports Against Animals, 2012 to 2022.

Q.    Do you know why this document was created?

A.    I believe it was in response to their requests for production that you had.

Q.    Do you have any data regarding use of force against animals from 2022 to today?

A.    Yes.

Q.    How many more incidents have there been since this document was created?

A.    Not having that report in front of me, I believe there were 50 -- around 50 of them.

Q.    Do you know how many incidents are on -- reported on Exhibit 8?

A.    There were duplicates on this report.  It's approximately 90, as I recall.

Q.    So in the period of 2012 to 2022, approximately 90 dogs were shot by deputies employed by the Jacksonville Sheriff's Office?

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 95

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

MR. BUEKER:  You can answer.

A.    There are animals other than dogs on the 2012 to 2022 report, but there's not many of them.

BY MS. LAHART:

Q.    **Right.  I see two raccoons.  Any other animals that are not dogs?**

A.    I believe -- I believe there was a deer.

MS. VENZA:  First page.

A.    About halfway down, the CCR number for the deer is 201200762264.

BY MS. LAHART:

Q.    **Okay.**

A.    Yeah.

Q.    **Do you agree with me that there are more than 100 incidents documented in this report?**

A.    No.

Q.    **Why not?**

A.    Because there are duplicates on this report.

Q.    **Do you know why there are duplicates?**

A.    I do not.

Q.    **So can you tell me how many times force was used against animals during that ten period -- 10-year period that were dogs?**

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 96

A.    There are --

Q.    How many -- how many times force was used against dogs during that 10-year period?  That's a better way --

A.    It's approximately 90.  I can go through and count each one and --

Q.    That's --

A.    -- try and avoid duplicates, if you would like.

Q.    That's not necessary.

Do you know how 90 incidents in 10 years compares to other cities of the size of Jacksonville?

MS. HARRELL:  Object to form.

A.    No, ma'am.

BY MS. LAHART:

Q.    Has anyone from the City ever looked into that?

MR. BUEKER:  Object to form.  Outside the scope.

MS. HARRELL:  Join.

MR. BUEKER:  You can answer.

A.    I'm not aware of such an endeavor, ma'am.

BY MS. LAHART:

Q.    Has the City done anything in response to this report, Exhibit 8?

MR. BUEKER:  Object to form.  That's outside the scope of this deposition today.

MS. HARRELL:  Join.

A.    Not that I'm aware of.

BY MS. LAHART:

Q.    **Are you aware of any officer being disciplined for any of these approximately 90 incidents?**

A.    The information regarding the Response to Resistance reviews, there were a few from this that did in fact have some type of remedial training or a follow-on, but the majority of them did not have any follow-on to them.

Q.    **When the City fails to discipline an officer that has used lethal force on a dog, is the City ratifying the officer's decision to use lethal force?**

MS. HARRELL:  Object to form.

MR. BUEKER:  Object to form.

MS. HARRELL:  Beyond the scope.

MR. BUEKER:  It's improper -- it's improper to ask that question because you're assuming that they need to be disciplined, and that's the way you asked it.

Also, it's outside the scope of what she's here to testify to today.

MS. HARRELL:  It's also a legal conclusion.

MR. BUEKER:  But you can answer the

question.  I can't stop you from answering it.

MS. VENZA:  I'm going to ask you guys to limit your instructions to form --

MR. BUEKER:  (Inaudible) --

MS. VENZA:  -- unless Marcy is asking for an explanation --

MR. BUEKER:  Okay.

MS. HARRELL:  Well --

MS. VENZA:  -- in the interest of time, too.

MS. HARRELL:  -- I agree with that, but if it's beyond the scope, I want to make a record that it's beyond the scope so that we can make a distinction between when she's answering in her personal capacity versus when she's answering on behalf of the City.

A.  The City's response, when it comes to discipline, is directly tied to what actually happened. So in these instances, there is a Response to Resistance incident review form for each of these that was reviewed by a director who made the decision as to what the next steps were.

BY MS. LAHART:

Q.  Okay.  And my question to you is, when that decision is no further action, as it was in this case,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 99

is the City ratifying the officer's use of lethal force?

MS. HARRELL:  Object to form.  Beyond the scope.

MR. BUEKER:  Join.

A.    I can't answer that question.

BY MS. LAHART:

Q.    Okay.  You mentioned that some officers have been required to have remedial training after an animal encounter?

A.    Yes.

Q.    Who provides that remedial training?

A.    Typically, the academy staff would provide that, but it's also case by case depending on what's needed.

Q.    Do you know what specific training would be considered appropriate?

A.    It would be situationally dependent.

Q.    What are the various options?

A.    Backstop considerations, what's beyond whatever it is that you're shooting at.  That's the only one that comes to mind as an immediate response to animals.

There was other training that was offered, but it was other policy violations that had nothing to do with the actual shooting, it was other policy violations noted, like a body-worn camera not turned on on time, or

something like that.

Q.   Okay.  Do you know of any instances in which an animal -- or a deputy was required to have remedial training in use of nonlethal force against animals or any animal encounters?

A.   No.

Q.   Do sheriff's deputies have training to perform animal control functions?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

A.   What you do you mean by "animal control functions"?

BY MS. LAHART:

Q.   Are deputies trained to investigate dog bites?

A.   We -- no.  We respond to the incident, and ACPS, Animal Care and Protective Services, handles the investigation beyond the -- the safety concerns at the scene.

Q.   Immediate safety concerns?

A.   Sure, yes.

Q.   Do they conduct dangerous dog investigations?

A.   Who?

Q.   Sheriff's deputies.

A.   We can initiate them.

Q.   How would you -- how would that happen?

A.    Respond to whatever the call for service is.

Q.    And then call ACPS to -- to complete the dangerous dog investigation?

A.    Depending upon what unfolded at that scene, sure.  It's an option.

Q.    Do you know what training for encounters with animals Officer Lampkin has received?

A.    The initial training from 2006, there is a mention in the Florida Department of Law Enforcement's CJSTC, Criminal Justice Standards & Training Commission, regarding animal encounters.  There's also a video series from 2015 that spanned five months' worth of recordings that we were instructed to watch during roll call.  Other than that, I wasn't able to produce any other training history.

Q.    How long were those five videos?

A.    I don't have an independent recollection.  And despite my efforts to retrieve them from the off-site storage, they were unable to be located.

Q.    Do you know the substance of those five videos?

A.    Essentially, the videos were a series as to how to interact with and approach dogs.  I think there was even a bear session.  But dealing with the animals on scenes.

          MS. LAHART:  I'm going to hand you what we

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 102

will refer to as Exhibit 9.

(Plaintiff's Exhibit Number 9 was marked for identification.)

BY MS. LAHART:

Q.   Are you familiar with this document?

A.   Yes.

Q.   Does this reflect -- refresh your recollection regarding how long the videos were?

A.   No.

Q.   Okay.  On Page 1, it says, Police & Dog Encounters 1 of 5, video, 15 minutes.

Do you have any reason to think that it was longer or shorter than 15 minutes?

A.   I don't.  That sounds appropriate, as far as the training videos go.  We -- we try to keep them short since they are held at roll calls.

Q.   Okay.  Have you seen those videos yourself?

A.   Yes.

Q.   Did you watch them in -- in 2015?

A.   Yes.

Q.   Has any training been offered to sheriff's deputies regarding police and dog encounters since 2015?

A.   I was unable to find any standalone training. Obviously, as new recruits have come out between 2015 and now, they have gotten the information I referenced

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.                    30(b)(6)
Weber, Erica on 04/02/2026                                                   Page 103

for the basic law enforcement from FDLE.  But a standalone course about dogs and police, no.

Q.    Do new officers watch the five videos?

A.    No.

Q.    So if somebody wasn't employed in 2015, they would never have seen the five videos that Officer Lampkin watched?

A.    Correct.

Q.    Do you know for certain that Officer Lampkin saw those videos?

A.    No, I do not.  You'd have to ask him.

Q.    I'd like to ask a little bit about sort of the aftermath of Lucy's death.  Do you know if there were any meetings held among any City employees?

A.    No, ma'am, I do not.

(Brief discussion held off the record.)

MS. LAHART:  I hand you what we will mark for purposes of identification as Exhibit 10.  It's two pages.

(Plaintiff's Exhibit Number 10 was marked for identification.)

BY MS. LAHART:

Q.    Are you familiar with this document?

A.    Yes, ma'am.

Q.    How did you become familiar with it?

A.   It is in the packet of information from Exhibit 6.

Q.   Okay.  There's a supplemental note from animal control officer Duren, "In addition to my notes speaking with Sergeant Crews, he asked numerous times for me to come out and issue a citation.  I informed Crews that I could handle the call without responding on scene and I would not be able to issue any citations until I completed my investigation."

Is there any City policy that would require a citation to have been issued in this case?

A.   Issuing citations are an option of Municipal Ordinance 462, but requiring it, I -- I'm unfamiliar with it.

Q.   What would -- what would a citation have been issued for?

A.   Running animals at large.

Q.   Even though the officer directed her to open the gate?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Form.

A.   Yes.

BY MS. LAHART:

Q.   I'd like to ask you some questions about a report that I believe was completed by Officer Burford.

Are you familiar with Officer Burford?

A.    I know of him, but I don't know him directly.

MS. LAHART:  I want to make sure I'm giving you the right number of pages here.

This will be Exhibit 11.

(Plaintiff's Exhibit Number 11 was marked for identification.)

BY MS. LAHART:

Q.    Is an RTR report required to be completed by any deputy that has used force?

A.    Yes.

Q.    Was a report completed by Officer Lampkin?

A.    A report was completed by Lieutenant Sircar. In situations where a firearm is deployed, the officer themselves do not write the report.

Q.    So is there any written report created by Officer Lampkin regarding this incident?

A.    I don't believe so.

Q.    Page 3 of 5, under Number 6, Officer Lampkin's investigation was interrupted due to an additional incident which resulted in the death of an animal and the arrested [sic] of an individual.  As a result, I was completed [sic] -- I was instructed to complete the investigation.

Is the additional incident being referred to

the shooting of Lucy?

A.    There are two 6s on that page that you're asking about.

Q.    At the top, the first 6.

MR. BUEKER:  I think she's reading right here (indicating).

Were you reading the paragraph after 6?

MS. LAHART:  Yes.

MR. BUEKER:  Okay.

A.    (Peruses document.)

I am -- I can only assume in that situation that the shooting is the additional incident.

BY MS. LAHART:

Q.    So is Officer Burford the deputy that was assigned to complete the investigation after the shooting incident?

A.    Yes.

Q.    And how did Officer Burford get so lucky to be designated?  Did he just happen to show up on the scene or do you know?

MS. HARRELL:  Object to the form.

A.    Officer Burford was dispatched at 7:36 and arrived at 7:41.  I don't know the events that led to him being primary and doing the report.

BY MS. LAHART:

Q.   Okay.   Is it typically luck of the draw?

A.   It really depends.

MS. LAHART:   I'm going to hand you what will be marked as Exhibit 12.

(Plaintiff's Exhibit Number 12 was marked for identification.)

BY MS. LAHART:

Q.   And I'll ask you if you can identify this document.

A.   The document is a Calls For Service List between 4/11 of '17 and 4/11 of '22 at an address, 3504 Rockwood Drive.

Q.   The category on the end says, Disposition Text. Can you explain to me what these entries mean?

A.   Most of them.  They have changed since I left patrol.  Zulu is other police service.  That's the first line.

The second line, 1 is the report written.  BC- --

Q.   That's BC5?  Oh, no --

A.   1.  The number 1.

Q.   1 means report.  Okay.

A.   BC5 is to save the body-worn camera for five years.  BC7 is to save it for seven years.  Kilo, K, is to assist another unit.  L, I'm going to ask for a

mulligan on L.

Q.   Fair.  Granted.

A.   RTR is the Response to Resistance report.

The third line, BC, that should have probably had a number after it.  And the foxtrot, the F --

Q.   Uh-huh.

A.   -- I'm not sure.

(Cell phone notification.)

MR. BUEKER:  Sorry.

A.   The fifth line, 1, again, is the report.  BC1 is one year of body cam retention.

The last line, 1 is the report.  BC1 is one-year body cam retention.  BC5 is five-year body cam retention.  And kilo is assisting another unit.

BY MS. LAHART:

Q.   Why are there two different numbers for the body cam retention, do you know?

A.   The officers keyed it in differently.

Q.   Something that's included in Order 551, and I'm sorry for jumping backwards, but under the Deadly Force Policy, it says, Deadly force is only permitted when deescalation techniques or lethal [sic] force options would not be reasonable.

Does that apply equally to deadly force against animals and deadly force against people?

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 109

A.    It's --

MR. BUEKER:  Where were you reading from, Marcy?

MS. LAHART:  C, Deadly Force Policy, Page 5 of 26.

A.    It is one policy, and we don't have a different policy for animals versus people.

BY MS. LAHART:

Q.    So the answer to my question is yes, it applies equally to animals and people?

A.    Yes.

Q.    Thank you.

Who determines what training sheriff's deputies will receive during their time employed with the Jacksonville Sheriff's Office?

A.    That is a very large question.  We do have a training academy policy.  The FDLE CJSTC, which is, again, the Criminal Justice Standards & Training Commission, sets policy for all officers across the state, whether it's JSO or Alachua County, doesn't matter which agency, and JSO.  So that policy is set.

There is required training that they push out that will be a major change to the state information, so there are policy updates -- or training updates from them.

There's also times where situations and incidents drive the training that -- that we receive.

There is an annual in-service training group that meets to discuss needs from within the units because we are a very large agency.  A lot of different units and kind of missions -- the overall mission is the same, but different units do independent things.  So depending on what training an individual unit might need, that could -- could be in play.

We also have the CJSTC trust fund, which is the State money that is provided to a training academy, and we can call in advanced and specialized training, which is typically calling in an outside vendor to produce training for whatever it is that betters an agency and our members.

Q.   **Can you think of any examples of training that has been provided under that policy?**

A.   Under the trust fund?

Q.   **Yes.**

MR. BUEKER:  Object to form.

You can answer.

A.   We have brought in groups to talk about barricaded subjects and the best way to respond.  We have brought in groups to provide interview and interrogations training.  We've brought in groups for

inmate population and -- and dealing with the nuances of inmates. I mean, it really runs the gamut. We've brought in driving instructors, motorcycle unit courses. I mean, it's really open because it -- it applies to not only JSO, but the entire region. And JSO is a member of region 5, which is basically anything from the state line down to, I believe it's, Putnam County.

BY MS. LAHART:

Q.    Are there any topics upon which it is JSO policy to have periodic refresher courses?

A.    Yes.

MR. BUEKER:  Object to form.  I think this is outside the scope of the deposition.

But you can answer.

A.    Yes.

BY MS. LAHART:

Q.    Do you know what those topics are?

A.    The required training that comes from FDLE to maintain our certifications, as well as firearms, the HR 218, which is a course of fire that FDLE sets forth that we must shoot and pass successfully.

There is a -- we do retrain on less lethal annually, which is the baton or Taser.

There's a ton of stuff that CALEA and the CFA -- that's the Commission on Accreditation For Law

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Page 112

Enforcement Agencies, it is an international standard that we meet for training; as well as the CFA, which is the commission that accredits Florida agencies -- so there is a whole list published in one of our orders that talks about what training we get, when, to keep us in compliance with accreditation standards.

Q. Do you know what order number that is, by chance?

A. I believe it is 461 or 462.

Q. Okay.

A. You know, it -- it's 561 and 562. One of them is the academy and one of them is the gun range. I think 561 is the academy and 562 is the range.

Q. Oh. You impressed me with your memory when you listed every job you had had with the department, so I -- I'm certainly not faulting you for not memorizing the number of all of the policies.

Moving on to Exhibit Number 13, are you familiar with this document?

A. I read a bunch of reports from the 2012 to 2022 list. I believe this one was in there.

(Plaintiff's Exhibit Number 13 was marked for identification.)

BY MS. LAHART:

Q. This report was generated after Officer Prince

responded to a call concerning one dog having unfortunately killed another dog?

A.    That is how it reads, yes, ma'am.

Q.    The last -- close to the bottom, it says, "NCIC advised me to make a complaint to Animal Control via the coj.net.  I made the complaint and received a confirmation number of 2017-5035784."

What is NCIC?

A.    They're referring to a portion of the Communications Center there.  There is a small office where it's the national criminal information clearinghouse, and it's -- it is usually two people that are entering information into NCIC, which all agencies report to, but they're entering and reporting concerns that come forward.

And we will occasionally use NCIC to make these calls to the agencies.  In this case, it is highly likely NCIC was asked to call Animal Control for that officer.

Q.    Okay.  Would it have been possible for Officer Lampkin to refer the investigation of the Barus dogs being at large and having allegedly chased Jaivon to Animal Control?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.   It is an option; however, given the situation Officer Lampkin encountered, that was not, obviously from the video, the path he chose.

MS. LAHART:  I am in need of a break.

MR. BUEKER:  Yeah.

MS. HARRELL:  Okay.

MS. LAHART:  If I could have 10 minutes, we could probably wrap this up pretty quickly.

MR. BUEKER:  Yeah.

MS. HARRELL:  Awesome.

(Whereupon, a brief recess was taken.)

BY MS. LAHART:

Q.   **Okay.  Just a few more questions.**

A.   Sure.

Q.   **I appreciate your cooperation.**

**I want to ask some follow-up questions about the training in 2015 and in 2006.  I remember you mentioned something about training in 2006.  Can you tell me more about that?**

A.   Are you asking about my statement that Lampkin and I were in the academy together?  That was when we both -- he and I both went through the basic law enforcement course --

Q.   **Okay.**

A.   -- at the academy.

Q.   Okay.  And what training regarding animal encounters did you receive then?

A.   There is a very brief portion in the basic law enforcement curriculum that talks about being aware of the fact that animals will be on some of the calls that we go to, and just having a general awareness of animals.

Q.   Okay.  Could you fish out Exhibit 10 for me?

A.   Yes.

     (Complies.)

Q.   In the -- in this area (indicating), it says, "I asked Barus if Lucy is current on rabies vaccines, she informed me, yes, through FCNMHP."

     Can you tell me what FCNMHP is?

A.   First Coast No More Homeless Pets.  It is a low-cost veterinary option in the city.

Q.   Okay.  So as of April 11th, 2022, the City was on notice that Lucy was up to date on her rabies vaccine?

     MS. HARRELL:  Object to the form.

A.   It appears officer -- Animal Code Enforcement Officer Duren confirmed that she was -- that Lucy was up to date on her rabies vaccine.

BY MS. LAHART:

Q.   And above that, in the second -- I'm sorry, the

third full paragraph, "I asked Officer Lampkin to text me photos of his bite, which he did.  Both bites are mild."

What is the City's policy regarding the use of personal phones by officers when they are on the clock?

MS. HARRELL:  Object to the form.  Beyond the scope.

MR. BUEKER:  Yeah.

You can answer.  I'll let you answer this one.

A.   The only real issue with cell phones, whether you're on duty or not, is to not send information that is CJIS compliant.  That's the criminal justice standards.  So you can't send private information, stuff that would be protected by public records laws, but images, as long as they're not inappropriate, would not have been a problem.

BY MS. LAHART:

Q.   Okay.  Do you know if Officer Lampkin used a phone issued by the City or a personal phone when he did that?

MS. HARRELL:  Objection.  Beyond the scope.

MR. BUEKER:  Join.

A.   I don't know.  The City only recently started

issuing phones to officers, though.  I -- I don't have a 100 percent answer for you.

BY MS. LAHART:

Q.    Okay.  So you don't know whether he had a -- even had a City-issued phone, then, in April of 2022?

A.    Correct.  I'm not sure.

MS. LAHART:  Okay.  And I think this will be our last exhibit.  What number are we up to?

MR. BUEKER:  We're at 14.

MS. LAHART:  Number 14.  I'm handing you what will be marked as Plaintiff's Exhibit Number 14.

(Plaintiff's Exhibit Number 14 was marked for identification.)

BY MS. LAHART:

Q.    Are you familiar with this document?

A.    Yes.

Q.    Would you be able to look at that document and point out to me where the training regarding animal encounters is depicted?

A.    As I recall from my review, I created this document from our systems.

Q.    Uh-huh.

A.    It was not listed.

Q.    Okay.  And could you pull out Exhibit 2 for me,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.                    30(b)(6)
Weber, Erica on 04/02/2026                                                  Page 118

please?

A.    Yes.

(Complies.)

Q.    I had asked you some questions like -- for example, about -- on Page 1 of 12, it says, Caller Info Updated, Unknown.

You weren't able to tell me who had updated the caller info?

A.    Shantavia Carr updated the caller info.

Q.    Okay.

A.    The operator.

Q.    So what is unknown here?

A.    That is a question for Shantavia Carr.

Q.    Okay.  I had asked you if looking at this event recap, you could point out any -- any phone call that had been received from Malene Ellington.  Are you able to do that?

A.    I did not see Ms. Ellington's name in here as a complainant.

Q.    Would anybody be able to point that out to me in this document, that you know of?

A.    No.

Q.    Do you agree with me that Lucy was never off her owner's property while --

MS. HARRELL:  Object to form -- I'm sorry.

BY MS. LAHART:

Q.    -- at any time when Officer Lampkin was present?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

A.    Based on the video information, it appeared Lucy was on the property of her owners.

BY MS. LAHART:

Q.    I have no more questions.

A.    I would like to go back to Exhibit 12 --

Q.    Okay.

A.    -- which is the Calls For Service List.

Q.    Okay.

A.    On Line Number 2 --

Q.    Uh-huh.

A.    -- the L is for the accessory report that was submitted.

Q.    What does that mean, accessory report?

A.    The -- it could have been the crime scene detective's report, it could have been a field investigator report.  It's -- I'm not sure in this specific -- it's -- whoever checked back with that L actually wrote some type of accessory report.

Q.    Is there any way to tell who that is?

A.    Yes, but -- I will see if it's in the event

recap.  Oh.  This is going to be from that specific -- oh, that is this one.  Disregard.

(Peruses documents.)

There we go.  Page 10 of 12, about halfway down, Disposition L Recorded For 632.

Q.    Okay.

A.    632 is Sergeant Crews.

Q.    Okay.  And I'm sorry, it's already slipped my mind, what is L?  Oh.  Supplemental report?

A.    Yes.

Q.    Okay.

A.    And then the last one, also -- I'm sorry -- also on Exhibit 12, the third line, which is CCR 2020498577, F is peace restored.

Q.    Okay.  Thank you.

A.    Yes, ma'am.

Q.    Do you have any other questions for yourself?

A.    No, ma'am, I do not.

Q.    Okay.  I just have, I think, one or two more.

In the video, you see Officer Lampkin is -- is holding a notepad, and there's a subsequent video in which he rips off the papers from those notepads and he hands them to another officer.  Do you know what happened to those notes?

A.    No, ma'am.

Q.    Are -- would -- is there a requirement that those notes be preserved?

A.    No.

Q.    It's not a public record?

A.    The report that's generated from the notes is the public record, and that is what is expected to be kept.

Q.    Okay.  Thank you.

(Brief discussion held off the record.)

MS. LAHART:  Did you have any questions?

MS. HARRELL:  No.

Read?  Do you want to read?

THE WITNESS:  Yes.

MR. BUEKER:  Sure.

THE REPORTER:  And are you ordering this deposition?

MS. LAHART:  Not today.

THE REPORTER:  If you need a copy, please let me know.

MS. HARRELL:  Okay.

(Witness excused.)

(The deposition was concluded at 12:14 p.m.)

-   -   -

CERTIFICATE OF OATH

STATE OF FLORIDA )

COUNTY OF DUVAL   )

    I, Diane M. Tropia, Florida Professional Reporter,

Notary Public, State of Florida, certify that City of

Jacksonville/Chief Erica Weber personally appeared

before me on April 2, 2026, and was duly sworn.

        Signed this 3rd day of May, 2026.

*Diane M. Tropia*
_____
            Diane M. Tropia, FPR
         Notary Public, State of Florida
          Commission No.:  HH 439521
           Expires: October 31, 2027

                    Personally Known_____

                Or Produced Identification___X___

          Type of Identification Produced___DL___

CERTIFICATE OF REPORTER


STATE OF FLORIDA )

COUNTY OF DUVAL  )


    I, Diane M. Tropia, Florida Professional Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of City of Jacksonville/Chief Erica Weber, that a review of the transcript was requested, and that the foregoing transcript is a true and complete record of my stenographic notes.


    I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.


        DATED this 3rd day of May, 2026.



*Diane M. Tropia*
_____
        Diane M. Tropia, FPR

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.    30(b)(6)
Weber, Erica on 04/02/2026    Page 124

ERRATA SHEET

PAGE NO.    LINE NO.    CHANGE    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct, subject to any changes in form or substance entered here.


_____
Date                                City of Jacksonville
                                    Chief Erica Weber

**-**

**-z-i** 93:4

**0**

**0738** 28:1,4

**1**

**1** 7:8,12 9:5 33:21 67:16 79:23 102:10,11 107:18, 21,22 108:10,12 118:5

**1,840-plus** 93:10

**10** 43:9 96:10 103:18,20 114:7 115:8 120:4

**10-33** 85:24 86:7

**10-year** 95:24 96:3

**100** 95:17 117:2

**1099** 66:11

**11** 26:18 32:19 43:17,19 105:5,6

**11th** 13:1 21:3 44:6,22 93:23 115:17

**12** 22:7,13,25 25:12 28:17 30:14,23 31:2,10 32:19 107:4,5 118:5 119:10 120:4,13

**1200** 43:7

**121** 24:20,24

**12:14** 121:22

**12:35** 31:4

**12:43** 31:14

**12:45** 30:23

**13** 112:18,22

**14** 117:9,10,12,13

**15** 102:11,13

**16** 16:8

**16:45** 33:19

**17** 107:11

**1700** 43:6

**186** 30:24 31:5,7

**2**

**2** 20:8,14 22:7,25 27:24 76:9 117:25 119:14

**20** 4:17 13:4

**20-year** 4:25

**2006** 101:8 114:17,18

**2012** 94:8,23 95:4 112:20

**201200762264** 95:12

**2015** 101:12 102:19,22, 24 103:5 114:17

**2017-5035784** 113:7

**2020** 42:18

**2020498577** 120:14

**2022** 12:19 13:1 21:3 32:15 44:22 66:3 93:23 94:8,13,23 95:5 112:20 115:17 117:5

**2022-209409** 66:14

**2022-209485** 65:17 66:5 76:4

**209409** 18:12 76:13

**212** 41:18 42:17 69:7

**218** 111:20

**22** 65:14 107:11

**226** 29:22

**229** 23:25 24:19

**25** 55:25

**26** 109:5

**3**

**3** 26:9,10 42:13 76:5,9 105:19

**3/17** 42:18

**30** 55:25

**30(b)(6)** 8:11 12:7 85:9

**319** 22:14 23:18 29:25 31:11,15 33:1,4 85:22

**33** 12:21 51:22

**33s** 25:23

**35** 31:5

**3504** 76:10 107:12

**4**

**4** 16:3 25:12 42:1,2,22 72:3 74:10

**4/11** 107:11

**4/11/2022** 31:14

**4/11/22** 23:16

**461** 112:9

**462** 104:13 112:9

**462.303** 43:13

**5**

**5** 27:25 62:23,25 63:1 72:6 74:23 81:10,22 102:11 105:19 109:5 111:6

**5/4** 65:14

**50** 94:18

**551** 62:18 63:4 70:2,6 79:18 108:19

**552** 62:18 80:21,22

**56** 21:19

**561** 112:11,13

**562** 112:11,13

**6**

**6** 28:17 29:20 42:22 65:6,7 75:4,21 76:1 104:2 105:19 106:4,7

**63** 25:23

**630** 43:2

**630-CITY** 42:25

**632** 24:25 29:8,12 120:5, 7

**6:22** 21:3

**6:30** 36:6

**6:48** 23:16

**6s** 106:2

**7**

**7** 80:23,24,25

**7:00** 55:12

**7:24** 23:22 24:14

**7:27** 25:13

**7:36** 106:22

**7:38** 28:1,13

**7:41** 106:23

**7:49** 29:10

**7:56** 29:18

**8**

**8** 42:22 94:2,3,20 96:23

**8:00** 43:6

**8:07** 29:25

**9**

**9** 30:23 31:2,10 43:3 102:1,2

**9-1-1** 16:16

**90** 94:22,24 96:5,10 97:5

**A**

**a.m.** 29:25 43:6

**a/k/a** 81:4

**ability** 5:23 8:2 55:14

**Absolutely** 51:17 79:13 83:21

**academy** 5:2,20 9:23 13:4,9,23 91:16 99:12 109:17 110:11 112:12, 13 114:21,25

**acceptable** 60:4

**access** 80:12

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: accessible..Barus

**accessible** 81:14,18 82:7

**accessory** 119:16,18, 23

**accordance** 43:25 59:25

**accreditation** 9:25 111:25 112:6

**accredits** 112:3

**accused** 57:1

**acknowledged** 24:2

**ACPS** 42:24 43:5,25 60:3 100:16 101:2

**act** 50:13

**acted** 50:10

**action** 56:12 69:11 98:25

**actions** 56:12,16

**active** 48:4

**actual** 12:25 66:12 67:16 99:24

**added** 25:3

**addition** 104:4

**additional** 25:3 76:9 105:20,25 106:12

**address** 45:8 58:9 76:13 107:11

**adhere** 67:6

**adhering** 17:23

**administrative** 73:7,8 74:16

**ADV** 25:13

**advanced** 83:9 92:20 93:12 110:12

**advised** 21:23 113:5

**advising** 25:22

**affairs** 9:25

**affect** 8:2 66:20

**aftermath** 27:4 103:13

**agencies** 112:1,3 113:13,17

**agency** 10:4 13:3 66:18, 20 72:9 78:13 109:21 110:5,14

**aggressive** 57:2 59:6 70:10 79:24

**aggressively** 58:1

**agree** 44:2,17 49:7 52:22 56:8 67:8 70:21 71:16 80:11 95:16 98:11 118:23

**ahead** 45:20 77:24

**Alachua** 109:20

**alert** 48:3,4

**aligns** 78:22

**allegedly** 59:6 113:22

**Allenton** 18:20 21:12, 22 23:7

**allowed** 46:3 56:16

**alternative** 60:4

**amended** 9:6 12:16

**animal** 26:18 27:2 41:18 42:17,23,24 43:3,9,10, 12,16,22,24 48:24 58:19 60:3 68:13,15,25 69:1,7 70:5,11,13 72:5,6,15 73:3,15,18,21,25 74:4,6, 11,14,19,22,25 76:11 79:20,23,24 80:5 99:8 100:3,5,8,11,16 101:11 104:3 105:21 113:5,18, 23 115:1,21 117:19

**animal-related** 58:19

**animals** 42:22 50:9 60:9 62:10 69:6,8 94:8, 13 95:4,7,24 99:21 100:4 101:7,23 104:17 108:25 109:7,10 115:5,7

**annual** 110:3

**annually** 111:23

**answering** 98:1,14,16

**answers** 6:10,25 11:1 26:3,22

**anticipating** 80:4

**AO** 31:15

**apologize** 7:3 80:21

**apparent** 87:3

**appeared** 65:3 119:6

**appears** 51:3 115:21

**applicable** 75:5,12

**application** 72:14

**applies** 44:14 60:11,14 69:4 109:9 111:4

**apply** 108:24

**approach** 101:22

**approval** 78:16

**approved** 78:16

**approximately** 94:22, 23 96:5 97:5

**April** 12:25 21:3 44:6,22 93:23 115:17 117:5

**AR** 23:13,21

**area** 21:12 62:20 81:14 82:7 86:9,10 91:17 115:11

**ARMS** 72:7,8,9 73:21

**arrested** 105:22

**arrive** 58:20

**arrived** 23:21 24:1 29:12 30:19 45:11 56:9, 17 62:2 63:25 76:10 86:18 106:23

**arrows** 23:21 75:14

**asks** 15:12

**assault** 5:7,13,15,17

**assigned** 66:7,21,25 67:3 81:13 106:15

**assist** 66:17,19 107:25

**assistance** 30:22 71:7

**assistant** 5:3

**assisted** 32:25 33:3,5, 11

**assisting** 108:14

**assume** 9:19 23:2 24:9 106:11

**assuming** 15:23 97:19

**assumption** 69:17

**attaching** 51:16

**attack** 76:14

**attention** 43:23,25 44:3,21

**attorney** 6:19

**attorney-client** 10:23 11:8

**authorization** 74:6

**authorize** 58:18 72:20

**authorized** 56:13 72:16 73:4,10,16 74:11

**auto** 10:1

**avoid** 96:8

**aware** 63:20 80:9 96:20 97:2,4 115:4

**awareness** 48:5 115:6

**Awesome** 114:10

**Axon** 13:18 14:20 83:24

---

**B**

---

**B5** 81:22

**back** 14:17 15:9 18:15 27:24 28:15 33:11 35:13,14,25 36:1,5,25 37:4,23 40:8 42:13 48:16 50:7 52:15,19,24 71:22 73:2 76:5 79:15, 17,20 82:21 83:15 84:15 88:9,12 89:14,17 90:11 91:8,19 92:10 93:7,9 119:10,22

**Backstop** 99:19

**backwards** 108:20

**backyard** 36:7,9 37:18 40:3 46:18

**bad** 35:25

**barking** 23:5,6,10

**barricaded** 110:23

**Barus** 34:15,18,24 35:2, 6,9,12,17,22,24 36:4,10,

13,14,16,17,18,20,23 37:3,4,5,7,10,16,17,18, 21,22,23,25 38:6,7 39:22 40:1,2,3,6,7,8,10 44:3 45:17,18,19,22 46:3,14,19,21,24 47:3,6, 9,12,15,18 48:15,18 52:23 53:9 56:9,17,18 71:16 84:4,6,8,9,10,11, 13,14,16,17,18,20,22, 24,25 85:2,5,20,23,25 87:7,17,19,22,23,24 88:2,6,8,11,13,15,19 89:4,7,11,13,16,18 90:1, 8,16,23 91:1,5,7,20 92:1,18 113:21 115:12

**Barus's** 58:12 59:5

**based** 6:11 24:10 27:12 50:12 67:11 119:6

**basic** 5:20 103:1 114:22 115:3

**basically** 13:24 111:6

**basis** 13:25 14:2

**baton** 60:4,6,12 64:8 80:17,18 111:23

**batons** 81:7 82:13,14

**BC** 108:4

**BC-** 107:19

**BC1** 108:10,12

**BC5** 33:24 107:20,23 108:13

**BC7** 32:20 107:24

**beanbag** 63:10

**bear** 101:23

**beep** 48:2

**beeping** 47:25 48:1

**beeps** 48:6

**begins** 34:7 39:19 45:13 46:9 48:8 52:16 53:5 83:18 85:17 89:1 90:13

**behalf** 6:8 8:5 11:22 98:16

**behave** 58:1

**believes** 24:11

**belongs** 28:10

**belt** 64:5,7,11,12,17 81:13 82:3,5,8 93:23

**bending** 71:23

**betters** 110:14

**bike** 5:19

**binding** 7:1 17:14

**bit** 28:18,24,25 103:12

**bitch** 47:10 84:22

**bite** 42:23 116:2

**bites** 100:14 116:2

**bitten** 53:16

**block** 75:5,11

**blocks** 75:6,12

**blood** 28:21

**Boards** 10:10 67:1

**bodily** 49:2

**body** 78:8 108:11,13,17

**body-worn** 12:18,21 13:12,17,19 14:5,25 15:1,5,7,25 16:4,10,16 17:18,19,21 32:23 33:24 48:1 51:3,4 55:11 78:20 83:14 99:25 107:23

**Bold** 65:19

**bottom** 29:19 31:15 113:4

**box** 68:12

**boxes** 75:15

**break** 18:2 79:12 114:4

**broad** 10:12

**brought** 110:22,24,25 111:3

**bud** 48:12

**Buddy** 87:15

**Bueker** 6:4 8:18 9:15 10:19,23 11:5,8,25 15:15,20 16:18,21 17:8 18:2,4,7 20:13 26:21,25 27:8 31:25 32:7 38:12, 14 39:10,13 40:20,23 41:2,6,16 42:11 44:4,7,

9,15,23 45:4 46:6 49:9, 19 50:3,6,24 51:12,14 52:9 53:1,15,22 54:7,18 55:1,10,21 56:4,19 57:4, 10 58:2,4,14 59:1,9,11 60:25 62:5,14 63:3,15 67:23,25 68:6,16,18 69:23 70:17,25 71:12,19 72:22 75:24 77:11,20,22 80:7,24 81:20 82:11 83:10 85:7,12,14 86:12, 20 88:22 90:3 92:4 95:1, 3 96:16,19,24 97:15,17, 25 98:4,7 99:4 100:10 104:21 106:5,9 108:9 109:2 110:20 111:12 113:24 114:5,9 116:8,24 117:9 119:5 121:14

**building** 13:23 78:2

**bullets** 76:20 77:5,19

**bunch** 112:20

**Burford** 104:25 105:1 106:14,18,22

**burglary** 5:16

**business** 17:5

---

### C

**CAD** 22:1 28:13

**CALEA** 67:6 111:24

**call** 5:25 6:3 21:5,7,12 22:14,23,24 25:16,19 27:13 33:6,7,16 34:21 39:7 41:14 42:24 43:5 57:23 58:17 63:25 66:13 76:18 101:1,2,14 104:7 110:12 113:1,18 118:15

**called** 18:17,22 75:21

**caller** 20:23 21:9,16 22:4 26:1 118:5,8,9

**calling** 42:25 60:3 86:5 110:13

**calls** 16:16 18:23 50:4 102:16 107:10 113:17 115:5 119:12

**calm** 92:14

**cam** 108:11,13,17

**camera** 12:18,22 13:12, 17,19 14:5,25 15:1,5,7, 25 16:4,10,16 17:18,20, 21 32:23 33:24 48:1 51:3,4 55:11 78:20 83:14 99:25 107:23

**cameras** 13:15

**cancel** 28:3

**canceled** 28:14

**capacity** 98:15

**capsicum** 60:2

**car** 34:21 35:15,17,20, 22 37:2,4,5 50:7,17 57:24 64:9 76:14 82:7

**Care** 42:25 60:3 100:16

**career** 4:25

**Carr** 118:9,13

**carried** 64:9

**carry** 64:11 81:12 82:2,9 93:22

**carrying** 80:18

**case** 11:12,14,19 44:14 65:16,23 72:11 74:17 98:25 99:13 104:11 113:17

**cases** 42:23

**casings** 76:22

**category** 81:6 107:13

**caused** 76:14

**caution** 72:13

**caveat** 60:8 72:14

**CCR** 18:12 65:16 66:5, 12,14 76:13 95:11 120:13

**cell** 108:8 116:11

**Center** 20:24 21:6 66:11 113:10

**Central** 66:6,8

**certifications** 111:19

**cetera** 27:2

**CEW** 81:3,11 82:2,5,8

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: CFA..Correspondence

**CFA** 67:7 111:25 112:2

**chain** 67:2

**chance** 112:8

**change** 32:14 109:23

**changed** 5:4 14:7 22:8 23:13,21,23 24:1 25:10 29:12,14,23,25 30:4 31:15 107:15

**charge** 43:15

**charged** 27:17

**chased** 34:22 56:14 76:12 113:22

**chasing** 18:16 35:18

**check** 75:14

**checked** 10:7 68:12 119:22

**checking** 33:11

**chief** 4:2,23 5:1,3 6:1,2, 7 7:25 9:22 20:7 54:9 63:6 79:17

**child** 34:13 76:14

**children** 5:10

**chose** 24:8 114:3

**chosen** 22:17

**circle** 14:17

**circumstance** 13:14

**circumstances** 88:20

**citation** 43:13 104:6,11, 15

**citations** 104:8,12

**cite** 49:21

**cities** 96:11

**citizen** 17:17

**citizens** 48:3 86:25

**city** 4:2 6:8,12,15,16,21, 22 7:1 8:5,12 10:22 11:1,23 12:4,21 17:15 19:5 32:14 43:2 55:6 59:17 61:7 63:20 64:20 77:16,18 78:25 79:4 86:24 88:18 96:15,22 97:11,12 98:16 99:1

103:14 104:10 115:16, 17 116:20,25

**City's** 16:8,13 26:3 48:23 49:16,25 54:2,14 60:5 62:8 73:18,24 78:6 80:3 81:24 92:2 98:17 116:4

**City-issued** 117:5

**Civic** 23:4

**civil** 5:8 43:13

**CJIS** 116:13

**CJSTC** 101:10 109:17 110:10

**CL** 29:14

**claimed** 57:24 60:22

**clarify** 19:24

**class** 13:4

**clear** 50:1 54:3,9,15

**clearinghouse** 113:12

**client** 50:21

**clock** 116:5

**close** 113:4

**closed** 29:15,23

**closest** 22:20 24:11 92:24

**closing** 33:7

**CMP** 23:1

**Coast** 115:15

**code** 21:20 75:4,9 115:21

**codes** 75:6,12

**COJ** 43:1,7

**coj.net.** 113:6

**collect** 67:1

**collected** 76:20

**collective** 19:6

**commander** 5:1,3

**commanding** 72:16,17 73:4,5 74:5,11,15,24

**comment** 28:6

**comments** 22:25 25:13 28:1,18 29:2 31:10,16 76:9

**commission** 101:10 109:19 111:25 112:3

**communications** 5:6 20:24 21:6 66:6,8,10 113:10

**community** 50:15 54:21,22 55:4,7,15,18 56:1

**company** 13:18

**compare** 78:1,2,3

**compares** 78:20 96:11

**complainant** 23:2,8 43:5 76:12,17 118:19

**complaint** 18:10,11 76:11,16 113:5,6

**complaints** 41:19 42:17,20 58:19 69:7

**complete** 62:2 74:21 75:24 101:2 105:23 106:15

**completed** 31:7 56:21, 22 72:7 74:1,20,24,25 104:9,25 105:9,12,13,23

**completing** 81:11 82:1

**compliance** 112:6

**compliant** 116:13

**Complies** 115:10 118:3

**component** 10:9

**computer** 13:16

**computer-aided** 18:18 20:22 75:10

**concern** 87:3

**concerns** 20:23 100:17, 19 113:14

**concluded** 121:22

**conclusion** 50:5 97:24

**condition** 8:1

**conduct** 73:7 74:16 100:21

**Conducted** 81:4

**confined** 62:1

**confirmation** 113:7

**confirmed** 115:22

**Congratulations** 4:20

**considerations** 99:19

**considered** 31:14 33:10 60:6 68:22 99:16

**consistent** 38:23 48:22 57:8 69:20 77:17 88:18 92:1

**contact** 43:23,25

**container** 13:16

**contemplate** 62:9

**continue** 81:14

**continues** 84:1 89:20, 23 90:2,5,17,20

**contracted** 32:13,15

**contributing** 66:23

**control** 26:18 27:2 43:12 52:23 58:19 100:8,11 104:4 113:5, 18,23

**converse** 92:10

**cooperate** 44:25

**cooperation** 114:15

**copies** 7:10,19 20:5,9

**copy** 20:2 26:6 41:24 64:24 121:18

**cordially** 92:10

**corner** 37:13 39:23 47:19 51:4,20 92:25

**corporate** 8:7 10:16 11:22 41:8 44:10 58:5 59:12 61:1 62:6

**correct** 15:24 24:13 34:2 41:5 49:2 50:18,19, 22 54:4,12 69:21 71:6,8, 11 72:1 73:10 75:22,23 76:21 80:19 103:8 117:6

**Correspondence** 65:13

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.                                    30(b)(6)
Weber, Erica on 04/02/2026                                                         Index: counsel..dogs

**counsel** 7:9 8:25 9:17 11:15 20:9 52:7

**count** 96:6

**County** 109:20 111:7

**courses** 111:3,10

**covered** 16:20

**crashes** 10:9 66:22

**create** 60:21 66:11

**created** 20:22 94:9,16 105:16 117:21

**creating** 43:22,24 50:1

**crew** 24:7

**Crews** 25:1,6 29:13 104:5,6 120:7

**crime** 64:2,22 119:19

**crimes** 5:10

**criminal** 101:10 109:18 113:11 116:13

**cross** 74:13

**current** 4:22 14:8 115:12

**curriculum** 115:4

**custody** 43:15

---

**D**

---

**daily** 13:25 14:1

**damn** 46:25 85:20 88:7, 13 89:12,18 91:6

**danger** 43:4 50:1 53:12 54:3,15 61:9

**dangerous** 70:10 79:24 100:21 101:3

**data** 94:12

**date** 115:18,23

**dated** 65:14

**day** 35:25 55:14 65:3

**deadly** 61:10,15,19 72:4,15,16 73:3,4,16 74:10,12,13 108:20,21, 24,25 109:4

**deal** 59:7

**dealing** 59:18 101:23 111:1

**death** 103:13 105:21

**decision** 24:10 50:13 69:9 97:13 98:21,25

**deer** 95:9,11

**deescalating** 85:6

**deescalation** 82:19 92:2 108:22

**defined** 82:13

**demand** 38:24 39:16

**demonstrations** 66:17

**demos** 10:6

**Denese** 20:2

**Denese's** 19:24

**department** 29:5 101:9 112:15

**dependent** 99:17

**depending** 78:24 99:13 101:4 110:8

**depends** 13:14 107:2

**depicted** 117:20

**deployed** 91:18 105:14

**deposition** 6:17,22 8:11 12:16 19:14 44:10 58:5 59:12 61:1 62:6 96:25 111:13 121:16,22

**deputies** 82:18 94:24 100:7,14,23 102:22 109:13

**deputy** 77:16 100:3 105:10 106:14

**designated** 8:7,12 10:15 11:4 106:19

**details** 32:6

**detective** 5:17,19 66:21,25 67:3

**detective's** 119:20

**determination** 12:6 67:19

**determine** 66:23 69:20 77:7

**determines** 109:13

**dialog** 34:8 39:20 45:14 46:10 48:9 52:17 53:6 84:2 85:18 87:13 89:2, 24 90:6,14,21

**die** 68:19

**differently** 108:18

**difficulty** 10:14

**direct** 4:6 46:3 56:25

**directed** 104:18

**directing** 12:8 17:6 85:5

**directly** 69:16 98:18 105:2

**director** 11:2 65:13 67:18,19 69:15 98:21

**directs** 10:4

**discharge** 66:1 68:12, 14,25 79:2

**discharged** 68:3

**discipline** 66:24 97:11 98:18

**disciplined** 97:4,19

**discretion** 31:21 56:23 57:21

**discuss** 110:4

**discussed** 11:14

**discussion** 7:6,23 20:10 34:6 64:25 82:22 83:17 93:25 103:16 121:9

**discussions** 38:19

**dispatch** 18:19 20:22 21:10 22:18 24:7,11 66:10 75:11

**dispatched** 18:9 22:10 24:4,15,16,21 27:18,19, 20,22 106:22

**dispatchers** 66:11

**dispatching** 16:15 17:1

**displayed** 83:3 92:21 93:13

**disposal** 59:24

**disposition** 30:24 31:5, 6 32:20,25 33:3,19,21 75:4,5,6,8,11,12 107:13 120:5

**dispute** 25:23

**Disregard** 120:2

**distinction** 98:14

**district** 13:21 28:16

**division** 10:2

**docked** 13:15

**docketing** 14:18

**docking** 13:17,20

**document** 7:15 16:2 19:12,25 20:17,21 26:13,24 41:22 42:15 62:22 65:10 66:12 67:17 70:9 94:6,9,16 102:5 103:23 106:10 107:9,10 112:19 117:16,18,22 118:21

**documented** 19:6 95:17

**documenting** 16:10,15

**documents** 11:16 12:15 19:1,8,18 20:4 72:12,24 74:8 75:25 120:3

**dog** 18:16 39:15 40:22 41:15 43:11 45:6 48:13 50:7,8,11,17,20 52:24 53:13,19 54:22 55:7 57:1,2,7,15 58:21 59:8 68:8 70:22 71:17,24 76:12 77:16,18,19 84:4, 10,13,19 87:22,24 89:4 90:16 97:12 100:14,21 101:3 102:10,22 113:1,2

**dog's** 78:8

**dogs** 23:4,9 34:22 35:4, 18,19 36:13,14,25 37:15,19 38:11,24 39:8, 16,25 40:4,18 41:12 42:20 44:3 46:24 51:6 56:14,18 57:24 58:1,12,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: domestic..flashlight

24 59:5,19 94:24 95:4,8, 25 96:3 101:22 103:2 113:21

domestic 69:5

door 34:12 35:6 36:1 51:5 54:24

downloaded 14:1,3

draw 107:1

drawing 52:23

drew 54:4

drive 76:11 107:12 110:2

driver's 30:7,9

driving 111:3

drone 10:7

Dude 88:3 89:8 91:2

due 105:20

duly 4:4

DUP 25:13

duplicate 25:16

duplicates 94:21 95:20, 21 96:8

Duren 104:4 115:22

duties 9:21

duty 64:5,7 81:12 82:3, 5,8 116:12

---

**E**

E-R-I-C-A 4:12

earlier 66:16 83:20

easier 30:14

easily 81:14,18

Eason 65:13

ebb 92:8

edited 52:7

effective 42:18

efforts 101:18

eighth 65:25

elect 81:12 82:2,9

electronic 47:21

electronically 78:17

elements 43:12

eleven 26:18

Ellington 59:6 118:16

Ellington's 118:18

emergency 28:3,8,14, 21 86:6

emotional 8:1

employed 4:13,14 94:24 103:5 109:14

employees 103:14

employment 5:11

en 25:10,11 29:7

encounter 59:8 61:25 80:5 99:9

encountered 63:21 114:2

encounters 100:5 101:6,11 102:11,22 115:2 117:20

end 7:4 27:25 107:13

endeavor 96:20

ends 38:8 40:15 45:25 47:23 48:20 52:20 53:10 85:3 86:3 88:16 90:10 91:10

energy 81:4

enforce 58:19

enforcement 11:3 43:14 103:1 112:1 114:23 115:4,21

Enforcement's 101:9

English 33:2

ensure 67:5 72:6 74:25

entered 31:16 33:4

entering 113:13,14

entire 87:5 111:5

entity 19:11,25

entries 107:14

entry 28:13 29:2 31:10 32:20,22,24 33:23 77:4

equally 108:24 109:10

Erica 4:2,12

Essentially 101:21

established 38:17

event 19:20 20:21 60:10 76:17 118:14 119:25

events 5:12,14 106:23

evidence 29:8 30:11 77:10,23 78:7

EXAMINATION 4:6

examine 77:18 78:8

examined 16:2

examines 70:9

examining 79:4

examples 110:16

excuse 64:20

excused 121:21

Executed 30:8

exhibit 7:8,12 9:5 20:8, 14 26:9,10 27:24 42:1,2 51:16 52:6 62:23,25 63:1 65:6,7 75:21 76:1 77:1 80:23,25 94:2,3,20 96:23 102:1,2 103:18,20 104:2 105:5,6 107:4,5 112:18,22 115:8 117:8, 11,13,25 119:10 120:13

existed 66:24

exit 18:4

expected 19:17 30:6 32:16 67:6 121:6

explain 15:14 44:12 107:14

explanation 98:6

extent 12:19

---

**F**

face 76:6

fact 55:3 67:11 74:8 78:4 97:8 115:5

factors 66:24

fails 97:11

Fair 26:8 68:11 93:11,16 108:2

familiar 94:6 102:5 103:23,25 105:1 112:19 117:16

family 78:4

fast 18:13 83:8

father 34:10,11

faulting 112:16

FCNMHP 115:13,14

FDLE 103:1 109:17 111:18,20

feasible 70:12,14 71:5 80:1 82:20

federation 52:2

female 51:1,5 76:11,16 93:6

fence 35:19 37:17 38:2 40:2,12 46:25 47:4 86:10

fenced 62:1

field 9:24 119:20

filed 8:25 9:18

find 9:9 22:19 75:16 77:18 102:23

fine 34:18 83:13

finish 39:3

finished 39:4

fire 29:4 111:20

firearm 52:23 66:2 68:3, 13,14,25 88:19 94:7 105:14

firearms 86:25 87:2 111:19

fired 55:8

fish 115:8

fist 46:15

five-year 108:13

flashlight 64:18

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.                    30(b)(6)
Weber, Erica on 04/02/2026                                    Index: flashlights..house

**flashlights** 81:7 82:14, 15

**flip** 22:13

**Florida** 101:9 112:3

**flow** 92:8

**folks** 14:22

**follow-on** 97:9,10

**follow-up** 114:16

**footage** 51:4

**force** 60:5,23 61:10,15 68:2 69:5,9 72:4,15,17 73:3,5,9,16 74:10,12,14 80:4,12 82:19 94:12 95:23 96:2 97:12,13 99:1 100:4 105:10 108:20,21,22,24,25 109:4

**forgot** 64:17

**form** 9:14 15:23 19:6,25 24:5 27:9 31:24 38:12 39:9,10 40:19,20 41:16 44:4,7,8 46:5 49:8,9,13, 18 50:2,23,24 51:12,13 52:25 53:14,21,22 54:5, 17,25 55:9,20 56:3,19 57:3,4,9 58:2,14,25 59:1,9,10,20 60:24,25 61:12,13,22 62:4,5 63:14,15 67:23 68:6,16 69:15,22 70:17,24 71:12,19 77:11,20,21 80:6,7 81:19,20 82:11 85:7,9 86:11,19 87:1 88:21 92:3 95:1 96:12, 16,24 97:14,15 98:3,20 99:2 100:9 104:20,21 106:21 110:20 111:12 113:24 115:20 116:6 118:25 119:4

**forty** 23:15

**forward** 15:4 83:8 113:15

**forwards** 78:23

**found** 23:16

**fourth** 55:8

**foxtrot** 108:5

**frame** 6:19 55:11 83:3

92:21,23 93:13

**frames** 83:9

**frequent** 13:24

**frequently** 32:14 55:13

**Friday** 43:6

**front** 19:21 41:18,21 54:24 76:1,4 86:10 94:17

**fuck** 84:24 87:20,23 88:2 89:7 91:1

**fucking** 84:4,10,13,18 88:11 89:16

**full** 116:1

**functions** 100:8,12

**fund** 110:10,18

---

### G

**gamut** 111:2

**gas-powered** 63:10

**gate** 35:6,9,10,13 36:7, 11,17 37:24 40:9 45:21 46:4 48:11 50:8,21,22 51:9 57:2,15 58:13,24 104:19

**general** 8:25 9:17 11:15 48:5 63:4 78:22 115:6

**generated** 112:25 121:5

**give** 14:8 20:11 30:13 41:7,8 49:23 53:25 82:24 85:24

**giving** 105:4

**Glock** 54:20

**god** 85:20 87:25 88:7,13 89:5,12,18 90:24 91:6

**good** 4:8 30:16 34:14 43:18 79:11

**Gotcha** 65:22

**government** 43:2

**Granted** 108:2

**great** 38:6 45:17 61:9

**grounds** 15:22

**group** 24:11 110:3

**groups** 110:22,24,25

**guess** 17:8 18:15 24:16 63:24

**gun** 9:23 34:22,24 64:9 112:12

**gunshots** 25:24 48:17 53:8

**guys** 98:2

---

### H

**halfway** 95:11 120:4

**hand** 7:7 20:7 28:18,24, 25 46:13 62:24 64:3 65:4 91:12 93:1,7 94:1 101:25 103:17 107:3

**handcuffs** 64:10

**handing** 117:10

**handle** 10:6 22:11 33:17 104:7

**handles** 100:16

**handling** 70:10 79:24

**hands** 88:25 89:22 120:23

**happen** 74:17 100:25 106:19

**happened** 28:6 36:18 58:21 98:18 120:24

**happy** 93:17

**harm** 49:2

**Harrell** 8:10 9:14 10:17, 20,24 11:6,24 12:1,4,10 16:24 17:4,13 18:4,25 19:4,10,17,23 24:5 27:9, 11 30:13 31:24 38:13,25 39:4,9 40:19 44:8,11,24 46:5 49:8,13,18 50:2,4, 23,25 51:13,15,18,25 52:4,10,25 53:14,21,23 54:5,17,25 55:9,20 56:3, 20 57:3,5,9 58:3,15,25 59:10,14,20 60:24 61:12,15,18,20 62:4,11 63:14,16 67:24 68:7,17

69:22 70:19,24 71:13 77:12,21 79:11 80:6 81:19 82:12 83:19,22 85:8 86:11,13,19,21 87:1 88:21 92:3 95:2 96:12,18 97:1,14,16,23 98:8,11 99:2 100:9 104:20 106:21 113:25 114:6,10 115:20 116:6, 22 118:25 119:4 121:11, 20

**health** 31:11,17,18 32:13

**hear** 23:5,6,9

**heard** 25:23 48:17 53:8 59:5 88:23

**heat** 36:23

**held** 4:24 7:6,23 18:15 20:10 34:6 64:25 70:1 82:22 83:17 93:25 102:16 103:14,16 121:9

**hell** 35:4 45:23

**helpful** 19:7

**Hey** 34:15 48:12,14 88:1 89:6 90:25

**highly** 113:17

**history** 101:15

**hit** 77:8,19

**hitting** 22:2

**hold** 64:12

**holding** 120:21

**home** 34:11

**Homeless** 115:15

**homeowners** 57:14

**homicide** 5:18

**Honda** 23:4

**hope** 7:22

**hopeful** 7:19

**hoping** 36:4

**hours** 28:4,13 43:6,7

**house** 35:3,14 36:6 58:20 88:7,13 89:12,18 91:6

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: household..keeping

household 56:10

HR 111:20

HRS 28:1,4

hurt 85:23

husband 34:22 35:2

**I**

identification 7:13
20:15 26:11 42:3 62:25
63:2 65:8 81:1 94:4
102:3 103:18,21 105:7
107:6 112:23 117:14

identified 7:18

identify 20:17 27:1
42:15 55:6 65:10 92:23
107:8

identity 26:16

IDS 22:14

image 64:4,22 65:2

images 116:16

immediately 72:18
73:6 74:15

imminent 50:1 53:12
54:3

imminently 91:18

impact 62:9 63:7

implements 10:5

important 78:3

impossible 55:16

impressed 5:23 112:14

improper 97:17,18

improperly 52:7

in-service 110:3

inappropriate 52:6
116:16

Inaudible 34:13 55:21
61:18 85:14 90:8 98:4

incident 8:20,23 12:19
21:3,24 27:4 33:15
43:20 65:15 66:1,9
68:20 72:19,21 78:24
98:20 100:15 105:17,21,

25 106:12,16

incidents 69:25 70:5
79:1,5,8,21,23 94:15,19
95:17 96:10 97:5 110:2

include 16:11

included 108:19

includes 20:23 43:15

including 27:2 70:12
80:1

incorrect 18:20

independent 101:17
110:7

indicating 106:6
115:11

individual 57:23 79:6
105:22 110:8

individuals 15:8 66:17

info 118:5,8,9

information 6:12 9:3,4,
9,10,18 14:8 15:9 18:19
20:23 21:9 22:2,4,19
25:24 50:12 67:1,2
78:10,22 97:6 102:25
104:1 109:23 113:11,13
116:12,14 119:6

informed 104:6 115:13

initial 101:8

initiate 100:24

Initiated 21:4,24

injured 49:12

injuries 49:5

injury 64:3 68:2

inmate 111:1

inmates 111:2

inspections 10:1

instance 10:7

instances 98:19 100:2

instructed 101:13
105:23

instructions 98:3

instructors 111:3

intended 46:15

intentional 73:23

intentionally 54:10

interact 101:22

Interdepartmental
65:12

interest 98:9

intermediate 71:25
81:6,16 82:2,10,13

internal 9:25

international 112:1

internet 5:10

interpretation 61:21
81:21,24

interrogations 110:25

Interrogatories 26:4,
23

interrogatory 11:1

interrupted 105:20

interview 110:24

investigate 58:16
76:11 100:14

investigating 78:25

investigation 56:22
62:2 66:23 72:6 73:7,9,
22,25 74:16,19,22,25
100:17 101:3 104:9
105:20,24 106:15
113:21

investigations 100:21

investigative 73:15,19
74:4

investigator 119:21

involved 10:8 30:5

involvement 8:8,13,20

involving 65:16 66:1

issue 61:20 104:6,8
116:11

issued 43:14 81:11 82:2
104:11,16 116:20

issuing 104:12 117:1

Item 42:22

items 7:21 9:2,10

**J**

Jacksonville 4:2,14
6:8,13,16,23 11:23 12:5
17:15 19:5 29:4 58:18
59:18 77:17 88:18 94:25
96:11 109:15

Jaivon 59:6 113:22

Jaivon's 56:13

JFRD 29:2,4

job 77:17 112:15

join 8:18 9:15 10:19
17:13 31:25 44:11 46:6
49:19 52:9 53:1,15 54:7,
18 55:1,10,22 56:4,20
58:3,15 59:14 67:24
68:7,17 70:19,25 71:13
77:12 82:12 85:8 86:12,
20 88:22 92:4 95:2
96:18 97:1 99:4 100:10
113:25 116:24 119:5

Jonathan 91:23,24

JSO 4:16,24 11:3 31:23
38:23 41:14 70:3 82:18
93:10 109:20,21 111:5,9

JSO-INVOLVED 66:22

JSO/M9 31:11

jump 76:14

jumping 108:20

justice 101:10 109:18
116:13

justification 61:9

juvenile 21:20

**K**

k-i-l-o 75:15

Karl 22:12

Karlous 22:15

keepers 64:12

keeping 33:24 67:5

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: Kelsey..manage

**Kelsey** 24:1,17 25:5 30:3 93:2,6

**key** 22:1,3

**keyed** 108:18

**kicking** 60:18

**kid** 34:21 36:5

**kill** 84:18 85:20

**killed** 69:2 84:11,14,17 87:22,24 113:2

**killing** 68:14

**kilo** 32:25 75:13,15 107:24 108:14

**Kim** 46:3 52:23 58:12 59:5 71:16 85:5

**kind** 25:12 110:6

**knowing** 32:10

**knowledge** 6:11 19:4, 24 38:16

**Kyle** 87:7 88:19 91:20, 24 92:1,18

---

**L**

**LAHART** 4:7 6:6 7:3,7, 14,24 8:15,21 9:20 10:21,25 11:9 12:2,8,11, 12 14:10,14,16 15:19 16:13,19,23,25 17:6,12, 16 18:8 19:3,9,13,22 20:2,6,12,16 21:18 24:12 26:9,12 27:6,14 30:16,18 32:4,17 38:9, 22 39:1,3,6,11,17 40:16, 25 41:10,20,23 42:1,14 44:5,12,19 45:2,5,9 46:1 47:24 48:21 49:11,15,24 50:16 51:7,17,21 52:2,8, 12,15,21 53:3,11,17 54:1,8,19 55:5,17,24 56:7,24 57:6,12 58:10, 22 59:4,16,22 61:6,13, 17,19,24 62:7,16 63:5, 19 64:24 65:4,9 68:4,10, 21 70:4,20 71:2,15,21 73:1 76:2 77:14 79:13, 15,16 80:10,23 81:2,23 82:16,23 83:4,15,21 85:4,10,13,15 86:4,15,

23 87:4 88:17,24 89:21 90:18 91:11 92:16,22 93:20 94:1,5 95:6,13 96:14,21 97:3 98:23 99:6 100:13 101:25 102:4 103:17,22 104:23 105:3,8 106:8,13,25 107:3,7 108:15 109:4,8 111:8,16 112:24 114:4, 7,12 115:24 116:18 117:3,7,10,15 119:1,8 121:10,17

**Lampkin** 11:18 13:1,2 16:3 18:9 22:12,15,16 23:19 24:3 27:12 32:22 34:2,10,14,16,19,20 35:1,5,8,11,16,21,23 36:3,8,12,19,22 37:1,6, 8,14,19 38:3,11,18 39:24 40:4,13 41:12 44:21 45:10,16,20,24 46:3,12,17,20,23 47:2,5, 7,11,13,16,20 48:11,14, 16,19 49:17 50:1,9,13, 18 51:6,8 52:19,22 53:13,16,25 54:4,15,21 55:14 56:9,13,16,21 57:14,15,25 58:11,16 59:7 60:18 61:25 63:12, 18,20,23 64:14,21 67:9 70:14,18 71:17 72:20 76:10 81:17 84:7,15,21, 23 85:1,16,22,24 86:1,8, 14,16,22 87:15,18,21 88:1,3,9,12,14 89:6,8, 14,17,19 90:25 91:2,8 93:22 101:7 103:7,9 105:12,17 113:21 114:2, 20 116:1,19 119:2 120:20

**Lampkin's** 12:19 49:5 83:14 105:19

**laptop** 82:25

**large** 41:15 42:21 54:21, 23 56:9 104:17 109:16 110:5 113:22

**law** 101:9 103:1 111:25 114:22 115:3

**laws** 17:24 116:15

**learned** 8:22

**leather** 64:12

**leave** 37:7 58:13 88:6, 13 89:11,18 91:5

**led** 106:23

**left** 51:4 107:15

**left-hand** 92:25

**leg** 28:18,24,25 64:3

**legal** 12:6 50:4 61:20 97:23

**lethal** 60:5,6,7,22 63:24 97:12,13 99:1 108:22 111:22

**letters** 52:4

**license** 30:8,9

**lieutenant** 5:7,9,25 27:19 31:7 65:13 72:19 74:20 75:20 105:13

**lieutenants** 14:22

**life** 28:22

**limit** 61:23 98:3

**limited** 70:12

**linear** 92:11

**link** 43:2

**list** 30:15 80:1 107:10 112:4,21 119:12

**listed** 22:14 23:7,25 32:3,5 71:8 72:1 85:13 112:15 117:24

**lists** 43:7

**livestock** 42:23

**locate** 43:11

**located** 101:19

**location** 25:20

**locations** 32:16

**long** 4:16 6:4 15:14 17:17 56:23 101:16 102:8 116:16

**longer** 102:13

**looked** 96:15

**loose** 42:23 43:10 84:21,23 85:1,5

**loss** 28:21,22

**lot** 5:22 110:5

**low-cost** 115:16

**lower** 28:18,24,25 51:3, 20

**luck** 107:1

**lucky** 106:18

**Lucretia** 24:20 30:12

**Lucy** 34:2 48:22 49:16, 25 53:12 54:3,14 56:8 60:18 61:19,25 63:22 68:5,8,19 70:15 71:10, 18 74:1 76:25 77:8,25 106:1 115:12,18,22 118:23 119:7

**Lucy's** 71:10 103:13

---

**M**

**M121** 30:11,12

**M19** 22:8

**M229** 23:22 25:4 30:1,2, 3

**M319** 22:8,12 23:13 30:1 32:20

**made** 8:15 21:7 24:10 35:2 39:16 50:13 98:21 113:6

**magazine** 64:9

**maintain** 111:19

**major** 28:21 109:23

**majority** 97:9

**make** 16:1 17:10,22 32:2 47:18 54:9 69:9 98:12,13 105:3 113:5,16

**makes** 14:24 15:12

**making** 12:6 15:10 32:22 42:4

**male** 51:1,5 93:8

**Malene** 118:16

**mamma** 36:4

**man** 18:14,21 50:7

**manage** 55:15

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: Management..officer

**Management** 72:10

**Marcy** 98:5 109:3

**mark** 7:8 11:2 20:8 26:9 42:1 62:24 65:5 103:17

**marked** 7:12 20:14 26:10 42:2 63:1 65:7 80:25 94:2,3 102:2 103:20 105:6 107:4,5 112:22 117:11,13

**Martin** 29:22 92:24

**match** 52:5

**matter** 7:3 8:9 109:21

**MCAD** 75:5,10

**meaning** 24:21 25:16 28:9 33:16

**means** 22:9 28:2,20 30:25 75:7 107:22

**medical** 31:19,22 32:9

**meet** 112:2

**meetings** 103:14

**meets** 110:4

**member** 55:15 56:1 111:5

**members** 55:18 110:15

**Memorial** 13:22

**memorize** 19:18

**memorizing** 112:16

**memory** 19:6 20:1 112:14

**mental** 8:1

**mention** 101:9

**mentioned** 24:17 99:7 114:18

**middle** 22:25 25:12 27:24,25

**Mike** 22:14 23:18,25 24:19,20,24 31:15 33:1, 4 85:22

**mild** 116:3

**mind** 99:21 120:9

**minute** 14:13 82:24

**minutes** 55:25 102:11, 13 114:7

**misreading** 24:13

**misrepresenting** 54:10

**missed** 91:22

**mission** 110:6

**missions** 110:6

**misstate** 54:11

**Misstates** 54:6

**mobile** 75:10

**Monday** 43:5

**money** 110:11

**months'** 101:12

**morning** 4:8 34:14,17 36:6 51:22 55:12

**mother** 34:10,11 37:8

**motherfucker** 84:6,8, 16 87:19

**motorcycle** 111:3

**mouse** 83:15

**move** 61:23 93:21

**Moving** 112:18

**mulligan** 108:1

**multiple** 13:21 20:5 66:20

**municipal** 43:13 58:17 104:12

---

### N

**NA** 23:23

**national** 113:11

**NCIC** 113:4,8,13,16,18

**needed** 33:17 44:21 51:23 99:14

**needlessly** 61:8

**neighborhood** 45:7

**nice** 6:4

**nipped** 50:8

**nips** 49:7

**noise** 47:25

**nonlethal** 59:18,23 63:13,21 70:11 71:5 79:25 80:4,12 100:4

**normal** 17:5

**note** 18:25 104:3

**noted** 52:13 99:25

**notepad** 120:21

**notepads** 120:22

**notes** 104:4 120:24 121:2,5

**notice** 12:16 15:18 32:3 115:18

**noticed** 10:22 11:1

**notification** 47:21 108:8

**nuances** 111:1

**number** 7:12 16:3,8 20:14 26:10 42:2 43:3,7, 9,17,19 63:1 65:7,16,18, 23 66:5,7,12 70:6 72:6 75:4 76:13 79:18,23 80:21,25 81:10,22 94:3 95:11 102:2 103:20 105:4,6,19 107:5,21 108:5 112:7,17,18,22 113:7 117:8,10,12,13 119:14

**numbers** 108:16

**numerous** 104:5

---

### O

**object** 8:10 9:14 15:22 24:5 26:21 27:9 31:24 38:12 39:9,10 40:19 41:16 44:4,7,8 46:5 49:8,9,13,18 50:2,23,24 51:12,13,18 52:5,25 53:14,21,22 54:5,17,25 55:9,20 56:3,19 57:3,4,9 58:2,14,25 59:1,9,10,20 60:24,25 61:12 62:4,5 63:14,15 67:23 68:6,16 69:22 70:17,24 71:12,19 77:11,20,21 80:6,7 81:19,20 82:11 85:7 86:11,19 87:1 88:21 92:3 95:1 96:12,16,24 97:14,15 99:2 100:9 104:20 106:21 110:20 111:12 113:24 115:20 116:6 118:25 119:4

**objected** 61:21

**objection** 8:16,18 10:17 11:5,6,24,25 15:15 17:10,14 32:2 38:13,25 40:20 44:23,24 45:4 52:12 62:11 69:23 116:22

**obligation** 45:7

**Obtaining** 71:7

**OC** 60:2,15

**occasionally** 113:16

**occupational** 31:11,17, 18

**occurred** 27:16 31:20 74:8

**off-site** 101:18

**offense** 43:12

**offer** 41:4 55:2 59:15 69:16

**offered** 40:22 51:5 57:14,15 99:22 102:21

**offering** 92:5

**office** 4:15 8:24 9:17,24 11:15 14:21 58:18 94:25 109:15 113:10

**officer** 11:18 12:18 13:1,2,3,13 18:9 22:10, 16,19 23:19 24:3 26:18 28:10 30:5,19 32:22 34:1,10,14,16,19,20 35:1,5,8,11,16,21,23 36:3,8,12,19,22 37:1,6, 8,14,19 38:3,11,18,24 39:15,24 40:4,13,21 41:12 42:24 43:4,11 44:21 45:8,10,16,20,24 46:3,12,17,20,23 47:2,5, 7,11,13,16,20 48:4,11, 14,16,19 49:5,17 50:1,8, 9,13,18 51:6,8 52:19,22 53:13,16,24 54:3,15,21

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: officer's..policy

55:14 56:9,12,16,21 57:14,15,21,22,25 58:11,16 59:7 60:18,21 61:25 63:12,17,20,23 64:6,14,20 65:2 67:9 69:8 70:14,18 71:17 72:4,15,16,18 73:3,4,6 74:5,10,11,13,15,19,24 75:16 76:10 79:1,5 80:3 81:17 82:24 83:14 84:7,15,21,23 85:1,16,22,24 86:1,8,14,16,22 87:3,15,18,21 88:1,3,9,12,14 89:6,8,14,17,19 90:25 91:2,8 93:6,14,22 97:4,11 101:7 103:6,9 104:4,18,25 105:1,12,14,17,19 106:14,18,22 112:25 113:19,20 114:2 115:21,22 116:1,19 119:2 120:20,23

**officer's** 59:23 97:13 99:1

**officers** 13:24 24:15 25:16 26:16,19 27:7,17 28:9,15 30:21 32:8 42:20 43:23,25 61:7 70:11 71:4 79:25 80:9 81:10 82:1 92:23 93:10 99:7 103:3 108:18 109:19 116:5 117:1

**OGC** 9:17

**oleoresin** 60:2

**one-year** 108:13

**online** 43:1

**open** 35:7,10 36:11 37:24,25 40:9,10 45:21 46:3,25 47:1 50:21 51:8 57:2,15 58:13 104:18 111:4

**opened** 35:6

**opening** 36:7

**operator** 118:11

**opinion** 40:21 41:3 44:16,17,25 45:3 49:22 53:24 55:2 59:13,15 61:3 77:13 92:5

**opinions** 41:4,7

**opposed** 69:5

**option** 63:13,21 71:1,8 72:1 101:5 104:12 114:1 115:16

**options** 59:18,23 70:11 71:5 79:25 99:18 108:22

**order** 31:13 41:18 42:5,17 44:1,13 62:2 63:4 69:7 70:2,6 79:18 80:21,22 108:19 112:7

**ordering** 121:15

**orders** 44:13 112:4

**ordinance** 43:13 58:17 104:13

**organized** 7:4

**original** 18:11,18 27:12 66:13

**originally** 33:8

**Oscar** 29:22

**oversee** 9:23

**Oversight** 9:25 10:2 11:16 65:14 66:2,15 68:23 69:18,24 78:18,19 79:8

**owner** 43:11 71:7,10

**owner's** 118:24

**owners** 58:21 119:7

**ownership** 43:15

---

**P**

---

**P-R-I-N-** 93:3

**p.m.** 121:22

**packet** 76:8 104:1

**pages** 76:5 103:19 105:4

**paper** 30:17

**papers** 7:5 120:22

**paragraph** 65:19 74:23 106:7 116:1

**part** 70:8 74:13 75:21

**pass** 111:21

**path** 114:3

**patrol** 5:9,16,19 11:2 13:6 72:17 73:5 74:14 107:16

**patrolman** 5:20

**pause** 18:6 52:14 93:19

**pay** 13:18 14:20

**peace** 120:14

**people** 38:20 55:12 92:9,13 108:25 109:7,10 113:12

**pepper** 64:14,21 67:13 71:25 80:14

**percent** 117:2

**perform** 100:7

**period** 14:6 94:23 95:24,25 96:3

**periodic** 111:10

**permitted** 108:21

**person** 14:25 15:12 43:15 55:6 64:1

**personal** 6:11 8:13 38:15 44:16 49:22 59:13,15 61:3 98:15 116:5,20

**persons** 15:1

**peruses** 72:12 75:25 106:10 120:3

**Petitioner's** 65:5 94:2

**Pets** 115:15

**phone** 37:9 108:8 116:20 117:5 118:15

**phones** 116:5,11 117:1

**photograph** 64:2

**photographed** 78:5

**photos** 116:2

**physical** 8:1

**picture** 67:9,12 76:25 77:1,4,8

**pictures** 49:4 77:2 78:9

**pile** 42:8

**pink** 51:4

**pistol** 54:4,16

**Pittman** 24:1,17 25:5,6 30:3 93:6

**place** 61:8 75:4,8

**plaintiff's** 7:8,12 20:14 26:10 42:2 63:1 65:7 80:25 94:3 102:2 103:20 105:6 107:5 112:22 117:11,13

**plaintiffs** 52:7

**plastic** 13:15

**play** 82:25 110:9

**playback** 34:7 38:8 39:19 40:15 45:13,25 46:9 47:22,23 48:8,20 52:16,20 53:5,10 83:18 84:1 85:3,17 86:3 87:12 88:16 89:1,20,23 90:2,5,10,13,17,20 91:10

**plug** 13:17

**point** 19:24 33:11 56:1 74:18 86:10 87:7 117:19 118:15,20

**pointed** 88:19

**points** 77:4 79:6

**police** 13:13,22 26:19 34:11 102:10,22 103:2 107:16

**policeman** 84:9

**policies** 9:9 10:6 16:8,13 32:8 48:23 70:1 112:17

**policy** 14:5,9 27:20 38:23 39:14 41:11 46:2 49:21 50:11 55:3 56:23,25 57:8,17,20,22 58:8 59:17,25 60:5,8,11,14,17 61:7,21 62:8,12,17 66:19 67:5,20 69:4,12,13,21 70:3,6 71:3,4 73:12,18,24 77:18,22 78:21,23,25 79:4,18 80:3,20,22 82:18 86:24 88:19 92:2,6,15,17 99:23,24 104:10 108:21 109:4,6,7,17,19,21,24 110:17 111:10 116:4

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: policy/procedure..recording

| | | | |
|---|---|---|---|
| **policy/procedure** 16:6 | **problem** 43:22,24 116:17 | **published** 112:4 | **Randy** 25:1,6 |
| **policywise** 92:6 | **procedures** 16:8,14 | **pull** 45:24 117:25 | **range** 9:24 112:12,13 |
| **population** 111:1 | **proceed** 8:2 | **pulled** 54:16 87:2 | **ratifying** 97:13 99:1 |
| **portion** 70:5 79:20 113:9 115:3 | **proceedings** 18:5,6 52:14 93:19 | **pulling** 34:22 86:24 | **read** 73:2 112:20 121:12 |
| **posing** 55:7 | **process** 10:8 63:25 78:12 | **pulls** 79:5 | **reading** 65:18 106:5,7 109:2 |
| **position** 4:22 49:16,25 54:2,14 | **processes** 10:5 | **pump** 36:23 | **reads** 113:3 |
| **positions** 4:24 | **processing** 16:15 17:1 | **purposes** 6:16 14:23 42:4 43:14 62:24 103:18 | **ready** 8:5 |
| **possession** 78:6 | **produce** 73:15 101:14 110:13 | **pursuant** 9:2 73:18,24 | **real** 116:11 |
| **possibly** 9:12 | **produced** 4:4 9:2 12:15,21 44:12 | **push** 109:22 | **reason** 8:4 24:3 34:19 50:20 57:25 86:8,16 102:12 |
| **potential** 28:22 45:6 66:24 | **product** 10:18 11:7 12:1 | **put** 42:13 57:21 67:1 77:15 83:11 | **reasonable** 60:21 108:23 |
| **Potentially** 9:16 | **production** 9:13 11:17 94:11 | **Putnam** 111:7 | **reasonableness** 61:3 |
| **practice** 16:23 | **Professional** 4:23 9:22,24 10:2 11:15 65:14 66:2,15 68:23 69:18,24 78:18,19 79:7 | | **recall** 26:5 64:4 94:22 117:21 |
| **practices** 16:9,14,25 | | **Q** | **recap** 19:20 20:21 76:17 118:15 120:1 |
| **pre-depo** 38:19 | **professionals** 27:3 | **qualified** 11:21 12:7 | **receive** 9:1 15:13 17:18 109:14 110:2 115:2 |
| **preceding** 72:14 | **prohibited** 17:25 | **Query** 30:8 | **received** 8:24 9:17 18:23 24:20 58:17 63:23 101:7 113:6 118:16 |
| **prepare** 12:13 19:13 | **promoted** 13:7 | **question** 12:9 16:24 17:7,9 19:20 26:15 27:1, 5 32:7,10 39:3 41:9 53:18 56:15 58:21 61:14 63:17 68:9 69:16 70:16 73:20,22,24 79:9,10 80:13 82:4,6 85:16 86:14,22 91:20 92:6 97:18 98:1,24 99:5 109:9,16 118:13 | **receives** 15:3,4 |
| **prepared** 7:17 15:21 44:18 59:7 63:12,21 73:19 80:4 | **property** 54:23 55:14 56:17 77:25 118:24 119:7 | | **receiving** 16:14,25 25:19 |
| **preplanned** 60:10 | **protected** 116:15 | | **recently** 116:25 |
| **prescribed** 81:15 | **protecting** 50:14 | | **recess** 79:14 114:11 |
| **present** 27:3 43:12 119:3 | **protection** 5:8 | **questions** 13:11 34:5 80:20 104:24 114:13,16 118:4 119:9 120:17 121:10 | **recognize** 83:5 |
| **presenting** 43:4 48:24 | **Protective** 42:25 60:3 100:16 | | **recollection** 101:17 102:7 |
| **preserved** 121:2 | **provide** 15:8 43:20 67:2 99:12 110:24 | **queue** 17:21 33:17 | **record** 4:11 7:6,23 8:16 20:10,18 27:1 34:6 42:16 52:13,15 63:3 64:25 65:10 72:22 79:15 82:22 83:10,17 93:25 98:12 103:16 121:4,6,9 |
| **pretty** 114:8 | **provided** 72:25 110:11, 17 | **quickly** 72:20 114:8 | |
| **prevented** 60:17 | **provider** 32:15 | | |
| **primary** 22:7 29:25 30:4 33:10,12 75:5,11 106:24 | **providers** 32:13 | **R** | |
| **Prince** 112:25 | **PRR** 16:6 | **rabies** 115:12,18,23 | **recorded** 21:9 30:24 31:5 32:20 33:1,21 120:5 |
| **Prinzi** 29:23 92:24 93:3 | **public** 14:24 15:2,3,9, 13,16 16:11,22 17:2,23 116:15 121:4,6 | **raccoons** 95:7 | |
| **Prior** 5:1,2 8:7 | | **radio** 28:4,8,10,14 64:10 86:6 | |
| **priority** 22:24 | | **radiofrequency** 28:15 | **recording** 16:9,15 48:3, 4 |
| **private** 116:14 | | **raising** 35:4 | |
| **privilege** 10:20 | | **ran** 37:12 39:22 | |
| **Privileged** 11:6 | | | |

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.                    30(b)(6)
Weber, Erica on 04/02/2026                                        Index: recordings..scope

recordings 101:13

records 14:24 15:2,3,4,
9,13,17 16:11,22 17:2,
23 116:15

recruit 13:10

recruits 102:24

redacted 17:20

reengaging 92:1

refer 6:21 14:6 42:24
65:24 66:5 76:5 102:1
113:21

reference 30:15 65:15

referenced 18:14 65:16
74:5 102:25

referred 18:19 69:14
105:25

referring 6:22 9:4 82:14
86:9 113:9

refers 76:16

reflect 102:7

reflected 19:1 29:13

reflects 28:13 51:1
71:20,23

refresh 102:7

refresher 111:10

refused 35:22

region 111:5,6

related 8:25 9:10,18
22:22

releases 15:10

releasing 17:24

relevant 77:10

remain 61:8 86:9

remedial 97:8 99:8,11
100:3

remember 5:24 114:17

renamed 52:8 83:25

rep 59:12 61:1 62:6

report 18:18 30:6 31:9
32:4,6 33:22 43:1 59:5
66:6,9 68:1 69:19 72:7

73:15,19,21,22,25 74:4,
7,19,21,22,25 75:9,16
76:4,10 78:11,19 94:17,
21 95:5,17,20 96:23
104:25 105:9,12,13,15,
16 106:24 107:18,22
108:3,10,12 112:25
113:14 119:16,18,20,21,
23 120:9 121:5

reported 94:20

REPORTER 42:8
121:15,18

reporting 23:9 72:9
113:14

reports 10:11 19:8 67:4
94:7 112:20

representative 8:8,12
10:16 11:22 12:7 41:8
44:10 45:1 58:5

request 8:24 9:1,13,16
14:25 15:2,4,10,13 17:3,
22 40:17 43:5 77:22

requested 9:3,19 15:9

requesting 28:20

requests 15:3,17 16:11,
22 17:18,20 94:10

require 104:10

required 27:20 41:11
46:2 58:11,23 60:22
70:11,23 79:25 92:17
93:22 99:8 100:3 105:9
109:22 111:18

requirement 64:8,16,
19 73:14 79:7 121:1

requires 71:3,4

requiring 39:14 82:18
104:13

rescue 28:20 29:4

Resistance 10:10,11
31:9 62:8,18 65:15,25
66:25 67:3,20 68:1
69:12,19,21,25 70:2
74:7,21 75:9 97:7 98:19
108:3

resisting 67:22 68:5

resolve 27:18

respond 30:22 41:14
42:20 45:8 72:18 73:6
74:15,20 100:15 101:1
110:23

responded 26:16 44:21
57:23 113:1

responding 18:10
104:7

response 9:12 10:10,11
12:16 15:2,17 17:2
26:15 31:9 44:1 56:13
62:8,18 63:24 65:15,25
66:25 67:3,20 68:1
69:12,19,20,25 70:1
71:14 74:7,21 75:9
94:10 96:22 97:6 98:17,
19 99:21 108:3

rest 50:14

restate 73:20

restored 120:14

result 68:19 105:22

resulted 105:21

results 68:2

resumes 87:12

retaining 16:9,16

retention 108:11,13,14,
17

retrain 111:22

retreat 70:14

retreating 70:12

retrievable 14:21

retrieve 15:1 101:18

retrieved 13:13

review 10:10 12:22,24
14:23 26:3 65:15 66:25
69:24 78:18 98:20
117:21

reviewed 12:15,18,25
34:1 66:1 69:1 98:20

reviewing 72:24

reviews 10:9 69:19 97:7

rips 120:22

risk 5:8

road 36:2 37:16 40:1

Rockwood 76:10
107:12

roll 90:11 101:13 102:16

Romano 11:2,10

round 63:10

route 25:11 29:7

routed 78:17

RTR 30:24 31:5,6,8 70:5
73:21 74:7 75:4,8,15
76:4 78:11,15 79:20,23
94:7 105:9 108:3

RTR22-0008 65:16,23

run 47:10

running 36:1 42:22
43:10 53:13,19 54:23
104:17

runs 111:2

**S**

safety 87:3 100:17,19

sat 86:17

Saturday 43:6

save 6:20 76:14 88:4
89:9 91:3 107:23,24

saved 51:21

scenario 40:21

scene 24:16 25:17
26:20 44:1 64:3,22 69:9
73:6 74:16 76:20 100:18
101:4 104:7 106:19
119:19

scenes 101:24

Schedule 7:18

schedules 81:15

Schmitt 65:13 67:18
69:15

Schmitt's 67:19

school 55:13 76:13

scope 8:13 10:12 15:16,
18 16:12 17:10,11 32:11
38:15 44:9 58:4,20

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: screen..succinctly

59:11 61:1 62:6 63:16 85:8 86:13,21 96:17,25 97:16,21 98:12,13 99:3 111:13 116:7,23

**screen** 24:20 52:11

**secondary** 5:11,13

**seek** 31:21 32:8

**seeking** 11:16 31:19

**selected** 24:9

**self-initiated** 24:21

**send** 36:5 86:1,2 116:12,14

**sending** 22:18

**sends** 78:15

**separate** 42:7 66:12 69:7

**sergeant** 5:10,11,12,14, 15,16 13:7 25:1 29:13 86:2,7,18 104:5 120:7

**sergeants** 27:21

**series** 101:12,21

**service** 58:17 101:1 107:10,16 119:12

**services** 13:19 42:25 60:3 100:16

**session** 101:23

**set** 109:21

**sets** 109:19 111:20

**Shantavia** 118:9,13

**share** 7:9

**shared** 20:23

**sheet** 9:2,4

**sheriff** 77:16

**sheriff's** 4:14 14:21 58:18 94:25 100:7,23 102:21 109:13,15

**shift** 14:3,4

**shirt** 51:5

**shoot** 74:6 111:21

**shooting** 12:25 27:16 28:9 30:5,21 34:2 48:22

60:18 66:7,12 74:1,8 99:20,24 106:1,12,16

**shoots** 77:16

**short** 6:19 102:15

**shorten** 6:15

**shorter** 102:13

**shot** 71:10,17 77:19 78:4 84:4 94:24

**shots** 55:8

**show** 13:25 40:22 42:19 51:6 57:14 76:17 77:4 106:19

**showing** 52:10 83:6

**shuffling** 7:5

**shut** 35:13

**sic** 14:18 22:8 29:25 31:11 65:5 66:11 75:16 80:21 105:22,23 108:22

**Sicar's** 75:16

**SIG** 21:19

**signature** 67:16

**signed** 11:2 69:15

**signs** 22:14

**similar** 25:20

**simply** 57:16 92:7

**simultaneous** 36:21 42:12

**single** 57:22

**sir** 38:5 45:16 46:14 47:6 87:21

**Sircar** 31:7 74:20 75:18, 19 105:13

**sit** 38:20

**sitting** 35:14

**situation** 27:16,18 28:11,21 30:21 45:8 60:22 61:16 85:6 106:11 114:1

**situationally** 99:17

**situations** 61:9 92:8,13 105:14 110:1

**six-month** 15:11

**size** 96:11

**slipped** 120:8

**small** 113:10

**software** 10:7 66:19

**somebody's** 36:6 38:24

**son** 47:9 76:12 84:22 85:5

**sort** 87:8 103:12

**sounds** 102:14

**spanned** 101:12

**speak** 92:15,18

**speaking** 36:21 42:12 104:4

**speaks** 42:22 43:19 53:2

**special** 5:7,12,13,14,15, 17

**specialized** 110:12

**specialty** 62:9 63:6

**specific** 7:20 16:5 21:1 32:16 39:14 55:11 62:12,20 99:15 119:22 120:1

**specifically** 14:22 23:15 58:8 74:4

**spelling** 18:20

**spent** 5:18

**spoken** 11:18

**spray** 60:2,15 64:14,21 67:13 71:25 80:14

**stacked** 33:15,16

**staff** 99:12

**stand** 52:1

**standalone** 102:23 103:2

**standard** 112:1

**standards** 4:23 9:22 67:6 101:10 109:18 112:6 116:14

**standing** 37:2 47:15

**staple** 26:23

**started** 116:25

**starting** 24:14

**state** 4:10 61:7 109:20, 23 110:11 111:6

**stated** 76:12

**statement** 44:17 56:14 58:12,24 114:20

**station** 13:17,20 14:19

**status** 23:12,18,22,25 24:25 25:9 29:12,14,22 31:15 33:15

**Stay** 47:5

**Step** 84:15

**stepped** 36:15

**steps** 78:12 98:22

**stolen** 36:23,24

**stop** 38:10 41:2 84:20, 25 90:11 98:1

**storage** 14:20 101:19

**straight** 35:3

**straps** 64:12

**street** 25:14,22

**stuff** 111:24 116:14

**stupid** 87:17

**subdue** 62:9

**subject** 65:21

**subjects** 7:18 25:22 110:23

**submitted** 119:17

**submitting** 43:1

**subsequent** 75:6,12 120:21

**substance** 101:20

**substations** 13:22

**successfully** 81:11 82:1 111:21

**succinctly** 19:20

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: suffered..veterinary

**suffered** 49:7

**suit** 8:25 9:18

**supervisor** 11:17 25:1 72:19 78:16

**supervisors** 27:19 78:17

**supplemental** 104:3 120:9

**supposed** 28:9

**supposedly** 57:1

**surprised** 36:14

**SWAT** 63:11

**sworn** 4:4

**system** 20:22 22:1 72:10

**systems** 117:22

**T**

**T33** 28:1,3

**T51** 29:2,7

**T66** 28:1,3

**T67** 28:18,19,20

**table** 36:24

**taker** 21:12

**takes** 15:14 17:17

**talk** 11:12 18:3 110:22

**talked** 38:17 66:16 75:13

**talks** 72:3 112:5 115:4

**tall** 93:8

**Taser** 60:7,9 64:8 81:5, 18 88:9,10,23 89:14,15 91:8,9,16,17,18 93:22 111:23

**technical** 10:13

**technician** 29:9 30:11 64:3,23 78:7

**technicians** 77:23

**techniques** 82:19 108:22

**technology** 66:18

**ten** 21:20 26:17 95:24

**tendered** 26:24

**tenders** 20:4 41:22 62:22

**test** 58:11,23

**testified** 4:5

**testify** 6:8 7:17 8:5 11:22 38:20 61:2 85:10 97:22

**testimony** 12:13

**text** 107:13 116:1

**thing** 5:3 57:22

**things** 7:20 13:16,18 15:23 17:1,20 33:17 38:21 110:7

**thought** 39:4 63:25

**threat** 45:7 48:24 49:1, 17 53:12,19 54:22 55:3, 7

**tied** 98:18

**time** 5:18 6:19,20 8:22 13:9 14:6,9 21:5,25 24:7 25:2 28:4 37:9 61:23 68:2 79:11 98:9 99:25 109:14 119:2

**times** 77:8 92:8,9 93:10 95:23 96:2 104:5 110:1

**title** 5:4 51:2

**today** 6:25 8:2 12:14 26:13 94:13 96:25 97:22 121:17

**told** 35:24 47:9 50:21 51:8

**ton** 111:24

**top** 18:15 21:23 22:7 23:4 37:2 106:4

**topic** 16:3 32:2,4 85:13 93:21

**topics** 19:15 111:9,17

**traffic** 28:4,8,14 86:6

**train** 81:15 91:16

**trained** 100:14

**training** 5:2 9:24 63:23 81:11,15 82:1 92:7 97:8 99:8,11,15,22 100:4,7 101:6,8,10,15 102:15, 21,23 109:13,17,18,22, 24 110:2,3,8,11,12,14, 16,25 111:18 112:2,5 114:17,18 115:1 117:19

**transcribed** 34:9 39:21 45:15 46:11 48:10 52:18 53:7 84:3 85:19 87:14 89:3,25 90:7,15,22

**transmit** 28:10

**trapped** 23:5 45:6,10 57:24

**treatment** 31:19,22 32:9

**trouble** 87:18 88:4 89:9 91:3

**true** 46:22

**trunk** 37:5

**trust** 110:10,18

**turn** 35:13

**turned** 99:25

**twelve** 23:16

**type** 42:24 97:8 119:23

**types** 69:8

**typically** 13:13 17:19 24:9 30:21 41:14 64:6, 11 65:2 69:18 99:12 107:1 110:13

**U**

**Uh-huh** 4:19 12:17 13:5 15:6 21:11 22:21 23:17, 20 24:18 27:15 29:6 35:5,8,11,16,21 36:19 46:17 47:2,20 76:3 91:21 108:6 117:23 119:15

**Ultimately** 9:16

**unable** 101:19 102:23

**unarmed** 86:25

**under-belt** 64:13

**understand** 6:7,10,21, 25 15:11 56:15 80:13

**understanding** 74:9

**underwear** 35:12

**unfamiliar** 104:13

**unfolded** 72:21 101:4

**unit** 5:19 9:25 10:1,4 11:16 15:4,5,7,9 17:21 22:7,14 23:12,18,22,25 24:8,25 29:8,12,14,22, 25 30:4 31:15 33:1,3,5, 10,12 63:11 65:14 66:2, 10,15,17,21 68:23 69:19,24 78:18,19 79:8 86:1 107:25 108:14 110:8 111:3

**units** 5:8 24:15 25:3 66:20 110:4,6,7

**unknown** 118:6,12

**unpredictable** 50:9

**updated** 22:2,5 118:6,7, 9

**updates** 66:19 109:24

**upload** 13:18

**upset** 92:9,13

**V**

**vaccine** 115:19,23

**vaccines** 115:12

**vacillate** 92:14

**vehicle** 10:9 18:15 78:1 81:14,18 86:17

**vendor** 110:13

**VENZA** 14:12,15 20:4, 11 21:14,17 41:22 95:10 98:2,5,9

**veracity** 58:12,23

**version** 9:6,8

**versus** 14:8 98:15 109:7

**veterinary** 115:16

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Weber, Erica on 04/02/2026

30(b)(6)
Index: vicinity..Zulu

**vicinity** 24:4

**vicious** 62:10

**video** 13:12 15:1,13 16:4 17:18 34:1,4,7,9 38:8 39:15,19,21 40:15 45:13,15,25 46:9,11 47:21,23 48:8,10,17,20 51:1,2,16 52:11,16,18, 20 53:2,5,7,8,10 55:19, 25 56:2 71:20,23 82:21 83:3,5,9,13,18,19 84:1,3 85:3,11,17,19 86:3 87:5, 12,14 88:16 89:1,3,20, 23,25 90:2,5,7,10,13,15, 17,20,22 91:10 92:20,21 93:12,13,18 101:11 102:11 114:3 119:6 120:20,21

**videos** 12:21 16:10,17 51:23 101:16,20,21 102:8,15,17 103:3,6,10

**violations** 67:5 78:21 99:23,24

**vocalizing** 48:13

**volatile** 92:13

---

## W

---

**W-E-B-E-R** 4:12

**wait** 15:12

**walk** 20:25

**walking** 76:13

**warning** 91:17

**warranted** 43:14

**watch** 87:5 101:13 102:19 103:3

**watched** 103:7

**watching** 83:20

**weapon** 63:7 79:1,5 81:4,12,16 82:3,10,13 87:8

**weapons** 62:9,19 71:25 80:22 81:7

**Weber** 4:2,12,13 5:25 6:7 7:25 20:7 54:9 63:6 79:17 82:24

**website** 43:1,8

**white** 23:4 51:5 93:8

**whomever** 15:10

**wide** 46:25

**wife** 46:21

**wildlife** 69:5

**wise** 42:5

**withdraws** 79:1

**woke** 35:3 45:22

**words** 50:8

**work** 10:18 11:7 12:1 13:25 15:8 22:17 93:9

**worked** 13:8

**working** 24:7 28:16

**World** 52:2

**worth** 101:12

**Wow** 4:18 5:21

**wrap** 114:8

**wrestling** 52:2

**write** 30:6 105:15

**written** 33:22 68:1 75:10 78:11,15,20 105:16 107:18

**wrong** 61:13

**wrote** 119:23

**WTF** 51:3,19,25

---

## Y

---

**yard** 58:13 62:1

**Yates** 24:20,24 25:6 30:12,19

**year** 66:3 108:11

**years** 4:17 13:4 14:7 32:23 33:25 96:10 107:24

**young** 18:14,21

---

## Z

---

**Zulu** 107:16



PLAINTIFF'S
EXHIBIT

ES 4/2/26 DMT

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
(Jacksonville Division)

CASE NO. 3:24-CV-01358-MMH-SJH

KIMBERLY BARUS,

          Plaintiff,

v.

THE CITY OF JACKSONVILLE, FLORIDA,
et al.,

          Defendants.

_____/

## PLAINTIFF'S AMENDED[1] NOTICE OF RULE 30(b)(6) DEPOSITION

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiff, by and through undersigned counsel, shall take the deposition upon oral examination of Defendant CITY OF JACKSONVILLE, FLORIDA [hereafter "Defendant" and/or "CITY"] through one or more of its officers, directors, agents, or other representatives who shall be designated to testify on its behalf regarding all information collectively known or reasonably available to it with respect to the subject matters identified in "Schedule A," below, on **Thursday, April 2, 2026, at 9:00 a.m. (est)** at 2442 Atlantic Boulevard, Jacksonville, FL 32207 (parking in rear) before an officer authorized by law to take depositions.

This deposition will be recorded by stenographic means and may be used at trial and for all other purposes permitted under the Federal Rules of Civil Procedure. Its taking may be adjourned from day to day until completed, and may occur over several days if more than one person is necessary or more time is needed to provide the information requested.

_____

[1]Amended as to date to accommodate Defendant Lampkin.

As used in this Notice, the terms "Defendant" and "You" mean Defendant CITY and any person acting on its behalf. "JSO" means the Jacksonville Sheriff's Office. "BWC" means Body Wear Camera.

## SCHEDULE A

1.  The CITY's Answer and Affirmative Defenses [DE 30].

2.  The CITY's answers to Plaintiff's Interrogatories and the documents and materials produced by the CITY in response to Plaintiff's Requests for Production in this case.

3.  JSO Orders produced by the CITY in discovery in this case.

4.  Lampkin BWC video of the 4/11/2022 subject incident.

5.  The CITY's additional BWC video of the 4/11/2022 subject incident.

6.  All Animal Encounter Training provided by the CITY for JSO that Lampkin received/underwent, including the Police and Dog Encounters Video Series utilized by JSO in 2015.

7.  The current Animal Encounter Training provided by the CITY for JSO.

8.  Malene Ellington and Javon Ellington 9-1-1 calls and interactions with JSO.

9.  The content of the CITY's Reports regarding the 4/11/2022 shooting of Plaintiff's dog Lucy and the 4/11/2022 calls from Malene and Javon Ellington.

10. The CITY's Intradepartmental Investigation, including by the Professional Oversight Unit, of the 4/11/2022 shooting of Plaintiff's dog Lucy.

11. The determination that Lampkin's actions on 4/11/2022 warranted "[n]o further action" and were "within policy."

12. JSO's Professional Oversight Unit's operation and investigation process.

13. Lampkin's EAIH history.

14.  The CITY's records regarding Lampkin's EAIH history.

15. The CITY's disposition of each incident comprising Lampkin's EAIH history.

16. The CITY's policies, procedures, and practices for receiving, processing,

2

dispatching, recording, documenting, and retaining 9-1-1 calls and BWC videos.

17. JSO's examination and handling of Lucy's body after the 4/11/2022 shooting.

18. The CITY's investigation of 4/11/2022 events at and near the Plaintiff's residence, and retention of evidence.

19. Lampkin's personnel file, training, and CITY's evaluation of his actions on 4/11/2022.

20. The CITY's "Event Recap" for 4/11/2022 and "Calls for Service List" for 4/11/2022 and all involved CITY personnel.

21. Excluding attorney/client communications, the CITY's communications with third parties regarding the CITY's policy, practices, rules, regulations, and procedures pertaining to Defendant Lampkin's shooting Lucy.

22. Excluding attorney/client communications, the CITY's communications with third parties regarding, relating, or concerning Plaintiff and the shooting of her dog.

23. The CITY's Board meetings, special meetings, intradepartmental, and general meetings in which the shooting of Plaintiff's dog Lucy and/or Defendant Lampkin's actions on 4/11/2022 were an agenda item or discussed, including but not limited those held by the Professional Oversight Unit.

24. Reports, complaints, comments, and/or information received by the CITY regarding, concerning, or relating to the shooting of Plaintiff's dog Lucy, including those received by the County Commission, and on the CITY or JSO social media pages.

25. The CITY's response to the dog shootings identified in the Second Amended Complaint and any other dog shootings involving JSO deputies/officer in the last seven years, including any disciplinary actions taken.

26. The CITY'S enforcement of relevant sections of Jacksonville Municipal Code Chapter 462 (i.e., 101, 102, 303, 315, etc.; not Parts 2; 5-18).

3

VENZA LAW, PLLC
12161 Mercado Drive, #227
Venice Beach, FL 33409-1147
Office: (561) 596-6329
Email: dvenza@venzalawpllc.com

BY: s / *Denese Venza*

Denese Venza, Esq.
Florida Bar No. 0599220
*Counsel for Plaintiff*

MARCY I. LAHART, PLLC
861 S. 40th Street
Tacoma, WA 98418
Telephone: (352) 545-7001
Facsimile: (888) 400-1464
Email: marcy@doglaw.co

BY: s/ *Marcy I. LaHart*

Marcy I. LaHart, Esq.
Florida Bar No. 0967009
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of February, 2026, a true and correct copy of the foregoing **PLAINTIFF'S AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION** was served via email to to counsel for Defendant CITY OF JACKSONVILLE, FLORIDA, Paul E. Bueker, Esq., Assistant General Counsel, 117 West Duval Street, Suite 480, Jacksonville, Florida 32202, via email to: PBueker@coj.net and GPaulino@coj.net; and to counsel for Defendant KARL D. LAMPKIN, Sonya Harrell, Esq., Deputy General Counsel, Tort Department, 117 West Duval Street, Suite 480, Jacksonville, Florida 32202, via email to: SonyaH@coj.net and BOsburn@coj.net.

BY: s/*Denese Venza*

Denese Venza, Esq./FBN 0599220
*Counsel for Plaintiff*

cc: Court Reporter [FCCR]

4

# Event Recap

| | | | | |
|---|---|---|---|---|
| Incident Number: | JSO/220411-00209409 | Incident Date/ Time: | 04/11/2022 06:22 | Closed Date/ Time: | 04/11/2022 16:45 |

Incident Number: **JSO/220411-00209409**  Incident Date/ Time: **04/11/2022 06:22**  Closed Date/ Time: **04/11/2022 16:45**

Address: **3504 ROCKWOOD DR**  Building:

Caller: **ALLENTON, MR  PARKVIEW DR / ROCKWOOD DR 904-862-5453**  Area:

Primary Officer: **BURFORD, KENDALL E  O320 / ID# 66783**  Subsector: **S-1**

Operator: **CARR, SHANTAVIA  ID# 84159**  Beat: **244**

Priority: **3**  Signal: **19  ANIMAL INVESTIGATION**  Alarm ID:

Dispositions:

| | |
|---|---|
| BC7 - BODY CAM - RETAIN FOR 7 YEARS/ | K - ASST OTHER UNIT/AGN;SUPERVISOR/ |
| K - ASST OTHER UNIT/AGN;SUPERVISOR/ | BC7 - BODY CAM - RETAIN FOR 7 YEARS/ |
| K - ASST OTHER UNIT/AGN;SUPERVISOR/ | BC7 - BODY CAM - RETAIN FOR 7 YEARS/ |
| BC7 - BODY CAM - RETAIN FOR 7 YEARS/ | K - ASST OTHER UNIT/AGN;SUPERVISOR/ |
| RTR - RESPONSE TO RESISTANCE/ | BC7 - BODY CAM - RETAIN FOR 7 YEARS/ |
| K - ASST OTHER UNIT/AGN;SUPERVISOR/ | L - ACCESSORY REPORT SUBMITTED/RTR BY 186 |
| BC5 - BODY CAM - RETAIN FOR 5 YEARS/ | K - ASST OTHER UNIT/AGN;SUPERVISOR/ |
| BC7 - BODY CAM - RETAIN FOR 7 YEARS/ | 1 - GENERAL REPORT WRITTEN/ |
| BC5 - BODY CAM - RETAIN FOR 5 YEARS/ | / |

PLAINTIFF'S EXHIBIT
4/2/26  2M1

## AUDIT TRAIL

| Create Date | Audit Text | Operator |
|---|---|---|
| 04/11/2022 06:22 | INCIDENT INITIATED | CONSOLE: JSO-09B; CARR, SHANTAVIA(84159) |
| 04/11/2022 06:22 | CALLER INFO UPDATED: UNKNOWN,UNKNOWN | CONSOLE: JSO-09B; CARR, SHANTAVIA(84159) |
| 04/11/2022 06:22 | COMMENTS: ON PARKVIEW....PITBULL CHASING CMP (SIG 56 MR.ALLENTON) ADV HE IS ON TOP OF A WHI SEDAN | CONSOLE: JSO-09B; CARR, SHANTAVIA(84159) |
| 04/11/2022 06:22 | INCIDENT INITIATED | CONSOLE: JSO-09B; CARR, SHANTAVIA(84159) |
| 04/11/2022 06:22 | | CONSOLE: JSO-09B; CARR, SHANTAVIA(84159) |
| 04/11/2022 06:23 | CALLER INFO UPDATED: UNKNOWN,UNKNOWN | CONSOLE: JSO-09B; CARR, SHANTAVIA(84159) |
| 04/11/2022 06:23 | | CONSOLE: JSO-09B; CARR, SHANTAVIA(84159) |
| 04/11/2022 06:23 | | CONSOLE: JSO-Z6B; HARLESS, SAMANTHA(82643) |

| 04/11/2022 06:23 | PRIMARY UNIT CHANGED TO [M319] | CONSOLE: JSO-Z6B; HARLESS, SAMANTHA(82643) |
|---|---|---|
| 04/11/2022 06:23 | UNIT STATUS FOR [M319] CHANGED TO <NA> | CONSOLE: JSO-Z6B; HARLESS, SAMANTHA(82643) |
| 04/11/2022 06:23 | UNIT DISPATCHED: [M319] | CONSOLE: JSO-Z6B; HARLESS, SAMANTHA(82643) |
| 04/11/2022 06:23 | INCIDENT STATUS: ACTIVE | CONSOLE: JSO-Z6B; HARLESS, SAMANTHA(82643) |
| 04/11/2022 06:23 | | CONSOLE: JSO-Z6B; HARLESS, SAMANTHA(82643) |
| 04/11/2022 06:24 | UNIT STATUS FOR [M319] CHANGED TO <EN> (LOCATION: PARKVIEW DR / ROCKWOOD DR) | CONSOLE: JSO-Z6B; HARLESS, SAMANTHA(82643) |
| 04/11/2022 06:25 | | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:25 | COMMENTS: DUP: CMP SIG 56 ON TOP OF THE WHI HONDA CIVIC | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:25 | | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:25 | CALLER INFO UPDATED: UNKNOWN,UNKNOWN | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:25 | | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:25 | | CONSOLE: JSO-06B; ROBERTS-BOONSTRA, JESSICA(77832) |
| 04/11/2022 06:25 | CALLER INFO UPDATED: UNKNOWN,UNKNOWN | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:25 | | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:25 | CALLER INFO UPDATED: UNKNOWN,UNKNOWN | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:25 | | CONSOLE: JSO-04B; MUNOZ, GISELLE(85000) |
| 04/11/2022 06:29 | | CONSOLE: JSO-Z6B; HARLESS, SAMANTHA(82643) |
| 04/11/2022 06:32 | | CONSOLE: JSO-14B; BARRON, SIMON(5762) |
| 04/11/2022 06:33 | COMMENTS: CMP ON TOP OF A WHI HONDA CIVIC, THE DOGS HAVE HIM TRAPPED, CAN HEAR THEM BARKING | CONSOLE: JSO-14B; BARRON, SIMON(5762) |
| 04/11/2022 06:34 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 06:41 | | CONSOLE: JSO-LAP44403-M; LAMPKIN, KARLOUS (63454) |
| 04/11/2022 06:41 | | CONSOLE: JSO-LAP44403-M; LAMPKIN, KARLOUS (63454) |
| 04/11/2022 06:48 | | CONSOLE: JSO-LAP44296-M; BLACKSHEAR, KELSEY(80723) |
| 04/11/2022 06:48 | UNIT STATUS FOR [M319] CHANGED TO <AR> | CONSOLE: JSO-LAP44403-M; LAMPKIN, KARLOUS (63454) |
| 04/11/2022 06:55 | | CONSOLE: JSO-LAP44403-M; LAMPKIN, KARLOUS (63454) |
| 04/11/2022 07:15 | | CONSOLE: JSO-LAP43842-M; NEWELL, AUSTIN (80840) |
| 04/11/2022 07:19 | | CONSOLE: JSO-LAP45777-M; YATES, LUCRETIA (69909) |
| 04/11/2022 07:23 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP44296-M; BLACKSHEAR, KELSEY(80723) |
| 04/11/2022 07:24 | UNIT STATUS FOR [M229] CHANGED TO <NA> | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |

| Date/Time | Description | Console |
|---|---|---|
| 04/11/2022 07:24 | UNIT DISPATCHED: [M229] | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:24 | UNIT STATUS FOR [M121] CHANGED TO <NA> | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:24 | UNIT DISPATCHED: [M121] | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:24 | UNIT STATUS FOR [632] CHANGED TO <NA> | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:24 | UNIT DISPATCHED: [632] | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:24 | | CONSOLE: JSO-19B; ROBINSON, PATRICIA(6630) |
| 04/11/2022 07:24 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP44137-M; MULHEARN, JASON (81351) |
| 04/11/2022 07:24 | | CONSOLE: JSO-05B; PEDATA, ANDREA(77828) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP44979-M; FOOTE, TYLER (82558) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP45051-M; KUIPER, BRIAN (67169) |
| 04/11/2022 07:24 | UNIT STATUS FOR [M229] CHANGED TO <EN> (LOCATION: PARKVIEW DR / ROCKWOOD DR) | CONSOLE: JSO-LAP44296-M; BLACKSHEAR, KELSEY(80723) |
| 04/11/2022 07:24 | UNIT STATUS FOR [M121] CHANGED TO <EN> (LOCATION: PARKVIEW DR / ROCKWOOD DR) | CONSOLE: JSO-LAP45777-M; YATES, LUCRETIA (69909) |
| 04/11/2022 07:24 | UNIT STATUS FOR [632] CHANGED TO <EN> (LOCATION: PARKVIEW DR / ROCKWOOD DR) | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP45777-M; YATES, LUCRETIA (69909) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP44296-M; BLACKSHEAR, KELSEY(80723) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP44155-M; PETERSON, MICHAEL (5771) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP43907-M; SWEET, JOSEPH (7074) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP44492-M; COPELAND, COURTNEY(72135) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP44843-M; HYMAN, TERENCE (7174) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP45216-M; CREWS, RANDALL (5239) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP43033-M; GAY, JORDAN(83462) |
| 04/11/2022 07:24 | | CONSOLE: JSO-IVB; LEVAI, ASHLEY(78911) |
| 04/11/2022 07:24 | | CONSOLE: JSO-LAP43049-M; SMITH, JULIUS(82390) |
| 04/11/2022 07:24 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:25 | | CONSOLE: JSO-LAP45272-M; ROBINSON, KEVIN (5798) |
| 04/11/2022 07:25 | | CONSOLE: JSO-LAP44155-M; PETERSON, MICHAEL (5771) |
| 04/11/2022 07:25 | | CONSOLE: JSO-IVB; LEVAI, ASHLEY(78911) |
| 04/11/2022 07:25 | | CONSOLE: JSO-05B; PEDATA, ANDREA(77828) |

| Date/Time | Description | Console |
|---|---|---|
| 04/11/2022 07:25 | | CONSOLE: JSO-LAP44344-M; BUMGARNER, CALEB (73993) |
| 04/11/2022 07:25 | | CONSOLE: JSO-LAP45824-M; GRIFFIN, RAFAEL (76077) |
| 04/11/2022 07:25 | | CONSOLE: JSO-LAP44924-M; TAYLOR, HEATHER (69744) |
| 04/11/2022 07:26 | UNIT STATUS FOR [186] CHANGED TO <EN> (LOCATION: PARKVIEW DR / ROCKWOOD DR) | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:26 | UNIT DISPATCHED: [186] | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:26 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:26 | | CONSOLE: JSO-LAP44296-M; BLACKSHEAR, KELSEY(80723) |
| 04/11/2022 07:26 | COMMENTS: PER M319 SIG 18 TO DOG SHOTS FIRED BY OFFCRS | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:26 | | CONSOLE: JSO-LAP45306-M; SHEA, BRANDON (66209) |
| 04/11/2022 07:26 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:26 | | CONSOLE: JSO-LAP44924-M; TAYLOR, HEATHER (69744) |
| 04/11/2022 07:27 | COMMENTS: DUP: ADV DOWN THE STREET SUBJS 63G THEN HEARD 33S , NOI | CONSOLE: JSO-07B; JOHNSON, GWENDOLYN (60939) |
| 04/11/2022 07:27 | | CONSOLE: JSO-07B; JOHNSON, GWENDOLYN (60939) |
| 04/11/2022 07:27 | CALLER INFO UPDATED: UNKNOWN,UNKNOWN | CONSOLE: JSO-07B; JOHNSON, GWENDOLYN (60939) |
| 04/11/2022 07:27 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:27 | | CONSOLE: JSO-LAP44296-M; BLACKSHEAR, KELSEY(80723) |
| 04/11/2022 07:27 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:28 | | CONSOLE: JSO-19B; ROBINSON, PATRICIA(6630) |
| 04/11/2022 07:28 | | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:28 | | CONSOLE: JSO-LAP44492-M; COPELAND, COURTNEY(72135) |
| 04/11/2022 07:29 | | CONSOLE: JSO-LAP44985-M; SIRCAR, ASHISH (7422) |
| 04/11/2022 07:30 | | CONSOLE: JSO-LAP45423-M; RAY, TIAWANA (19432) |
| 04/11/2022 07:30 | | CONSOLE: JSO-LAP45423-M; MATZEN, JOHN (19432) |
| 04/11/2022 07:30 | | CONSOLE: JSO-05B; PEDATA, ANDREA(77828) |
| 04/11/2022 07:30 | | CONSOLE: JSO-LAP46004-M; SAMES, JENNIFER (64623) |
| 04/11/2022 07:31 | UNIT STATUS FOR [M229] CHANGED TO <AR> | CONSOLE: JSO-LAP44296-M; BLACKSHEAR, KELSEY(80723) |
| 04/11/2022 07:31 | UNIT STATUS FOR [646] CHANGED TO <AR> | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |
| 04/11/2022 07:31 | UNIT DISPATCHED: [646] | CONSOLE: JSO-Z5B; BRYAN, AVERY(80814) |