# In the Matter of:

*KIMBERLY BARUS*

*vs*

*THE CITY OF JACKSONVILLE, FLORIDA, et al.*

*Case No. 3:24-CV-01358-MMH-SJH*

*KARL LAMPKIN*

*April 03, 2026*



2442 Atlantic Boulevard, Jacksonville, FL  32207
(904) 396-1050          www.firstcoastcr.com

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
(Jacksonville Division)

CASE No.: 3:24-CV-01358-MMH-SJH


KIMBERLY BARUS,

     Plaintiff,

  v.

THE CITY OF JACKSONVILLE, FLORIDA,
et al.,

     Defendants.
----------------------------------


     Deposition of Karl D. Lampkin, taken on behalf of

the Plaintiff, pursuant to Plaintiff's Amended Notice of

Deposition, in the above-entitled action, on Friday,

April 3, 2026, at 9:00 a.m., at First Coast Court

Reporters, 2442 Atlantic Boulevard, Jacksonville,

Florida, before Diane M. Tropia, FPR, a Notary Public in

and for the State of Florida at Large.



First Coast Court Reporters
2442 Atlantic Boulevard
Jacksonville, FL 32207
(904) 396-1050


- - -

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

Page 2

APPEARANCES:

MARCY I. LAHART, Esquire, Marcy I. LaHart, PLLC, 861 S. 40th Street, Tacoma, WA 98418, Attorney for Plaintiff.

DENESE VENZA, Esquire, Venza Law, PLLC, 12161 Mercado Drive, Suite 227, Venice Beach, FL 33409, Attorney for Plaintiff.

SONYA HARRELL, Deputy General Counsel, City of Jacksonville, Office of General Counsel, 117 West Duval Street, Suite 480, Jacksonville, FL 32202, Attorneys for Defendant Karl D. Lampkin.

PAUL E. BUEKER, Assistant General Counsel, City of Jacksonville, Office of General Counsel, 117 West Duval Street, Suite 480, Jacksonville, FL 32202, Attorneys for City of Jacksonville.

- - -

Page 3

I N D E X

WITNESS

  KARL D. LAMPKIN

    DIRECT EXAMINATION BY MS. VENZA . . . . PAGE  4

- - -

E X H I B I T S

FOR IDENTIFICATION

   PLAINTIFF'S EXHIBIT  1 . . . . . . . . . . PAGE  70

   PLAINTIFF'S EXHIBIT  2 . . . . . . . . . . PAGE  99

   PLAINTIFF'S EXHIBIT  3 . . . . . . . . . . PAGE 109

   PLAINTIFF'S EXHIBIT  4 . . . . . . . . . . PAGE 116

   PLAINTIFF'S EXHIBIT  5 . . . . . . . . . . PAGE 199

   PLAINTIFF'S EXHIBIT  6 . . . . . . . . . . PAGE 231

   PLAINTIFF'S EXHIBIT  7 . . . . . . . . . . PAGE 235

   PLAINTIFF'S EXHIBIT  8 . . . . . . . . . . PAGE 236

   PLAINTIFF'S EXHIBIT  9 . . . . . . . . . . PAGE 238

- - -

Page 4

- - -

KARL D. LAMPKIN having been produced and first duly sworn as a witness, testified as follows:

DIRECT EXAMINATION

BY MS. VENZA:

Q.  Good morning, sir.  We've already had our introductions.  Would you please state and spell your full name?

A.  First name Karlous, K-a-r-l-o-u-s; middle name Deshun, D-e-s-h-u-n; last name Lampkin, L-a-m-p-k-i-n.

Q.  Are you a senior?

A.  Yes.

Q.  Do you have a son with the exact same -- that has the exact same name?

MS. HARRELL:  Let me just object.  We're not going to get into family names here. Obviously, it's because he's a senior, but that's enough for family information.

MS. VENZA:  Okay.

BY MS. VENZA:

Q.  You've testified under oath previously?

A.  Yes.

Q.  And you've testified both in depositions and in trial, correct?

Page 5

A.  Yes.

Q.  And you understand you're under oath?

A.  Yes.

Q.  And you understand that this is a deposition, not a trial here today, correct?

A.  Yes.

Q.  And you are aware that the rules are different about testifying in a deposition than they are in a trial?

MS. HARRELL:  Object to the form. You can answer.

A.  Tell the truth either way.

BY MS. VENZA:

Q.  Now, I can ask things here today that I might not be able to ask in trial because the rules of evidence do not apply here; are you aware of that?

MS. HARRELL:  Object to the form. You can answer.

A.  No, I'm not aware of that.

BY MS. VENZA:

Q.  Well -- so I'm going to explain to you that there are rules of evidence that don't apply here today. The rules of discovery, if you will, are broader.  I can ask about things that you might not think are relevant, but the rules of discovery allow me to.  I --

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                                                Pages 6..9

Page 6

MS. HARRELL: Object to -- go ahead. Sorry.
BY MS. VENZA:
Q.  I will not ask about -- or I will try not to ask about things that are privileged.  That's the only thing that is off limits here today, is things that are privileged.
MS. HARRELL: Let me object to the form.
Are you finished?
MS. VENZA: (Nods head.)
MS. HARRELL: Okay.
I'm going to object to the form.  I'm also going to object and, if necessary, set the groundwork for a motion for protective order as to information that may not be privileged, but should not be asked in this.  And it's something we discussed before, about personal information, family information that --
MS. VENZA: Okay.  But let's -- you can hold that.
MS. HARRELL: Sure.
MS. VENZA: If you have an objection in the future --
MS. HARRELL: Okay.
MS. VENZA: And this is why I was trying

Page 7

to establish that.
BY MS. VENZA:
Q.  If I ask a question, you're required to answer unless your attorney objects and has a ground for objection that is privileged.  If she does not have that, once she makes her statement of objection, she's limited to form.  That's so that there's no appearance that she's coaching you with your answer.
So allow me to ask my question.  Allow time, in case your attorney wants to interpose an objection of form or privilege and instruct you to answer or not answer, and then go ahead with your answer.  Okay?  Do you understand that?
MS. HARRELL: I -- I'm going to object to the form.  You're misstating the law.  You're misstating the Federal Rules of Civil Procedure relating to depositions, and you're misstating the discovery guidelines of the Middle District, so I'm objecting.
You may answer her question.
BY MS. VENZA:
Q.  Do you understand what I said?
A.  Okay.  I'm going to ask her a question.
Q.  I --
MS. HARRELL: You can't ask me a

Page 8

question --
THE WITNESS: Okay.
MS. HARRELL: -- right now.
BY MS. VENZA:
Q.  Do you want me to repeat what I said?
A.  No.
Q.  Okay.  Do you understand what I said?
A.  Yes.
Q.  You went into the police academy in 2006; is that right?
A.  One more time?
Q.  You entered the police academy in 2006?
A.  Yes.
Q.  Who sponsored you?
A.  The City.
Q.  There was no individual?
A.  No.
Q.  You didn't have to have a reference or somebody who was on the force or another police official?
A.  What do you mean by "sponsor"?  Is that who paid me -- paid to go or a reference?
Q.  Either one.
Okay.  Let's start with, did someone pay for you to go?
A.  No.  The City paid.  It was a job.

Page 9

As far as references are concerned, I don't remember.
Q.  You don't remember who -- who was your reference for you to apply to --
A.  (Inaudible.)
Q.  Let me finish the question.
-- for you to apply to the police academy?
A.  It was 19 years ago.  As far as the references that -- as far as character references, are you -- are we speaking of?
Q.  Whoever the police academy required.  The police academy requires people to have references, correct?
A.  Correct.
Q.  Okay.  And you applied to the police academy, correct?
A.  Yes.
Q.  And so you gave them references, correct?
A.  Yes.
Q.  Okay.  So who were those references?
A.  I don't know.  You'd have to look at my file to find that out.
Q.  You don't remember?
A.  I do not.  As I mentioned, I do not remember.
Q.  Now, this is it, where this is discovery and

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                                 Pages 10..13

Page 10

this is different than at trial, because you're obligated to search in your brain and give me everything that you remember. And you do not remember who sponsored you to go to the police academy?

MS. HARRELL: Object to the form.

I'm going to mark this as a potential grounds for -- it's harassing, it's oppressive, because you're not properly stating the rules and you're telling him he has to do things that he is not obligated to do in a deposition.

MS. VENZA: I'm going to ask you to limit your --

MS. HARRELL: I am setting the grounds for a motion for a protective order. I am allowed to -- to do that under the rules.

MS. VENZA: I'm going to ask you to limit your objections to proper objections.

MS. HARRELL: And I'm going to ask you to state the law correctly.

BY MS. VENZA:

Q. And how old were you when you entered the police academy?

A. Around 33.

Q. Was this a big career change for you?

A. It was a career change, yes.

Page 11

Q. So you don't agree with the word "big"?

A. No.

Q. It was just a small change in career for you?

A. It was a career change. We'll leave it at that.

Q. Well, tell me more about that. Did you have multiple career changes before age 33?

A. I left Blue Cross Blue Shield customer service. It was different, but as far as saying -- it was a career change. That's all I'm going to say.

Q. Why did you leave Blue Cross Blue Shield?

A. To be a police officer.

Q. How many references were you required to have?

A. I can't remember, but I would comfortably say most companies, they -- they will use three. At least three. So I'm not a hundred percent sure, but I would say probably three.

Q. And you don't remember one of them?

A. No. It was 19 years ago, ma'am.

Q. How many career changes have you had in your life?

MS. HARRELL: Object to the form.

You can answer.

A. I don't remember.

BY MS. VENZA:

Page 12

Q. How many years were you at Florida Blue?

A. Five years, I would say.

Q. When did you graduate high school?

A. That's in my -- in my record. Do you have that?

Q. I'm asking you a question, sir.

A. Do you have -- do you have it?

Q. Do you --

MS. HARRELL: You can answer the year.

A. 1991.

BY MS. VENZA:

Q. Did you get a job after you graduated high school?

A. Yes.

Q. Where did you work?

A. As entry-level jobs, I worked at a restaurant called Scoots (phonetic). It was like a standalone fast-food joint.

Q. Did you work in the kitchen? Did you work up front? What did you do?

A. I worked -- basically, at that job, you do everything.

Q. How many years were you with Scoots?

A. I don't remember.

Q. Okay. Did you have any other jobs between

Page 13

Scoots and Florida Blue?

A. Yeah. I worked at Publix.

Q. What did you do for Publix?

A. I worked at a deli.

Q. And how many years did you work for Publix?

A. I would say between two and three.

Q. Two and three years?

A. Yes.

Q. Any other jobs between -- any other jobs, other than working at Scoots, Publix, and Florida Blue before you entered the police academy?

A. Yes. I also worked at Shoney's, the restaurant.

Q. And what did you do at Shoney's?

A. I was a night cook.

Q. Are you a good cook?

A. I like to think so.

Q. Any other jobs?

A. I did some construction.

Q. Was that with a company?

A. Uh-huh.

Q. And that's a yes?

A. Yes. It was a company.

Q. And what -- what company?

A. It was called qualified marciting [sic] --

Case 3:24-cv-01358-MMH-SJH    Document 74-1    Filed 06/01/26    Page 6 of 89 PageID
1590
KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                          Pages 14..17

Page 14

Q. What kind of --

A. Or Quality Marciting is what it was.

Q. What kind of construction?

A. A pool business.

Q. I'm sorry?

A. Pool. We built swimming pools -- or marcited swimming pools.

Q. Any other jobs?

A. I worked at Convergys.

Q. What's that?

A. It's a call center.

Q. Was that before or after the Florida Blue job?

A. That was before Florida Blue.

Q. Did that lead to the Florida Blue job?

A. Yes, it did.

Q. So now, have we covered all of your careers?

A. Well, I would -- I would say yes.

Q. You started to say well, and I'm sorry, I cut you off.

A. I -- I -- I believe so.

Q. Did any of the jobs involve interactions with canines?

A. No.

Q. Did you do any volunteer work, intern work, or anything else that involved interactions with canines

Page 15

before you entered the police academy?

A. No.

MS. HARRELL: I hate to interrupt you, but I -- do you mean dogs generally or do you mean canines in the policing term? I just -- I want to clarify that because canine is kind of --

MS. VENZA: He answered. He answered the question.

MS. HARRELL: Okay. Well, I just -- okay. I'll ask a clarification. I just wanted to make things easier.

BY MS. VENZA:

Q. You graduated the police academy in 2006 -- or no. I know you entered in 2006.

A. Right. Just look at my file and find that answer.

Q. No, I'm asking you a question, sir.

A. I do not recall the specific date. If -- if I --

Q. I'm not asking for a specific date. I was asking for the year.

A. Okay. It would be 2007 or 2008.

Q. Okay. Forgive me, how long is one in the police academy?

A. I think, like, eight months, and then it's

Page 16

various -- it's various phases to it. You go into the academy, you go into orientation, and then you go to the field training portion of it.

Q. Okay. So when I say "graduated," is there different graduations? Is there police academy graduation, then when you complete your field training is there a graduation?

A. You graduate the academy.

Q. You graduate the academy?

A. And then you go into field training. So I would just say approximately a year. We'll -- let's say, ballpark, 2007.

Q. 2007 is when you completed all that you needed to complete to be a police officer?

A. No. That's when I graduated the academy. But you asked me --

Q. That's when you graduated the academy?

A. -- specifically about graduation, right?

Q. You are correct. And then after that, you went to field training?

A. Yes.

Q. And how long were you in field training?

A. I'd say probably four months or so, three to four months.

Q. When and where were you sworn in as a police

Page 17

officer?

A. Excuse me?

Q. When and where were you sworn in as a police officer?

A. You have to look at my file. I can -- I can tell you, official swearing-in, it -- that should be in my file. I don't know the date.

Q. That wasn't a big event for you?

A. It was a big event, but I just don't know the date. I --

Q. Can you give me -- and I'm --

A. Okay --

(Simultaneous speaking.)

Q. Give me a year?

A. Okay. 2007.

Q. Was it -- I know we're in Florida, but was it the winter, the summer?

A. Okay. I -- it was at the -- I can tell you the where, but I can't tell you the when.

Q. All right. Tell me the where.

A. Okay. The where is at the -- at the North Campus, Florida Community College campus, at that north branch.

Q. In 2007? And you graduated --

A. (Nods head.)

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 18..21

Page 18

Q. And you said yes?

A. Uh-huh.

Q. You've got to -- please verbalize your responses.

A. Yes.

Q. And you've -- you've testified before and you're aware, the court reporter is present and she's trying to take down everything that's said here today?

A. Yes.

Q. You didn't graduate -- you didn't -- you were not sworn in alone, correct?

A. That's correct.

Q. Okay. So that -- you were whatever class graduated in 2007?

A. Yes. There was a class.

Q. Was there more than one class? Do you know?

A. No. We graduate classes at a time.

Q. And then did you immediately start working at JSO? And by "JSO," I mean the Jacksonville Sheriff's Office. Can we have that agreement, when I say JSO, I mean Jacksonville Sheriff's Office?

A. Yes.

Q. Okay. And if I refer to the City of Jacksonville -- I'm sorry. If I say "City," I'm referring to the City of Jacksonville. Do we have an

Page 19

understanding that that's what I'm referring to?

A. Yes.

Q. All right. So after you were sworn as a -- sworn in as a police officer in 2007, where did you work first?

A. That's when we went -- go to field training, when we graduate.

Q. And how long did that last?

A. That field training, I think I mentioned, like three to four months.

Q. And then what -- then what is next?

A. Then, you get -- when you complete field training, then you get assigned your permanent zone that you will -- you will work.

Q. And you said there was -- like, the City paid -- sponsored -- when I asked you about being sponsored --

A. Right.

Q. -- you explained to me it was the City. And you were referring to the City of Jacksonville as well, correct?

A. I didn't fully understand your question.

Q. Okay.

A. When you said "sponsor," I was thinking more of who paid, as far as sponsor, because there are academy

Page 20

classes that are paid by the City, then there are classes where people do not get paid. Then there --

Q. But you were paid?

A. Yes.

Q. And the City -- and this is what I was just trying to qualify. You meant the City of Jacksonville as well when you responded to me and said the City, correct?

A. Uh-huh. Correct. The City. It was -- like, I was paid from the City. That's who -- that's who paid for my class -- or that's what I meant as far as who sponsored me.

Q. And because the City paid for your police academy training, were you obligated to work for the City as a police officer?

A. Yes.

Q. Okay. And that was with the Jacksonville Sheriff's Office, JSO?

A. Yes.

Q. Approximately what year were you officially a police officer?

MS. HARRELL: Object to the form.

You can answer.

A. That -- that information would be in my file. I can give you a random answer.

Page 21

BY MS. VENZA:

Q. I -- well, I'm not asking for a random answer.

A. I know, but there -- well --

Q. You're --

(Simultaneous speaking.)

A. Go ahead.

Q. You said 2007, we've got you graduated -- you completed field training, right?

A. Uh-huh.

Q. That's a yes?

A. Yes.

Q. So when did you start officially working as a police officer?

A. I would -- I would have to look at my file to see.

Q. Well, was it a year after field training?

A. No, because, like --

Q. Was it --

(Simultaneous speaking.)

A. I can't tell you as far as the month is concerned because they could stay or it could be -- just for an example, if I started the academy in May, and then I do all the training, then I go to the field training, I could say 2007, but potentially it could be early -- it could be a late 2007 or an early 2008 or a

Case 3:24-cv-01358-MMH-SJH    Document 74-1    Filed 06/01/26    Page 8 of 89 PageID 1592

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                Pages 22..25

Page 22

mid 2008.  So it's --

Q.   Okay.  So somewhere around 2007 or 2008?

A.   Just look in the file and find out.

Q.   Am I correct, it would be somewhere between 2007 and 2008?

A.   Okay.  Yes.  It could be 2007 -- between 2007 and 2008.

Q.   Have you ever been a police officer anywhere other than JSO?

A.   No.

Q.   So you've been with JSO for the last 19 years?

A.   Yes.

Q.   Have you done any job or volunteer or intern position before entering the police academy in 2006 that involved interacting with dogs?

A.   No.

Q.   Aside from your job as a police officer with JSO, have you had any job or volunteer position or intern position since graduating from the police academy which involved interacting with dogs?

A.   No.

Q.   What's your current title with JSO?

A.   Police officer.

Q.   Like, lieutenant?  Deputy?

A.   No, just police or deputy sheriff.

Page 23

Q.   A deputy?  Okay.

Was that your title on 4 -- on 4/11/2022?

A.   Well, we have -- because our city is consolidated, we -- we can use two terms.  We can be a police officer or a deputy sheriff, just because we're consolidated.

Q.   And when did they consolidate?  Well, who consolidated?

A.   Ma'am, that was --

Q.   Is that --

(Simultaneous speaking.)

A.   I don't even think I was in the elementary school at that time, so it's -- that's something you'll have to look in the archives of the City.

MS. HARRELL:  Yeah.  You probably weren't born.

BY MS. VENZA:

Q.   Well -- well -- so wait a minute.  So -- well, you're saying consolidated.  So which term do you use, either one?  Since you graduated, you've used that --

A.   I've used -- I've used police and deputy sheriff.

Q.   So that's --

A.   At this time, currently, we're using -- we're using deputy sheriff in our -- as notifications in our

Page 24

paperwork, but I've used interchangeably police and deputy sheriff --

Q.   So --

A.   -- because it's -- right.  We can do so because we're consolidated.

Q.   Okay.  So it depends upon who is the chief, who is running the show there, whether you use the term deputy or police officer?

MS. HARRELL:  Object to the form.

A.   I don't know.  I don't have a way of explaining it to you.  You just -- you have to look in the City archives.

My answer is this:  We are -- this agency is consolidated; therefore, by being consolidated, police officers are police and deputy sheriff.

BY MS. VENZA:

Q.   Are there periods of time during your 19 years that one term is favored over another?

MS. HARRELL:  Object to the form.

A.   I normally use the word "police."

BY MS. VENZA:

Q.   But you're saying at no time would it be incorrect for me to refer to you as deputy?

A.   You can.  That would not be incorrect.  You can refer to me as deputy sheriff.

Page 25

Q.   So did you get a promotion since 4/11/2022?

A.   No.

Q.   What's the next rank above?  Whether you call it a police officer or deputy sheriff, what's the next rank?

A.   Sergeant.

Q.   And you are not a sergeant, correct?

A.   Yes.

Q.   Was there some discussion about you becoming a sergeant?

MS. HARRELL:  Object to the form.

A.   That's a -- that's a process.  It had nothing to do with that date.

BY MS. VENZA:

Q.   Okay.  But since that date, are -- are you in the running to become a sergeant?

A.   Yes, I am.  I am on the promotion list to be a sergeant.

Q.   But you have not been -- I don't know if I'm using the proper word.  You've not been awarded that?

A.   Right.  I have not been awarded as of yet.

Q.   What were your job duties on 4/11/2022?

A.   Patrol administration.  Just patrol.

Q.   You said patrol and administration?

A.   No, just patrol.  It's one.  It's a phrase,

Page 26

patrol administration.

Q.   That's --

A.   That's basically, you -- you serve the functions of a patrol officer.

Q.   And what does a patrol officer do -- or what specifically did they do on 4/11/2022?

A.   You respond to calls for service and you (inaudible) view activity, monitor traffic.

Q.   So the "respond to calls for service," those calls come in through a radio on your vehicle?

A.   Yes.

Q.   Okay.  Do you -- and at the time of 4/11/2022, did you patrol alone?

A.   Yes.  We have -- no one is in our car.

Q.   So was that -- on 4/11/2022, was that the process -- I'm using the wrong word -- for all patrol officers, everybody was solo?

A.   Right.  I was a solo officer at that time.

Q.   But some officers went with more than one?

A.   You --

Q.   Was there, like, sometimes somebody in training or --

A.   Right.  That's -- that's field training, yeah. You'll have a trainee in the car.

Q.   But you weren't training anyone?

Page 27

A.   No.

Q.   And no one was training you?

A.   Right.

Q.   So the call comes in through a radio on your car, and that radio is part of the vehicle.  It's a police-issued radio, correct?

A.   Yes.

Q.   And that is dispatch that's calling in?

A.   Yes.

Q.   And does dispatch -- on 4/11/2022, did dispatch specifically make a call to you regarding 3504 Rockwell [sic], or was there a general dispatch call to any patrol officer in the area?

MS. HARRELL:  Object to the form.

You can answer.

A.   I was dispatched to that area.

BY MS. VENZA:

Q.   Specifically?

A.   Uh-huh.

Q.   That's a yes?

A.   Yes.  That's a yes.

Q.   Okay.  Do you know why you were specifically dispatched?

A.   Yes.

Q.   Why?

Page 28

A.   It was an animal complaint.

Q.   Why you?

A.   We have -- we have the zone separated into sectors, and if you're a sector -- sector officer and you're available, they will -- they will assign you the call.

Q.   Okay.  The zone is geographic?

A.   Yes.  It's parted into six zones.

Q.   What was your zone?

A.   At that time -- let me see.  It was District 5 or Zone 5.

Q.   Oh, that's easy.  So there's six zones, and they call them District 1, 2, 3, 4, 5, 6?

A.   Yes.

Q.   And you were District 5.

So you were in District 5, but you answered -- they dispatched you because of an animal complaint, so I'm still trying to figure out, how does that go together?

A.   Right.  So it's -- within the -- the districts, then there are sectors within the district.

Q.   Okay.  What kind of sectors?

A.   Well, they are -- they are by numbers.  So -- I mean, by letters.  Letters and numbers.  So I'm a Sierra -- Sierra officer.  That's the sector that I'm

Page 29

assigned to.  So that call was in -- that call for service was in the Sierra sector.

Q.   Okay.  So it's all geographic?

A.   Yes.

Q.   And so there's -- the bigger -- well, the bigger geographic is Florida, and then your county, but then specifically for the JSO there's districts, and then there's subcategories of sectors.

Do I have that right?

A.   Yes.

Q.   So I'm still trying to understand why you said you were specifically dispatched to 3504 Rockwell [sic] on 4/11/2022 because of an animal complaint?

MS. HARRELL:  Object to the form.

BY MS. VENZA:

Q.   Why were you -- what does an animal complaint have to do with you being specifically dispatched to that address on that date?

MS. HARRELL:  Object to the form.

You can answer.

A.   The call was given to me by dispatch.  I'm a sector officer.  The incident happened in my assigned sector, so she gave me the call -- so assigned me the call for service.

BY MS. VENZA:

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 30..33

Page 30

Q.   Is it because you were geographically -- strike that.

Is it because that address was in your geographic zone and sector?

A.   Yes.

Q.   Did it have anything to do with the type of call it was?

A.   Please explain.

Q.   Did it have to do -- that there's one police officer that does domestic violence and one -- or certain ones that do animal issues?

A.   No. I was available, so she assigned me the call.

Q.   Why did you answer my question originally that you were specifically dispatched because it was an animal complaint?

MS. HARRELL:  Object to the form.

A.   Because that was -- that was something that happened. They called in to dispatch, and dispatch dispatched me to that call.

BY MS. VENZA:

Q.   What does an animal complaint have to do with your being specifically dispatched?

MS. HARRELL:  Object to the form. Asked and answered.

Page 31

MR. BUEKER:  Join.

MS. VENZA:  He's -- he's not answered it.

I'm asking why the animal complaint -- why was he called for an animal complaint.

A.   And that's something you may have to --

MR. BUEKER:  Asked and answered.

MS. HARRELL:  Join.

BY MS. VENZA:

Q.   You -- do you know?

A.   It was given to me by dispatch.

Q.   And I'm asking you -- you originally answered -- we can go back and read the transcript.

A.   You can.

Q.   I -- I --

MS. HARRELL:  Yeah.

BY MS. VENZA:

Q.   I had asked you, were you specifically dispatched to the 3504 Rockwell property on 4/11/2022?

You said, yes.

Then I said, why?

And you said, animal complaint. That was your answer.

MS. HARRELL:  Right. Look --

BY MS. VENZA:

Q.   And I'm trying to understand why. Why was an

Page 32

animal complaint -- I asked you if it's geographic.

A.   Yes.

Q.   It was purely geographic?

A.   Yes, ma'am.

Q.   It had nothing to do with the nature of the call, just the area of the call, that you were specifically dispatched?

A.   If they dispatch us, we -- we respond. It's just that simple.

MS. HARRELL:  Yeah. Maybe I can help you clarify?

MS. VENZA:  No, that's okay. We're good. I'm good.

MS. HARRELL:  Okay. I'll -- your question wasn't clear. I could probably help you and it would save some time.

BY MS. VENZA:

Q.   Who did you report to on 4/11/2022?

A.   As far as being my sergeant? My higher-up superior, is that we're speaking of?

Q.   Okay. We'll start with sergeant.

A.   Okay. That -- if you're asking me who I report to, it would be -- my first would be Randy Crews.

Q.   Okay. And what does Randy Crews do?

A.   He's a sergeant.

Page 33

Q.   What I meant is --

(Simultaneous speaking.)

A.   He's a sergeant. That's who I reported to --

Q.   Okay. So you --

A.   -- on that day.

Q.   And that is -- right now, that's what -- trying to be specific, we are talking about 4/11/2022?

A.   Right. Right.

Q.   So you would report to your sergeant?

A.   (Nods head.)

Q.   And you're nodding your head yes?

A.   Yes.

Q.   And that was Randy Crews?

A.   Yes, ma'am.

Q.   And Crews is C-r-e-w-s?

A.   Yes.

Q.   Did you report to anybody else on 4/11/2022?

A.   Yes.

Q.   Who?

A.   Ashish Sircar.

Q.   And what was he, was he --

A.   Ashish is -- he's Indian. He's foreign. Ashish.

Q.   Can you --

MS. HARRELL:  Spell it.

Page 34

The WITNESS:  S-i-r-c-a-r.  That's the best you can get from me.  That's his last name.

MS. HARRELL:  We can pull it off the report, Madam Court Reporter.

THE REPORTER:  Thank you.

BY MS. VENZA:

Q.  Was he a sergeant?

A.  No, ma'am, he's -- he's a lieutenant.

Q.  Okay.  So he's above a sergeant?

A.  Yes.

Q.  Would you report to Sergeant Crews, who then reported up to Lieutenant Sircar?

A.  Yes, that's the chain of command.

Q.  Or did you also directly report to Lieutenant Sircar?

MS. HARRELL:  Object to the form.

BY MS. VENZA:

Q.  And let me -- you know, I think -- I'm talking right now, in general, on 4/11.  Let's say it's before you got the call to 3504 Rockwell.  What was your reporting process?  You would report to Sergeant Crews, correct?

MS. HARRELL:  Object to the form.

You can answer if you understand it.

Page 35

A.  That's -- that's our chain of command.

BY MS. VENZA:

Q.  Right.  So before you get the call specifically to 3504 Rockwell, on that day you would report to Sergeant Crews, correct?

A.  Your question doesn't make sense.

Q.  Okay.  What doesn't make sense about it?

A.  You're asking me -- are you asking me, if I get a call for service, then I check in to a sergeant?  Is that what you're asking me?

Q.  Well, if anything goes on, would -- would you -- I asked you about --

A.  I'm just getting clarification.

Q.  I asked you about reporting --

A.  Yes, ma'am.

Q.  -- and you gave me answers.  So --

A.  Right.

Q.  -- what did you understand "reporting" to mean?

A.  Reporting, our hierarchy, we meet -- we meet for roll call.  That's our sergeant.  Our lieutenant is our -- is the next part of the chain of command.  So that's -- that's who we report to in police -- in the police terminology.

So if you're asking me to be clear, to be on the same page with you, that's -- that's who I report

Page 36

to.  But on that day, it was Randy Crews.

Q.  Okay.  So on -- on 4/11/2022, part of the normal process for you is you would attend roll call when you started your day, correct?

A.  Right.

Q.  What time did your shift start on 4/11/2022?

A.  5:00 a.m.

Q.  And when did it end?

A.  4:25.  That's our normal.

Q.  That's what I was just going to -- and that's your --

A.  Our normal day, our normal time frame of working, 5:00 a.m. to 4:25 p.m.

Q.  Was the last shift you worked before 4/11/2022, the day before, at 5:00 a.m. to 4:25 p.m.?

A.  I would have to look at my calendar to see where that falls in the workweek because I -- I --

Q.  You do?

A.  To be honest -- well, I wouldn't know right now.  I don't know if that was -- if that was our first day back, but that's something I can look at my calendar and let you know, as far as did I work somewhere else before that or that was a day off.  But if it was in the middle of the workweek, I would have worked the same time frame.

Page 37

Q.  Okay.  That's what -- that's what I was getting at.  You weren't -- being on the force at that point for 15 years, you -- you didn't get the midnight shift and things like that?

A.  Well, when we work, we work our -- we work that particular time.  So we don't -- we don't -- like, some agencies may work three months on a different time schedule.  We don't do that.  My -- my permanent job, unless I go somewhere else, it's going to be watch 1 hours, 5:00 a.m. to 4:25 p.m.

Q.  So you weren't sleep deprived on 4/11/2022?

A.  Excuse me?

Q.  You weren't sleep deprived on 4/11/2022?

A.  No.

Q.  And I forgot to ask you a question.  Are you taking any medication today, prescription or nonprescription, that would affect or inhibit your ability to testify?

A.  I'm not going to answer that question.

MS. HARRELL:  You can answer to the effect of whether there's anything going on that would affect your ability to testify, like a --

A.  Okay.  There's -- there's nothing that prohibits me from testifying.

BY MS. VENZA:

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                   Pages 38..41

Page 38

Q.  Accurately and honestly?

A.  Accurately and honestly.

Q.  And I'm also going to ask the question, do you have any mental health or physical health condition that is or could prevent you from testifying accurately and honestly today?

A.  No.

Q.  Were you wearing a Taser on 4/11/2022?

A.  Yes.

Q.  A CEW?

A.  They're the same.

Q.  A baton?

A.  No.

Q.  Pepper spray?

A.  Yes.

Q.  And that's also referred to as OC; is that right?

A.  Yes.

Q.  Why were you at 3504 Rockwell on 4/11/2022?

MS. HARRELL:  Object to the form.

You can answer.

A.  Call for service.

BY MS. VENZA:

Q.  Did you have a baton in your car on 4/11/22?

A.  Yes.

Page 39

Q.  Do you know what time the call for service came in?

A.  I cannot recall.  I'd have to look at the records and see.

Q.  Did you review anything in preparation for today's deposition?

A.  Yes.

Q.  What did you review?

A.  Body-worn camera.

Q.  Anything else?

A.  I read the reports.

Q.  Which body-wear [sic] camera?  When you referred to body-wear cam video, is that what you meant?

A.  Yes.

Q.  Which -- which one?

A.  Mine.

Q.  Any other?

A.  No.

Q.  And you said you read the reports, correct?

A.  Uh-huh.

Q.  That was a yes?

A.  Yes.

Q.  Which reports?

A.  The incident reports that were generated on that day, the Response to Resistance reports.  The --

Page 40

I -- reports for -- I can tell you who authored the reports.

Lieutenant Sircar authored a report, the Response to Resistance report.  And Kendall Burford generated a -- I believe, an Incident Report.  Detective Matzen generated a crime scene report.  I think it's M-a-t-z-e-n.  And there was an arrest docket.

Those are the reports that I reviewed.

Q.  In preparation for today's deposition, was that the first time you reviewed your body-wear camera video?

A.  No.

Q.  How many times did you -- estimate, how many times did you review that video?

A.  Three.  Approximately three times.

Q.  When was the first time?

A.  I can't recall the first time.  I can say it was probably shortly thereafter.

Q.  Shortly after 4/11/2022?

A.  Yes.

Q.  And by shortly after, do you mean within a month?

A.  I -- I can't tell you.  I could just say shortly, without -- just say the first three months.

Q.  I'm sorry.  It's my memory.  Did you say you did or you did not review any other body-wear camera

Page 41

videos?

A.  No.  No, I did not review any other.  I just -- only mine.

Q.  And that's at no time?  So the only -- only body-wear camera video regarding 4/11/2022 events that you have reviewed is your own, correct?

A.  Well -- yes.  Yes.

Q.  And what were you going to say?

A.  Nothing.

Q.  Well, you were going to say something and you stopped yourself.

MS. HARRELL:  Object to the form.

BY MS. VENZA:

Q.  Did you want to add something?

A.  No.

Q.  So in reviewing the -- one, two, three -- four -- I'm sorry, the three reports -- and by reports, you're -- you're referring to the Response to Resistance uniform reports that a police officer fills out?

MS. HARRELL:  Object to the form.

A.  When I say "reports," I think I gave you -- is it on your transcript as far as reports I told you that I read?

BY MS. VENZA:

Q.  Yeah.  You did.  You did.  And I'm trying to

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                              Pages 42..45

Page 42

clarify, just -- this isn't a trick, I'm just trying to -- they're called Response to Resistance reports, that's what you mean by "report"?

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. Correct?

A. I think I mentioned on the transcript that I told you I reviewed an Arrest and Booking docket.

Q. Right. And I'm not asking --

A. Right.

Q. -- about that. I'm asking about the reports. And by, "the reports," you're talking about the Response to Resistance --

A. Okay.

Q. -- form that JSO asks its officers to complete, correct?

MR. BUEKER: Object to form.

MS. HARRELL: Join.

A. I -- can you answer a question? What -- what are you -- what are you asking? I'm not --

BY MS. VENZA:

Q. I'm asking you what I asked you.

A. Okay.

(Brief discussion held off the record.)

BY MS. VENZA:

Page 43

Q. Okay. As my co-counsel is telling me, so not all reports are RTRs, correct?

A. Correct.

Q. Is that what everybody at this table except the court reporter is trying to get to -- across to me?

MS. HARRELL: Yes.

A. Okay. All reports are not Response to Resistance reports.

BY MS. VENZA:

Q. Okay. So by, "reports," what did you mean?

A. And that's what I meant. The reports that I read were --

Q. The ones you specifically --

A. Right.

MS. HARRELL: Let him finish, please.

A. The reports that I read that's on the transcript. I read an Incident Report, a crime scene report, an Arrest and Booking Report, and a Response to Resistance report.

I believe -- is that what I mentioned before?

BY MS. VENZA:

Q. You said arrest and docket. Okay.

A. Arrest and Booking or docket, however you want to phrase it.

Q. Okay. I just wanted to clarify for me, and

Page 44

apparently I needed it. Okay.

And so after reviewing all of those documents --

A. Yes.

Q. -- it did not refresh your recollection as to the time that you received the call?

MS. HARRELL: Object to the -- object to the form.

A. Do you -- do you have a copy of any of those reports with you today?

BY MS. VENZA:

Q. Just answer my question.

A. I'm asking, do you have a copy of any of those reports with --

Q. And I -- I am -- that's not how this process works.

A. Well --

Q. Sir, you've been -- 19 years you've been a police officer, and you've been deposed before. I ask the questions.

So I am just asking you, did any of those refresh your recollection as to the time?

MS. HARRELL: Object to the form.

A. The times are on the report; however, I don't remember the time -- the exact time at -- at this

Page 45

moment. But if you can furnish one of those reports, I can, yes, tell you --

Q. In the --

A. -- what the time is.

Q. Okay. In your body-wear camera video footage, there is a car clock. Would that help refresh your recollection?

A. Yeah. If you turn it to me, I can tell you.

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. All right. I am showing -- I'm trying to make a record here. I am showing the witness the video that was produced in discovery by both the -- by both defendants in response to the plaintiff's request for production of documents. It is marked at the top by the City or JSO or Counsel, not sure, 2022-04-11 T, as in Tom, 11:18:14Z, as in zebra, AXON BODY 2 X, like x-ray, 81326035.

And I'm turning it to the witness. And if you give it a moment, in the middle of the screen on the bottom, there is the clock, and it, at some point, zooms in.

A. (Examines screen.)

Q. And I'm going to move this closer to the witness.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                              Pages 46..49

Page 46

Can you see the time on there?

MS. HARRELL: Are you referring to the timestamp on the --

MS. VENZA: No.

MS. HARRELL: -- body-worn or the actual car clock?

MS. VENZA: And you can't see it there.

MS. HARRELL: Let the record reflect that counsel is leaning in and adjusting her glasses, as am I, because nobody can see what she's referring to.

MS. VENZA: I'm going to object to that statement.

And you could hit this button because it's going to go closer.

THE WITNESS: Which one?

MS. VENZA: Just -- that. And it's --

THE WITNESS: I'm trying to see the clock. Can you --

MS. VENZA: Nope. Nope. It's too old. It doesn't expand.

THE WITNESS: (Examines screen.)

BY MS. VENZA:

Q. Can't see it?

A. No. I don't -- I can't make that out.

Page 47

Q. Okay. I don't want to lose that.

(Examines screen.)

7:19. At -- at 00:12, does the clock indicate 7:19?

MS. HARRELL: Object to the form.

A. Can I just see a clock in the report?

BY MS. VENZA:

Q. I'm just asking from the video, can you tell?

A. Yeah, that -- there's a clock on the -- it appears to be 7:19.

Q. Okay. And that would have been a.m., correct?

A. Yes.

MS. VENZA: And now I'm going to ask, Sonya, where are you saying the timestamp is? I'm using the clock counter.

MS. HARRELL: I was using -- I -- when you were asking us to look at the -- the body-worn camera for the clock, it wasn't clear whether you were referring to the timestamp, which is 2022-04-11 T11:18:26Z, which is --

MS. VENZA: Okay. So you're saying that that's -- all right. I'm going to use both for reference.

MS. HARRELL: Both what?

MS. VENZA: Both times.

Page 48

MS. HARRELL: Okay.

MS. VENZA: So in the -- the counter for the video, it's 00:12, and then at the top, it's 18:26Z.

MR. BUEKER: 00:12?

MS. LAHART: Into the video.

MR. BUEKER: Oh, so there's --

MS. HARRELL: On the --

MR. BUEKER: Okay. So you're --

MS. VENZA: On the time player, which is the same for all of them.

MR. BUEKER: Yeah.

MS. VENZA: When you put the video in anything, it plays the clock at the bottom. It's the same thing.

MR. BUEKER: Well, also, in the top right, where you have it paused, just for the record, it does say 11:18:26. Does it say that?

MS. HARRELL: Yeah.

MS. VENZA: Yes.

MR. BUEKER: So that's -- that's the actual time.

MS. VENZA: Okay.

MS. HARRELL: Yeah. That's the actual footage.

Page 49

MR. BUEKER: That's the -- that's the clock time, not the run time.

MS. HARRELL: Right. You're --

MS. VENZA: That's the clock time on the video?

MS. HARRELL: Right.

MR. BUEKER: That is the actual time of that video, that that moment is --

MS. VENZA: Of the day?

MR. BUEKER: -- the time of the day.

MS. VENZA: Okay.

MR. BUEKER: Minus -- it's obviously Zulu time.

MS. VENZA: Right. Okay. Okay.

MS. HARRELL: Yeah. And --

MR. BUEKER: (Inaudible.)

MS. VENZA: Okay. Well, I have -- the rest of this is done by that, so we can use that for reference.

MS. HARRELL: Okay. And that's what -- 00:12 is what you're referring to from the Microsoft --

MS. VENZA: I'll do both.

MS. HARRELL: -- media player?

MS. VENZA: Yes.

Page 50

BY MS. VENZA:

Q. Okay. Now, I've got the time down. So that's 7:19 a.m., also known as 18:26Z [sic]. Do you see that at the corner?

A. You -- 18 --

MS. LAHART: 11:18.

A. 11:18 --

BY MS. VENZA:

Q. Okay. I was -- 11 --

A. -- because 18 would be 6 o'clock.

Q. Okay. 11:18:26Z. I was just doing it for a frame of reference.

A. Okay. I understand.

Q. Okay. You received a call for service. What was that call for?

A. The call was for an animal complaint.

Q. Anything else?

A. At the time of the call being dispatched, it was regarding an animal complaint.

Q. And what about an animal complaint?

MS. HARRELL: Object to the form.

A. Aggressive dogs. Aggressive dogs, through -- put a child on top of a car. For the child to escape, he jumped on top of a car.

BY MS. VENZA:

Page 51

Q. Aggressive dogs, so that means -- you said plural, dogs, correct?

A. Yes.

Q. How many?

A. They didn't tell me in the dispatch, initially. They just said dogs. They didn't say one, two, or three.

Q. A child. How old?

A. That -- they didn't display the age of the child.

Q. Was your understanding that "child" meant any -- any person that was under the age of 18?

MS. HARRELL: Object to the form.

A. (Nods head.)

BY MS. VENZA:

Q. You're nodding your head yes?

A. A juvenile. A juvenile -- juvenile person, yeah.

Q. Is that correct?

A. So under -- under 18, yes.

Q. And on top of a car, did you get any information about what car?

A. In the --

MS. HARRELL: Object to the form.

Go ahead.

Page 52

A. They didn't put that -- that information in the --

BY MS. VENZA:

Q. And --

A. In --

MS. HARRELL: Let him finish.

BY MS. VENZA:

Q. -- escape --

A. They didn't -- they didn't put in any information. Basically, the call was aggressive dogs in the area.

Basically, I -- you know, you go ahead and answer [sic] your question. We'll get to it. I don't want to put the cart before the horse.

Q. As --

A. Because I'm --

(Simultaneous speaking.)

BY MS. VENZA:

Q. I asked you a question about the --

A. I want to -- I want to answer your question specifically.

Q. Well, I want you to as well.

A. Uh-huh.

Q. I asked you a question about why you were at 3504 Rockwell, and you responded, a call for service,

Page 53

correct?

MS. HARRELL: Object to the form.

A. (Nods head.)

BY MS. VENZA:

Q. And I said, what was the call for?

And you said, animal complaint.

And then I asked you, specifically, what about an animal complaint?

So are you --

A. Okay.

Q. You explained to me it was aggressive dogs put a child on top of a car, was your answer.

A. Right.

MS. HARRELL: Object to the form.

Go ahead.

A. So let me just clarify. You -- we're talking about -- you mentioned, why was I dispatched and why was I there, right?

BY MS. VENZA:

Q. Yes.

A. Okay.

Q. I'm -- I'm asking, you were --

A. Right --

Q. No. Stop.

We started out and we're still on, you received

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

Page 54

a call for service.  That's what you said.

And I said, for what?

And you said, animal complaint.

And I said, for what?

And you explained it to me.

So you -- when you received the call from dispatch and you're done with the call from dispatch, what is your understanding as to why you need to go to 3504 Rockwell?

MS. HARRELL:  Object to the form.

A.  Because there was an animal complaint of aggressive dogs in the area.

BY MS. VENZA:

Q.  So at that time, the only information you had was aggressive dogs in the area?

MS. HARRELL:  Object to the form.

A.  Right.  Yes.

BY MS. VENZA:

Q.  Multiple dogs?

A.  I said dogs.  I --

Q.  So when did you obtain information that put a child on top of a car?

A.  I called the complainant and -- who provided information that her child was -- had to jump on top of a car to escape aggressive dogs.

Page 55

Q.  Where did you get the information about who the complainant was?

A.  Ms. Ellington.

Q.  Where did you get the information that there was a Ms. Ellington?

A.  We have -- on our -- on our system, we have a record of who called and their phone number, and we have a record if they want to be called back or not.

Q.  So you get the dispatch call that -- about aggressive dogs, and then you also simultaneously are receiving further information about that?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

You can answer.

A.  That -- that information, when -- when it comes to patrol, that information is already on the -- is already embedded.

BY MS. VENZA:

Q.  And how do you -- already embedded in --

A.  It's already embedded as far as what -- why we're -- what the call is from the dispatcher.  She will label what the call is, she will put additional information in, and -- and then she will -- she will put in who -- who called and their phone number and whether they want to be called back or not.

Page 56

Q.  And is that sent to you?

A.  Yes.

Q.  And you can access it?

A.  Yes, ma'am.

Q.  So after you receive the telephone -- the radio call, then you access that additional information?

A.  Yes, ma'am.

Q.  Did you pull over or were you driving when you were accessing the additional information?

A.  At some point I was driving, and at some point I did pull over.

Q.  And when you pulled over, did you make the telephone call to the complainant?

A.  Yes.

Q.  And that complainant was who?

A.  I believe it was Ms. Ellington.

Q.  What's her first name?

A.  I can't recall her first name.

Q.  Does Malene refresh your recollection?

A.  Yes.

Q.  Was it a Malene?

A.  Malene.

Q.  And she said her child -- and she reported to you that her child had been chased by dogs?

A.  That he was on top of a car because of the

Page 57

dogs, to get away from an attack.

Q.  An attack?

A.  Yeah.  There -- that's why he got on top of the car, to escape the dogs.

Q.  Did they -- did these dogs -- did she report that these dogs bit her son -- I'm sorry, bit this child?

A.  No, she did not report that the dogs --

Q.  Okay.  Was this -- was this her son that she was calling about?

MS. HARRELL:  You can go ahead and answer, but I don't think he finished his answer to his last -- to your last question.

THE WITNESS:  Okay.

MS. HARRELL:  So please just let him finish his answers.

A.  She did not report that her son was bitten by a dog, just that the dogs had -- he had -- she -- he escaped, had to get on top of a car because of the dogs, because of the aggressive dogs.  And --

BY MS. VENZA:

Q.  And she was --

A.  -- he was --

Q.  Go ahead.

A.  And he was -- he was afraid.  She was on the

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Pages 58..61

Page 58

phone with him, and she heard the -- she heard his voice, heard him crying, and that he called his mother and she was on the phone with him when he was crying and telling -- explaining the incident to her and was describing what was happening at that time.

Q. This was her son?

A. Yes, ma'am.

Q. His name is Jaivon?

A. Yes. You can pronounce it that way.

Q. Does -- am I mispronouncing? Correct me.

A. I don't know. Jaivon or Jaivon (pronouncing), it's one or the other.

Q. He -- he escaped, she -- is what she reported to you?

A. Escaping by -- escaping the attack from the dogs or --

Q. (Nods heads.)

A. Well, that -- that, she -- right. He retreated to be on top of a car and was basically cornered by the dogs, couldn't get down. Walking -- he was walking to school, and the dogs -- dogs were aggressive, he had to get on top of a car.

Q. Did you ask her where he was walking from?

A. I did ask her the route, about the route that he takes to get to where he was going, which was a bus

Page 59

stop, because that -- in that area, the kids walk to the bus stop.

Q. Where was the bus stop?

A. I don't -- I don't remember where the bus stop was.

Q. How old was her son?

A. I can't recall how old he is.

Q. Well, at that time, did -- did she report that to you at the time? Whether you remember it or not, did she tell you?

A. One thing I do remember that she reported, that he [sic] said he was tall for his age, and she was -- she was wanting to explain that he's just a child.

Q. But you didn't ask his age?

A. I don't remember.

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. I couldn't hear you. What -- what did you say?

A. I don't recall asking about the age.

Q. All right. Bus stop. Was it your understanding he was going to school?

A. Yes.

Q. Did she tell you anything about the dogs?

A. I believe she referred to them as pit bulls.

Q. Did she say how many?

Page 60

A. No, she did not. I can't recall how many she -- if she mentioned a certain number.

Q. So after you complete that call, what did you do next?

A. I went to the address to speak to the people at the home because the incident transitioned from an animal complaint to a potential -- a potential aggravated assault.

Q. How did that happen?

A. The mother -- the mother said that while her son was on the car, there was a lady trying to get him off the car, and that he was afraid to come down because of the dogs. And the lady threatened to get her husband to get the child off the car.

And Ms. Ellington said that the -- her son told her that the guy came out with a gun and chased him down the street.

Q. And so before you got to the doorstep of 3504 Rockwell, you were investigating two complaints; is that fair?

MS. HARRELL: Object to the form.

A. Yes. I was going to investigate an aggravated assault and to see if the person actually left the property, just to actually see if it was an aggravated assault or somebody who was exercising their second

Page 61

amendment rights.

Q. And dogs?

A. And dogs.

Q. Okay. So can we say you were investigating -- and I'm just saying two things to make it easier for the deposition -- dogs and a gun? Is that fair?

A. Well --

MS. HARRELL: Object to the form.

A. -- I'd put it in the -- in the order of guns and then dogs, because the aggravated assault had -- is -- is more serious than the complaint about a -- about dogs.

BY MS. VENZA:

Q. Was -- was Ms. Ellington there at -- through any of this? Did she see the dogs or the gun?

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. How did she know about this?

MS. HARRELL: Object to the form.

A. She knew because of a statement that came from her son. That -- that's the information that I got from her. What she knew at that time was the information she gathered from her son, and that she passed it on to the police.

BY MS. VENZA:

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 62..65

Page 62

Q. And you? And she passed it on to you?

A. Right.

Q. So all of her information came from her son, correct?

MS. HARRELL: Object to the form.

A. When you speak of all the information, what do you mean by all the information?

BY MS. VENZA:

Q. All of her information that she conveyed to you about what was allegedly happening to her son came from her son, correct?

A. No.

Q. Where else did it come from?

A. Her son -- as I mentioned in the transcript, her son had a phone on while he was calling his mother and during the incident, so she's a witness to -- to hearing her son crying, hearing the stress, and actually attempting, yelling, trying to speak to the female or the mother.

Q. Ms. Ellington was not there in person, correct?

A. No, she was not there in person.

Q. That's a correct statement by me?

A. Yes.

MS. HARRELL: Object to the form. Asked and answered.

Page 63

BY MS. VENZA:

Q. And she did not witness with her eyes any of the events at 3504 Rockwell, correct?

MS. HARRELL: Object to the form.

A. She was -- she was not there physically.

BY MS. VENZA:

Q. Okay. So she did not witness anything by viewing it at 3504, correct?

MS. HARRELL: Object to the form.

A. She was on the phone. She only heard. She --

BY MS. VENZA:

Q. She didn't see?

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. Correct?

MS. HARRELL: Object to the form. You can answer it again.

A. She -- she did not see.

BY MS. VENZA:

Q. And her son is not the best historian, correct?

MS. HARRELL: Object to the form.

A. I -- I couldn't tell you, ma'am. I don't know the -- I don't know the young fellow.

BY MS. VENZA:

Q. Since the events of 4/11/2022, you have not

Page 64

learned that some of the information that Jaivon Ellington reported was untrue?

MR. BUEKER: Object to form.

MS. HARRELL: Object to the form.

A. What Ms. Ellington -- the information that she conveyed was what she knew at that time.

BY MS. VENZA:

Q. I'm asking you, since the 4/11/2022 events, have you since come to learn that some of the information that Jaivon Ellington reported was untrue?

A. I'm --

MS. HARRELL: Object to the form. You can answer.

A. It's in the report. The report -- the report was read. I read the report years after the -- after the incident, basically recently. And as far as what he mentioned, I think he thought he saw a gun or whatever he -- he mentioned.

Now, to be accurate about it, I mean, it's in the report that you can read yourself.

BY MS. VENZA:

Q. So not everything was a hundred percent accurate, correct?

A. Excuse me?

Q. Not everything was a hundred percent accurate,

Page 65

correct?

MS. HARRELL: Object to the form.

MR. BUEKER: Form.

A. At that time. All she knew was the information that was conveyed by her son.

MS. LAHART: Can we take a break?

MS. HARRELL: Fine with me.

MS. VENZA: Okay.

(Whereupon, a brief recess was taken.)

MS. VENZA: So we're back on the record.

THE WITNESS: Ma'am?

MS. VENZA: Okay. We're back on the record.

THE WITNESS: Okay.

BY MS. VENZA:

Q. When you arrived at 3504 Rockwell [sic], were there any dogs running loose on the property?

MS. HARRELL: Object to the form. And it's Rockwood.

MS. VENZA: Rockwood? Huh. I apologize.

MS. HARRELL: That's what everyone has said.

MS. VENZA: So everybody else agrees, Rockwood?

MR. BUEKER: Well, that's why I kept

Page 66

objecting to form.

MS. VENZA:  I renamed it.

MS. HARRELL:  Uh-huh.

MS. VENZA:  Okay.  Thanks for the correction.

MR. BUEKER:  (Inaudible.)

BY MS. VENZA:

Q.  When you arrived at -- by the way, all my questions, and as you answered them, you understood I meant Rockwood, right?

A.  Yes.

Q.  Okay.  When you arrived at 3504 Rockwood, were there any dogs running loose on the property?

A.  No.

Q.  Did you see any dogs running loose in the area?

A.  No.

Q.  I'm going to show you some of the video.  This is you knocking on the door.

And I'm starting the video at 11:20:07Z, and the clock counter is 1:53.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Tell your mother and father police is at the door.

Page 67

CHILD:  (Inaudible.)

OFFICER LAMPKIN:  Good morning, ma'am.

MS. BARUS:  Hey.

OFFICER LAMPKIN:  How you doing this morning?

MS. BARUS:  Just fine.

OFFICER LAMPKIN:  Okay.  The reason why I'm out here -- I'm Officer Lampkin.  I got a call about a kid on your -- on your car being chased by dogs and your --

(Audio momentarily paused.)

OFFICER LAMPKIN:  -- pulling a --

(Audio momentarily paused.)

MS. BARUS:  We don't even own a gun.

(Video playback ends.)

BY MS. VENZA:

Q.  Okay.  So you told her that you were there because somebody called about a kid on the hood of your car being chased by dogs and your husband pulling a gun on him --

A.  Yes.

Q.  -- correct?

You didn't mention, "attack," correct?

MS. HARRELL:  Object to the form.

A.  No, I didn't mention anything about attack.

Page 68

BY MS. VENZA:

Q.  You used the word "chased," correct?

A.  Rewind it so I can hear it again.

Q.  I'm rewinding it to the same spot, one second earlier, 2:01, 11:20:15Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  The reason why I'm out here -- I'm Officer Lampkin.  I got a call about a kid on your -- on your car being chased by dogs and your husband pulling a gun on him.

(Video playback ends.)

BY MS. VENZA:

Q.  So no mention of "attack," correct?

A.  That's correct.

Q.  Okay.  You -- you said "chased," right?

A.  Yes.

Q.  Did you say anything about being chased down the street with a gun?

MS. HARRELL:  Object to the form.

A.  Okay.  Rewind it again so I can hear it.

BY MS. VENZA:

Q.  I'm starting it a little bit sooner, but rewound to the same spot.

Page 69

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  -- ma'am.

MS. BARUS:  Hey.

OFFICER LAMPKIN:  How you doing this morning?

MS. BARUS:  Just fine.

OFFICER LAMPKIN:  Okay.  The reason why I'm out here -- I'm Officer Lampkin.  I got a call about a kid on your -- on your car being chased by dogs and your husband pulling a gun on him.

MS. BARUS:  We don't even own --

(Video playback ends.)

BY MS. VENZA:

Q.  So there's no mention of anybody chasing down the -- being chased down the street with a gun, correct?

A.  That -- that's with the mother.  That's the -- that information came from the mother with the phone call.

Q.  Right.  But -- but when you come to the house of 3504 Rockwood and you tell the people that come out of the house why you're there --

A.  Uh-huh.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                          Pages 70..73

Page 70

Q.   -- there's no mention of someone chasing someone down the street with a gun, correct?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Object to the form.

A.   Okay.  No, not at that moment.

BY MS. VENZA:

Q.   And there's no report of a dog biting anyone, correct?

MS. HARRELL:  Object to the form.

A.   There's no -- correct.  There's no report of a -- a dog bite.

BY MS. VENZA:

Q.   And do you recognize the woman in the video?

A.   Yes.

Q.   Who is that?

A.   Kimberly Barus, I believe is her name.

Q.   We've been saying Barus (pronouncing).

A.   Barus?  Okay.  Kimberly Barus.

Q.   I'm not -- to be honest, she never corrected me, so I think that's -- anyway, that's our client, and you do remember her from that day?

A.   Uh-huh.

MS. VENZA:  I'm going to show you Plaintiff's Exhibit 1.

(Plaintiff's Exhibit Number 1 was marked for

Page 71

identification.)

BY MS. VENZA:

Q.   Do you recognize this animal?

A.   Yes.

Q.   Okay.  Who is that?

A.   That's Lucy.

Q.   And is that the dog that you shot and killed on 4/11/2022?

MS. HARRELL:  Object to the form.

A.   Yes.

BY MS. VENZA:

Q.   If you could, from here on out, put the exhibits in the middle for the court reporter.

And I'm going to back up the video.

Now, I've -- I've backed up the video to a timestamp on the bottom, 00:46; timestamp at the top right corner, T11:19:00Z.

(Brief section of video played.)

BY MS. VENZA:

Q.   What are you doing right there, putting on a COVID mask?

A.   Yes.

Q.   But you didn't wear it when you were sitting alone in your car, did you?

MS. HARRELL:  Object to the form.

Page 72

A.   No.

BY MS. VENZA:

Q.   You put it on because you were about to interact with people, correct?

A.   Yes.

Q.   Were you wearing the mask when you went to the Barus' backyard to see Lucy?

A.   I mean, if I had it on then, I'm quite sure it would have been on when I was going in the backyard, but --

Q.   So you --

MS. HARRELL:  Let him finish.

MS. VENZA:  I'm sorry.  I thought he was done.

BY MS. VENZA:

Q.   Were you done?

A.   Yes.

Q.   So once you put the mask on, while you're conducting your -- we'll call it an investigation; is that fair?

A.   Yes.

Q.   And you kept it on while you were interacting with other people, correct?

A.   I don't recall taking it off.

Q.   Okay.  So that's what -- that's why I'm asking.

Page 73

So you enter -- you put it on, we see in the video.  You talk to the -- I believe the owners of the house -- they are the owners of the house -- and then you walked around the back to see the dogs, correct?

A.   Yes.

MS. HARRELL:  Object to form.

BY MS. VENZA:

Q.   So you would --

(Simultaneous speaking.)

A.   Well, it's -- it was a -- yeah.  I talked to the owners, got them to separate.  One owner went to the back.  Spoke to another owner in the front.  Then after I got some information, then I went to the backyard.

Q.   Okay.  But you would have kept the mask on the whole time?

MS. HARRELL:  Object to the form.

Why -- this is venturing into annoyance and harassment.  It sounds like --

MS. VENZA:  I completely disagree.  I completely disagree.

MS. HARRELL:  Okay.

BY MS. VENZA:

Q.   So can you please just answer the question?

MR. BUEKER:  Form.

A.   Why is a --

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                          Pages 74..77

Page 74

BY MS. VENZA:

Q.   As best you --

A.   -- COVID mask --

Q.   As best you can recall, were you wearing the mask when you went to the backyard?

A.   Based on putting that -- that on, I can only -- I can put it like this, I don't remember.  I need to -- I don't remember if -- when -- if I took the mask off or if it was on, I can just recall now that I seen me putting the mask on.  So -- there's no video of me taking the mask off, so I -- I could probably infer that the mask was still on then.

    But what's -- what's -- what's the relevance of --

Q.   So would you have --

A.   I'm asking a question.

Q.   No.  You don't get to ask the questions.  That's not how it works.

    So would you have had your mask on when you reached your hand out to Lucy?

    MS. HARRELL:  Counsel, I'm going to say one more time, if you -- if you -- it sounds like you're harassing him about wearing a COVID mask.

    MS. VENZA:  I am not.  These are relevant

Page 75

questions.

BY MS. VENZA:

Q.   Were you wearing --

    MR. BUEKER:  That's asked and answered.

BY MS. VENZA:

Q.   Were you wearing --

    MS. HARRELL:  Asked and answered.

    MS. VENZA:  No, I just asked this question.

BY MS. VENZA:

Q.   Were you wearing a COVID mask when you reached your hand out to Lucy?

A.   I can only infer that if I had the mask on then, the mask would be --

Q.   You would have kept it on?

A.   I would have kept it on.

    MS. HARRELL:  Let -- you just talked over him, Counselor.  Again, this is a pattern of harassment about a COVID mask.  Let him finish his answer.

    MS. VENZA:  There's no -- there's no pattern of harassment.

    MR. BUEKER:  Well, you're --

    MS. VENZA:  I'm asking a question.

    MR. BUEKER:  Denese, you're a little bit

Page 76

of a fast talker, and he's a slow talker.

    MS. VENZA:  I will slow down.

    MR. BUEKER:  Not that there's anything wrong with either of them.  I can be kind of a slow talker too sometimes.  I don't mean to be criticizing anybody, it's just --

    THE WITNESS:  It's okay.

    MS. HARRELL:  And I'm a fast talker.

    MS. VENZA:  Pretty sad to be called a pattern of harassment.  Sorry if you don't see the relevance of the questions, but there's nothing wrong with the questions.

    MS. HARRELL:  You've asked him five times about the COVID mask.

    MS. VENZA:  I was getting my answer.

    MS. HARRELL:  (Inaudible.)

BY MS. VENZA:

Q.   I've rewound the video -- or I've fast forwarded it to the timestamp in the left corner, 1:01, right-hand corner, timestamp T11 -- it's either a 10: or 9:15Z.

    (Brief section of the video played.)

BY MS. VENZA:

Q.   Now, you are in front of the Barus' house; is that correct?

Page 77

A.   Yes.

Q.   Okay.  And there are two vehicles there, correct?

A.   Yes.

Q.   Both of those vehicles are entirely on the Barus' property, correct?

A.   Yes.

Q.   And can you describe the white vehicle passenger side?  Is it clean, dirty?

A.   The passenger side?

Q.   Of the white vehicle (indicating).

A.   Yeah.  It -- it appears to be clean --

Q.   Okay.  It's free from --

A.   -- from this -- from this view.

Q.   Okay.  Let's put it this way.  It's free from blood marks and streaks, correct?

A.   Yes.

Q.   Did you do anything to prepare for your visit to 3504 Rockwood after receiving the call from dispatch about someone being chased by dogs?

A.   I spoke to the complainant on the phone who provided more information of why -- of why her son was in the state that he was in, emotional state.

Q.   Did you do anything else to prepare for your visit to 3504 Rockwood other than talk to

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 78..81

Page 78

Complainant Marlene [sic] -- Malene Ellington?

A. No, not that -- nothing else.

Q. Besides putting on the COVID mask, did you do anything else to prepare to investigate a complaint about someone being chased by dogs and a gun being pulled?

A. No.

Q. Did you check your Mace before you exited the car?

MS. HARRELL: Object to the form.

A. No.

BY MS. VENZA:

Q. Did you check your Taser --

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. -- before you exited the car?

A. At that time I went to the call? Going --

Q. No, before you -- after you --

A. Before -- before, you mean any time during that day? Or --

Q. No. Right -- right now, we're very specific.

A. Okay.

Q. I'm saying you've gotten the call, you're preparing to go visit the front door of the house, you're preparing to go visit to 3504 Rockwood. Did you

Page 79

check your Taser?

A. No.

Q. Did you consult any JSO order -- and by JSO order, I mean the JSO policy, okay?

A. Uh-huh.

Q. Did you check any JSO order on what to do regarding animal complaints?

A. And once again, just for -- asking for clarification. I understand I don't get to answer -- ask -- ask any questions, but you mean as far as me pulling up to the house, did I pull over and pull up a general order or a policy and review it? Is that what you're asking me?

Q. Yes. I'm asking -- the question is, did you do anything to prepare for your visit to 3504 Rockwood -- that time -- you've gotten a call --

A. Uh-huh.

Q. -- you've talked to the mom --

A. Okay.

Q. -- you're getting ready to get out of the car and -- and talk to whomever you find at 3504 Rockwood.

A. Uh-huh.

Q. At -- between that time and before you start talking to the owners of the house, did you consult any JSO order on what to do regarding animal complaints?

Page 80

A. No.

Q. All right. Is the JSO Order about Animal Complaints available to you in your police vehicle at that time?

A. Yes.

Q. So if you wanted to refresh your recollection on how to handle an animal complaint on 4/11/2022, you could have, correct?

MR. BUEKER: Object to form.

MS. HARRELL: Join.

A. It's on a computer. I can -- I can access it, yes.

BY MS. VENZA:

Q. Okay. So if you wanted to, you could just call it up on the computer?

A. Yes, I can access it on my computer.

Q. You requested that the body-wear cam video from the 4/11/2022 dog shooting that we're watching now be retained for seven years, correct?

MR. BUEKER: Object to the form.

MS. HARRELL: Join.

A. I need to look it up and see what was the -- check my code so I can give you a specific answer.

BY MS. VENZA:

Q. If I represent to you that your Chief Weber

Page 81

testified yesterday that you requested seven years, would that refresh your recollection?

A. It --

MR. BUEKER: Object --

MS. HARRELL: Object to the form.

You can answer.

MS. VENZA: And everybody talked at the same time. I didn't catch it.

Did you catch it?

THE REPORTER: No.

A. If it's -- if I -- if I marked it BC7, then it would be retained for seven years. That's the reason why I'm asking if I could see the -- check my code, is I could tell you for sure it would be seven years. If the -- Chief Weber said seven years, that means she would have researched and saw that my disposition code was BC7 and, therefore, seven years.

BY MS. VENZA:

Q. Okay. So you get to select at that time whether it's retained for seven years or five years or some lesser time; is that right?

MS. HARRELL: Object to the form.

A. Yes.

BY MS. VENZA:

Q. Do you always automatically -- at that time,

Page 82

4/11/2022, do you always pick seven years?

A. No.

Q. Okay. If we believe in our representing to you, yes, she said that you selected BC7, why would you do that? Why would you pick seven years versus a lesser time?

A. Because the allegation of aggravated assault.

Q. Aggravated assault being what?

A. A felony 3.

Q. Being -- the aggravated assault was what Jaivon reported to his mother that she reported to you, correct?

A. Correct. That's the allegation she made.

Q. Have you ever been to 35- -- before 4/11/2022, had you ever been to 3504 Rockwood before?

A. I don't remember. If I would throw out an answer to you, I would probably tell you no, because I don't remember ever going to that home.

Q. But it's -- but you're saying it's possible?

A. It's possible because I've worked in the area for, like, 19 years. But I don't remember ever going to that address.

Q. Well, at that time it had been 15 years, right?

A. Fifteen years, right. Thank you.

Q. As best you can recall, had you met Ms. Barus

Page 83

before 4/11/2022?

A. I don't recall ever meeting her.

Q. Okay. Mr. Barus, her husband?

A. Same.

Q. Their son, Kyle?

A. The same.

Q. There was a notepad that you were writing on that appears in this video. Do you recall that?

A. Yes, I --

Q. Do you --

A. -- do. It's in my hand right there.

Q. Okay. So you were -- you're -- you take notes? You were taking notes?

A. Yes.

Q. Do you keep notes on every investigation?

A. I -- I don't keep them.

Q. Okay. I'm sorry. Do you take notes on -- in every investigation that you do?

A. No. If it's something serious, I will take notes.

Q. And the -- and the 3504 Rockwood, on 4/11/2022, call was serious because of the aggravated assault?

A. The -- right. The aggravated assault.

Q. Not because of the dogs?

A. Well, it's all together. It's one thing

Page 84

compounded together.

Q. So who retains possession of your notebook after you've filled it?

A. No one does.

Q. What do you do with it?

A. Just throw it away.

Q. What do you use your notebook for?

A. I --

Q. Why are you taking notes?

A. For clarification. That's -- the weakest pencil is stronger than the best mind.

Q. Clarification of events?

A. Yes. That's good.

Q. So what do you -- what do you do with it? If you throw it out later, what -- what are you doing with your notes?

A. The notes are basically taken so if I generate a report, I can be accurate, so I don't -- at this time, we have body-worn cameras. We can play back cameras. But I just -- from -- I'm stuck in the time where -- before the cameras, where I just -- we just take good notes. That's what they taught us in the academy, always reference -- you just take good notes.

Q. The notes that you took regarding 4/11/2022, you gave to another officer, correct?

Page 85

MS. HARRELL: Object to the form.

A. Yeah, there was an officer generating a -- there was an officer generating a report, so I gave him the -- gave him some information.

BY MS. VENZA:

Q. Was that Officer Yates?

A. I can't recall if it was Burford or Yates.

Q. You didn't give it to Officer K. Burford, did you?

A. I'm not sure. It could -- it would be one or the other, whoever would have been generating the reports. It's -- it would be on camera, so it would be -- as we go through it, we'll see. I mean, I can't be a hundred percent certain.

Q. Okay. So we know that you -- the notes that you did have that you took on 4/11/2022, you do know you gave to somebody else?

A. Right.

Q. Do you know what that officer did with those notes, other than maybe use it to write their report?

MS. HARRELL: Object to the form.

A. I can't tell you what someone else --

BY MS. VENZA:

Q. I mean, did they give it back to you, is what I'm asking.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                        Pages 86..89

Page 86

A. Okay. That's -- that's the question. No.

Q. Jaivon Ellington, did you know him before 4/11/2022?

A. I can't recall ever meeting him, but I -- I would venture out and say no.

Q. Same question with regard his mother, Malene.

A. Same.

Q. So other than 4/11/2022, had you had any interactions with either of them?

A. I can't recall. I would venture out to say no.

Q. Before you went to the front door of 3504 Rockwood, had you talked to Jaivon Ellington?

A. No.

Q. Did you drive around the block to -- did you drive around the block?

A. Yes.

Q. Is that on your body-wear cam video?

A. I don't -- I don't think that would be on the body-worn -- body-worn camera --

Q. Okay.

A. -- video, of me riding around the block.

Q. Why did you drive around the block?

A. Just looking for people in the area. I was actually looking for -- to see if I actually saw Jaivon.

Q. Did you?

Page 87

A. No.

Q. Were you looking to see where he lived?

A. I was -- I was looking for him, the person.

Q. Did you know who you were looking for?

A. Just a young black male.

Q. Anything else for the description that you were looking for?

A. No.

Q. Did you find him?

A. No, ma'am, I did not find Jaivon.

Q. Did you check his bus route?

A. I didn't meet him, so I wouldn't -- I wouldn't have known his bus route. And I talked to his mother about walking and him taking an alternate course or direction, and she mentioned that was the only way that he goes. So --

Q. Did you drive past his house?

A. I don't -- I don't think I drove past his house.

Q. Did you have some interactions with Jaivon on 4/11/2022?

A. No.

Q. And you alluded to this earlier, K. Burford completed the -- correct me if I'm wrong -- Response to Resistance report -- or is it an Incident Report?

Page 88

A. Incident Report.

Q. Is that a report that you -- you did not complete one; is that right?

A. Right. I did not complete any reports.

Q. Okay. Is an Incident Report one that you would have completed if events didn't escalate on 4/11/2022?

A. In an incident, as -- what you mean, as far as -- if an incident wouldn't have occurred, I would have wrote a report, whether -- to ascertain whether the homeowner had a gun or not was evidence, if -- if there was a factual incident of aggravated assault or a person actually exercising their second amendment rights, I would have -- I would have wrote a report to that effect, if --

Q. Is --

A. -- the incidents would have occurred -- if -- if nothing would have -- would have happened in that -- in that manner.

But then if you're asking about a situation as far as a dog being -- a dog being shot by the police, then the lieutenant would complete the Response to Resistance report.

Q. But in this instance, this instance being 4/11/2022, K. Burford completed the Incident Report, correct?

Page 89

A. Yes, I believe he did.

Q. So did you relay your accounting of events before the dog shooting to K. Burford?

MR. BUEKER: Object to form.

MS. HARRELL: Join.

A. Yes, I informed him of --

BY MS. VENZA:

Q. And --

A. -- the incident.

Q. And then K. Burford did his own investigation?

A. Yes.

Q. And you've said you have reviewed K. Burford's report, correct?

A. Yes, I reviewed his report.

Q. Which included that Jaivon, who originally told his mother who told you about a man pulling a gun, had changed his story, correct?

MS. HARRELL: Object to the form.

A. Okay. Do you have the report on file?

BY MS. VENZA:

Q. I do.

A. May I --

Q. But I'm asking you -- you've reviewed it before, right?

A. I did review it.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 90..93

Page 90

Q. I'm sorry?

A. I did review the report.

Q. Okay. And you testified earlier there was a retraction of Jaivon's telling that a man pulled a gun on him?

MR. BUEKER: Object to form.

MS. HARRELL: Object to the form.

A. Okay. That -- that's in the report, but I wanted to read it to you verbatim.

BY MS. VENZA:

Q. So Jaivon --

A. So --

Q. -- was either mistaken --

A. So that --

Q. -- or lied?

A. My -- my report --

MS. HARRELL: Object to the -- let me object to her statement --

MR. BUEKER: Yeah. Join.

MS. HARRELL: -- and then you can -- I don't know if there's a question, but if there is, you can answer it.

BY MS. VENZA:

Q. So Jaivon was either mistaken or lied, correct, about the man pulling a gun?

Page 91

MS. HARRELL: Object to the form.

MR. BUEKER: Object to form.

A. It's in the report. If you have the report, I'll read it to you, what Officer Burford wrote in his findings.

BY MS. VENZA:

Q. Because you're unable to answer my question?

MS. HARRELL: Object to the form.

Counsel, you are asking him about the contents of a report. He's not expected to memorize it. You are harassing the witness. You are being annoying and oppressive. I'm going to move for a protective order.

BY MS. VENZA:

Q. If a witness tells a police officer one version of events and then tells a police officer a different version of those events, what do you usually conclude?

MS. HARRELL: Object to the form. You can answer.

A. Personally, at that time of 15 years, I would have really asked them both again to make sure that everything is factual or it comes close.

BY MS. VENZA:

Q. So the --

A. The -- the reason -- and reason being, if you

Page 92

have the report, I can -- I can read to you verbatim what --

Q. I --

A. -- Officer Burford wrote. Is that what you want?

Q. I -- I asked you my question. You're a police officer and you have -- through your 19 years, you have people tell you about an event that happened, correct?

A. Uh-huh.

Q. And then later, you learn that not everything they reported to you is accurate, correct? You've had --

A. People -- if you're asking, people do lie. People -- I've experienced, people lie all the time.

Q. So some people lie and some people make a mistake, correct?

A. That's -- that's true.

Q. Jaivon also said two pit bulls were chasing him, correct?

A. And -- and that's in Officer Burford's report? Or -- because I didn't talk to him.

Q. Well, when you talked to the mother --

A. She said dogs. I can't -- I can't tell you --

Q. Were --

A. -- it was two or more that -- she used the --

Page 93

from my recollection, she used the word "dogs" --

Q. Earlier in your --

A. -- (inaudible).

(Simultaneous speaking.)

Q. Are you done?

A. Yeah.

Q. Okay.

A. She used the word "dogs," plural.

Q. Earlier in your testimony when I asked you about your conversation with Ms. Ellington, you said she said two pit bulls.

MS. HARRELL: Object to the form.

A. I recall telling you that they were pit bulls. I don't --

BY MS. VENZA:

Q. You don't know how --

A. I don't recall saying there were two pit bulls.

Q. Okay. Were there any pit bulls at Ms. -- I'm sorry.

Were there any pit bulls at 3504 Rockwood?

A. Not -- there was -- Lucy was -- was there. I don't know about the other dog.

Q. Okay. I'm looking at Exhibit 1. Is Lucy a pit bull?

A. She could be mixed.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Pages 94..97

Page 94

Q.   Did you see any pit bulls at the property?

A.   I only -- I only saw Lucy.

Q.   Lucy, who could be a mix?

A.   Uh-huh.

Q.   Yes?

A.   I said she could be a mix.

Q.   You said "uh-huh," and I was trying to clarify that you --

A.   Yeah.  Right.  Yes, she could be a mix.  I could see features of a pit bull.

Q.   Your interactions with Malene on 4/11/2022 that you testified about, did you independently remember that or did you review something specifically to refresh your recollection?

MS. HARRELL:  Object to the form.

A.   Explain that to me.

BY MS. VENZA:

Q.   We -- when we -- when I'm asking you questions about your interactions with Marlene [sic] --

A.   Uh-huh.

Q.   -- Malene on 4/11/2022, how were you able to answer my questions?  Was that because you reviewed something recently or was that independent recollection?

MS. HARRELL:  Object to the form.

You can answer.

Page 95

A.   As far as me preparing for this deposition?

BY MS. VENZA:

Q.   As far as your answering my questions.

A.   No, I watched the body-worn camera of the conversation.

(Brief discussion held off the record.)

A.   I reviewed the body-worn camera of me speaking to Malene on the phone, Ms. Ellington, on the phone.

BY MS. VENZA:

Q.   Did you review K. Buford's [sic] -- Burford's report before it was finalized?

A.   I can't recall, but the answer -- if I would venture out, I would say no, I didn't review his --

Q.   You said you reviewed it before today, though, correct?

A.   Yes, I did.

Q.   Do you agree with it?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.   I'm not going to answer that question.

BY MS. VENZA:

Q.   Why not?

A.   Because -- you asked me, do I agree with it?

Q.   Did you agree with it?  You reviewed it.  So did you agree with it?

Page 96

A.   I mean, he -- he wrote the report and he's a -- he's a -- he's a standup officer.  He's a good guy.  So I would -- I think it would be factual.  As far as me agreeing with his report or --

Q.   Uh-huh.

A.   -- disagreeing with his report --

Q.   Uh-huh.

A.   -- I mean, that's -- I don't understand the relevance of that question.

Q.   You don't need to understand the relevance, you just need to answer the question.

MS. HARRELL:  Object to the form.

A.   I don't understand the relevance, but if he -- if he wrote -- if Burford wrote the report, I would agree with it.

BY MS. VENZA:

Q.   If there was something factually inaccurate that you read in there, you would have said something or requested a correction, yes?

A.   I mean, he's a standup guy and a good officer.  He has a -- he has a reputation of being a good guy, being a good officer and a hard worker, so I can attest for his character, that -- that he would do a good -- a good investigation and documented the report.

Q.   If you read his report and it said, when

Page 97

Officer Lampkin arrived at the scene there were 15 pit bulls running around on the front lawn, would you have corrected him or sought to correct that report?

MS. HARRELL:  Object to the form.

You can answer.

A.   I would -- I would have told him, yes.

BY MS. VENZA:

Q.   So was there anything about K. Burford's report that you told him about, you said, you got this wrong, or, this is not correct?

A.   Burford -- Burford, he did some other investigating, which I wasn't there, so I wasn't privy to the -- to his discovery in parts of that report.  So to go in and -- I can tell you what was factual on my end, but I can trust his character that, you know, he will do a complete report.  But everything that -- part of his investigation was not something that I handed over to him.  There was some discovery on his own part.

Q.   So after his report -- you never met with him after to discuss something in his report that you thought needed to be changed?

A.   No.  I didn't read his report until years later; however, you know, that -- that's his report, and I believe -- I believe his report is accurate.

Q.   Okay.  And you never met with him --

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

A.  No.

Q.  -- after and said --

A.  I gave -- I gave him my portion of it, and he did the further investigating on his part.

Q.  What's your relationship with A. Sircar, Officer A. Sircar?

MS. HARRELL:  Object to the form.

A.  My lieutenant at the time.  He was my lieutenant.

BY MS. VENZA:

Q.  Okay.  So he was your lieutenant at the time, 4/11/2022?

A.  Yes, ma'am, the lieutenant in command.

Q.  And what was your relationship with him?

A.  My professional relationship.  He's my lieutenant.  I'm an officer.

Q.  Did you review -- he completed -- and correct me if I'm wrong -- an RTR report, correct?

A.  Yes.

Q.  Would you explain that to me?  Because there was a shooting, so the lieutenant -- there was a dog shooting, so the lieutenant completes the RTR, correct?

A.  Yes.

Q.  Have you reviewed his RTR about the 4/11/2022 shooting of Lucy before today?

A.  Yes.

Q.  Did you give him a statement under oath about events on 4/11/2022?

A.  I wouldn't call it under oath.

Q.  What would you call it?

A.  I gave him a statement.  It's part of the -- part of what the process is.  I can't recall if it -- I had to raise my right hand.  Is that what you mean by under oath, raising --

Q.  Yes, I do --

A.  -- my right hand and --

Q.  That's what I mean; you were not under oath when you talked to him?

A.  Right.

Q.  Okay.  Do you know why he -- he states in his report that you testified?

MS. HARRELL:  Object to the form.

A.  I don't recall him saying that I testified.

BY MS. VENZA:

Q.  Do you -- and my -- my correction.  Testimony.

So his use of "testimony" -- and I'm going to go ahead and ask the court reporter to mark this as Barus's report -- not Barus's report, I'm sorry -- A. Sircar's report, RTR, from 4/11/2022.

(Plaintiff's Exhibit Number 2 was marked for

identification.)

(Brief discussion held off the record.)

BY MS. VENZA:

Q.  Okay.  I'm -- I'm looking at Page 3.  At the very top, it says, From the BWC -- body-wear camera -- and Officer Lampkin's testimony.

Do you see that right -- the first sentence?

A.  Yeah.  Yeah.

Q.  Do you have any reason -- do you have any reason why he used the term "testimony"?

A.  I -- maybe to describe my account of the event. I mean, it's --

Q.  So that's what I was getting at.  Testimony in the legal world means you're under oath.  You were not under oath when you spoke to --

A.  But you said he said under oath.

Q.  I'm sorry?

A.  You said that.

Q.  Right.  I'm saying in the lawyer world, "testimony" means someone is under oath.

MS. HARRELL:  Object to the form.

BY MS. VENZA:

Q.  And that's why I'm asking whether you were under oath when you spoke to him.

MR. BUEKER:  Join.

A.  Now, speaking to a lieutenant, you or any other officer, you're not going to say something that's not true, right?  So as far as if he writes "testimony" to say his -- if that's his way of describing it, that's his way of describing it.  But if you're asking me did I raise my right hand, no, I didn't raise my right hand. So that's what he was saying, not was I under oath.

BY MS. VENZA:

Q.  Did you review Officer Sircar's report before it was finalized?

A.  No.

Q.  You told Ms. Barus that somebody called about a kid on the hood of your car being chased by dogs and your husband pulling a gun on him, correct?  I'm just trying to reorient us.

Correct?

A.  Yes, ma'am.

Q.  Okay.  The hood of what car?

MR. BUEKER:  Object to the form.

MS. HARRELL:  Join.

A.  She didn't describe a car.  She said the hood of a car.

BY MS. VENZA:

Q.  So you didn't know which car?

A.  No, not at the time.  Not at -- not -- not

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

Page 102

after my initial conversation, my walking up.

Q. Nonetheless, so there's two cars on the property, correct?

A. Uh-huh. Uh-huh.

Q. That's a yes?

A. Yes. Two cars right there.

Q. I'm trying to get you -- because you said "uh-huh" again --

A. Okay.

Q. -- so I was just trying to get you to do the verbal.

And both cars are on -- entirely on the Barus property, correct?

A. Yes.

Q. So if someone is standing on a car of the Barus' property, whether -- whether it's the silver or the white, they are on the Barus' property, correct?

MS. HARRELL: Object to the form.

A. Yes, the car is on the property, so they would be, technically, on the property at that time.

BY MS. VENZA:

Q. Is it your understanding that Jaivon was wearing a black COVID mask and a dark jacket on 4/11/2022?

A. No, I wasn't aware of that.

Page 103

Q. If it was in K. Burford's report, would you agree with it?

A. If he wrote it, I would agree with it.

Q. Do you know where Jaivon's house is in relation to the -- on 4/11/2022, did you know where Jaivon's house was in relation to the Barus house and the hood of the car?

A. I could only believe that it's in the immediate area because he -- he's walking to a bus stop.

Q. So by looking at this video, and even if I let it play all the way, that doesn't help you, you don't know where his house was, correct?

A. Correct.

Q. And you don't know where the bus stop was, correct?

A. Correct.

Q. Have you ever owned a dog?

A. Ma'am?

Q. Have you ever owned a dog?

A. Yes.

Q. How many in your lifetime?

A. I can't tell you.

Q. So --

A. Many.

Q. Many?

Page 104

A. Uh-huh.

Q. That's a yes?

A. That's a yes. I've owned dogs before.

MS. HARRELL: Remember -- just remember, you have to say yes or no for the court reporter because she can't --

THE WITNESS: Okay.

MS. HARRELL: It's hard for her to take down uh-huh or unh-unh.

MR. BUEKER: That's an -- unh-unh is a tough word to spell.

THE WITNESS: I'll watch it.

MR. BUEKER: And it sounds -- it's spelled very similarly to uh-huh.

BY MS. VENZA:

Q. Do you currently own a dog?

A. Yes.

Q. Why are you hesitating?

A. Because it's personal information, and my private life is not relevant in this case. Like HIPAA law, it's private law, children's names, where I live, that's -- all that should be focused on is what happened on that day.

Q. How old were you when you got your first dog?

MS. HARRELL: Object to the form.

Page 105

A. I can't tell you.

BY MS. VENZA:

Q. Have you had dogs your whole life?

A. I probably was about four years old. So --

Q. Any of your dogs euthanized?

A. Euthanized? No.

Q. I'm sorry. You said no?

A. No.

Q. Any of your dogs killed?

A. Yes.

Q. Car accident?

A. Uh-huh.

Q. Is that a yes?

A. That's a yes. Thank you.

Q. And --

MS. HARRELL: Counsel, we're venturing again into harassment and oppression. His history with dogs is not relevant to whether your client's constitutional rights were violated, so --

MS. VENZA: It is relevant to their damages.

MS. HARRELL: No, no, no, no. His feelings and his dog history is not at all relevant to your client's damages, so I don't

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                        Pages 106..109

Page 106

want to --
    MS. VENZA:  It also has to do with his ability to interact with dogs.
    MS. HARRELL:  And again, we're going to limit it.  Officer Lampkin --
    MS. VENZA:  Okay.  Do you -- do you want to make --
    (Simultaneous speaking.)
    MS. HARRELL:  I am making a motion for a protective order, and I am setting the grounds for it in case we have to call the judge.
    Officer Lampkin has been vilified and harassed outside of this litigation, and you're continuing the pattern in this --
    MS. VENZA:  Your tone is --
    MS. HARRELL:  -- deposition.
    MS. VENZA:  -- is unnecessary, Sonya.
    MS. HARRELL:  I -- I am making my record.  I am --
    MS. VENZA:  Okay.  You can --
    MS. HARRELL:  Don't interrupt me --
    (Simultaneous speaking.)
    MS. VENZA:  -- you don't need to have a tone.
    MS. HARRELL:  You don't need -- don't --

Page 107

do not interrupt me.  Let me make my motion.
    Limit the harassing, annoying, and oppressive inquires into Officer Lampkin's personal history and personal matters.  That is my motion.  I am moving for a protective order.  I'm putting it on the record.
    If this line of questions continues and there's no relevance, we will -- we will pause the proceedings and have to talk to the magistrate.
    You may proceed.
BY MS. VENZA:
    Q.  Are you trained in how to interact with dogs?
    A.  Ma'am?
    Q.  Are you trained in how to interact with dogs?
    A.  Yes.
    Q.  What training have you received?
    A.  Monthly roll call training.
    Q.  And I'm sorry, you --
    A.  Monthly roll call training.
    Q.  Monthly roll call training with the JSO?
    A.  Yes.
    Q.  Since when?
    A.  I can't tell you the dates specifically.  They are in Acadis.  But we had a segment of training,

Page 108

monthly training where they focused on officers interacting with animals.
    Q.  Oh.  So this -- this is not every month currently that you have dog training?
    A.  No, no.
    Q.  Are you referring to training in 2015?
    A.  Could be 2015.
    Q.  Okay.  So you -- all right.  You say monthly roll call.  That's when -- do you recall seeing videos about animal -- animals, dog training?  Is that what you're referring to?
    A.  Yes.  Computer-based training.
    Q.  I'm sorry, computer based?
    A.  Computer-based training, where we get monthly training on different subjects.
    Q.  That is not occurring -- has that happened in 2026?
    A.  No.
    Q.  Okay.  Other than the monthly training with JSO that you're referring to, have you had any other dog training?
    A.  No, outside of just my personal experience.
    Q.  Okay.  So what training have you had in your personal experience?
    A.  Raising dogs in general.

Page 109

    Q.  So just -- you have not had formal training outside of JSO?
    A.  No, no formal training where I was awarded certificates and plaques.  Nothing of that nature.
    Q.  Did you ever hire a dog trainer for any of your -- any of the dogs that you have owned since you were about four?
    A.  No.
    MS. VENZA:  I'm going to hand you, after the court reporter marks it, deposition Exhibit 3.
    (Plaintiff's Exhibit Number 3 was marked for identification.)
BY MS. VENZA:
    Q.  These are a series of information bulletins from 2015.  I believe one is improperly dated 2014.
    Do these refresh -- is this what you're referring to by your dog training?
    A.  Yes.
    Q.  There was five, 15-minute segments during the year 2015, correct?
    A.  Well, there were -- there were segments, yeah, like additional --
    Q.  Okay.  I'll --
    A.  -- additional training --

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

Page 110

(Simultaneous speaking.)

Q. -- with you, but I'll represent to you that we deposed -- we deposed Chief Weber yesterday about this case. Were you aware of that?

A. Yes.

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. Did you talk to Chief Weber about her testimony yesterday, either before or after?

A. No.

Q. How did you know that she testified?

MS. HARRELL: Objection. Subject to attorney-client privilege.

Don't answer that.

BY MS. VENZA:

Q. And if I represent to you that she testified and confirmed yesterday that this was the dog training that the City has given its officers, would you have any reason to disagree with it?

A. No.

Q. Okay. And this will show you -- and if you want to read through it, you're more than welcome to -- it says, Police & Dog Encounters, 1 of 5 -- you see it on the very first page down near the bottom. Police & Dog Encounters, 1 of 5, Video, 15 minutes.

Page 111

A. Yes.

Q. Do you see that?

A. Uh-huh.

Q. So there were -- that's a yes?

A. Yes. That's a yes.

Q. That was five 15-minute videos.

A. Okay.

Q. And it was throughout the year 2015?

A. Yes.

Q. And those are the -- those are the roll call trainings you're referring to?

A. Yes.

Q. Other than that, did you receive any other training from JSO or the City with regard to dogs?

A. No.

Q. Did you receive any training from the City or JSO with regard to canines?

A. No.

Q. Have you ever been -- before 4/11/2022, have you ever been bitten by a dog?

A. No, never been bitten by a dog.

Q. Do you agree that for some people their pets are like their children?

A. Yes.

MS. HARRELL: Object to form.

Page 112

BY MS. VENZA:

Q. Were you aware that when you fired your weapon at Lucy there were children in the Barus' backyard?

MS. HARRELL: Object to form.

MR. BUEKER: Object to form.

A. No.

BY MS. VENZA:

Q. Is it your understanding that every barking dog is a threat?

MS. HARRELL: Object to the form.

A. No.

BY MS. VENZA:

Q. Is it your understanding that every dog with a tail wagging is friendly?

MS. HARRELL: Object to the form.

A. One more time?

BY MS. VENZA:

Q. Is it your understanding that every dog with a tail wagging is friendly?

MS. HARRELL: Object to the form.

MR. BUEKER: Object to form.

A. It -- it depends on the dog.

BY MS. VENZA:

Q. Would that --

A. All dogs -- it is a -- it could be symbolized,

Page 113

yes, by some, but it's -- it's not all the same.

Q. And I didn't hear the word. It could be what?

A. It's not the same. All dogs who wags [sic] their tail is not friendly.

Q. And was that your --

A. But it's a common -- it's a common display for most dogs.

Q. And was that your understanding on 4/11/2022?

A. No. I know some dogs who can wag their tail and -- and be aggressive.

Q. No, I'm saying on 4/11/2022, did you believe that because a dog, Lucy, was wagging her tail --

A. Yeah, I -- yeah, I --

MS. HARRELL: Let her finish her question.

THE WITNESS: Okay.

BY MS. VENZA:

Q. -- she was wagging her tail, that she was friendly?

A. I thought Lucy was friendly.

Q. Okay. And I'm asking, because she was wagging her tail, did you think she was friendly?

A. Yes, I did.

Q. And so you've since come to learn that that may mean something else, correct?

A. Correct.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Pages 114..117

Page 114

Q. What information did you expect to learn from visually observing Lucy on 4/11/2022?

A. Ma'am? Clarify your question.

Q. What part is unclear?

A. I mean, you were just asking me, what did I expect to learn from visually observing her.

Q. Yes. That's the question.

A. Okay. It's -- it's kind of a standalone question. There's, like, no leading up to it or what have you.

Visually observing Lucy, I mean, that's -- what do I expect to learn? So I think I need you to clarify the question.

Q. Do you understand the question?

A. I need you to clarify it.

Q. (No response.)

A. Do your best.

Q. When you went to -- when you went to the front of the house, Lucy was not there, at the front of 3504 Rockwood?

A. Uh-huh.

Q. Correct statement by me?

A. Yes, ma'am.

Q. And then you went around to the back of the house to visually observe Lucy -- or the dogs, I should

Page 115

say. You went around the back of the house to visually observe dogs, correct?

MS. HARRELL: Object to the form.

A. No.

BY MS. VENZA:

Q. No?

A. I went around to the back of the house. The lady, she -- she wanted to open the gate. I obliged for her. She said that her dogs would not come out of the gate unless -- even if she opened the gate. But that was the process of me going around the house, to let the -- Ms. Kimberly -- how do you pronounce her last name?

Q. Barus.

A. Barus. Thank you.

Yeah. So, basically, she wanted -- she -- I obliged to her statement that she wanted to open the gate to show me that her dog wouldn't come out of the gate.

MS. VENZA: I'm going to ask the court reporter to mark this as an exhibit. This is Defendant Karl D. Lampkin's Second Amended Answers to Plaintiff's Interrogatories.

THE REPORTER: This is Exhibit 4.

MS. VENZA: Thank you.

Page 116

(Plaintiff's Exhibit Number 4 was marked for identification.)

BY MS. VENZA:

Q. Okay. And, sir, can you go to the last page?

A. (Complies.)

Q. Is that your signature?

A. Yes, that's my signature.

Q. And it states that you swear under oath on December 19, 2025, that the answers contained in this document are true and accurate?

A. Yes.

Q. Okay. Now, I'd like to direct your attention to page -- it's Page 11. It's Question Number 22.

A. So Page 11?

Q. Yeah. It's marked off the -- I mean, my copy is hard to see. Question Number 22.

A. Question 22? Okay.

(Peruses document.)

Oh, why did I direct the plaintiff to open the gate, thereby allowing --

Q. But --

A. -- Lucy to escape?

Q. So let's keep it clear for the record.

So 22 asks, "What information did you expect to learn from visually observing Lucy on April 11, 2022?"

Page 117

Do you see that question?

A. Yes.

Q. Okay. And I'm going to ask you to -- to go down to the part that's highlighted in yellow.

A. Uh-huh.

Q. And what did you say as your answer?

A. That I wanted to observe whether the dog would, in fact, come out of the fence, so I responded, okay, let me see them.

Q. Okay. So the -- the answer that you gave under oath was, "I expected to gain information regarding the dog's behavior and demeanor and whether the dog would leave the fenced-in area if the gate was open."

Correct?

MS. HARRELL: Object to the form.

A. Okay.

BY MS. VENZA:

Q. Is that --

A. Now, you -- that's here. What -- what's being wrote is right here, right? So --

Q. So this was your answer. And I'm asking the questions.

This was your answer that you gave on December 19, 2025, correct?

A. Yes, that is my answer. Uh-huh.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Pages 118..121

Page 118

Q.   That's your answer?

A.   Yes.

Q.   You were aware that there had been a robbery -- a robbery at 3504 Rockwood previously?

A.   I can't recall that.  It -- was that towards -- towards your -- Ms. Barus's family?

Q.   Well, the -- the address, 3504 Rockwood.

A.   Yeah.

Q.   Let me put it this way -- I should have -- that was a bad question.

Before your service call to 3504 Rockwood on 4/11/2022, were you aware that there had been a robbery at that address within the last year?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.   That's a no.

BY MS. VENZA:

Q.   Or within the last two years?

MR. BUEKER:  Object to form.

MS. HARRELL:  Same objection.

A.   I wasn't aware of any --

BY MS. VENZA:

Q.   Any --

A.   -- robbery or -- or them experiencing any type of robbery, or a robbery at that location.

Page 119

Q.   And now your investigation at 3504 Rockwood was regarding dogs, plural, correct?

A.   Yes.

Q.   And you didn't know how many, correct?

A.   Correct.

Q.   So when you directed Ms. Barus, "You go open the gate," you didn't know how many dogs would be coming -- or could possibly come out of the gate, correct?

MS. HARRELL:  Object to the form.

A.   I didn't direct her to open the gate.  I obliged to her --

BY MS. VENZA:

Q.   Okay.  If you could -- I'm going to cue it up.

MS. HARRELL:  He's -- he -- I don't --

Were you finished answering your question?

THE WITNESS:  Yes.

MS. HARRELL:  Okay.

BY MS. VENZA:

Q.   So you -- you don't recall telling her to open the gate?

A.   Your words were --

MS. HARRELL:  Object to the form.

A.   -- direct her to open the gate.

BY MS. VENZA:

Page 120

Q.   Oh.  So you're taking issue with the word "direct" versus "tell"?

MS. HARRELL:  Object to the form.

A.   Yeah, because you're saying that -- direct, meaning that I made her open the gate, and that was not the case.

BY MS. VENZA:

Q.   Okay.  I'm at the video.  The times tape [sic] on the bottom is 03:44.  At the top, it's T11:21:5- -- can anybody see that, it's either -- -8Z.

(Still frame of video displayed.)

Q.   And that's Mr. Barus in the image, correct?

A.   Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  You go open the gate. I'll be there.

MR. J. BARUS:  Besides getting woke the hell up.

OFFICER LAMPKIN:  Okay.  Did you pull -- did you have something --

(Video playback ends.)

BY MS. VENZA:

Q.   Let me back up again so you can hear it.

Page 121

(Video playback begins.)

A.   Could -- could you play before that?

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  How are you doing, sir?

MR. J. BARUS:  I'm doing great.

MS. BARUS:  Come on.

MR. J. BARUS:  Yourself?

OFFICER LAMPKIN:  No, go ahead.  You go open the gate.  I'll be there.

(Video playback continues.)

BY MS. VENZA:

Q.   Sure.

(Video playback continues.)

(Whereupon, the following dialog was transcribed from video:)

MR. J. BARUS:  Besides getting woke the hell up.

(Video playback ends.)

BY MS. VENZA:

Q.   Okay.  I've now backed it up --

A.   Just a little bit more, if you don't mind.

Q.   I'll back it up to an even 2:50.  Is the --

(Video playback begins.)

(Whereupon, the following dialog was

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 122..125

Page 122

transcribed from video:)

MS. BARUS: He was. He had --

(Video playback ends.)

BY MS. VENZA:

Q. There? I was there. Hold on. Let me --

A. Okay.

Q. All right. I'm going to --

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: -- car.

OFFICER LAMPKIN: Okay.

(Video playback ends.)

BY MS. VENZA:

Q. I'm starting it at 2:40, top corner T11:20:54Z. You ready?

A. Uh-huh.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: -- I told him it was about to be a bad day for him, and I come back in the back door. And when I did, he took off running up the road. That's the last we seen of him.

OFFICER LAMPKIN: Okay.

Page 123

MS. BARUS: I was hoping his momma would come back down here. You don't send a kid out at 6:30 in the morning to somebody's house, opening a gate in their backyard.

OFFICER LAMPKIN: So is he in your backyard?

MS. BARUS: He was. He had to have been. The gate was open.

OFFICER LAMPKIN: Did --

MS. BARUS: My dogs would have been out.

MR. J. BARUS: Our dogs surprised him when he stepped in --

MS. BARUS: Yeah.

MR. J. BARUS: -- that gate.

MS. BARUS: That's what happened.

OFFICER LAMPKIN: Uh-huh.

MR. J. BARUS: And --

(Simultaneous speaking.)

OFFICER LAMPKIN: And why --

MS. BARUS: -- my heat pump stolen out here. I've had a table stolen out here. That's why those dogs are back there.

OFFICER LAMPKIN: And was he -- was he standing on the top of your car?

MR. J. BARUS: Yes.

Page 124

MS. BARUS: On the back of the car.

MR. J. BARUS: On the trunk of the car.

OFFICER LAMPKIN: Okay.

MS. BARUS: And would not leave.

OFFICER LAMPKIN: And was his mother on the phone at --

(Video playback ends.)

BY MS. VENZA:

Q. Which car is Ms. Barus pointing to?

A. The white car.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: I don't know. I do not know. He wouldn't -- I don't know. He got down and ran, and that's all we know, is he ran around that corner --

OFFICER LAMPKIN: And where were your dogs?

MS. BARUS: -- and up that road.

MR. J. BARUS: In the fence.

MS. BARUS: In the backyard.

OFFICER LAMPKIN: Do your dogs ever come outside?

MR. J. BARUS: No.

Page 125

MS. BARUS: No.

MR. J. BARUS: You can go back there and open that gate --

MS. BARUS: You can -- I'll go open it right now, and they will not come out of that fence on you.

OFFICER LAMPKIN: Okay. Well, let me see them.

(Video playback ends.)

BY MS. VENZA:

Q. Okay. And then you ask her to let you see them, correct?

MR. BUEKER: Form.

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. Correct?

A. Yes.

Q. And you're referring to "them," plural, correct?

A. Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: How are you doing, sir?

MR. J. BARUS: I'm doing great --

Case 3:24-cv-01358-MMH-SJH    Document 74-1    Filed 06/01/26    Page 34 of 89 PageID 1618

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                              Pages 126..129

Page 126

MS. BARUS: Come on.

MR. J. BARUS: Yourself?

(Video playback ends.)

BY MS. VENZA:

Q. Could you hear at 3:42:03 Ms. Barus saying, "Come on"?

A. Yes.

Q. Okay. And you responded. And that's where we were at.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: No, go ahead. You go open the gate. I'll be there.

MR. J. BARUS: Besides --

(Video playback ends.)

BY MS. VENZA:

Q. So you told her, "You go open the gate"?

A. Yeah. I was separating them for a purpose.

Q. Okay. You said specifically, No, you go ahead, You go open the gate, I'll be right there. Correct?

A. Right. To see --

MS. HARRELL: Object to the form. Lack of context.

Page 127

BY MS. VENZA:

Q. Now, back to my question about your answer to Question Number 22 in which you said, "I expected to gain information regarding the dog's behavior and demeanor and whether the dog would leave the fenced-in area if the gate was open."

What did you expect to learn?

MR. BUEKER: Object to form.

MS. HARRELL: Join.

A. Well, she said they would open it and they would not leave the gate, and that -- at that point, see if the dogs would come out the gate, see if they were aggressive as -- as what they -- as what was being reported.

BY MS. VENZA:

Q. Okay. So you wanted her to open the gate for multiple dogs for which you were investigating a complaint that dogs had chased somebody onto a hood of a car, correct?

MS. HARRELL: Object to the form.

A. Her testimony was that -- her statement, rather, was that the dogs wouldn't leave the fenced-in area even if the gate was open.

BY MS. VENZA:

Q. Can you answer my question, please?

Page 128

MS. HARRELL: Object to the form.

MS. VENZA: Court reporter, can you read back the question?

(Whereupon, the following question was read by the reporter:

"Q. So you wanted her to open the gate for multiple dogs for which you were investigating a complaint that dogs had chased somebody onto the hood of a car, correct?")

A. I obliged the question -- I obliged her statement that she wanted to open the gate. I told her to go ahead.

BY MS. VENZA:

Q. Did you believe Ms. Barus when she said they won't come out of the gate?

MS. HARRELL: Object to the form.

A. I had -- I had no thoughts of her. I had no reason to disprove that, but she wanted to show me that, so that's where we were, with me obliging to her opening the gate.

BY MS. VENZA:

Q. I didn't understand your answer. Did you believe her or not?

MS. HARRELL: Object to the form. Asked and answered.

Page 129

A. Did I believe her?

BY MS. VENZA:

Q. Yeah. Did you believe her?

MS. HARRELL: Object to the form.

A. It was something that we had to discover. There was -- there was no thought of actual -- actual -- saying whether I believe her or not. We were in the moment. I was focusing on speaking with the -- speaking with them separately for the allegation of the aggravated assault.

BY MS. VENZA:

Q. Were you skeptical?

A. I was skeptical.

Q. Do you agree that a dog chasing a trespasser off property is different than a dog running at large?

MR. BUEKER: Object to form.

MS. HARRELL: Object to the form.

A. Are you asking me are they same or is one ethical or unethical?

BY MS. VENZA:

Q. No, I'm asking if they're the same.

A. If a -- if a dog is chasing a trespasser and if the dog is attacking someone, is that what -- is that what you're saying, that they're the same?

Q. Do you agree that a dog chasing a trespasser

Page 130

off property is different than a dog running at large?

A. Yeah. That -- that's different.

Q. Do you agree that whether one or two dogs come out of the gate when its owner is standing there and has let them out would not be a reasonable evaluation of how dogs acted at 6:30 a.m.?

MR. BUEKER: Form.

MS. HARRELL: Object to the form.

A. Read that again, please.

BY MS. VENZA:

Q. Do you agree that whether one dog or two dogs came out of the gate when its owner is standing there and has let them out would not be a reasonable evaluation of how the dogs acted at 6:30 a.m.?

A. It all depends on the dog. I can't -- I can't say -- would that be reasonable or not, I can just say that that depends on -- on the dog and their level of training, their level of socialization.

Q. What kind of training did Ms. Barus's dog have on 4/11/2022?

MS. HARRELL: Object to the form.

A. I have no idea.

BY MS. VENZA:

Q. And you didn't have any idea at that time, correct?

Page 131

A. Correct.

Q. Did you really want to see the dogs or did you want to separate Mr. and Ms. Barus?

MS. HARRELL: Object to the form.

A. To separate them to get individual statements.

BY MS. VENZA:

Q. Because you were skeptical of their statements?

A. No, because I wanted to prove or disprove that there was -- there was an allegation of aggravated assault.

Q. So --

A. Yeah. So he -- I was speaking with them, and it seems like her -- she wouldn't allow Mr. Barus to speak while they were together at the front door.

Q. Could you have just asked Ms. Barus to step away or step in the house so you could talk to her husband?

MS. HARRELL: Object to the form.

A. That's a possibility. It could have happened that way.

BY MS. VENZA:

Q. Do you agree that from the trunk of the white vehicle on the Barus' property, you could not see the front door?

A. I'm sorry?

Page 132

Q. Do you agree that standing on the trunk of the white vehicle on the Barus' property on 4/11/2022, you could not see the front door?

A. If you -- right. If someone is at the -- in the backyard, they can't see the front door.

Q. But you agree, standing on the vehicle, the white vehicle, on 4/11/2022, you can't see the front door?

A. That's correct.

Q. When Ms. Barus offered -- strike that.

When Ms. Barus said, I can go open the gate right now, and whatever she said about the dogs won't leave --

A. Uh-huh.

Q. -- you told Mr. Barus to stay right here, correct?

MS. HARRELL: Object to the form.

A. Let me hear that. I don't -- I don't recall hearing that.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MR. J. BARUS: -- woke the hell up.

OFFICER LAMPKIN: Okay. Did you pull -- did you have something --

Page 133

(Video playback ends.)

BY MS. VENZA:

Q. Let me back up.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: In the backyard.

(Video playback ends.)

BY MS. VENZA:

Q. I'm starting it sooner, so we get a -- bear with me.

A. Yes. I appreciate it.

Q. I'm starting it at 3:30 at top time state [sic] -- stamp 11:21:44Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: Do your dogs ever come outside?

MR. J. BARUS: No.

MS. BARUS: No.

MR. J. BARUS: You can go back there and open that gate --

MS. BARUS: You can -- I'll go open it right now, and they will not come out of that

Page 134

fence on you.

OFFICER LAMPKIN: Okay. Well, let me see them.

How are you doing, sir?

MR. J. BARUS: I'm doing great.

MS. BARUS: Come on.

MR. J. BARUS: Yourself?

OFFICER LAMPKIN: No, go ahead. You go open the gate. I'll be there.

MR. J. BARUS: Besides getting woke the hell up.

OFFICER LAMPKIN: Okay. Did you pull -- did you have something in your hand?

MR. J. BARUS: Oh, no, sir. I had my fist, and that's what I intended to use when I got to him.

OFFICER LAMPKIN: Uh-huh. Did you see him in your backyard or anything?

MR. J. BARUS: No.

OFFICER LAMPKIN: Okay.

MR. J. BARUS: But what my wife says is true.

OFFICER LAMPKIN: Okay.

MR. J. BARUS: My dogs don't go outside that damn fence if it's open. It can be wide

Page 135

open --

OFFICER LAMPKIN: Uh-huh.

MR. J. BARUS: -- and they don't go outside that fence.

OFFICER LAMPKIN: Okay. Stay right here.

MR. J. BARUS: Yes, sir.

(Video playback ends.)

BY MS. VENZA:

Q. Did you direct Mr. Barus to stay right there?

A. I did.

Q. And you feel that directing -- you feel that telling Mr. Barus to "stay right there" is different than your telling Ms. Barus, "You go open the gate"?

MS. HARRELL: Object to the form.

A. That was to separate them so I could speak with her -- that was to separate them so I can speak with them away from each other.

That -- you know, that's -- that was the motion of the conversation, so that was the direction that we went at that time. So I went --

BY MS. VENZA:

Q. But you were telling --

A. Yeah, I told him to stay right there so I could talk --

Q. And that was a directive?

Page 136

A. -- so I could speak with his wife.

Q. And that was a directive?

MS. HARRELL: Object to the form.

A. Yeah. That was -- it was an investigation.

BY MS. VENZA:

Q. When -- you didn't tell Ms. Barus, no, don't do that, did you?

MS. HARRELL: Object to the form.

A. In reference to?

BY MS. VENZA:

Q. Opening the gate.

A. No, I didn't tell her -- I did not say that.

Q. You could have, right?

MS. HARRELL: Object to the form. And let him finish his answer.

A. I could have said many things, but I did not say that.

BY MS. VENZA:

Q. You could have told her, don't open the gate, correct?

MS. HARRELL: Object to the form.

A. I could have.

BY MS. VENZA:

Q. I'm going to ask you about the length of time between when you tell Ms. Barus, "You go open the gate,

Page 137

I'll be there," to when you are there. Okay?

A. Okay.

Q. So I'm starting the video at 3:32. That's the bottom timestamp. And the right corner, T11:21:46Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MR. J. BARUS: You can go back there and open that gate --

MS. BARUS: You can -- I'll go open it right now, and they will not come out of that fence on you.

OFFICER LAMPKIN: Okay. Well, let me see them.

How are you doing, sir?

MR. J. BARUS: I'm doing great --

MS. BARUS: Come on.

MR. J. BARUS: Yourself?

(Video playback ends.)

BY MS. VENZA:

Q. Okay. Now, at 3:43 she says, "Come on." Agreed? I just said that correctly?

A. Uh-huh. Yes.

(Video playback begins.)

(Whereupon, the following dialog was

Page 138

transcribed from video:)

OFFICER LAMPKIN:  No, go ahead.  You go --

(Video playback ends.)

BY MS. VENZA:

Q.  So we looked at 3:43, and then I'm going to stop it when you go over to the backyard.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Okay.  I'll be there.

MR. J. BARUS:  Besides getting woke the hell up.

OFFICER LAMPKIN:  Okay.  Did you pull -- did you have something in your hand?

MR. J. BARUS:  Oh, no, sir.  I had my fist, and that's what I intended to use when I got to him.

OFFICER LAMPKIN:  Uh-huh.  Did you see him in your backyard or anything?

MR. J. BARUS:  No.

OFFICER LAMPKIN:  Okay.

MR. J. BARUS:  But what my wife says is true.

OFFICER LAMPKIN:  Okay.

MR. J. BARUS:  My dogs don't go outside

Page 139

that damn fence if it's open.  It can be wide open --

OFFICER LAMPKIN:  Uh-huh.

MR. J. BARUS:  -- and they don't go outside that fence.

OFFICER LAMPKIN:  Okay.  Stay right here.

MR. J. BARUS: Yes, sir.

OFFICER LAMPKIN:  Did you -- what did you say to him?

MR. J. BARUS:  I told him, you son of a bitch, you better run.

OFFICER LAMPKIN:  Okay.

MR. J. BARUS:  That's all I said.

OFFICER LAMPKIN:  Where were you when you said that?

MR. J. BARUS:  Standing right here.

OFFICER LAMPKIN:  Okay.  So you never came over here?

MR. J. BARUS:  No.  Didn't make it that far.  He was coming around the corner.

OFFICER LAMPKIN:  Uh-huh.

(Video playback ends.)

BY MS. VENZA:

Q.  Is there any blood on the white vehicle at this time?

Page 140

A.  No.

(Video playback begins.)

(Electronic notification in video playback.)

(Video playback ends.)

BY MS. VENZA:

Q.  At 3:37:89, you're now on the driver's side of the white vehicle, correct?

A.  Yes.

(Brief section of video played.)

BY MS. VENZA:

Q.  So at 3:40 [sic] -- I'm sorry, at 4:43, you're now in an area where you could clearly see the back gate, correct?

A.  Yes.

Q.  Okay.  So that's been a minute since you directed Ms. Barus to go open the gate to when you're in the backyard and can see the back gate, correct?

MS. HARRELL:  Object to the form.

A.  I didn't direct her; however, she was back there, and now I'm at that spot at 3- -- what -- whatever the time is.

BY MS. VENZA:

Q.  Okay.  So I'll change -- I'll change the question to a minute has passed between the time you

Page 141

told Ms. Barus, "You go open the gate," to when you got to the backyard and you could visually see clearly the back gate, correct?

A.  At that point, I could visibly see the backyard.  I could --

Q.  So you --

A.  -- visibly see her at the back gate --

Q.  At --

A.  -- so I can visibly see.  I can't see in the backyard.  I can visibly see her, Ms. Barus, at the gate, and she opened the door, and the dog was out the gate.

Q.  So it's been a minute that's passed?

A.  Right.

Q.  And during that minute, you could not clearly see the back area where the gate was, correct?

MS. HARRELL:  Object to the form.

A.  I can see that there is a backyard.  As far as me looking at the totality and seeing everything in the backyard, seeing all the chains and doghouses and any other things, I -- I didn't see that.

BY MS. VENZA:

Q.  You're referring to minute -- at the -- you're referring to the timestamp 4:43?

A.  Right.  Right.  So --

Page 142

Q.  Okay.  I'm saying --

A.  -- so all I can see is -- is her at the rear gate with the dog.  And from this angle, I can't see all in the backyard to see if there are other dogs or not.

Q.  So you -- from three forty -- from 4:43 forward, your view gets better, obviously, correct?

A.  Yes.

Q.  And before 4:43, your view decreases.  Backing up from 4:43, the further away you get, the less you can see, correct?

A.  From the front door, that's what you're meaning?

Q.  (Nods head.)
So that's yes?

A.  Yes.

Q.  So there's -- before you walked around the corner, had you been in the backyard of the Barus' house?

A.  No, ma'am.

Q.  So you didn't know what you were going to see as you went around the corner, correct?

A.  That's correct.

Q.  You didn't know how many dogs you might encounter, correct?

A.  Yes.

Page 143

Q.  And you were skeptical as to whether or not the dogs were going to stay inside the gate or be outside of the gate, correct?

MS. HARRELL:  Object to the form.

A.  I didn't know, right.  I didn't know the actions of the dogs.

BY MS. VENZA:

Q.  And you didn't -- you hadn't been in the -- in the back area, so you didn't know whether any people were around in the back area, correct?

A.  That's correct.

Q.  You didn't know if there were schoolchildren, correct?

A.  Right.  I didn't know anybody -- see anybody in the backyard.  I didn't know if anybody was in -- in the backyard.

Q.  Was there anything preventing you from telling Ms. Barus to wait?

A.  To wait for?

Q.  She told you, "Come on."
And you said, "No, you go ahead.  You go open the gate.  I'll be right there."

MS. HARRELL:  Object to the form.

BY MS. VENZA:

Q.  I can back it up again if you would like me to.

Page 144

A.  No, no.  I told --

Q.  Okay.

A.  Are you asking --

Q.  I'm asking you, is there -- is there anything preventing you from telling her to wait, to wait for you?

MS. HARRELL:  Object to the form.

A.  There's nothing preventing me from saying -- telling her to wait.  She was told to go ahead so I could speak with her husband alone.

BY MS. VENZA:

Q.  In fact, she invited you to "come on"?

A.  Yeah.

Q.  And you declined, correct?

MS. HARRELL:  Object to the form.

A.  I wanted to speak with the husband.

BY MS. VENZA:

Q.  Okay.  So you declined her offer to come on, come back with me, correct?

A.  I didn't decline her offer.  I just stayed there to speak with her husband.

Q.  All right.  You told her no, correct?

MS. HARRELL:  Object to the form.

A.  Let me hear it.  I told her no?

MS. VENZA:  I'm starting the video at

Page 145

3:41, top counter T11:21:55Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  How are you doing, sir?

MR. J. BARUS:  I'm doing great --

MS. BARUS:  Come on.

MR. J. BARUS:  Yourself?

OFFICER LAMPKIN:  No, go ahead.  You go open the gate.  I'll be there.

(Video playback ends.)

BY MS. VENZA:

Q.  Did you hear that?

A.  Yeah.  You go ahead, I'll be there.

Q.  No.  You said, no.

A.  I didn't -- I don't recall hearing -- I don't -- I didn't hear a no.  Turn it up for me.

(Brief discussion held off the record.)

BY MS. VENZA:

Q.  This is all the way up.  Okay.
And I'm starting it a little sooner.  It's at 3:50, and the top counter is T11:22:04Z.  And in the picture frame is Mr. Barus, correct?

A.  Yes.

(Video playback begins.)

Page 146

(Whereupon, the following dialog was transcribed from video:)

MR. J. BARUS: I had my fist, and that's what I intended to use when I got to him.

OFFICER LAMPKIN: Uh-huh. Did you see him in your backyard or anything?

(Video playback continues.)

BY MS. VENZA:

Q. You ready? I've got to go back further.

(Video playback continues.)

(Whereupon, the following dialog was transcribed from video:)

MR. J. BARUS: But what my wife says --

(Video playback ends.)

BY MS. VENZA:

Q. All right. Let me go back a little further.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: Well, let me see them. How are you doing, sir?

MR. J. BARUS: I'm doing great.

MS. BARUS: Come on.

MR. J. BARUS: Yourself?

OFFICER LAMPKIN: No, go ahead. You go --

Page 147

(Video playback ends.)

BY MS. VENZA:

Q. Did you hear the no?

A. Unh-unh.

Q. I'm starting the video now at 3:37, rewinding it again. Top timestamp is T11:21:51Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: Okay. Well, let me see them. How are you doing, sir?

MR. J. BARUS: I'm doing great.

MS. BARUS: Come on.

MR. J. BARUS: Yourself?

OFFICER LAMPKIN: No, go ahead. You go open the gate. I'll --

(Video playback ends.)

A. Yeah, I said, no, go ahead.

BY MS. VENZA:

Q. So she said, "Come on." And you said, "No, go ahead. You go open the gate."

Correct?

A. And that's what that -- the rest of it says? Go ahead and play it.

Page 148

Q. Just -- just play it.

A. I just want to make sure.

Q. Okay.

I'm backing up the video again. 3:35, timestamp, top right corner, T11:21:49Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: -- right now, and they will not come out of that fence on you.

OFFICER LAMPKIN: Okay. Well, let me see them.

(Video playback ends.)

BY MS. VENZA:

Q. And she says, "Come on."

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: How are you doing, sir?

MR. J. BARUS: I'm doing great.

MS. BARUS: Come on.

MR. J. BARUS: Yourself?

(Video playback ends.)

BY MS. VENZA:

Q. Did you hear her say, "Come on"?

Page 149

A. Uh-huh.

Q. And that's a yes?

A. Yes. That's a yes.

Q. Okay. Now, here's -- coming up.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: No, go ahead. You go open the gate. I'll be there.

MR. J. BARUS: Besides getting woke --

(Video playback ends.)

BY MS. VENZA:

Q. And you said, "No, you go ahead," you -- "You go open the gate, I'll be right there," correct?

A. Yes. Uh-huh.

Q. So she said, "Come on," asking you to come with her, but you declined, correct?

A. I -- I didn't. That was -- that was -- that was not a decline.

Q. Okay. But you said no?

A. Not in the context of what you're speaking, though.

Q. You said no. You said the word "no," correct?

A. (Inaudible.)

MS. HARRELL: Object to the form.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 150..153

Page 150

BY MS. VENZA:

Q. And you can't see the back gate from the front, correct?

A. That's correct.

Q. In hindsight, does that seem reasonable to you?

MS. HARRELL: Object to the form.

A. What does seem reasonable?

BY MS. VENZA:

Q. Directing Ms. Barus -- I'm sorry, telling Ms. Barus, "No, you go ahead, You go open the gate."

A. That's reasonable.

Q. Telling or approving Ms. Barus to open the back gate, was that a reasonable means to keep dogs from escaping into the neighborhood?

MS. HARRELL: Object to the form.

A. One more time.

BY MS. VENZA:

Q. Telling or approving Ms. Barus to open the back gate, was that a reasonable means to keep the dogs from escaping into the neighborhood?

MS. HARRELL: Object to the form.

A. That -- the dogs -- I was obliging her -- her invitation to open the gate to prove that her dogs were aggressive or not. There was no intent for her to put her dogs out into the community to be a further menace

Page 151

or anything of that nature.

BY MS. VENZA:

Q. Do you agree that a reasonable means to keep dogs from escaping into the neighborhood is to keep them in a gated area?

MS. HARRELL: Object to the form.

A. Yeah. You can -- you can have your dogs secure with a gate.

BY MS. VENZA:

Q. And wasn't keeping the gate closed the most reasonable means to keep the dogs at the Barus house from escaping into the neighborhood?

MS. HARRELL: Object to the form.

A. It's a -- it's -- closing the gate is a reasonable means.

BY MS. VENZA:

Q. But Lucy did not escape into the neighborhood, did she?

MS. HARRELL: Object to the form.

A. Did Lucy escape into the neighborhood?

BY MS. VENZA:

Q. (Nods head.)

A. No.

Q. In fact, at no time during your presence at the Barus home on 4/11/22 did Lucy leave the Barus property,

Page 152

correct?

A. In my presence, no, Lucy did not leave the property.

Q. And when Ms. Barus opened the gate and Lucy came out, Lucy was on the Barus' property, correct?

A. Yes.

Q. And when Lucy walked over to you, she was still on the Barus' property, correct?

A. Yes.

Q. Did you think the dog's behavior with her owner -- with her owner present right there is indicative of how the dogs would behave in the presence of a stranger?

MS. HARRELL: Object to the form.

MR. BUEKER: Join.

A. That depends on the nature of the dog.

BY MS. VENZA:

Q. Okay. Now I'm pushing the video forward with the timestamp at the bottom --

A. Hold on just for a second.

Q. Oh, sure. I'm sorry. I'm sorry, sir.

THE WITNESS: Can we take a break?

MS. VENZA: Sure. Absolutely.

MS. HARRELL: Okay. Yeah, go ahead and go. We'll go off the record now.

Page 153

(Whereupon, a brief recess was taken.)

MS. VENZA: Okay. We're back on the record. It's 11:57 p.m. [sic] -- I'm sorry, a.m.

And I apologize that I didn't offer earlier. Did you get something to eat and something to drink?

THE WITNESS: I did.

MS. VENZA: Okay. If you need to take a break, please just let me know. You can kick me under the table, whatever you want to do. Okay?

MS. HARRELL: Objection. Please don't kick counsel.

(Discussion held off the record.)

BY MS. VENZA:

Q. Okay. I'm going to play the video again, starting at 4:41, lower left corner; top right, T11:22:55Z.

And you're walking around from the front of the house along the back gate, correct?

A. Correct.

Q. The back fence.

(Brief section of video played.)

BY MS. VENZA:

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                          Pages 154..157

Page 154

Q.  And I'm stopping the video to ask you, where was your GLOCK located as you walked right now showing in the video, as you walk past the white car and you're going along the back fence?

A.  On my right side.  Holstered on my right side.

Q.  Was it -- was the safety on or off?

A.  It was on.  Well, let me explain it.  The GLOCKs that we use has -- have an internal safety.  It just -- meaning there's lack in the trigger.  So you have to press the lack of the excess to the point where it -- it aligns with the trigger, and that -- and that engages.  I can't pull it out and show you, but it's like a -- it's --

Q.  Okay.  So it's not a simple --

A.  No.

Q.  -- little switch?

A.  No.

Q.  So it's a two-part process?

A.  Basically -- it's basically a two-part --

Q.  Is that --

A.  -- process within a trigger guard.

Q.  But at that point, it was on -- bad word.  At that point --

A.  Well, the safety would have activated.

Q.  Okay.

Page 155

A.  The pistol was holstered.

Q.  Where was your OC spray at this time?

A.  It was on my belt, holstered on my -- holstered and snapped, right side.

Q.  And where was your baton?

A.  I was not wearing a baton.

Q.  It was in the -- was your baton in the car?

A.  Yes.

Q.  And where was your CEW --

A.  It was --

Q.  -- at the time?

A.  -- on my left side.

Q.  You had nothing out or prepared in hand, correct?

A.  Correct.

MS. VENZA:  Returning again to the video.  I'm letting it play.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Well, he's out the gate.

(Video playback ends.)

BY MS. VENZA:

Q.  So at 4:46, top timestamp T11:23:007 [sic], you state, "Well, he's out the gate," correct?

Page 156

A.  Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Hey, bud.

(Dog vocalizing.)

(Video playback ends.)

BY MS. VENZA:

Q.  So now, at around 4:47, 4:48, and the top timestamp T11:23:02Z, you say, "Hey, bud," and we hear a dog barking and howling?

A.  Uh-huh.

Q.  Okay.  Was that a yes?

A.  Yes.

Q.  Was -- and was that Lucy?

A.  I don't -- I don't -- I don't think the dog howling was Lucy.  I think that may have been another dog.

Q.  Okay.  The dog that was approaching you, that was Lucy?

A.  Yes.

Q.  And she's still on Barus's property, correct?

A.  Yes, outside the gate.

Q.  Okay.

A.  I don't know if that's a City easement or --

Page 157

we'll just say that's her property.

Q.  Do you know if there were any other dogs on the -- in the fence --

A.  I didn't --

Q.  -- the fenced area?

A.  I didn't see any.

Q.  But you didn't know?

A.  Right.  I didn't know if there were any other dogs.

Q.  And now I'm starting it again at 4:48, T23:02:2 [sic].

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Hey.

MS. BARUS:  Come on.

OFFICER LAMPKIN:  Get --

(Video playback ends.)

BY MS. VENZA:

Q.  Okay.  So between the time of 4:48 and 4:50, you yelled, "Hey," between that time frame, correct?

A.  Uh-huh.

Q.  Is that a yes?

A.  Yes.  Yes.

Q.  Now, in this frame, this frame being 4:50,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Pages 158..161

Page 158

T11:23:04Z, your right hand is in front of the body-wear camera, correct?

A. Yes.

Q. Okay. Is there a weapon in your hand?

A. Yes.

Q. What weapon?

A. My GLOCK.

Q. Okay. Is the safety on or off?

MS. HARRELL: Object to the form.

A. The GLOCKs, they have internal safety. It's not something that you -- you switch on and switch off.

Q. Okay. Then I want to understand --

A. Because that's -- that's -- that's not how a GLOCK works.

Q. Okay.

A. So is -- the safety is in trigger guard, so at that point, my finger would be on the trigger.

Q. So it's ready to fire?

A. It's ready to fire.

Q. Okay. So at this point, this point being the 4:50, T11:23:04Z, your GLOCK is in your right hand and you are prepared and ready to fire the weapon, correct?

A. Yes.

Q. Was there anything preventing you from picking up your pepper spray instead of the GLOCK?

Page 159

MS. HARRELL: Object to the form.
You can answer.

MR. BUEKER: And I join the objection.

A. Yeah, that -- it's -- that wouldn't be feasible.

BY MS. VENZA:

Q. Was there anything preventing you from picking it up, "it" being the pepper spray?

MS. HARRELL: Object to the form.

A. In that situation, it's not feasible.

BY MS. VENZA:

Q. But my question remains. And I understand you want to explain things your way, but I'm just asking you, was --

A. I'm --

Q. -- could you have picked up the --

MR. BUEKER: Physically? Physically you're preventing or -- I think y'all are on different pages here.

MS. VENZA: (Inaudible.)

MR. BUEKER: Okay. I'm sorry.

BY MS. VENZA:

Q. Was it feasible?

MS. HARRELL: Object to the form.

A. It -- it was not feasible. That -- that's the

Page 160

option that I chose, that's the option that was used. And I understand that you may not get the answer that you want, but it wasn't feasible to pick up pepper spray at that point, after being bitten twice.

BY MS. VENZA:

Q. I -- I just want the truth.

A. That -- that's the truth.

Q. And I -- I'll take --

A. And --

Q. -- Paul's suggestion and say, was it physically possible for you to -- to pick up your pepper spray at that time?

A. Well, were my --

MS. HARRELL: Object to the form.

A. -- body functions working properly enough, was I strong enough to unsnap my OC spray and pull it out? Yes, ma'am, I was strong enough to do so.

BY MS. VENZA:

Q. Okay. And then the OC spray was available, correct?

A. OC spray was available on my person.

Q. When you said, "Hey," had you been bitten? What was the "hey" in response to?

A. Being bit.

Q. Was it possible for you to kick Lucy?

Page 161

MS. HARRELL: Object to the form.

A. Due to the position, where he's biting me behind my leg, the answer would -- the actual answer would be no, because it's -- dogs -- dogs are -- they're a lot more agile and faster than I am, so it wouldn't -- kicking -- kicking -- turning around and trying to kick at that point, no, it wouldn't be feasible.

Q. Was it feasible for you to turn around?

A. Yes, it was feasible for me to turn around.

Q. So when you were saying, "Hey," Lucy bit you where?

A. Back leg, back -- the back of my left calf.

Q. Anywhere else?

A. Well, initially, bit me on the finger. And that's when you see me pulling it up. Then circles around swiftly, bites my back calf.

Q. And for the record, Lucy was a she.

A. Okay. Well, she -- she bit my finger, right pointer finger, and you can see my hand comes up. It's empty. Then the second time, she comes -- she swirls around and bites the back of my calf.

Q. At this point, this point being the 4:50, T11:23:04C [sic] -- -4Z, had she bitten your finger?

A. Not at that time. She was biting my calf.

Q. At that time when you were saying, "Hey," she

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 162..165

Page 162

bit your calf?
   A.  I think the "hey" was the finger first.
   Q.  Had she already bitten your calf before you said, "Hey"?
   A.  No.  Finger was first.
   Q.  Okay.
   A.  Calf was second.  So that --
   Q.  So would --
   A.  -- "hey" was finger.
   Q.  Okay.  And would you agree that she nipped your finger?
       MS. HARRELL:  Object to the form.
   A.  No.  I -- I've never used the word "nip."
BY MS. VENZA:
   Q.  Okay.  So you just don't use that word?
       MS. HARRELL:  Object to the form.
   A.  No.  (Inaudible.)
BY MS. VENZA:
   Q.  And which hand did she nip you on -- or, I'm sorry, which hand did she bite you on?
   A.  Right hand.
   Q.  And you said your pointer finger and your index finger?
   A.  Uh-huh.  Yes.
   Q.  And that -- was that in the cuticle area?

Page 163

   A.  Yes, in the cuticle area, below the knuckle. I'll just -- I'll describe it below the knuckle.
   Q.  And you are right-handed?
   A.  Yes.
   Q.  Okay.  And you're using your right hand at this point in the video?
   A.  Yes.
   Q.  That's your -- your gun hand?
   A.  Right.
   Q.  And so the bite from Lucy didn't stop you from being able to use your gun, correct?
   A.  Correct.
   Q.  It didn't stop you from being able to use your pepper spray, correct?
   A.  Correct.
   Q.  And it wouldn't have stopped you from being able to use your baton if you had had it on you, correct?
   A.  I was physically able to do those things. That's a yes.
   Q.  Okay.  Your baton was on you?
   A.  No.  But you said --
   Q.  Okay.
   A.  You mentioned, if it was --
   Q.  Right.

Page 164

   A.  -- on me.
   Q.  Right.  You would have been able to use that?
   A.  Uh-huh.
   Q.  And that's a yes.
       Okay.  So she bit you on your index finger, and then she went around and bit you on the back of the leg?
   A.  Yes.
   Q.  And that's your left leg?
   A.  Yes.
   Q.  And it was the side of your leg or the back of your leg?
   A.  The back.
   Q.  It was not your Achilles though, correct?
   A.  No.
   Q.  That's a correct statement by me?
   A.  Right.  That's correct.
   Q.  Would you agree both bites were minor?
       MS. HARRELL:  Object to the form.
   A.  I didn't -- I didn't know if that dog had rabies shots or not, so as far as that dog biting me, I don't know if it's -- as far as bacteria or what have you, but as far as whether it -- ripping long lacerations, no.  But as far as bacteria, rabies, it could be a yes.
BY MS. VENZA:

Page 165

   Q.  Okay.  Let's take rabies out of it.  Okay? Were both bites minor?
       MS. HARRELL:  Object to the form.
   A.  I couldn't -- I wouldn't be able to tell you if rabies were in there.  I can't -- I would not say a yes to that question because you can deal with a puncture; however, what comes behind the puncture is -- that's -- that has some play in it as well.
BY MS. VENZA:
   Q.  Did you have any reason to think that Lucy was rabid?
   A.  After -- after the bite, I --
   Q.  Before she bit you.
   A.  Before she bit me, no.
   Q.  Now, after Lucy nipped you or retreated to -- after Lucy nipped you, she released, correct?
       MS. HARRELL:  Object to the form.
   A.  She bit my finger, and then she went to -- bit the finger, then she went and bit the back leg.
BY MS. VENZA:
   Q.  And she released --
   A.  She released.
   Q.  -- after each bite, correct?
   A.  Yes.
   Q.  She did not hold on and clamp her mouth on your

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                           Pages 166..169

Page 166

body, correct?
   A.  Well, she bit down, but she didn't -- she didn't shake.
   Q.  Okay.  She -- at no time did she grab your body and hold on to a body part, correct?
   A.  Correct.
      MS. HARRELL:  Object to form.
BY MS. VENZA:
   Q.  In this part of the video, which is 4:50, T11:23:04Z, no part of your body is in contact with Lucy, correct?
      MS. HARRELL:  Object to the form.
   A.  I don't believe so.
BY MS. VENZA:
   Q.  You said, you --
   A.  I don't believe so.  She was -- at that point. It was in a -- it was ongoing, so ...
   Q.  Well, the -- this is -- you raise your gun, and both bites have occurred, correct?
   A.  Yes.
   Q.  Okay.  And so the first bite was at, "Hey," correct?
   A.  Yes.
   Q.  And that was at 4:48.  And this is 4:50?
   A.  Uh-huh.  Yes.

Page 167

   Q.  Okay.  So that is two seconds, correct?
   A.  Uh-huh.
   Q.  And that's a yes?
   A.  That's a yes.  Thank you.
   Q.  And Lucy was not running around at large, correct?
      MR. BUEKER:  Object to form.
      MS. HARRELL:  Join.
BY MS. VENZA:
   Q.  Correct?
   A.  And clarify "running around at large."
   Q.  Lucy is still on her property, right?
   A.  Yes.
   Q.  Lucy is right in front of you, correct?
   A.  At that point, Lucy is behind me.
   Q.  Right there, Lucy is in front of you, the bottom right corner.  Right there, being 4:50, T11:29:04Z, Lucy is in the bottom left corner of the screen?
   A.  Okay.
   Q.  So that's a correct statement by me?
   A.  Okay.
   Q.  Yes?
   A.  Well, she's on the -- she's still on the property.

Page 168

   Q.  She's still on the -- and she's right in front of you, correct?
   A.  Well, part of her body --
   Q.  She's --
   A.  -- is in front of me.
   Q.  She's slightly to the left of you?
   A.  Slightly to the left, some in the front, some in the back.
   Q.  Okay.  Where is Ms. Barus?
   A.  If you rewind the video or forward, when my hand comes down, you will see her.  So she has to be, like, directly in front.
   Q.  So your hand is blocking the view in the body-wear camera video?
   A.  Yes.
   Q.  So she's behind Lucy in this frame of the video?
   A.  Yes.
   Q.  How far away is Ms. Barus from the end of your firearm at that point?
   A.  I would say probably between 6 to 10 feet.
   Q.  Well, the average car is about 9 to 13 feet, agree?
      MS. HARRELL:  Object to the form.
   A.  I have no idea.

Page 169

BY MS. VENZA:
   Q.  You think you could fit a car between your -- end of your firearm and Ms. Barus?
      MS. HARRELL:  Object to the form.
   A.  It could be possible.
BY MS. VENZA:
   Q.  I'm not talking about a Peugeot, a little car.
   A.  I mean -- and whether you say compact, midsize, or full, I'm just saying it could be possible.
   Q.  And Lucy is backing away from you, correct?
   A.  I -- I can't tell you that.
   Q.  Okay.  But she wasn't charging you, was she?
      MS. HARRELL:  Object to the form.
   A.  Well, for me going forward, it was -- it was a -- she didn't charge; however, it was a swift, sudden move.  She bit one part, and then goes to the back, to the next, to bite another.
BY MS. VENZA:
   Q.  And then after the second bite, she retreated, she backed away from you, correct?
      MS. HARRELL:  Object to the form.
   A.  Backed away?
BY MS. VENZA:
   Q.  She went backwards, not forwards?
   A.  I can't -- I can't answer that question.  If

Case 3:24-cv-01358-MMH-SJH  Document 74-1  Filed 06/01/26  Page 45 of 89 PageID 1629

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Pages 170..173

Page 170

you can show me the video that she -- because I didn't see it when I looked at it. I didn't see that she backed away.

Let's go ahead and play it so we can see it, if you don't mind.

Q. I will in a moment.

Did she bite you more than two times?

A. Only twice.

Q. Okay. And so after the second bite, your body no longer came in contact with Lucy, correct?

A. Correct.

Q. And now we're at the point at 4:50, and a lot happens. You've already pulled your weapon, correct?

A. Yes.

Q. And Lucy and you are already separated, correct?

A. Yes. She's not -- no longer attached to my leg or what have you.

Q. Well, at one -- at what time was she attached to your leg?

A. When she -- when she bit me.

Q. Okay. So there was two seconds between the "hey" and now that you have your gun pulled. Those two seconds, are you saying that she was attached to your leg in the two seconds?

Page 171

A. She bit me at the attachment, yeah. It would be two -- two things coming together. She bit me.

Q. So you're not saying she was on your leg hanging on?

A. Right. She's not doing that.

Q. Okay. All right. Now, I'm going to go ahead at your request and I'm going to continue to play the video forward from 4:50 and the T11:23:04Z.

(Brief section of video played.)

Q. As I was saying, a lot happens here. I'm going to have to rewind it.

A. Uh-huh.

Q. Now, did that help refresh your recollection of events and how quickly they occurred?

A. I mean, I -- it was -- it was rapid and ongoing. And I didn't -- I couldn't tell, like you said, the dog was backing away. I didn't see the dog in a guarding position.

Q. I'm sorry, you didn't see what?

A. In a -- backing away in a guarding position.

Q. Okay. I backed up the video to 4:47, top counter is T11:23:01Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

Page 172

(Dog vocalizing.)

OFFICER LAMPKIN: Hey.

(Video playback ends.)

BY MS. VENZA:

Q. And that's the first bite, the "hey," correct?

A. Uh-huh. Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: Come on.

OFFICER LAMPKIN: Get --

(Video playback ends.)

BY MS. VENZA:

Q. You heard Ms. Barus say, "Come on," correct?

A. I didn't hear that.

Q. I backed the video up again. I'm starting it at 4:48, T11:23:02Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: Hey.

MS. BARUS: Come on.

(Video playback ends.)

BY MS. VENZA:

Q. Did you hear Ms. Barus say, "Come on"?

Page 173

A. Unh-unh.

Q. I backed the video up once again to 048 [sic], T11:23:0- -- T -- -02Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: Hey.

MS. BARUS: Come on.

(Video playback ends.)

BY MS. VENZA:

Q. Did you hear that?

A. I heard her say something. I don't know if she said "time out." I don't -- of course she wouldn't say "time out," but it's what it sounded like. But --

Q. Okay. So Ms. Barus --

A. It could be -- it could be "come on."

Q. Ms. Barus speaks something. Now, you could --

A. She says something, yes.

Q. At 04:50 in this frame that I have stopped here, you could see Lucy's tail?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And Ms. Barus is walking towards you, correct?

A. Yes.

Page 174

Q.   And the gate is open, correct?

A.   Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Get back.

(Gunshots heard on video.)

(Video playback ends.)

BY MS. VENZA:

Q.   When you fired your first weapon [sic] -- I'm sorry, you fired your first round at 4:51, correct?

A.   Yes.

Q.   How many rounds did you fire?

A.   Four.

Q.   Did you know that at the time?

A.   No.

Q.   Is that after reviewing material?

A.   Yes.

Q.   You've had to turn from where you were standing when you were first bitten -- you didn't have to turn. Strike that.

You turned from when you were first standing to when you fired your first shot, correct?

A.   Yes.

Q.   Where is Lucy?

Page 175

(Brief section of video played.)

(Gunshots heard on video.)

BY MS. VENZA:

Q.   And I've stopped it at 4:52, T11:23:05Z.

Do you see Lucy in the frame?

A.   Uh-huh.  Yes.

Q.   Okay.  And she is -- her back is to you, correct?

A.   Yes.

Q.   Okay.  She is running away from you, correct?

A.   Yes.

Q.   Now, you've already fired your first shot, correct?

A.   Yes.

Q.   And you continued to fire several other shots, correct?

A.   Yes.

Q.   And Lucy was no longer in front of you, correct?

A.   Well, in front of -- yes, she is in front, but not --

Q.   Lucy --

A.   -- head to head.

Q.   Lucy is not charging you, correct?

A.   Right.  Right.  She's in front of me.

Page 176

Q.   Lucy is not a threat to you at this point, correct?

MS. HARRELL:  Object to the form.

A.   It's an ongoing event.  It wasn't over.

BY MS. VENZA:

Q.   Okay.  Right now in this frame, 0- -- 04:52, T11:23:05Z, is Lucy a threat to you?

A.   Yes, because it's an ongoing event.

Q.   What -- what is ongoing?

A.   Dogs do reengage.  Animals do reengage after attack.

Q.   Okay.  So you thought she might have -- even though she's running away from you and you're firing your weapon, you feared that she was going to turn around and come back?

A.   She could.  That's a possibility.

Q.   Was that what was the reasonable belief in your mind at that time?

A.   Yes.  The dog got out, and I -- it's already proven aggressive.  And I saw the footprints on the back of the car.

Q.   I'm sorry?

A.   As far as the reason with the child, the initial incident.

Q.   Okay.  I wasn't asking about that, but

Page 177

appreciate it.

A.   You didn't -- right.  You didn't ask about it.

Q.   Did you -- did you call animal control at any time on 4/11/2022?

A.   No.

Q.   Anything stopping you from doing so?

A.   No, but I wouldn't -- within that situation, I wouldn't -- I wouldn't call animal control.

Q.   So do you think that it was -- it would have been reasonable behavior to have called animal control?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.   You call animal control afterwards.  After we have an animal complaint, our investigation, if -- because there's -- at times, you may have a complaint that doesn't merit animal control responding.  But if there is something that animal control needs to respond to, then we -- then we call them.

BY MS. VENZA:

Q.   Do you agree that animal control officers have far more training than an hour and 15 minutes regarding animal encounters?

A.   Yes, they do.

Q.   So they have far more training than you, correct?

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                   Pages 178..181

Page 178

A. Yes.

Q. Do you agree it was unreasonable to allow a situation to be created whereby multiple dogs you believed had chased someone earlier were not contained?

MS. HARRELL: Object to the form.

MR. BUEKER: Join.

A. Sounds like a compound question. Can you break it down to --

BY MS. VENZA:

Q. Do you --

(Simultaneous speaking.)

A. -- (inaudible) for me?

Q. Do you agree it was unreasonable to allow a situation to be created whereby multiple dogs you believed had chased someone earlier were not contained?

MS. HARRELL: Object to the form.

MR. BUEKER: Object to form.

A. Yeah, it's like a compound question. You're asking -- asking a bunch of questions. Let's -- let's do, like, one segment of the question, and then I'll answer that segment, then we can move on to the next part and get your answer because it seems like each segment --

BY MS. VENZA:

Q. Answer the question --

Page 179

A. Each segment --

(Simultaneous speaking.)

MS. HARRELL: Let him finish explaining why he can't understand your question.

A. Like, each segment has an answer that needs to be answered, rather than combining them all.

BY MS. VENZA:

Q. Do you agree you created a situation whereby multiple dogs were able to exit a contained area?

MS. HARRELL: Object to the form.

A. No.

BY MS. VENZA:

Q. Do you agree that with the gate closed, dogs were contained in the area?

A. That's a possibility. And like I said, it all depends on the dog.

Q. And do you agree, with the gate open the dogs are better able to roam freely?

A. Yes.

MS. HARRELL: Can we just pause for a second?

(Brief pause in the proceedings.)

BY MS. VENZA:

Q. You didn't know anything about these dogs, these dogs being Ms. Barus's dogs, correct?

Page 180

A. Correct.

Q. You didn't even know how many dogs there were, correct?

A. Correct.

Q. And you even had information that pit bulls were involved, correct?

A. Correct.

Q. And you were skeptical that the dogs were going to remain inside the fence if the gate was open, correct?

A. Correct.

Q. You did not tell Ms. Barus, no, don't open the gate, did you?

A. I did not say those words, you are correct.

Q. You told her to go ahead, go open the gate, correct?

A. Correct.

Q. You think that that was reasonable?

MS. HARRELL: Object to the form.

MR. BUEKER: Join.

A. Yes, I believe it was reasonable.

BY MS. VENZA:

Q. Would you agree that you did not deescalate the situation?

MS. HARRELL: Object to the form.

Page 181

MR. BUEKER: Join.

A. There was -- there was no room for -- in that situation, as far as me shooting a -- shooting some rounds and killing Lucy, there was no -- no other solution as far as deescalating, as far as a dog biting, running off and -- running off into the neighborhood to a school zone area.

BY MS. VENZA:

Q. So that's a school zone area?

A. I don't know if it's a school zone area, but the kids walk to school.

Q. And you're aware of that, right?

A. Yeah.

Q. But you didn't check before you told Ms. Barus to go open the gate for, potentially, two pit bulls that had allegedly chased a kid onto a hood of a car before you told her to open the gate?

MS. HARRELL: Object to the form.

MR. BUEKER: Object to form.

A. There were no kids around at the time of the incident.

BY MS. VENZA:

Q. But you didn't check the area before?

A. Actually, I did drive around the area. You can see it -- see it when I pulled up. Well, you can see it

Page 182

on the -- on the body-worn camera when I spoke to Ms. Ellington.

Q. But before you walked from the front of the house to the back of the house, you didn't check, correct?

A. As far as the entire area at that -- that time frame?

Q. Any -- any area. Behind their house?

A. No. No, I didn't see any kids during that time.

Q. When you arrived at 3504 Rockwood, there were no loose dogs, correct?

A. That's correct.

Q. There were no stranded trespassers on trunks of cars, correct?

A. Correct.

Q. The dogs that you believe you were there to investigate were contained in a fenced yard, correct?

MS. HARRELL: Object to the form.

A. Correct. There were no --

BY MS. VENZA:

Q. And -- there were no guns around, correct?

A. Correct. I didn't see any guns.

Q. When you arrived, there was no imminent threat of seriously -- of serious bodily harm to yourself,

Page 183

correct?

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. When you arrived at 3504 Rockwood on 4/11/2022, there was no imminent threat of serious bodily harm to you, correct?

A. When I arrived, at that point, there was -- there was no -- as far as I know, there was no --

Q. As far as you know --

A. Yeah, as far as I know, there was no --

Q. -- there was no imminent threat of serious bodily harm to you, correct?

A. Correct.

Q. Or to others, correct?

MS. HARRELL: Object to the form.

A. When I arrived, I didn't see anyone. There was -- it was quiet. As far as I'm concerned, at that particular time, there -- I didn't see any dogs out. I didn't see anyone with a gun. That does not mean that there is potential for something to happen.

BY MS. VENZA:

Q. But as far as you know, when you arrived, there was no imminent threat of serious bodily harm to others?

MS. HARRELL: Object to the form.

A. Let's -- let's -- let's take that at -- let's

Page 184

take that question and slice it in half. Just be patient with me. I appreciate it. So just -- just explain it like how you do other things, how you --

BY MS. VENZA:

Q. Well, if you can't answer the question, all right, but you answered it with regard to yourself. And you said no. So I'm asking you now with regard to others.

MS. HARRELL: Object to the form.

A. I don't -- I don't know what would have happened -- when I leave.

BY MS. VENZA:

Q. I'm sorry?

A. I don't understand what would happen or I don't know in the future what would happen if I leave.

Q. Well, I'm talking about when you arrived. The question was specific.

A. Yeah.

Q. When you arrived at 35- -- Rockwood, there was no -- as far as you know, there was no imminent threat of serious bodily harm to others, correct?

A. As far as I know.

Q. Did you have any reason to think that Ms. Barus's dogs could get out if the gate was closed?

A. Dogs -- dogs have a way of escaping, digging

Page 185

under a gate, jumping over a gate. I've seen it with my own eyes while working.

Q. But did you have any reason to think that they could?

A. I know dogs can. I've seen it with my own eyes. Yeah, her dogs can get out. That dogs -- the dogs can jump over the gate or dig under a gate.

Q. Did you have any information that her dogs were jumping the gate and getting out of the fence?

A. No. She said her door -- her gate door was open. But the question was, can -- can they get out? And the answer is, yes, they can get out.

Q. After -- in the two seconds from the first bite to the second bite, was there anything preventing you from backing up, away from Lucy, and directing Ms. Barus to contain Lucy in the yard?

MS. HARRELL: Object to the form.

A. No.

BY MS. VENZA:

Q. After Lucy bit you in those two seconds, she bit you on the finger and she bit you on the leg, was there anything preventing you, you, from backing up away from Lucy and telling Ms. Barus to lock Lucy up in the yard?

A. No, there was nothing preventing me from doing

Page 186

such a thing.

Q. OC spray is a less-lethal force than a GLOCK, correct?

A. Yes.

Q. And the JSO deadly force policy requires you to use less-lethal force when possible, correct?

A. Correct.

Q. Do you agree it would have been reasonable for you to have had your OC spray in hand ready as you walk blindly around to the back?

MS. HARRELL: Object to the form.

A. No.

BY MS. VENZA:

Q. Do you agree it would have been possible?

A. I could have, yes.

Q. Do you agree that the best thing you could have done is not go around to the back gate to observe the dogs?

MS. HARRELL: Object to the form.

MR. BUEKER: Object to form.

A. (Inaudible.)

BY MS. VENZA:

Q. And I didn't hear his answer.

I'm sorry, did you answer?

A. No. That's not -- that's not --

Page 187

Q. Was that your answer, no?

A. The answer is -- no is the answer.

Q. Did your one hour and 15 minutes of training from JSO include teaching you that a wagging tail does not always mean a friendly and approachable dog?

A. I don't recall that. I don't believe that's in there. I could be wrong, but I don't believe it's in there.

Q. On 4/11/2022, did you know that reaching your hand toward the face of a dog can be viewed -- viewed as aggression by the dog?

A. No.

Q. Was that any part of your training at JSO?

A. Only part of the training was the initial, just put your hand down, let them sniff, to show -- that action shows the dog that you are friendly. Blade your body so you can be smaller.

Q. Did your training include anything about a dog's reaction to people wearing hats?

A. I can't recall that.

Q. Did your training include anything about people wearing masks?

A. I can't --

(Simultaneous speaking.)

Q. When interacting with dogs?

Page 188

A. -- (inaudible).

Q. Did your training involve anything about how now -- how to not aggravate a situation with dogs?

MS. HARRELL: Object to the form.

A. I don't recall that either, but the -- the whole part of the training was to teach officers to encounter dogs safely.

BY MS. VENZA:

Q. Did any other dog come out of the Barus' backyard between the time that Lucy came out and you fired your first shot?

A. No other dogs came out.

Q. At any time that you were there, did any dogs come out of the backyard?

A. No, I didn't see -- I didn't -- did not see any other dogs come out the backyard.

Q. Did your first bullet strike Lucy?

A. I'm sorry?

Q. Did your first bullet strike Lucy?

A. I don't believe so.

Q. Did you know?

A. No, not for certain, but I don't believe so.

Q. And after you fired your gun the first time, Lucy was still on the Barus' property, correct?

A. Yes.

Page 189

MS. HARRELL: Object to the form.

BY MS. VENZA:

Q. And Lucy is clearly running away from you, correct?

MR. BUEKER: Object to form.

MS. HARRELL: Join.

A. Yeah. The dog motion was away from me -- going away from me, yes.

BY MS. VENZA:

Q. Your recollection is you fired a total of four rounds?

A. Per the reports, I fired four rounds.

Q. Would it surprise you that it was five rounds?

MS. HARRELL: Object to the form.

A. It would surprise me.

BY MS. VENZA:

Q. After you were done firing your weapon at Lucy on 4/11/2022, did you ever go back and check to see how many rounds you had fired?

A. I counted -- I counted my ammo. I got more from the gun range, put them in. I didn't -- can't recall what the count was.

THE REPORTER: I'm sorry, can you speak up, please?

A. I went to our gun range and I got more

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                      Pages 190..193

Page 190

ammunition to put into the magazine to make it full. I don't recall how many they gave me, but I know it was full. We do have spot inspections to test how many rounds we have in our rifles and magazines commonly. I could ascertain that there was four rounds -- reported that I fired four rounds from the crime scene investigation.

BY MS. VENZA:

Q. Okay. At any time after you ceased firing your weapon at Lucy, did you go back and check the area to look for casings?

A. I can't recall I did. I know they -- I know I was asked how many rounds, but I was also asked to step away so I don't agitate.

Q. Agitate what?

A. At the present, they were highly upset with my presence, so --

Q. You were asked to step away so that you did not agitate?

A. Right. It was --

Q. Because --

A. -- an emotional situation.

Q. Because your presence was agitating?

A. Not agitating --

Q. (Inaudible.)

Page 191

A. Because they were emotionally -- they were -- they were mad at me --

Q. Right.

A. -- so just basically stay away.

Q. Because you had shot their dog?

A. Because I shot their dog.

Q. Okay. I'm going to back up again and ask you to pay attention and ask you about the rounds you fired.

Okay. I backed up to 04:47, top timestamp T11:23:01Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: Hey, bud.

(Dog vocalizing.)

OFFICER LAMPKIN: Hey.

MS. BARUS: Come on.

OFFICER LAMPKIN: Get back.

(Gunshots heard on video.)

(Video playback ends.)

BY MS. VENZA:

Q. That's how many?

A. Okay. That's two.

(Video playback begins.)

(Whereupon, the following dialog was

Page 192

transcribed from video:)

(Gunshots heard on video.)

MS. BARUS: No. No. No.

OFFICER LAMPKIN: Get down.

(Video playback continues.)

A. That's four.

(Video playback continues.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: Why would you fucking do that?

(Video playback continues.)

BY MS. VENZA:

Q. Okay. So it was four?

(Video playback continues.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: Well, your dog bit me.

MS. BARUS: Oh, my god. You really fucking just shot --

(Video playback ends.)

BY MS. VENZA:

Q. How many --

MR. BUEKER: Just for the record, I heard four too.

MS. HARRELL: I -- yeah.

Page 193

MS. VENZA: I did too.

(Simultaneous speaking.)

MS. VENZA: A long time ago, I heard five. Did you ever hear five? I just made that up today?

MS. LAHART: I don't recall.

MS. VENZA: Okay. Four rounds is what -- I could play it again for everybody.

MS. HARRELL: I --

MS. VENZA: I can honestly --

(Simultaneous speaking.)

MS. HARRELL: I think we all heard four.

MS. VENZA: Okay.

MS. HARRELL: And every -- everything we've seen says four.

BY MS. VENZA:

Q. Out of all the rounds -- out of all the rounds you fired, how many struck Lucy?

A. I believe it was reported I struck her three times.

Q. Three -- three struck her?

A. Yeah.

Q. And did you know that at the time?

A. No.

Q. When did you learn that information?

Page 194

A. I think it was in the report or something. I don't know if that was a guesstimation or the report.

Q. So it's definitely after 4/11/2022 you learned how many of your rounds struck her, correct?

A. Yes.

Q. Where did Lucy go?

A. She went close to the front yard area.

Q. Okay. Did she run down the street?

A. No, she was in the -- if you play the video, you'll -- you'll see.

Q. She stayed on the -- on the Barus' property the entire time, correct?

A. Yes.

Q. I'm going to back up. If you want to count, you can, but that's not what I'm asking you for. I've got to go back to the scene, 4:47. I backed it up, T11:23:01Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

(Dog vocalizing.)

OFFICER LAMPKIN: Hey.

MS. BARUS: Come on.

OFFICER LAMPKIN: Get back.

(Gunshots heard on video.)

Page 195

MS. BARUS: No. No. No.

(Video playback ends.)

MS. HARRELL: I heard five.

MS. VENZA: I heard five. I'm going to back it up again.

MR. BUEKER: Denese, I think you just paused it on the -- one of the shots.

MS. VENZA: I think I did too.

MR. BUEKER: You were pausing it and restarting it.

MS. VENZA: Okay. I'm starting it at 42, and I was going to let it play. 42, the top is T11:22:55 [sic] -- -56Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: Well, he's out the gate. Hey, bud.

(Dog vocalizing.)

OFFICER LAMPKIN: Hey.

MS. BARUS: Come on.

OFFICER LAMPKIN: Get back.

(Gunshots heard on video.)

MS. BARUS: No. No.

(Video playback ends.)

Page 196

MR. BUEKER: Yeah, that's five.

MS. HARRELL: That's five.

BY MS. VENZA:

Q. There's five rounds. Okay. Five rounds were fired. But your answers are the same, you didn't know how many struck her at the time, correct?

A. Correct.

Q. You learned after 4/11/2022, correct?

A. Correct.

Q. And you read it in one of the reports, correct?

A. It could -- it could be the report or hearsay.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: No.

OFFICER LAMPKIN: Get down.

MS. BARUS: Why would you --

(Video playback ends.)

BY MS. VENZA:

Q. Why did you tell Ms. Barus to get down at approximately 4:54 -- 4:54, T11:23:01Z?

A. Talking about in -- in just that segment?

Q. Yes.

A. Just -- just for -- just for her to get back. I mean, that was more like a phrase just to say give me

Page 197

space. That was the intention of that phrase. I just --

Q. Why did you want her to give you space?

A. Because I had -- because I didn't want her to attack or -- or run up on me or different things of that nature. It was an emotional situation. You don't know what's going to happen.

Q. Okay.

A. All you can do is just lay a -- lay --

Q. Okay. You weren't --

A. -- lay a foundation.

MS. HARRELL: Let -- let him finish.

BY MS. VENZA:

Q. You didn't mean literally get down?

A. No --

Q. You weren't instructing her to get down --

A. No, I didn't instruct --

Q. -- on the ground?

A. It wasn't meant to say get down, it was more to give me space.

Q. Did you -- okay. So at 4:55, T11:23:09Z, did you know where Lucy was?

A. Yeah. Yes. She laid to rest. She -- she was in the area, probably, like, 40 --

Q. At this --

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026
Pages 198..201

Page 198

A. -- 40 feet away from me.

Q. At this point, did you know where she was?

A. This is after the shooting?

Q. No, this is right now, at this point in the video, which is on 4/11/2022 --

A. Right. But the question was --

MS. HARRELL: Let her --

A. -- after she was -- after the -- this is after the shooting, right? After the five rounds were shot?

BY MS. VENZA:

Q. Yes.

A. Right. She was on the ground.

Q. Okay. Well, this is 4:55, T11:23:09Z, after the shooting.

A. Uh-huh.

Q. Okay?

A. Yes.

Q. Right now, at this frame of the video, do you know where Lucy is?

A. Yes.

Q. How do you know that?

A. Because the dog -- she's on the ground. The target is -- the threat is eliminated.

Q. Lucy has come -- Lucy went to the front porch of the Barus' house, correct?

Page 199

A. I don't think the dog made it that far.

(Brief discussion held off the record.)

MS. VENZA: I just want to hand you a document to mark as an exhibit, Diane, when you're ready. We're on, what, 5?

THE REPORTER: This is Number 5.

(Plaintiff's Exhibit Number 5 was marked for identification.)

BY MS. VENZA:

Q. The court reporter handed you Exhibit 5. Do you recognize this document?

A. Yes.

Q. What is it?

A. Exhibit 5, court document --

(Brief discussion held off the record.)

BY MS. VENZA:

Q. Okay. So you -- this -- this is part of the scene diagram prepared by Officer Matzen?

A. Uh-huh.

Q. Is that right?

A. Yes.

MR. BUEKER: Object to form.

MS. HARRELL: Form.

BY MS. VENZA:

Q. Have you seen --

Page 200

A. Detective. Crime scene detective.

MS. VENZA: Okay. Is that what you were objecting to?

MR. BUEKER: That's not what it says. You know, it says, Drawn By.

BY MS. VENZA:

Q. Okay. It says, Drawn by J. N. Amponin, but as far as you know from the material you reviewed, it was prepared by or at the direction of Officer Matzen?

MS. HARRELL: Object to the form.

A. Now --

BY MS. VENZA:

Q. You don't know?

A. It's between Matzen and the two crime scene detectives that came, so --

Q. Is --

A. -- it's -- that's --

Q. Was that who Amponin is?

A. Yes.

Q. He's a crime scene detective?

A. Yes. There are two crime scene detectives.

Q. And you did -- and you did review a report, you testified earlier, by Officer Matzen, correct?

A. Right. He authored the crime scene report, he took pictures.

Page 201

Q. Okay. In any event, does this refresh -- refresh your recollection about where Lucy's body came to rest on 4/11/2022?

MS. HARRELL: Object to the form.

A. Okay. If -- if you play the video, I think you may see the dog in the -- in the video.

BY MS. VENZA:

Q. But I'm asking you, by looking at this scene -- I mean, by looking at this diagram --

A. Uh-huh.

Q. -- it shows -- do you agree that this diagram shows that the dog is on the front porch?

A. Yeah. Right. This is what the diagram says. I can agree to that.

Q. I'm sorry. You said this is --

A. Yeah, this is what the diagram -- diagram presents, that the dog is on the front door of the house, front door of the --

Q. Do you disagree with this diagram?

A. You --

MS. HARRELL: Object to the form.

A. I would -- I would like to see the video.

BY MS. VENZA:

Q. Okay. Based on right now, before we review the video, do you disagree with this?

Page 202

A. I --

MS. HARRELL: Object to the form.

A. Well, I didn't see the dog on the front --

BY MS. VENZA:

Q. Did you --

A. -- porch.

Q. -- go look?

A. No, I didn't look. I saw the dog laying on, like, the side of the house, what have you. I don't know if somebody could have after the situation, because when they got there the situation was ongoing. But they probably wasn't there -- they probably got there -- I mean, they say 45 minutes to an hour, or 30 minutes to an hour, so someone could have moved the dog from point A to point B.

Q. "They," you're talking about other officers or the crime scene detectives?

A. No, I mean family.

Q. The family? Okay.

A. Yeah, the family.

Q. All right. But going back to the video, playing at 4:55, which is the timestamp that is on the left-hand side, and at the top right corner, T11:23:09Z.

(Video playback begins.)

(Whereupon, the following dialog was

Page 203

transcribed from video:)

MS. BARUS: -- fucking do that?

(Video playback ends.)

BY MS. VENZA:

Q. And you shot all five rounds, correct?

A. Yes.

MS. HARRELL: Object to the form.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: -- your dog bit me.

MS. BARUS: Oh, my god. You really fucking just shot my dog.

MR. K. BARUS: What the --

(Video playback ends.)

BY MS. VENZA:

Q. Okay. So you -- you haven't left the area of the backyard, correct?

A. I haven't left that -- right. I haven't left the area outside the fence. I never went to the backyard. I just never --

Q. I'm sorry, you haven't left the area?

A. Outside the gate.

Q. Outside the gate, when you -- from where you shot Lucy, correct?

Page 204

A. Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: You shot --

OFFICER LAMPKIN: Get back.

MS. BARUS: -- my fucking dog.

Oh, no. Don't.

MR. K. BARUS: You motherfucker.

OFFICER LAMPKIN: You will -- you will --

(Video playback ends.)

BY MS. VENZA:

Q. And what are you holding in your hand at --

A. That -- that's -- that's a GLOCK. That's my pistol.

Q. Okay. So at -- let me finish the question. What are you holding in your hand at 05:07, T11:23:21Z? You're holding your GLOCK?

A. Yes.

Q. You still have your gun. Okay. And you're pointing it at Ms. Barus, and that is her son Kyle?

A. No --

MS. HARRELL: Object to the form.

A. -- I'm not pointing that gun at them.

BY MS. VENZA:

Page 205

Q. Okay. You have your gun --

A. That's the tip of the gun, the back end of it.

Q. Okay.

A. That means -- if you see that lateral piece, that means the barrel of the gun is straight down to the ground.

Q. Okay. So your -- your GLOCK is still out, correct?

A. Right. But it's not being pointed at anyone.

Q. Okay. Where is your finger on -- in relation to the GLOCK?

A. At this point, it's like this (indicating) on the side.

Q. It's just down on the side?

MS. HARRELL: And let me -- let me just reflect for the record, he made a pointing motion as if he was holding a GLOCK, and his index finger was parallel with what would be the barrel of the imaginary gun, which is --

A. That's our training. After we shoot, we hold our gun -- our pistol on the outside of it.

BY MS. VENZA:

Q. Do you agree with your counsel's description about --

A. I mean, it's right there. She's --

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Pages 206..209

Page 206

MS. HARRELL: Yeah --
BY MS. VENZA:
Q. So that's your --
A. She --
Q. -- your right finger?
A. Yeah.
Q. Your index finger on your right hand?
A. Yeah.
Q. It's the one that Lucy bit you on?
A. Right. It's outside the trigger guard.
Q. Okay. So you -- you weren't impeded by the bites or any of the -- either of her two bites, correct?
MS. HARRELL: Object to the form.
MR. BUEKER: Join.
A. I was still able to fire the weapon.
(Video playback begins.)
(Whereupon, the following dialog was transcribed from video:)
MR. K. BARUS: -- motherfucker.
MS. BARUS: He's a policeman. Don't.
(Video playback ends.)
BY MS. VENZA:
Q. Where is Lucy? I've stopped the --
A. My eyes are not on Lucy --
Q. Okay.

Page 207

A. -- at this point.
Q. Okay. I've stopped the video at 05:09, T11:23:23Z.
(Video playback begins.)
(Whereupon, the following dialog was transcribed from video:)
MR. K. BARUS: -- my fucking dog?
MS. BARUS: He killed her. He killed her. Don't --
MR. K. BARUS: Where's my fucking dog?
MS. BARUS: He killed her.
OFFICER LAMPKIN: Step back.
MR. K. BARUS: You motherfucker.
MS. BARUS: He killed her.
MR. K. BARUS: Why did you kill my fucking dog?
MS. BARUS: Stop.
OFFICER LAMPKIN: Let him --
(Video playback ends.)
BY MS. VENZA:
Q. I've stopped the video at 05:19, T11:23:33Z. Where is Lucy?
A. I don't see her.
Q. And I'm asking -- at --
A. At this point --

Page 208

Q. You don't see her in the video.
A. At this point, I'm focused on them.
Q. Okay.
A. Okay.
Q. And so you don't know where Lucy is at -- on 4/11/2022, at this time in the video, taking you back there, why -- the position you're in as it's reflected in the video, you don't know where Lucy is, correct?
A. Correct.
Q. You're focusing on Kyle, the son, correct?
A. Correct.
(Video playback begins.)
(Whereupon, the following dialog was transcribed from video:)
MR. K. BARUS: -- of a bitch.
OFFICER LAMPKIN: Let him loose.
MR. K. BARUS: I will fuck you up.
MS. BARUS: Stop.
OFFICER LAMPKIN: Let him loose.
MS. BARUS: Help me up.
MR. K. BARUS: No. I'll god damn kill you.
OFFICER LAMPKIN: Mike M319 --
MS. BARUS: You hurt me.
OFFICER LAMPKIN: -- give me a 10-33 --

Page 209

MR. K. BARUS: I'm sorry.
OFFICER LAMPKIN: -- send me a unit. And send a sergeant.
(Video playback ends.)
BY MS. VENZA:
Q. At 05:30, top timestamp T11:23:44Z, where is Lucy on 4/11/2023 [sic] -- I'm sorry, 4/11/2022, as you were there at that time, did you know were Lucy was?
A. No.
Q. And she's not shown in that frame of the video either, correct?
A. Correct.
Q. And you didn't know whether any of your bullets had struck her, correct?
A. I -- I know bullets had struck her.
Q. At -- on 4/11/2022, at that time, you knew your bullets had struck her?
A. Yes.
Q. How many had struck her?
A. I couldn't tell you how many had struck her, but I knew she was struck by a bullet.
Q. Okay. At least one?
A. Like I said, she got -- by at least one, she was struck. I know that.
Q. Okay. And that was your knowledge on

Page 210

4/11/2022, that she was struck by at least one?

A. Yes.

Q. And it might have been more?

A. Yes.

Q. It might -- might have been just the one?

A. I -- I know she was struck by a bullet.

Q. Okay. By -- by one, but you don't know if it was more than one?

MS. HARRELL: Object to the form.

A. No. I didn't do an autopsy when present.

BY MS. VENZA:

Q. And you didn't follow her, correct?

A. Correct.

Q. So you did not follow the dog you believed was a danger to the health and safety of others, correct?

MS. HARRELL: Object to the form.

A. Correct. It was -- it was -- the threat was eliminated.

BY MS. VENZA:

Q. Lucy died on the front porch of the Barus' home; do you have any reason to disagree with that?

A. I do not have a reason to disagree with it.

Q. On 4/11/2022, when you left twenty -- the address of the Barus -- the Rockwood home, did you know Lucy was dead?

Page 211

A. I believe that -- I believe that the dog was dead when I left the home, yes.

Q. You -- you didn't think she was still alive?

A. Correct --

Q. When you left the property --

A. -- I believe the dog was dead.

Q. No, no. When all the events were concluded and you're leaving that home, you knew Lucy was dead, correct?

A. Yes.

Q. You didn't -- not have any reason to believe she was euthanized, did you?

A. Are you -- explain that to me.

Q. Did you think Lucy had been euthanized?

A. By the family?

Q. By anyone?

A. No.

Q. I'm going to back up the video again, 05:12, top timestamp T11:23:26Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MR. K. BARUS: -- fucking dog?

MS. BARUS: He killed her.

OFFICER LAMPKIN: Step back.

Page 212

MR. K. BARUS: You motherfucker.

MS. BARUS: He killed her.

MR. K. BARUS: Why did you kill my fucking dog?

MS. BARUS: Stop.

OFFICER LAMPKIN: Let him loose.

MR. K. BARUS: You son of a bitch.

(Video playback ends.)

BY MS. VENZA:

Q. I've stopped it at 05:20, T11:23:34Z.

You told -- or you were directing Ms. Barus to let him loose, correct?

A. Right.

Q. And you were referring to Ms. Barus, who was holding her son by the T-shirt and laying -- she's laying on the ground, correct?

A. Yes.

Q. Okay. Why did you tell her to let him loose?

A. Because he was -- he wanted to fight and be an agitator and fight the police. I was full uniform with a badge. And if he's going to come out and fight the police, I was just going to Tase him.

Q. So why tell her to release him? Wouldn't it be better that she holds him so that the situation doesn't escalate?

Page 213

A. No, she didn't -- it could be better if she could control him, but it appeared it -- it didn't look like she was controlling him.

Q. So how would releasing him help the situation?

A. At that point, if he wanted to fight the police, she wasn't doing a good job controlling him, I could have Tased him. If he was going to fight, fight me, charge me. That's a part of our policy. He displayed those signs. I actually backed up to give him space.

Q. Did you want to Tase him?

A. No. If I wanted to Tase him, I could have Tased him.

Q. Did you have your Taser at this frame -- frame of the video, did you have your Taser out?

A. Yes, ma'am.

Q. When did you get your Taser out?

A. Actually, it was in transition. It was --

Q. Do you want me to back it up?

A. Well -- right. Yeah, you could back it up. Yeah. When he was coming over, I saw nothing was in his hands. He didn't -- didn't have any knives or blunt objects or anything to that nature, so --

Q. So --

A. -- I transitioned from -- from a handgun to a

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                                                    Pages 214..217

Page 214

Taser. And if anything would have happened, if I would have been attacked by this -- by the -- by the son, I could prevent it -- prevent something happening, something -- having to use a firearm or what have you, so I actually transitioned to a less lethal ...

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: You will -- you will --

(Video playback ends.)

BY MS. VENZA:

Q. Okay. I got the video to 04:57 in the bottom, top T11:23:11Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: -- dog bit me.

MS. BARUS: Oh, my god. You really fucking just shot my --

(Video playback ends.)

BY MS. VENZA:

Q. At this point in the video, that's 05:00, T11:23:14Z, Kyle is, you can see in the frame, coming, running towards you, correct?

A. Yes.

Page 215

Q. Okay. Now, do you have your GLOCK in hand?

A. Yes.

Q. Okay. And your Taser is away?

A. Yes.

Q. It's in your belt?

A. Yes.

Q. In its holster? Is that the proper term?

A. Yeah. The Taser is holstered.

Q. Okay.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: -- dog.

MR. K. BARUS: What the fuck is --

MS. BARUS: You shot --

OFFICER LAMPKIN: Get back.

(Video playback ends.)

BY MS. VENZA:

Q. Where is your gun?

A. It's in my hand.

Q. Where is your -- your Taser, same spot?

A. Yeah. Gun is in hand, and Taser is holstered.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

Page 216

MS. BARUS: -- my fucking dog.

(Video playback ends.)

BY MS. VENZA:

Q. Where is your gun at 05:04, T11:23:18Z?

A. It is still out at this point.

Q. Gun is out, Taser is in the holster?

A. Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MR. K. BARUS: You motherfucker.

OFFICER LAMPKIN: You will --

(Video playback ends.)

BY MS. VENZA:

Q. At 05:07, T11:23:20Z, gun is out. We see it in the video.

A. Uh-huh.

Q. And your Taser in the holster, correct?

A. Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN: -- you will --

MR. K. BARUS: You motherfucker.

MS. BARUS: He's a policeman. Don't.

Page 217

MR. K. BARUS: Where's my fucking dog?

MS. BARUS: He killed --

(Video playback ends.)

BY MS. VENZA:

Q. It's -- I stopped it at 05:11, T11:23:25Z. Same -- everything same, gun's out, Taser is holstered?

A. Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: He killed her. Don't --

MR. K. BARUS: Where's my fucking dog?

MS. BARUS: He killed her.

OFFICER LAMPKIN: Step back.

MR. K. BARUS: You motherfucker.

MS. BARUS: He killed her.

MR. K. BARUS: Why did you --

(Video playback ends.)

BY MS. VENZA:

Q. At 05:17, T11:23:31Z, where is your gun and where is your Taser?

A. It's transitioning now.

Q. Okay. Right here? Okay.

(Video playback begins.)

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

Page 218

(Whereupon, the following dialog was transcribed from video:)

MR. K. BARUS:  -- my fucking dog?

(Video playback ends.)

BY MS. VENZA:

Q.   05:19, T11:23:32Z, is your gun holstered and your Taser is out?

A.   It's in -- in the transition and will be --

Q.   Still in transition?

A.   It's transition.  That's what I'm backing up doing.  I -- at this point, I ascertained that he's not a lethal threat, because I didn't know if he got -- had something on him or not.  So at this point, I was comfortable saying this guy is -- don't have any objects on him, nothing.  I got a pretty good look and I was satisfied that he had no other weapons, so it was safe -- at that point, it was safe for me to transition from a handgun to a Taser.

Q.   Your Taser can be deployed from 15 to 20 feet -- 25 feet away; is that right?

A.   Yes.

Q.   How much volts did -- is in a -- is in the Taser that you carried on 4/11/2022?

A.   I do not know that answer.

Q.   Does 200 volts sound right?

Page 219

A.   It may be more.  We have a new Taser now.

Q.   And that's at 4/11/2022?

A.   Oh.  Oh, yeah.

Q.   Was it 200 volts?

A.   I would have to look up the -- look up the policy to look at the X26's --

Q.   So you're not sure?

A.   -- capability.

I'm not sure that --

Q.   But you -- you were trained in that on 4/11/2022?

A.   I was, yes.

Q.   And you were certified on 4/11/2022 in use of a Taser weapon?

A.   Yes.

Q.   Prior to 4/11/2022, had you deployed your Taser in any other police -- well, prior to 4/11/2022, had you deployed your Taser in police circumstances other than in training?

A.   Yes.

Q.   Had you deployed your Taser in any circumstances involving a dog?

A.   No.

Q.   And other than in training, have you deployed your Taser in any non-police circumstance?

Page 220

A.   No.

Q.   Same question with regard to your gun.

A.   No.

Q.   Other than Lucy, have you shot any other dogs?

A.   No.

Q.   Okay.  I'm picking up the video from where we left.  It's 05:19, T11:23:324 [sic].

You said you're backing up to complete the transition from firearm to Taser, right?

A.   Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Let him loose.

MR. K. BARUS:  You son of a bitch.

OFFICER LAMPKIN:  Let him loose.

MR. K. BARUS:  I will --

(Video playback ends.)

BY MS. VENZA:

Q.   I backed up the video again to 04:39, to T11:22:53Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Well, he's out the gate.

Page 221

Hey, bud.

(Dog vocalizing.)

OFFICER LAMPKIN:  Hey.

(Video playback ends.)

BY MS. VENZA:

Q.   Okay.  I stopped it.  And we heard the "hey"?

A.   Uh-huh.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  Come on.

OFFICER LAMPKIN:  Get back.

(Gunshots heard on video.)

(Video playback ends.)

BY MS. VENZA:

Q.   Two quick fires.  Now, I've stopped it again at 04:52, T11:23:06Z.

Was there anything preventing you from switching from your firearm to the Taser?

A.   Nothing is preventing me from switching from my firearm to the Taser, but we don't use -- that's not policy.  We -- we won't -- we don't use Tasers on dogs.

Q.   Isn't it policy -- isn't it JSO policy to use least -- to use less-lethal force when possible?

A.   Yes.  And that also counts before an event,

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                                Pages 222..225

Page 222

such as something being preplanned.

Q. You could have preplanned when you walked from the front of the house to the back of the house to check on dogs that you were skeptical of staying in the yard, correct?

MS. HARRELL: Object to the form.

MR. BUEKER: Join.

BY MS. VENZA:

Q. In hindsight?

A. In hindsight, correct; however, the preplanned is pertaining to having a plan with -- set up in place with, I guess, superiors. You can be allowed to try to use a Taser on -- a Taser on a -- a dog that really moves fast, you're not going to have a good chance of landing both probes on a dog. It's -- I'm not saying it's impossible, but it would be very, very hard to do.

Q. I'm resuming the video.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS: No. No.

OFFICER LAMPKIN: Get down.

MS. BARUS: Why would you fucking do that?

OFFICER LAMPKIN: Well, your dog bit me.

MS. BARUS: Oh, my god. You really

Page 223

fucking just shot my dog.

MR. K. BARUS: What the fuck is --

MS. BARUS: You shot --

OFFICER LAMPKIN: Get back.

MS. BARUS: -- my fucking dog.

Oh, no. Don't.

MR. K. BARUS: You motherfucker.

OFFICER LAMPKIN: You will -- you will --

MR. K. BARUS: You motherfucker.

MS. BARUS: He's a policeman. Don't.

MR. K. BARUS: Where's my fucking dog?

MS. BARUS: He killed her. He killed her.

Don't --

MR. K. BARUS: Where's my fucking dog?

MS. BARUS: He killed her.

OFFICER LAMPKIN: Step back.

MR. K. BARUS: You motherfucker.

MS. BARUS: He killed her.

MR. K. BARUS: Why did you kill my fucking dog?

MS. BARUS: Stop.

OFFICER LAMPKIN: Let him loose.

MR. K. BARUS: You son of a bitch.

(Video playback ends.)

BY MS. VENZA:

Page 224

Q. Could you tell that Kyle was in emotional anguish at this point?

MS. HARRELL: Object to the form.

A. Emotional anguish and -- which leads to a person being unpredictable. I can understand that he wanted to attack me to -- for revenge or whatever state like that. And that's the purpose of -- of putting myself in a position where if he comes forward to attack me, I would Tase him.

Did he deserve to be shot? No, he didn't. But he didn't -- he didn't pose any threat to me, so that's why I transitioned from lethal force to less-lethal force. He didn't have knives or anything on him of that nature.

Q. And you agree that "let him loose" would escalate the situation?

A. He already -- he already escalated the situation by charging and threatening, and --

Q. And then --

A. -- that manner in which he -- the manner and aggression which he displayed would -- gives me a reasonable cause, probable cause to say, hey, this guy is going to fight. So --

Q. So letting him loose would allow that same individual free to come after you?

Page 225

A. He's an adult male. He's --

Q. Is that correct?

A. He's going to hurt her trying to get to me. And you can see, there's an elderly lady on the ground.

Q. Did you --

MS. HARRELL: Objection. She -- that lady is the same age as I am. She's not elderly.

THE WITNESS: I'm sorry.

MS. VENZA: Oh, thank you.

BY MS. VENZA:

Q. Did you say you were sorry to Ms. Barus for killing her dog?

A. I may have said I'm sorry, these things happen, but I never said I'm sorry for killing her dog.

Q. Are you?

A. I can understand her anguish. As you mentioned, you asked a question before, I understand how that feels. I understand the person in which the incident happened. To me, it was not that person's fault.

Q. I'm just asking if you feel remorse for having killed Ms. Barus's dog.

MS. HARRELL: Object to the form.

MR. BUEKER: Join.

A. I'm not going to answer that question.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                      Pages 226..229

Page 226

BY MS. VENZA:

Q.  Why not?

A.  Because I chose to.

Q.  So it's fair to say from that, you don't feel remorse?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

A.  I'm not going to answer that question. It has nothing to do with this case.

BY MS. VENZA:

Q.  It does have to do with this case. And if there's no privileged reason by which you're refusing to answer a question, I'll have to file a motion to compel, and you'll have to come back and answer the question.

MS. HARRELL:  Objection to form. Object to -- and you're not stating proper legal grounds.

A.  I'm not going to answer that question.

BY MS. VENZA:

Q.  Where I've stopped the video, 05:20, T11:23:3347 [sic], you're not looking for Lucy, correct?

A.  No.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

Page 227

OFFICER LAMPKIN:  Let him loose.

(Video playback ends.)

BY MS. VENZA:

Q.  Okay. I forwarded the video to 13:01, T11:31:15Z.

In the frame, Mr. Barus is standing in the back of the silver car, correct? You agree that that's what's being displayed in the frame?

A.  Yes.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  He's crossing the line.

MR. J. BARUS:  No, you crossed the line when you shot my fucking dog.

OFFICER LAMPKIN:  No, you -- you probably crossed the line when you pulled a gun on the kid and ran him down the street.

(Video playback ends.)

BY MS. VENZA:

Q.  What information did you have that Mr. Barus chased a kid down the street -- pulled a gun and chased a kid down the street?

A.  That came from his mother, Ms. Ellington. And that's what I was there trying to prove or disprove.

Page 228

Q.  You didn't have any information from her about him chasing anyone down the street with a gun.

A.  The -- the phrase that -- that the mother used in our conversation is that he came out the door with a gun and he chased him down the street. So if he came out the door with a gun and if he chased him down the street, more than likely the gun is in his hand still while he's chasing him down the street.

Q.  Isn't it true that the only information you had was that a gun had been pulled?

MS. HARRELL:  Object to the form.

A.  He came out the house with a gun and chased him down the street.

BY MS. VENZA:

Q.  And it's your testimony that that's what you -- the information you had on --

A.  Right. So it's on -- if you play the videos, you can hear it, on the body-worn camera from that conversation with the complainant.

Q.  And you since learned that through K. Burford's investigation of your initial events, that -- solicited from the trespasser, there was no gun, right?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A.  That's what's written in the report, ma'am.

Page 229

BY MS. VENZA:

Q.  You declined treatment at the scene; is that correct?

MS. HARRELL:  Object to the form.

A.  That's incorrect.

BY MS. VENZA:

Q.  Okay. Did you tell multiple colleagues and a supervisor that you were okay?

A.  Yes. Which I -- which I was.

And to understand the police world, you -- if they were -- if they were asking me am I'm okay, it's more than just a physical thing.

Q.  But it includes the physical, right?

A.  It does include the physical, but it's more than just --

Q.  Okay.

A.  -- the dog bite.

Q.  I forwarded the video to 20:18, top stamp [sic] T11:33:32Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

SERGEANT KUIPER:  We'll handle that, Lampkin.

OFFICER LAMPKIN:  Yeah. I'm -- Sarge, I'm

Page 230

good.

SERGEANT KUIPER:  Okay.

OFFICER LAMPKIN:  I'm a hundred percent good.

SERGEANT KUIPER:  Do me a favor --

(Video playback ends.)

BY MS. VENZA:

Q.   So you -- you were telling -- who is that? Sarge -- who is that?

A.   That's -- that's Sergeant Kuiper.

Q.   I'm sorry.  Sergeant what?

A.   Kuiper.

Q.   Okay.

A.   K-u-i-p-e-r.  B. Kuiper.

Q.   So you told him, "Sarge, I'm good, I'm a hundred percent good," correct?

A.   Yes.  Yes, ma'am.  That's -- that's a code word for I don't want to be bothered.  High-stress situation, you decompress in levels.

Q.   So you -- you're a hundred percent good, so you're really stressed?

A.   That means leave me alone.

Q.   Okay.  So you really --

A.   That's what that --

Q.   When you're saying a hundred percent good, it

Page 231

means really leave me alone?

A.   Right.

(Brief section of video played.)

BY MS. VENZA:

Q.   And I'm starting the video again at 20:18, T11:33:32Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

SERGEANT KUIPER:  We'll handle that, Lampkin.

OFFICER LAMPKIN:  Yeah.  I'm -- Sarge, I'm good.

(Video playback ends.)

MS. VENZA:  No.  I'm sorry.  That was repeating.

Can you please mark this as the next deposition exhibit?

THE REPORTER:  This is Exhibit 6.

(Plaintiff's Exhibit Number 6 was marked for identification.)

BY MS. VENZA:

Q.   Okay.  Officer Lampkin, the court reporter has handed you the next deposition exhibit.

A.   Uh-huh.

Page 232

MS. VENZA:  What did you say it was, 6?

THE REPORTER:  6.

BY MS. VENZA:

Q.   Okay.  Did you take a look at it?

A.   Yes, ma'am.

Q.   Okay.  What are these?

A.   Those are pictures of my -- my right finger and my left calf.

Q.   Now, I'm looking at the -- the picture of your leg.  It looks like it's on the side.  Is it on the side or is it the back of your leg?

A.   Looks like the back of the leg to me.

Q.   Who took these pictures?

A.   I did.

Q.   With your cell phone camera?

A.   Yes.

Q.   Okay.  The cell phone camera -- I'm sorry, the cell phone that you had on 4/11/2022, was that issued by JSO?

A.   No.

Q.   Okay.  That was your private phone?

A.   Yes.

Q.   Okay.  And you took photos of your leg, why?

A.   To send them to -- I was -- I was asked by the crime -- the animal -- ACPS to send pictures, so I just

Page 233

complied with her.

Q.   Was that Officer Duren?

A.   I'm not sure.  I know I talked to her.  It was a female officer.  She asked, and I complied.

Q.   How did she ask you?

A.   On the phone.

Q.   Okay.  You were -- you were talking with her or texting with her?

A.   I think I was texting and talking.  I'm not -- I'm not a hundred percent sure.

Q.   Okay.  I had previously asked for your cell phone records from that date.  Do you -- you were asked to sign an authorization allowing us to obtain your text messages from 4/11/2022.  Are you willing to sign that authorization?

MS. HARRELL:  Object to the form.

That's something we can discuss off the record.  It's not appropriate for a deposition. It's -- he's not -- that's not testimony.  It's not -- it has to do with discovery, so it's -- I don't think that's proper for outside [sic] the deposition.  And it's something that he needs to discuss with counsel, so I will assert an attorney-client and a work product privilege.

Page 234

BY MS. VENZA:

Q. So, at this time, you used your private cell phone and you did communicate about events on 4/11/2022 from that phone -- utilizing that phone, correct?

A. I sent her pictures and --

Q. And you --

A. -- texted her. I sent her pictures.

Q. Did you text anybody else on that -- on 4/11/2022 about the events of 4/11/2022?

A. I don't recall. I know -- I know I did that. I -- I actually couldn't find any texts or anything in my phone from that date.

Q. Do you still have the same phone that you had on 4/11/2022?

A. I'm not going to answer that question.

MS. HARRELL: If you're asking about his personal cell phone, that's going to be protected information. I --

MS. LAHART: Whether he has the same phone or not is not protected information.

MS. HARRELL: I'm going to object to the question.

MS. LAHART: Are you also directing him not to answer the question?

A. No, I'm going to just say, I -- I'm not going

Page 235

to answer the question.

MS. VENZA: And I'm going to show you another exhibit, when the court reporter marks it.

THE REPORTER: This is Exhibit 7.

(Plaintiff's Exhibit Number 7 was marked for identification.)

BY MS. VENZA:

Q. Okay. This is -- do you recognize that?

A. Yes.

Q. Okay. And that's another photograph of your index finger after -- after you shot Lucy, correct?

A. Yes.

Q. Who took that picture?

A. Crime scene detective.

Q. Do you know which one?

A. I believe it was Matzen, Detective Matzen.

Q. And the injury that you sustained from Lucy on your right index finger is the size of a paper cut; would you agree?

MS. HARRELL: Object to the form.

A. It's a puncture, ma'am. There's a difference between a paper laceration and a paper cut.

BY MS. VENZA:

Q. Okay. You're describing Exhibit 7 as a

Page 236

puncture mark?

A. Right. It's teeth going into -- breaking the skin.

MS. VENZA: Madam Court Reporter, mark the next exhibit, please.

THE REPORTER: This is Exhibit 8.

(Plaintiff's Exhibit Number 8 was marked for identification.)

BY MS. VENZA:

Q. Do you recognize Exhibit 8?

A. Yes.

Q. And what is that?

A. It's a left calf.

Q. And that was taken on the date of the shooting; is that correct?

A. Yes.

Q. And that was the injury to your left leg that you sustained from Lucy?

A. Yes.

Q. You received treatment at an urgent care?

A. Yes.

Q. You went to an urgent care for treatment at the direction of a supervisor; is that right?

A. The way it goes, I get -- I get to decide where I go.

Page 237

Q. Okay. I'm sorry.

You got medical treatment because it was JSO policy, correct?

A. Well, it's -- it was necessary. I went to -- I wasn't sure about the rabies -- rabies, the dog having rabies or not, so I wanted to ensure that I don't -- I don't -- I get some type of preventative care.

Q. Are you familiar with -- didn't the animal control officer confirm that Lucy had a valid rabies vaccination?

MS. HARRELL: Object to the form.

A. That expired. I was informed by someone that -- that she may have had a rabies vaccination, but on the card, it expired. I think it's, like, an annual thing here. An annual --

BY MS. VENZA:

Q. Who --

A. Could be -- I'm not sure, but it's -- it has a timestamp on --

Q. Who?

A. We do, in the state. It's --

Q. No.

A. Yes.

Q. No, I didn't -- no, I'm not saying no to that. I'm saying, in response to -- you said someone told you.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                Pages 238..241

Page 238

A. Well, that --

Q. Who?

A. -- that card expired. I mean, it's kind of hearsay.

Q. Who told you that?

A. I'm not sure. I talked to several people. It could have been hearsay that the -- but it was before I left the scene, I knew that that dog's -- Lucy's vaccination time expired.

MS. VENZA: I'm going to give the court reporter another document to please mark.

THE REPORTER: This is 9.

(Plaintiff's Exhibit Number 9 was marked for identification.)

BY MS. VENZA:

Q. The court reporter has handed you what's now been marked as deposition Exhibit 9. It states at the top, Activity Card With Owner. It's dated 4/11/2022. And in the middle, it states, S. Duren, D-u-r-e-n, Number 305.

Do you see that?

A. I don't see S. Duren.

Q. Go -- go to the middle.

A. Middle? What --

Q. S. Duren, Number 305, Animal Code Enforcement

Page 239

Officer.

A. No, that's at the end. That's at the end of the paragraph.

Q. End of the paragraph, middle of the page --

A. Right.

Q. -- but fair?

A. Right.

Q. Okay. I was just trying --

A. Okay.

(Simultaneous speaking.)

Q. I'm just trying to orient everybody to what document we're looking at.

Have you seen this before?

A. Yes.

Q. Okay. Did you review this?

A. Yes.

Q. In preparation for today's deposition?

A. Yes.

Q. Okay. That first area, that first paragraph, do you see where it says -- starting from the bottom, working your way up -- "I asked Barus if Lucy is current on the rabies vaccine."

Did -- do you see that? Are you with me?

A. No, I'm not with you.

Q. Okay. See the --

Page 240

A. Okay.

Q. You with me? Okay.

A. Yes.

Q. It states, "I asked Barus if Lucy is current on the rabies vaccine. She informed me yes, through FCNMHP."

Do you know that to be a free clinic -- or free veterinary clinic or low-cost veterinary clinic?

A. Well, I'm not familiar with them as being a low-cost --

Q. Okay.

A. -- veterinary clinic.

Q. But you know it's a veterinary clinic?

A. Right.

Q. Okay. And then after that, it states, "I called FCNMHP and confirmed."

Do you see that?

A. Yes.

Q. Did I read that accurately?

A. Yes.

Q. Okay. So S. Duren, Number 305 -- Officer Number 305, on 4/11/2022 confirmed that Lucy was current on her rabies vaccine, correct?

A. You mean -- okay. Where -- where are you reading that at?

Page 241

Q. Okay. The part I was just reading. I'll reread it.

"I asked Barus if Lucy is current on the rabies vaccine. She informed me yes, through FCNMHP."

A. Okay.

Q. And then it states, "I called FCNMHP and confirmed."

A. Right. You were --

Q. Okay.

A. You were reading -- it sounded like you were reading something else after that or you were just adding --

Q. No, I'm saying yes --

(Simultaneous speaking.)

Q. So it was S. Duren, Number 305, Officer 305 --

A. Uh-huh.

Q. -- confirmed that Lucy was current on her rabies vaccine on 4/11/2022, correct?

A. Yes.

Q. When you -- when you went to an urgent care to receive medical treatment, you reported that you had no pain and no problems, correct?

A. I don't recall what I told the doctor, if it --

Q. You would have to defer to the records?

A. Do I have to look at the records?

Case 3:24-cv-01358-MMH-SJH   Document 74-1   Filed 06/01/26   Page 63 of 89 PageID 1647

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Pages 242..245

Page 242

Q.  Would you defer to them?

A.  If you have them.

Q.  Whether I do or I don't, would you defer to them?

MS. HARRELL:  Object to the form.

Could --

MS. VENZA:  Okay.

MS. HARRELL:  You're just referring to basic records?

A.  May I look?

BY MS. VENZA:

Q.  Would you defer to medical records about what you told doctors on the day you were there?

A.  Yeah, but if you have the records, I could look at them and see.  I mean, I would rather rely on them on this point.

Q.  Put it this way.  You would have no reason to dispute them, you would think that the doctors took -- did -- were -- were as accurate as they could be, and nurses or whoever you're dealing with?

A.  No.  The doctor that I dealt with at Amelia Care [sic], yes.  But the doctor that I dealt with at -- I believe it was UF --

Q.  So -- and what was --

(Simultaneous speaking.)

Page 243

A.  And the doctor that I talked to -- I believe it was at UF -- I didn't.  His information turned out to be -- be okay, you know, because he was saying that -- that we hadn't a rabies case in Duval for a long time, and he said the chances of me having it may be highly unlikely, because I actually followed up to get treatment, and he actually said that it's a -- it's a huge chance that it wouldn't -- it wouldn't happen.  And I could understand the process of rabies, that when it -- when it hits, it hits, and there's no reversing it.

Q.  Did you go to UF for medical treatment?

A.  I was referred to go to UF because --

Q.  Okay.  Is UF a separate medical --

A.  Yeah, I went to -- I'm sorry.

Q.  Is UF a separate medical facility than Amelia Urgent Care?

A.  Yes, ma'am.

MS. HARRELL:  Denese, just so you know, we have a UF Health here.  It's a division of Shands.  And that's -- it's a -- they have a freestanding facility.  So he's not saying he went down to Gainesville or anything.  I just want to --

BY MS. VENZA:

Page 244

Q.  Well, I'm not saying that, but I -- I only am aware of -- that you treated at Amelia Urgent Care, 510 Airport Road [sic] -- I'm sorry -- at -- yeah, at Fernandina Beach.

A.  No.

Q.  Did you -- did you go to Amelia Urgent Care?

A.  Yeah, 510 Airport Road.

Q.  Okay.  There you go.  Okay.  At 510 --

A.  We're talking about the same place.

Q.  That's the same place as UF?

A.  No, ma'am.

Q.  Okay.  So -- all right.  Where did you get your medical care?

A.  At Amelia and UF Health.

Q.  Okay.  So there are -- more than one place?

A.  Yes.

Q.  On the same day?  On 4/11/2022?

A.  No, I did follow-ups.

Q.  Okay.  And so the -- so on 4/11/2022, the only place you treated at was Amelia Urgent Care, 510 Airport Center Road [sic], Jacksonville?

A.  Yes.

Q.  And then you did follow-ups at that facility, correct?

A.  Yes, I --

Page 245

Q.  And elsewhere?

A.  Yes.

Q.  And that's UF.  And where is UF?  What do you --

A.  It's on Dunn Avenue.  Dunn Avenue, I-295.

(Discussion held off the record.)

(Whereupon, a brief recess was taken.)

MS. VENZA:  Okay.  I was given -- and I'm not making this an exhibit --

MS. HARRELL:  Okay.

MS. VENZA:  -- okay?  I'm just giving this for reference.

In discovery, your attorney provided only a copy of the Amelia Urgent Care work status note from 4/11/2022 and a work status note from 4/19/2022.

His date of birth is on here, so I'm not including it.

MS. HARRELL:  Okay.

BY MS. VENZA:

Q.  But regardless, did you -- I'll show you.  Did you tell the doctors that there was -- a dog's rabies test was done on its brain and it's pending?

MS. HARRELL:  I'm going to object to the form and also just note for the record that

Case 3:24-cv-01358-MMH-SJH   Document 74-1   Filed 06/01/26   Page 64 of 89 PageID 1648

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026
Pages 246..249

Page 246

these were submitted to JSO -- or these were obtained by JSO -- or from JSO.

A. I don't -- I don't recall saying that. I may have said something like I was led to believe that there was a test or something was going to be done, but not something that's going to be done on the dog's brain. I -- I don't remember that.

BY MS. VENZA:

Q. You don't know how that got in there?

A. Not -- yeah, I don't -- that's not even -- that's -- I don't even think that's even part of any rabies test.

Q. Okay. And I'll just clarify the record that the document I handed Officer Lampkin was what -- what his attorney produced to us. She explained where she got it from, but that was what we received.

A. I mean, I went to the doctor's office. I know I alluded to, I thought the dog was going to be getting a rabies test.

Q. And you returned to fit for duty without restrictions on 4/11/2022, correct?

A. Yes.

Q. And that didn't change in terms of your recheck on 4/19/2022? It says, Still fit for duty without restrictions starting 4/11/2022, correct?

Page 247

A. Correct.

Q. Did you get rabies?

A. No.

Q. Okay. Did you develop an infection from either bite?

A. No.

Q. Did you suffer any complications from either bite?

A. No.

Q. Have you ever been disciplined by JSO in your 19-year career?

MS. HARRELL: Object to the form.

A. You have to clarify what's "discipline."

BY MS. VENZA:

Q. Reprimanded?

A. Never been reprimanded, no.

Q. And is there -- is there official discipline that occurs in JSO?

A. It is, but there -- there's something that's called formal and informal, then you go to something, then disciplined. And I've never reached any -- never had any discipline, more like formal counseling or something like that, but no -- no discipline.

Q. So there's informal discipline and formal discipline?

Page 248

A. It's called counseling.

Q. The informal?

A. Yes.

Q. And you've -- you've had neither? You've had --

A. I've -- I've had -- I've never been disciplined, but I've had formal --

Q. Informal --

A. -- formal -- I've had informal and formal counseling, but I've never been disciplined, from what I understand. I could -- I could be wrong, but I've -- I've never been disciplined.

Q. Okay. So you've had formal and informal counseling?

A. Right.

Q. And that is steps below discipline?

A. That's steps before you get to discipline.

Q. Okay. Do either of the formal or informal counseling have anything to do with firing your weapon?

A. No.

Q. Anything to do with animal encounters?

A. No.

Q. Do you feel that you were adequately trained by JSO for animal encounters before 4/11/2022?

MS. HARRELL: Object to the form.

Page 249

A. Yes.

BY MS. VENZA:

Q. Did you feel that your JSO training with regard to animal -- animal encounters was in any way deficient on 4/11/2022?

MS. HARRELL: Object to the form.

A. No.

BY MS. VENZA:

Q. So you don't feel like if you had been better trained by JSO, you could have handled things in a different way that might have had a different outcome?

MS. HARRELL: Object to the form.

A. I -- I believe the training was sufficient.

BY MS. VENZA:

Q. Sufficient?

A. (Nods head.)

Q. Are you familiar with JSO policy 212?

A. Yes.

Q. I'm going to ask you if you -- if you agree with this. If not, I can find the order for you.

Do you agree that it's JSO 212 policy on 4/11/2022 that any animal creating a clear and immediate danger to the officer or the public may be killed if an attack is imminent and no other solution exists?

A. That's our -- that's the policy.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

Page 250

Q.  And you understood that was the policy on 4/11/2022?

A.  Yes.

Q.  Other solutions did exist on 4/11/2022 other than your shooting and killing Lucy, correct?

A.  No.

Q.  There were no other solutions?

A.  No.

Q.  You couldn't have gotten your baton before you walked around to the side of the house?

MS. HARRELL:  Object to the form.

A.  It wasn't on me, so -- it wasn't on my person, so I wouldn't have had it in my hand.

BY MS. VENZA:

Q.  Okay.  But you could have had it in your hand --

A.  It's a possibility.

Q.  -- when you walked around the side of the house?

A.  It's a possibility.

Q.  As is having pepper spray in hand?

A.  It's a possibility.

Q.  As is having the Taser in hand?

A.  I wouldn't have had the Taser in hand.

Q.  And -- as is not going around the back of the

Page 251

house to look at the dogs, correct?

MS. HARRELL:  Object to the form.

BY MS. VENZA:

Q.  Your attorney waived her hand, signaling you can answer.

MS. HARRELL:  Oh.  Yeah.

A.  That is a possibility.  All those things are possible.

BY MS. VENZA:

Q.  And it's also possible that you could have backed away after Lucy came out of the gate?

MS. HARRELL:  Object to the form.

A.  Like I said, it's possible.

BY MS. VENZA:

Q.  So they're all options, correct?

A.  They're options that you can use in hindsight, yes.

Q.  Have you ever been sued for any reason associated with your police work before the Barus' lawsuit?

A.  As it relates to?

Q.  Okay.  This is what I'm asking.  I'm going to ask you if you've been sued before, and I don't want to ask you about your personal life, so I'm asking you, have you been sued before in your capacity as a police

Page 252

officer?

A.  No.

Q.  On 4/11/2022, after watching you shoot and kill her dog Lucy, Ms. Barus is crying and asks, "Why would you fucking do that?"  I'm going to tee that up on the video.

I've teed the video up to 4:54 on the bottom, top counter T11:23:08Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  Why would you fucking do that?

(Video playback ends.)

BY MS. VENZA:

Q.  Okay.  Did you hear her --

A.  Yes.

Q.  -- asking -- okay.

And you answered her.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

OFFICER LAMPKIN:  Well, your dog bit me.

MS. BARUS:  Oh, my god.

(Video playback ends.)

A.  What?  I --

Page 253

BY MS. VENZA:

Q.  I'll back it up.

Same spot, 4:55, T11:23:09Z.

(Video playback begins.)

(Whereupon, the following dialog was transcribed from video:)

MS. BARUS:  -- fucking do that?

OFFICER LAMPKIN:  Well, your dog bit me.

MS. BARUS:  Oh, my god.

(Video playback ends.)

BY MS. VENZA:

Q.  And your answer was because, "Your dog bit me," correct?

A.  Yes, I said that.

Q.  Do you regret saying to Ms. Barus, "You go open the gate"?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

A.  Do I regret that?

BY MS. VENZA:

Q.  Uh-huh.

A.  No.

Q.  Knowing what you do now, is there anything you would do differently on 4/11/2022?

MS. HARRELL:  Objection.  Object to form.

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Pages 254..257

Page 254

This is -- this is bordering on a -- on a bad faith.

A. I wouldn't do anything different.

MS. VENZA: Take a break?

MS. HARRELL: Yeah, sure.

(Whereupon, a brief recess was taken.)

MS. VENZA: We're back on the record at 1:51.

Mr. Lampkin, I thank you for your time today. At present, I don't have any more questions; however, plaintiff's counsel, Attorney LaHart and I, were just given a scan [sic] drive -- or a Zip drive at about 8:30 a.m. this morning of 108 photographs --

THE WITNESS: Uh-huh.

MS. VENZA: -- which we've never seen before, which may or may not give rise to questions we want -- may want to ask you about.

In addition, we were previously provided 33 body-wear cam videos from all of the police, et cetera, personnel that came to the Rockwell address on 4/11/2022, but they don't include identification of who the officers are, who the people are on the video, and we've asked for that in an effort to limit the time that we may

Page 255

want to ask you further questions.

THE WITNESS: Okay.

MS. VENZA: And so I am done asking you questions, but I may have new questions that I didn't ask that arise from either of those.

And in addition, though I have requested several times, we do not have your text records or your medical records, which also may lead to additional questions.

So I'll reserve the right to continue the deposition that we've started now. In the meantime, I will turn it over to your attorney who may want to ask you some questions.

MS. HARRELL: We will -- thank you for your statements. We will address those as necessary.

I have no questions for you.

MS. VENZA: Okay. So the deposition is not concluded; it's done for now. I'm reserving the right to have to maybe bring you back and maybe do it by Zoom in the future. Okay?

THE WITNESS: It's your choice.

MS. HARRELL: Well, we'll address that.

MS. VENZA: Okay. So you are free to go.

Page 256

THE WITNESS: All right. Thank you.

THE REPORTER: Read or waive?

MS. HARRELL: Do you want to read it or do you want to waive?

THE WITNESS: I'll waive.

MS. HARRELL: We'll waive.

THE REPORTER: Okay. And are you ordering these depositions?

MS. VENZA: Not right now.

(Witness excused.)

(The deposition was concluded at 1:53 p.m.)

- - -

Page 257

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF DUVAL  )

I, Diane M. Tropia, Florida Professional Reporter, Notary Public, State of Florida, certify that Karl D. Lampkin, personally appeared before me on April 3, 2026, and was duly sworn.

Signed this 5th day of May, 2026.

*Diane Tropia*

Diane M. Tropia, FPR
Notary Public, State of Florida
Commission No.:  HH 439521
Expires: October 31, 2027

Personally Known_____
Or Produced Identification___X___
Type of Identification Produced___DL___

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                                                    Page 258

Page 258

                        CERTIFICATE OF REPORTER


STATE OF FLORIDA )

COUNTY OF DUVAL  )


     I, Diane M. Tropia, Florida Professional Reporter,

do hereby certify that I was authorized to and did

stenographically report the deposition of Karl D.

Lampkin, that a review of the transcript was not

requested, and that the foregoing transcript is a true

and complete record of my stenographic notes.


     I FURTHER CERTIFY that I am not a relative,

employee, or attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.


          DATED this 5th day of May, 2026.

                    *Diane Tropia*
          _____

                    Diane M. Tropia, FPR

**-**

**-02Z** 173:3

**-4Z** 161:23

**-56Z** 195:13

**-8Z** 120:10

**0**

**0-** 176:6

**00:12** 47:3 48:3,5 49:21

**00:46** 71:16

**03:44** 120:9

**048** 173:2

**04:39** 220:20

**04:47** 191:9

**04:50** 173:19

**04:52** 176:6 221:17

**04:57** 214:12

**05:00** 214:22

**05:04** 216:4

**05:07** 204:17 216:15

**05:09** 207:2

**05:11** 217:5

**05:12** 211:18

**05:17** 217:21

**05:19** 207:21 218:6 220:7

**05:20** 212:10 226:20

**05:30** 209:6

**1**

**1** 28:13 37:10 70:24,25 93:23 110:23,25

**10** 76:20 168:21

**10-33** 208:25

**108** 254:14

**11** 50:9 116:13,14,25

**11:18** 50:6,7

**11:18:14Z** 45:17

**11:18:26** 48:18

**11:18:26Z** 50:11

**11:20:07Z** 66:19

**11:20:15Z** 68:5

**11:21:44Z** 133:14

**11:57** 153:3

**13** 168:22

**13:01** 227:4

**15** 37:3 82:23 91:20 97:1 110:25 177:21 187:3 218:19

**15-minute** 109:20 111:6

**18** 50:5,10 51:12,20

**18:26Z** 48:4 50:3

**19** 9:8 11:19 22:11 24:17 44:18 82:21 92:7 116:9 117:24

**19-year** 247:11

**1991** 12:10

**1:01** 76:19

**1:51** 254:8

**1:53** 66:20 256:11

**2**

**2** 28:13 45:17 99:25

**20** 218:20

**200** 218:25 219:4

**2006** 8:9,12 15:13,14 22:14

**2007** 15:22 16:12,13 17:15, 24 18:14 19:4 21:7,24,25 22:2,5,6

**2008** 15:22 21:25 22:1,2,5, 7

**2014** 109:16

**2015** 108:6,7 109:16,21 111:8

**2022** 116:25

**2022-04-11** 45:16 47:20

**2025** 116:9 117:24

**2026** 108:17

**20:18** 229:18 231:5

**212** 249:17,21

**22** 116:13,16,17,24 127:3

**25** 218:20

**2:01** 68:5

**2:40** 122:15

**2:50** 121:23

**3**

**3** 28:13 82:9 100:4 109:11, 12

**3-** 140:21

**30** 202:13

**305** 238:20,25 240:21,22 241:15

**33** 10:23 11:7 254:20

**35-** 82:14 184:19

**3504** 27:12 29:12 31:18 34:21 35:4 38:19 52:25 54:9 60:19 63:3,8 65:16 66:12 69:23 77:19,25 78:25 79:15,21 82:15 83:21 86:12 93:20 114:20 118:4,7,11 119:1 182:11 183:4

**3:30** 133:13

**3:32** 137:3

**3:35** 148:4

**3:37** 147:5

**3:37:89** 140:7

**3:40** 140:12

**3:41** 145:1

**3:42:03** 126:5

**3:43** 137:21 138:5

**3:50** 145:22

**4**

**4** 23:2 28:13 115:24 116:1

**4/11** 34:20

**4/11/2022** 23:2 25:1,22 26:6,12,15 27:10 29:13 31:18 32:18 33:7,17 36:2, 6,14 37:11,13 38:8,19 40:18 41:5 63:25 64:8 71:8 80:7,18 82:1,14 83:1,21 84:24 85:16 86:3,8 87:21 88:6,24 94:11,21 98:12,24 99:3,24 102:24 103:5 111:19 113:8,11 114:2 118:12 130:20 132:2,7 177:4 183:4 187:9 189:18 194:3 196:8 198:5 201:3 208:6 209:7,16 210:1,23 218:23 219:2,11,13,16,17 232:18 233:14 234:3,9,14 238:18 240:22 241:18 244:17,19 245:15 246:21, 25 248:24 249:5,22 250:2, 4 252:3 253:24 254:22

**4/11/2023** 209:7

**4/11/22** 38:24 151:25

**4/19/2022** 245:16 246:24

**40** 197:24 198:1

**42** 195:11,12

**45** 202:13

**4:25** 36:9,13,15 37:10

**4:41** 153:18

**4:43** 140:12 141:24 142:5, 8,9

**4:46** 155:24

**4:47** 156:9 171:21 194:16

**4:48** 156:9 157:10,20 166:24 172:17

**4:50** 157:20,25 158:21 161:22 166:9,24 167:17 170:12 171:8

**4:51** 174:11

**4:52** 175:4

**4:54** 196:21 252:7

**4:55** 197:21 198:13 202:22 253:3

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                                 Index: 5..area

**5**

**5**  28:10,11,13,15,16 110:23, 25 199:5,6,7,10,14

**510**  244:3,7,8,20

**5:00**  36:7,13,15 37:10

**6**

**6**  28:13 50:10 168:21 231:19,20 232:1,2

**6:30**  123:3 130:6,14

**7**

**7**  235:5,6,25

**7:19**  47:3,4,10 50:3

**8**

**8**  236:6,7,10

**81326035**  45:18

**8:30**  254:14

**9**

**9**  168:22 238:12,13,17

**9:15Z**  76:21

**A**

**a.m.**  36:7,13,15 37:10 47:11 50:3 130:6,14 153:4 254:14

**ability**  37:18,22 106:3

**Absolutely**  152:23

**academy**  8:9,12 9:7,11,12, 15 10:4,22 13:11 15:1,13, 24 16:2,5,8,9,15,17 19:25 20:14 21:22 22:14,19 84:22

**Acadis**  107:25

**access**  56:3,6 80:11,16

**accessing**  56:9

**accident**  105:11

**account**  100:11

**accounting**  89:2

**accurate**  64:19,23,25 84:18 92:11 97:24 116:10 242:19

**accurately**  38:1,2,5 240:19

**Achilles**  164:13

**ACPS**  232:25

**acted**  130:6,14

**action**  187:16

**actions**  143:6

**activated**  154:24

**activity**  26:8 238:18

**actual**  46:5 48:22,24 49:7 129:6 161:3

**add**  41:14

**adding**  241:12

**addition**  254:19 255:6

**additional**  55:22 56:6,9 109:23,25 255:9

**address**  29:18 30:3 60:5 82:22 118:7,13 210:24 254:22 255:15,24

**adequately**  248:23

**adjusting**  46:9

**administration**  25:23,24 26:1

**adult**  225:1

**affect**  37:17,22

**afraid**  57:25 60:12

**age**  11:7 51:9,12 59:12,14, 19 225:7

**agencies**  37:7

**agency**  24:13

**aggravate**  188:3

**aggravated**  60:8,22,24 61:10 82:7,8,10 83:22,23 88:11 129:10 131:9

**aggression**  187:11 224:21

**aggressive**  50:22 51:1 52:10 53:11 54:12,15,25 55:10 57:20 58:21 113:10 127:13 150:24 176:20

**agile**  161:5

**agitate**  190:14,15,19

**agitating**  190:23,24

**agitator**  212:20

**agree**  11:1 95:17,23,24,25 96:15 103:2,3 111:22 129:14,25 130:3,11 131:22 132:1,6 151:3 162:10 164:17 168:23 177:20 178:2,13 179:8,13,17 180:23 186:8,14,16 201:11,14 205:23 224:15 227:7 235:20 249:19,21

**Agreed**  137:22

**agreeing**  96:4

**agreement**  18:20

**agrees**  65:23

**ahead**  6:1 7:12 21:6 51:25 52:12 53:15 57:11,24 99:22 121:9 126:13,20 128:12 134:8 138:2 143:21 144:9 145:9,14 146:25 147:16,19,22,25 149:8,13 150:10 152:24 170:4 171:6 180:15

**Airport**  244:3,7,20

**aligns**  154:11

**alive**  211:3

**allegation**  82:7,13 129:9 131:9

**allegedly**  62:10 181:16

**allowed**  10:14 222:12

**allowing**  116:20 233:13

**alluded**  87:23 246:18

**alternate**  87:14

**Amelia**  242:21 243:16 244:2,6,14,20 245:14

**Amended**  115:22

**amendment**  61:1 88:12

**ammo**  189:20

**ammunition**  190:1

**Amponin**  200:7,18

**angle**  142:3

**anguish**  224:2,4 225:16

**animal**  28:1,17 29:13,16 30:11,16,22 31:3,4,21 32:1 50:16,19,20 53:6,8 54:3,11 60:7 71:3 79:7,25 80:2,7 108:10 177:3,8,10,13,14, 16,17,20,22 232:25 237:8 238:25 248:21,24 249:4,22

**animals**  108:2,10 176:10

**annoyance**  73:17

**annoying**  91:12 107:2

**annual**  237:14,15

**answering**  95:3 119:16

**answers**  35:16 57:16 115:23 116:9 196:5

**apologize**  65:20 153:5

**apparently**  44:1

**appearance**  7:7

**appeared**  213:2

**appears**  47:10 77:12 83:8

**applied**  9:15

**apply**  5:16,22 9:4,7

**approachable**  187:5

**approaching**  156:19

**approving**  150:12,18

**approximately**  16:11 20:20 40:14 196:21

**April**  116:25

**archives**  23:14 24:12

**area**  27:13,16 32:6 52:11 54:12,15 59:1 66:15 82:20 86:23 103:9 117:13 127:6, 23 140:13 141:16 143:9,10 151:5 157:5 162:25 163:1 179:9,14 181:7,9,10,23,24 182:6,8 190:10 194:7 197:24 203:17,20,22

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                                    Index: arise..bites

239:19

**arise** 255:5

**arrest** 40:7 42:8 43:18,22, 23

**arrived** 65:16 66:8,12 97:1 182:11,24 183:4,7,16,22 184:16,19

**ascertain** 88:9 190:5

**ascertained** 218:11

**Ashish** 33:20,22,23

**asks** 42:15 116:24 252:4

**assault** 60:8,23,25 61:10 82:7,8,10 83:22,23 88:11 129:10 131:10

**assert** 233:23

**assign** 28:5

**assigned** 19:13 29:1,22, 23 30:12

**attached** 170:17,19,24

**attachment** 171:1

**attack** 57:1,2 58:15 67:23, 25 68:15 176:11 197:5 224:6,8 249:24

**attacked** 214:2

**attacking** 129:23

**attempting** 62:18

**attend** 36:3

**attention** 116:12 191:8

**attest** 96:22

**attorney** 7:4,10 245:13 246:15 251:4 254:12 255:12

**attorney-client** 110:13 233:24

**audio** 67:11,13

**authored** 40:1,3 200:24

**authorization** 233:13,15

**automatically** 81:25

**autopsy** 210:10

**Avenue** 245:5

**average** 168:22

**awarded** 25:20,21 109:3

**aware** 5:7,16,19 18:7 102:25 110:4 112:2 118:3, 12,21 181:12 244:2

**AXON** 45:17

---

**B**

---

**back** 31:12 36:21 55:8,25 65:10,12 71:14 73:4,12 84:19 85:24 114:24 115:1, 7 120:25 121:23 122:22,23 123:2,22 124:1 125:2 127:2 128:3 133:3,22 137:8 140:13,18,20 141:3, 7,16 143:9,10,25 144:19 146:9,16 150:2,12,18 153:2,21,23 154:4 161:12, 16,21 164:6,10,12 165:19 168:8 169:16 174:6 175:7 176:15,20 182:4 186:10,17 189:18 190:10 191:7,18 194:14,16,24 195:5,22 196:24 202:21 204:6 205:2 207:12 208:6 211:18,25 213:19,20 215:16 217:15 221:12 222:3 223:4,16 226:14 227:6 232:11,12 250:25 253:2 254:7 255:21

**backed** 71:15 121:21 169:20,22 170:3 171:21 172:16 173:2 191:9 194:16 213:9 220:20 251:11

**backing** 142:8 148:4 169:10 171:17,20 185:15, 22 218:10 220:8

**backwards** 169:24

**backyard** 72:7,9 73:13 74:5 112:3 123:4,6 124:22 132:5 133:7 134:18 138:6, 19 140:18 141:2,5,10,18, 20 142:4,17 143:15,16 146:6 188:10,14,16 203:18,21

**bacteria** 164:21,23

**bad** 118:10 122:22 154:22 254:1

**badge** 212:21

**ballpark** 16:12

**barking** 112:8 156:11

**barrel** 205:5,19

**Barus** 67:3,6,14 69:5,8,14 70:16,17,18 82:25 83:3 101:12 102:12 103:6 115:14,15 119:6 120:12,19 121:6,7,8,17 122:2,11,21 123:1,7,10,11,13,14,15,17, 20,25 124:1,2,4,9,14,20, 21,22,25 125:1,2,4,25 126:1,2,5,15 128:14 131:3, 13,15 132:10,11,15,23 133:7,20,21,22,24 134:5,6, 7,10,14,19,21,24 135:3,6, 9,12,13 136:6,25 137:8,10, 16,17,18 138:11,15,20,22, 25 139:4,7,10,13,16,19 140:17 141:1,10 143:18 145:6,7,8,23 146:3,13,22, 23,24 147:13,14,15 148:9, 20,21,22 149:10 150:9,10, 12,18 151:11,25 152:4 157:16 168:9,19 169:3 172:10,14,22,25 173:8,15, 17,24 180:12 181:14 185:15,23 191:17 192:3, 10,18 194:23 195:1,21,24 196:15,17,20 203:2,12,14 204:5,7,9,21 206:19,20 207:7,8,10,11,13,14,15,17 208:15,17,18,20,21,24 209:1 210:24 211:23,24 212:1,2,3,5,7,11,14 214:18 215:13,14,15 216:1,11,24, 25 217:1,2,12,13,14,16,17, 18 218:3 220:15,17 221:11 222:21,23,25 223:2,3,5,7, 9,10,11,12,14,15,17,18,19, 21,23 225:11 227:6,14,21 239:21 240:4 241:3 252:4, 12,23 253:7,9,15

**Barus'** 72:7 76:24 77:6 102:16,17 112:3 131:23 132:2 142:17 152:5,8 188:9,24 194:11 198:25 210:20 251:19

**Barus's** 99:23 118:6 130:19 156:22 179:25 184:24 225:22

**based** 74:6 108:13 201:24

**basic** 242:9

**basically** 12:21 26:3 52:10,12 58:19 64:16 84:17 115:16 154:19 191:4

**baton** 38:12,24 155:5,6,7 163:17,21 250:9

**BC7** 81:11,17 82:4

**Beach** 244:4

**bear** 133:10

**begins** 66:21 68:6 69:1 120:14 121:1,24 122:8,18 124:11 125:21 126:10 132:20 133:4,15 137:5,24 138:7 140:2 145:2,25 146:17 147:7 148:6,16 149:5 155:18 156:2 157:12 171:23 172:7,18 173:4 174:3 191:11,24 194:18 195:14 196:12 202:24 203:8 204:2 206:16 207:4 208:12 211:20 214:6,14 215:10,23 216:8,20 217:9, 25 220:11,22 221:8 222:18 226:23 227:10 229:20 231:7 252:9,19 253:4

**behave** 152:12

**behavior** 117:12 127:4 152:10 177:10

**belief** 176:17

**believed** 178:4,15 210:14

**belt** 155:3 215:5

**big** 10:24 11:1 17:8,9

**bigger** 29:5,6

**birth** 245:17

**bit** 57:6 68:24 75:25 121:22 160:24 161:10,14,18 162:1 164:5,6 165:13,14,18,19 166:2 169:16 170:21 171:1,2 185:20,21 192:17 203:11 206:9 214:17 222:24 252:22 253:8,12

**bitch** 139:11 208:15 212:7 220:15 223:23

**bite** 70:11 162:20 163:10 165:12,23 166:21 169:17, 19 170:7,9 172:5 185:13, 14 229:17 247:5,8

**bites** 161:16,21 164:17

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                Index: biting..check

165:2 166:19 206:12

**biting** 70:7 161:2,24 164:20 181:5

**bitten** 57:17 111:20,21 160:4,22 161:23 162:3 174:20

**black** 87:5 102:23

**Blade** 187:16

**blindly** 186:10

**block** 86:14,15,21,22

**blocking** 168:13

**blood** 77:16 139:24

**Blue** 11:8,11 12:1 13:1,10 14:12,13,14

**blunt** 213:22

**bodily** 182:25 183:5,12,23 184:21

**body** 45:17 160:15 166:1, 4,5,10 168:3 170:9 187:17 201:2

**body-wear** 39:12,13 40:10,25 41:5 45:5 80:17 86:17 100:5 158:1 168:14 254:20

**body-worn** 39:9 46:5 47:17 84:19 86:19 95:4,7 182:1 228:18

**Booking** 42:8 43:18,23

**bordering** 254:1

**born** 23:16

**bothered** 230:18

**bottom** 45:21 48:14 71:16 110:24 120:9 137:4 152:19 167:17,18 214:12 239:20 252:7

**brain** 10:2 245:23 246:6

**branch** 17:23

**break** 65:6 152:22 153:10 178:7 254:4

**breaking** 236:2

**bring** 255:20

**broader** 5:23

**bud** 156:5,10 191:14 195:18 221:1

**BUEKER** 31:1,6 42:17 48:5,7,9,12,16,21 49:1,7, 10,12,16 55:12 64:3 65:3, 25 66:6 70:4 73:24 75:4, 23,25 76:3 80:9,20 81:4 89:4 90:6,19 91:2 95:18 100:25 101:19 104:10,13 112:5,21 118:14,19 125:13 127:8 129:16 130:7 152:15 159:3,17,21 167:7 177:11 178:6,17 180:20 181:1,19 186:20 189:5 192:23 195:6,9 196:1 199:22 200:4 206:14 222:7 225:24 226:7 228:23 253:18

**Buford's** 95:10

**built** 14:6

**bull** 93:24 94:10

**bullet** 188:17,19 209:21 210:6

**bulletins** 109:15

**bullets** 209:13,15,17

**bulls** 59:24 92:18 93:11, 13,17,18,20 94:1 97:2 180:5 181:15

**bunch** 178:19

**Burford** 40:4 85:7,8 87:23 88:24 89:3,10 91:4 92:4 96:14 97:11

**Burford's** 89:12 92:20 95:10 97:8 103:1 228:20

**bus** 58:25 59:2,3,4,20 87:11,13 103:9,14

**business** 14:4

**button** 46:14

**BWC** 100:5

---

### C

**C-R-E-W-S** 33:15

**calendar** 36:16,21

**calf** 161:12,16,21,24 162:1, 3,7 232:8 236:13

**call** 14:11 25:3 27:4,11,13 28:6,13 29:1,21,23,24 30:7,13,20 32:6 34:21 35:3,9,20 36:3 38:22 39:1 44:6 50:14,15,16,18 52:10, 25 53:5 54:1,6,7 55:9,21, 22 56:6,13 60:3 67:9 68:10 69:11,21 72:19 77:19 78:17,23 79:16 80:14 83:22 99:4,5 106:11 107:18,20,21 108:9 111:10 118:11 177:3,8,13,18

**called** 12:17 13:25 30:19 31:4 42:2 54:23 55:7,8,24, 25 58:2 67:18 76:9 101:12 177:10 240:16 241:6 247:20 248:1

**calling** 27:8 57:10 62:15

**calls** 26:7,9,10

**cam** 39:13 80:17 86:17 254:20

**camera** 39:9,12 40:10,25 41:5 45:5 47:18 85:12 86:19 95:4,7 100:5 158:2 168:14 182:1 228:18 232:15,17

**cameras** 84:19,21

**campus** 17:22

**canine** 15:6

**canines** 14:22,25 15:5 111:17

**capability** 219:8

**capacity** 251:25

**car** 26:14,24 27:5 38:24 45:6 46:6 50:23,24 51:21, 22 53:12 54:22,25 56:25 57:4,19 58:19,22 60:11,12, 14 67:9,19 68:11 69:11 71:24 78:9,16 79:20 101:13,18,21,22,24 102:15,19 103:7 105:11 122:11 123:24 124:1,2,9, 10 127:19 128:9 154:3 155:7 168:22 169:2,7 176:21 181:16 227:7

**card** 237:14 238:3,18

**care** 236:20,22 237:7 241:20 242:22 243:17 244:2,6,13,20 245:14

**career** 10:24,25 11:3,4,7, 10,20 247:11

**careers** 14:16

**carried** 218:23

**cars** 102:2,6,12 182:15

**cart** 52:14

**case** 7:10 104:20 106:11 110:4 120:6 226:9,11 243:4

**casings** 190:11

**catch** 81:8,9

**ceased** 190:9

**cell** 232:15,17,18 233:11 234:2,17

**center** 14:11 244:21

**certificates** 109:4

**certified** 219:13

**cetera** 254:21

**CEW** 38:10 155:9

**chain** 34:14 35:1,21

**chains** 141:20

**chance** 222:14 243:8

**chances** 243:5

**change** 10:24,25 11:3,4,10 140:24 246:23

**changed** 89:17 97:21

**character** 9:9 96:23 97:15

**charge** 169:15 213:8

**charging** 169:12 175:24 224:18

**chased** 56:24 60:16 67:10, 19 68:2,11,17,19 69:12,18 77:20 78:5 101:13 127:18 128:8 178:4,15 181:16 227:22 228:5,6,12

**chasing** 69:17 70:1 92:18 129:14,22,25 228:2,8

**check** 35:9 78:8,13 79:1,6 80:23 81:13 87:11 181:14, 23 182:4 189:18 190:10 222:3

**chief**  24:6 80:25 81:15 110:3,8

**child**  50:23 51:8,10,11 53:12 54:22,24 56:23,24 57:7 59:13 60:14 67:1 176:23

**children**  111:23 112:3

**children's**  104:21

**choice**  255:23

**chose**  160:1 226:3

**circles**  161:15

**circumstance**  219:25

**circumstances**  219:18,22

**city**  8:15,25 18:23,24,25 19:15,19,20 20:1,5,6,7,9, 10,13,15 23:3,14 24:11 45:16 110:18 111:14,16 156:25

**Civil**  7:16

**clamp**  165:25

**clarification**  15:10 35:13 79:9 84:10,12

**clarify**  15:6 32:11 42:1 43:25 53:16 94:7 114:3,12, 15 167:11 246:13 247:13

**class**  18:13,15,16 20:11

**classes**  18:17 20:1,2

**clean**  77:9,12

**clear**  32:15 35:24 47:18 116:23 249:22

**client**  70:20

**client's**  105:19,25

**clinic**  240:7,8,12,13

**clock**  45:6,21 46:6,18 47:3, 6,9,15,18 48:14 49:2,4 66:20

**close**  91:22 194:7

**closed**  151:10 179:13 184:24

**closer**  45:24 46:15

**closing**  151:14

**co-counsel**  43:1

**coaching**  7:8

**code**  80:23 81:13,16 230:17 238:25

**colleagues**  229:7

**College**  17:22

**combining**  179:6

**comfortable**  218:14

**comfortably**  11:14

**command**  34:14 35:1,21 98:13

**common**  113:6

**commonly**  190:4

**communicate**  234:3

**community**  17:22 150:25

**compact**  169:8

**companies**  11:15

**company**  13:20,23,24

**compel**  226:13

**complainant**  54:23 55:2 56:13,15 77:21 78:1 228:19

**complaint**  28:1,17 29:13, 16 30:16,22 31:3,4,21 32:1 50:16,19,20 53:6,8 54:3,11 60:7 61:11 78:4 80:7 127:18 128:8 177:14,15

**complaints**  60:19 79:7,25 80:3

**complete**  16:6,14 19:12 42:15 60:3 88:3,4,21 97:16 220:8

**completed**  16:13 21:8 87:24 88:6,24 98:17

**completely**  73:19,20

**completes**  98:22

**complications**  247:7

**complied**  233:1,4

**Complies**  116:5

**compound**  178:7,18

**compounded**  84:1

**computer**  80:11,15,16

108:13

**Computer-based**  108:12, 14

**concerned**  9:1 21:21 183:17

**conclude**  91:17

**concluded**  211:7 255:19 256:11

**condition**  38:4

**conducting**  72:19

**confirm**  237:9

**confirmed**  110:17 240:16, 22 241:7,17

**consolidate**  23:7

**consolidated**  23:4,6,8,19 24:5,14

**constitutional**  105:19

**construction**  13:19 14:3

**consult**  79:3,24

**contact**  166:10 170:10

**contained**  116:9 178:4,15 179:9,14 182:18

**contents**  91:10

**context**  126:25 149:21

**continue**  171:7 255:10

**continued**  175:15

**continues**  107:7 121:11, 14 146:7,10 192:5,7,11,14

**continuing**  106:14

**control**  177:3,8,10,13,16, 17,20 213:2 237:9

**controlling**  213:3,6

**Convergys**  14:9

**conversation**  93:10 95:5 102:1 135:19 228:4,19

**conveyed**  62:9 64:6 65:5

**cook**  13:15,16

**copy**  44:9,13 116:15 245:14

**corner**  50:4 71:17 76:19, 20 122:15 124:17 137:4

139:20 142:17,21 148:5 153:18 167:17,18 202:23

**cornered**  58:19

**correct**  4:25 5:5 9:13,14, 16,18 16:19 18:11,12 19:21 20:8,9 22:4 25:7 27:6 34:23 35:5 36:4 39:19 41:6 42:6,16 43:2,3 47:11 51:2,19 53:1 58:10 62:4, 11,20,22 63:3,8,15,20 64:23 65:1 67:22,23 68:2, 15,16 69:18 70:2,8,10 72:4,23 73:4 76:25 77:3,6, 16 80:8,19 82:12,13 84:25 87:24 88:25 89:13,17 90:24 92:8,11,16,19 95:15 97:3,10 98:17,18,22 101:14,16 102:3,13,17 103:12,13,15,16 109:21 113:24,25 114:22 115:2 117:14,24 119:2,4,5,9 120:12 125:12,16,19 126:22 127:19 128:9 130:25 131:1 132:9,16 136:20 140:8,14,18 141:3, 16 142:6,10,21,22,24 143:3,10,11,13 144:14,19, 22 145:23 147:23 149:14, 17,23 150:3,4 152:1,5,8 153:21,22 155:14,15,25 156:22 157:21 158:2,22 160:20 163:11,12,14,15,18 164:13,15,16 165:16,23 166:1,5,6,11,19,22 167:1, 6,10,14,21 168:2 169:10, 20 170:10,11,13,16 172:5, 14 173:24 174:1,11,23 175:8,10,13,16,19,24 176:2 177:25 179:25 180:1,3,4,6,7,10,11,14,16, 17 182:5,12,13,15,16,18, 20,22,23 183:1,6,12,13,14 184:21 186:3,6,7 188:24 189:4 194:4,12 196:6,7,8, 9,10 198:25 200:23 203:5, 18,25 205:8 206:12 208:8, 9,10,11 209:11,12,14 210:12,13,15,17 211:4,9 212:12,16 214:24 216:18 222:5,10 225:2 226:21 227:7 229:3 230:16 234:4 235:12 236:15 237:3 240:23 241:18,22 244:24 246:21,25 247:1 250:5 251:1,15 253:13

**corrected** 70:19 97:3

**correction** 66:5 96:19 99:20

**correctly** 10:19 137:22

**counsel** 45:16 46:9 74:21 91:9 105:16 153:14 233:23 254:11

**counsel's** 205:23

**counseling** 247:22 248:1, 10,14,19

**Counselor** 75:18

**count** 189:22 194:14

**counted** 189:20

**counter** 47:15 48:2 66:20 145:1,22 171:22 252:8

**counts** 221:25

**county** 29:6

**court** 18:7 34:5 43:5 71:13 99:22 104:5 109:10 115:20 128:2 199:10,14 231:23 235:3 236:4 238:10,16

**covered** 14:16

**COVID** 71:21 74:3,23 75:11,19 76:14 78:3 102:23

**created** 178:3,14 179:8

**creating** 249:22

**Crews** 32:23,24 33:13,15 34:12,22 35:5 36:1

**crime** 40:6 43:17 190:6 200:1,14,20,21,24 202:17 232:25 235:15

**criticizing** 76:6

**Cross** 11:8,11

**crossed** 227:14,17

**crossing** 227:13

**crying** 58:2,3 62:17 252:4

**cue** 119:14

**current** 22:22 239:21 240:4,22 241:3,17

**customer** 11:8

**cut** 14:18 235:19,23

**cuticle** 162:25 163:1

---

**D**

---

**D-E-S-H-U-N** 4:11

**D-U-R-E-N** 238:19

**damages** 105:22,25

**damn** 134:25 139:1 208:21

**danger** 210:15 249:23

**dark** 102:23

**date** 15:18,20 17:7,10 25:13,15 29:18 233:12 234:12 236:14 245:17

**dated** 109:16 238:18

**dates** 107:24

**day** 33:5 35:4 36:1,4,12,15, 21,23 39:25 49:9,10 70:21 78:20 104:23 122:22 242:13 244:17

**dead** 210:25 211:2,6,8

**deadly** 186:5

**deal** 165:6

**dealing** 242:20

**dealt** 242:21,22

**December** 116:9 117:24

**decide** 236:24

**decline** 144:20 149:19

**declined** 144:14,18 149:17 229:2

**decompress** 230:19

**decreases** 142:8

**deescalate** 180:23

**deescalating** 181:5

**Defendant** 115:22

**defendants** 45:14

**defer** 241:24 242:1,3,12

**deficient** 249:4

**deli** 13:4

**demeanor** 117:12 127:5

**Denese** 75:25 195:6 243:19

**depends** 24:6 112:22 130:15,17 152:16 179:16

**deployed** 218:19 219:16, 18,21,24

**deposed** 44:19 110:3

**deposition** 5:4,8 10:10 39:6 40:9 61:6 95:1 106:16 109:10 231:18,24 233:18, 22 238:17 239:17 255:11, 18 256:11

**depositions** 4:24 7:17 256:8

**deprived** 37:11,13

**deputy** 22:24,25 23:1,5,21, 25 24:2,8,15,23,25 25:4

**describe** 77:8 100:11 101:21 163:2

**describing** 58:5 101:4,5 235:25

**description** 87:6 205:23

**deserve** 224:10

**Deshun** 4:11

**detective** 40:5 200:1,20 235:15,17

**detectives** 200:15,21 202:17

**develop** 247:4

**diagram** 199:18 201:9,11, 13,16,19

**dialog** 66:22 68:7 69:2 120:15 121:3,15,25 122:9, 19 124:12 125:22 126:11 132:21 133:5,16 137:6,25 138:8 145:3 146:1,11,18 147:8 148:7,17 149:6 155:19 156:3 157:13 171:24 172:8,19 173:5 174:4 191:12,25 192:8,15 194:19 195:15 196:13 202:25 203:9 204:3 206:17 207:5 208:13 211:21 214:7,15 215:11,24 216:9, 21 217:10 218:1 220:12,23 221:9 222:19 226:24 227:11 229:21 231:8

252:10,20 253:5

**Diane** 199:4

**died** 210:20

**difference** 235:22

**differently** 253:24

**dig** 185:7

**digging** 184:25

**direct** 4:5 116:12,19 119:11,24 120:2,4 135:9 140:20

**directed** 119:6 140:17

**directing** 135:11 150:9 185:15 212:11 234:23

**direction** 87:15 135:19 200:9 236:23

**directive** 135:25 136:2

**directly** 34:15 168:12

**dirty** 77:9

**disagree** 73:19,20 110:19 201:19,25 210:21,22

**disagreeing** 96:6

**discipline** 247:13,17,22, 23,24,25 248:16,17

**disciplined** 247:10,21 248:7,10,12

**discover** 129:5

**discovery** 5:23,25 7:18 9:25 45:13 97:13,18 233:20 245:13

**discuss** 97:20 233:17,23

**discussed** 6:17

**discussion** 25:9 42:24 95:6 100:2 145:18 153:15 199:2,15 245:6

**dispatch** 27:8,10,12 29:21 30:19 31:10 32:8 51:5 54:7 55:9 77:19

**dispatched** 27:16,23 28:17 29:12,17 30:15,20, 23 31:18 32:7 50:18 53:17

**dispatcher** 55:21

**display** 51:9 113:6

Case 3:24-cv-01358-MMH-SJH    Document 74-1    Filed 06/01/26    Page 74 of 89 PageID 1658

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Index: displayed..exercising

**displayed** 120:11 213:9 224:21 227:8

**disposition** 81:16

**disprove** 128:18 131:8 227:25

**dispute** 242:18

**district** 7:19 28:10,13,15, 16,21

**districts** 28:20 29:7

**division** 243:20

**docket** 40:7 42:8 43:22,23

**doctor** 241:23 242:21,22 243:1

**doctor's** 246:17

**doctors** 242:13,18 245:22

**document** 116:10,18 199:4,11,14 238:11 239:12 246:14

**documented** 96:24

**documents** 44:3 45:15

**dog** 57:18 70:7,11 71:7 80:18 88:20 89:3 93:22 98:21 103:17,19 104:16,24 105:24 108:4,10,20 109:5, 18 110:17,23,25 111:20,21 112:8,13,18,22 113:12 115:18 117:7,12 127:5 129:14,15,22,23,25 130:1, 11,15,17,19 141:11 142:3 152:16 156:6,11,16,18,19 164:19,20 171:17 172:1 176:19 179:16 181:5 187:5,10,11,16 188:9 189:7 191:5,6,15 192:17 194:21 195:19 198:22 199:1 201:6,12,17 202:3,8, 14 203:11,13 204:7 207:7, 10,16 210:14 211:1,6,23 212:4 214:17 215:13 216:1 217:1,13 218:3 219:22 221:2 222:13,15,24 223:1, 5,11,14,20 225:12,14,22 227:15 229:17 237:5 246:18 252:4,22 253:8,12

**dog's** 117:12 127:4 152:10 187:19 238:8 245:22 246:6

**doghouses** 141:20

**dogs** 15:4 22:15,20 50:22 51:1,2,6 52:10 53:11 54:12,15,19,20,25 55:10 56:24 57:1,4,5,6,8,18,19, 20 58:16,20,21 59:23 60:13 61:2,3,6,10,12,15 65:17 66:13,15 67:10,19 68:12 69:12 73:4 77:20 78:5 83:24 92:23 93:1,8 101:13 104:3 105:3,5,9,18 106:3 107:13,15 108:25 109:6 111:14 112:25 113:3,7,9 114:25 115:2,9 119:2,7 123:10,11,22 124:19,23 127:12,17,18,22 128:7,8 130:3,6,11,14 131:2 132:12 133:18 134:24 138:25 142:4,23 143:2,6 150:13,19,22,23, 25 151:4,7,11 152:12 157:2,9 161:4 176:10 178:3,14 179:9,13,17,24, 25 180:2,8 182:12,17 183:18 184:24,25 185:5,6, 7,8 186:18 187:25 188:3,7, 12,13,16 220:4 221:22 222:4 251:1

**domestic** 30:10

**door** 66:18,25 78:24 86:11 122:23 131:14,24 132:3,5, 8 141:11 142:11 185:10 201:17,18 228:4,6

**doorstep** 60:18

**Drawn** 200:5,7

**drink** 153:7

**drive** 86:14,15,22 87:17 181:24 254:13

**driver's** 140:7

**driving** 56:8,10

**drove** 87:18

**Due** 161:2

**duly** 4:3

**Dunn** 245:5

**Duren** 233:2 238:19,22,25 240:21 241:15

**duties** 25:22

**duty** 246:20,24

**Duval** 243:4

---

**E**

---

**earlier** 68:5 87:23 90:3 93:2,9 153:6 178:4,15 200:23

**early** 21:25

**easement** 156:25

**easier** 15:11 61:5

**easy** 28:12

**eat** 153:6

**effect** 37:20 88:14

**effort** 254:25

**elderly** 225:4,7

**electronic** 140:3

**elementary** 23:12

**eliminated** 198:23 210:18

**Ellington** 55:3,5 56:16 60:15 61:14 62:20 64:2,5, 10 78:1 86:2,12 93:10 95:8 182:2 227:24

**embedded** 55:17,19,20

**emotional** 77:23 190:22 197:6 224:1,4

**emotionally** 191:1

**empty** 161:20

**encounter** 142:24 188:7

**encounters** 110:23,25 177:22 248:21,24 249:4

**end** 36:8 97:15 168:19 169:3 205:2 239:2,4

**ends** 67:15 68:13 69:15 120:23 121:19 122:3,13 124:7 125:9 126:3,16 133:1,8 135:7 137:19 138:3 139:22 140:5 145:11 146:14 147:1,18 148:13,23 149:11 155:22 156:7 157:18 172:3,12,23 173:9 174:8 191:20 192:20 195:2,25 196:18 203:3,15 204:11 206:21 207:19 209:4 212:8 214:10,20 215:17 216:2,13 217:3,19

218:4 220:18 221:4,14 223:24 227:2,19 230:6 231:14 252:13,24 253:10

**Enforcement** 238:25

**engages** 154:12

**ensure** 237:6

**enter** 73:1

**entered** 8:12 10:21 13:11 15:1,14

**entering** 22:14

**entire** 182:6 194:12

**entry-level** 12:16

**escalate** 88:6 212:25 224:16

**escalated** 224:17

**escape** 50:23 52:8 54:25 57:4 116:22 151:17,20

**escaped** 57:19 58:13

**escaping** 58:15 150:14,20 151:4,12 184:25

**establish** 7:1

**estimate** 40:12

**ethical** 129:19

**euthanized** 105:5,6 211:12,14

**evaluation** 130:5,14

**event** 17:8,9 92:8 100:11 176:4,8 201:1 221:25

**events** 41:5 63:3,25 64:8 84:12 88:6 89:2 91:16,17 99:3 171:14 211:7 228:21 234:3,9

**evidence** 5:16,22 88:10

**exact** 4:14,15 44:25

**EXAMINATION** 4:5

**examines** 45:23 46:22 47:2

**excess** 154:10

**Excuse** 17:2 37:12 64:24

**excused** 256:10

**exercising** 60:25 88:12

Case 3:24-cv-01358-MMH-SJH    Document 74-1    Filed 06/01/26    Page 75 of 89 PageID 1659

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Index: exhibit..forwarded

**exhibit** 70:24,25 93:23 99:25 109:11,12 115:21,24 116:1 199:4,7,10,14 231:18,19,20,24 235:3,5,6, 25 236:5,6,7,10 238:13,17 245:9

**exhibits** 71:13

**exist** 250:4

**exists** 249:24

**exit** 179:9

**exited** 78:8,16

**expand** 46:21

**expect** 114:1,6,12 116:24 127:7

**expected** 91:10 117:11 127:3

**experience** 108:22,24

**experienced** 92:14

**experiencing** 118:24

**expired** 237:12,14 238:3,9

**explain** 5:21 30:8 59:13 94:16 98:20 154:7 159:13 184:3 211:13

**explained** 19:19 53:11 54:5 246:15

**explaining** 24:10 58:4 179:3

**eyes** 63:2 185:2,6 206:24

---

**F**

---

**face** 187:10

**facility** 243:16,22 244:23

**fact** 117:8 144:12 151:24

**factual** 88:11 91:22 96:3 97:14

**factually** 96:17

**fair** 60:20 61:6 72:20 226:4 239:6

**faith** 254:2

**falls** 36:17

**familiar** 237:8 240:9 249:17

**family** 4:17,19 6:18 118:6 202:18,19,20 211:15

**fast** 76:1,8,18 222:14

**fast-food** 12:18

**faster** 161:5

**father** 66:25

**fault** 225:20

**favor** 230:5

**favored** 24:18

**FCNMHP** 240:6,16 241:4,6

**feared** 176:14

**feasible** 159:5,10,23,25 160:3 161:7,8,9

**features** 94:10

**Federal** 7:16

**feel** 135:11 225:21 226:4 248:23 249:3,9

**feelings** 105:24

**feels** 225:18

**feet** 168:21,22 198:1 218:20

**fellow** 63:23

**felony** 82:9

**female** 62:18 233:4

**fence** 117:8 124:21 125:6 134:1,25 135:4 137:12 139:1,5 148:10 153:23 154:4 157:3 180:9 185:9 203:20

**fenced** 157:5 182:18

**fenced-in** 117:13 127:5,22

**Fernandina** 244:4

**field** 16:3,6,10,20,22 19:6, 9,12 21:8,16,23 26:23

**Fifteen** 82:24

**fight** 212:19,20,21 213:5,7 224:23

**figure** 28:18

**file** 9:21 15:15 17:5,7 20:24 21:14 22:3 89:19 226:13

**filled** 84:3

**fills** 41:19

**finalized** 95:11 101:10

**find** 9:22 15:15 22:3 79:21 87:9,10 234:11 249:20

**findings** 91:5

**fine** 65:7 67:6 69:8

**finger** 158:17 161:14,18, 19,23 162:2,5,9,11,22,23 164:5 165:18,19 185:21 205:10,18 206:5,7 232:7 235:12,19

**finish** 9:6 43:15 52:6 57:16 72:12 75:19 113:14 136:15 179:3 197:12 204:16

**finished** 6:9 57:12 119:16

**fire** 158:18,19,22 174:13 175:15 206:15

**firearm** 168:20 169:3 214:4 220:9 221:19,21

**fired** 112:2 174:10,11,23 175:12 188:11,23 189:10, 12,19 190:6 191:8 193:18 196:5

**fires** 221:16

**firing** 176:13 189:17 190:9 248:19

**fist** 134:15 138:16 146:3

**fit** 169:2 246:20,24

**Florida** 12:1 13:1,10 14:12,13,14 17:16,22 29:6

**focused** 104:22 108:1 208:2

**focusing** 129:8 208:10

**follow** 210:12,14

**follow-ups** 244:18,23

**footage** 45:5 48:25

**footprints** 176:20

**force** 8:19 37:2 186:2,5,6 221:24 224:12,13

**foreign** 33:22

**Forgive** 15:23

**forgot** 37:15

**form** 5:10,17 6:8,12 7:7,11, 15 10:5 11:22 20:22 24:9, 19 25:11 27:14 29:14,19 30:17,24 34:17,24 38:20 41:12,20 42:4,15,17 44:8, 23 45:9 47:5 50:21 51:13, 24 53:2,14 54:10,16 55:12 59:16 60:21 61:8,16,19 62:5,24 63:4,9,13,16,21 64:3,4,12 65:2,3,18 66:1 67:24 68:21 70:3,4,9 71:9, 25 73:6,16,24 78:10,14 80:9,20 81:5,22 85:1,21 89:4,18 90:6,7 91:1,2,8,18 93:12 94:15,24 95:18 96:12 97:4 98:7 99:17 100:21 101:19 102:18 104:25 110:6 111:25 112:4,5,10,15,20,21 115:3 117:15 118:14,19 119:10, 23 120:3 125:13,14 126:24 127:8,20 128:1,16,24 129:4,16,17 130:7,8,21 131:4,18 132:17 135:14 136:3,8,14,21 140:19 141:17 143:4,23 144:7,15, 23 149:25 150:6,15,21 151:6,13,19 152:14 158:9 159:1,9,24 160:14 161:1 162:12,16 164:18 165:3,17 166:7,12 167:7 168:24 169:4,13,21 176:3 177:11 178:5,16,17 179:10 180:19,25 181:18,19 182:19 183:2,15,24 184:9 185:17 186:11,19,20 188:4 189:1,5,14 199:22,23 200:10 201:4,21 202:2 203:7 204:23 206:13 210:9,16 222:6 224:3 225:23 226:6,15 228:11,23 229:4 233:16 235:21 237:11 242:5 245:25 247:12 248:25 249:6,12 250:11 251:2,12 253:17,25

**formal** 109:1,3 247:20,22, 24 248:7,9,13,18

**forty** 142:5

**forward** 142:6 152:18 168:10 169:14 171:8 224:8

**forwarded** 76:19 227:4 229:18

Case 3:24-cv-01358-MMH-SJH    Document 74-1    Filed 06/01/26    Page 76 of 89 PageID 1660

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Index: forwards..HARRELL

**forwards** 169:24

**foundation** 197:11

**frame** 36:12,25 50:12 120:11 145:23 157:21,25 168:16 173:19 175:5 176:6 182:7 198:18 209:10 213:14 214:23 227:6,8

**free** 77:13,15 224:25 240:7 255:25

**freely** 179:18

**freestanding** 243:22

**friendly** 112:14,19 113:4, 18,19,21 187:5,16

**front** 12:20 73:12 76:24 78:24 86:11 97:2 114:18, 19 131:14,24 132:3,5,7 142:11 150:2 153:20 158:1 167:14,16 168:1,5,7,12 175:18,20,25 182:3 194:7 198:24 201:12,17,18 202:3 210:20 222:3

**fuck** 208:17 215:14 223:2

**fucking** 192:10,19 203:2, 13 204:7 207:7,10,15 211:23 212:3 214:19 216:1 217:1,13 218:3 222:23 223:1,5,11,14,19 227:15 252:5,12 253:7

**full** 4:9 169:9 190:1,3 212:20

**fully** 19:22

**functions** 26:4 160:15

**furnish** 45:1

**future** 6:23 184:15 255:21

---

**G**

---

**gain** 117:11 127:4

**Gainesville** 243:23

**gate** 115:8,10,18,19 116:20 117:13 119:7,8,11,21,24 120:5,17 121:10 123:4,8, 14 125:3 126:14,18,21 127:6,11,12,16,23 128:6, 11,15,20 130:4,12 132:11 133:23 134:9 135:13 136:11,19,25 137:9

140:14,17,18 141:1,3,7,11, 12,16 142:3 143:2,3,22 145:10 147:17,22 149:9,14 150:2,10,13,19,23 151:8, 10,14 152:4 153:21 155:21,25 156:23 174:1 179:13,17 180:9,13,15 181:15,17 184:24 185:1,7, 9,10 186:17 195:17 203:23,24 220:25 251:11 253:16

**gated** 151:5

**gathered** 61:23

**gave** 9:18 29:23 35:16 41:21 84:25 85:3,4,17 98:3 99:6 117:10,23 190:2

**general** 27:12 34:20 79:12 108:25

**generally** 15:4

**generate** 84:17

**generated** 39:24 40:5,6

**generating** 85:2,3,11

**geographic** 28:7 29:3,6 30:4 32:1,3

**geographically** 30:1

**give** 10:2 17:11,14 20:25 45:20 80:23 85:8,24 99:2 196:25 197:3,20 208:25 213:9 238:10 254:17

**giving** 245:11

**glasses** 46:10

**GLOCK** 154:2 158:7,14, 21,25 186:2 204:14,18 205:7,11,17 215:1

**GLOCKS** 154:8 158:10

**god** 192:18 203:12 208:21 214:18 222:25 252:23 253:9

**good** 4:7 13:16 32:12,13 67:2 84:13,21,23 96:2,20, 21,22,23,24 213:6 218:15 222:14 230:1,4,15,16,20, 25 231:13

**grab** 166:4

**graduate** 12:3 16:8,9 18:10,17 19:7

**graduated** 12:12 15:13 16:4,15,17 17:24 18:14 21:7 23:20

**graduating** 22:19

**graduation** 16:6,7,18

**graduations** 16:5

**great** 121:6 125:25 134:5 137:16 145:6 146:22 147:13 148:20

**ground** 7:4 197:18 198:12, 22 205:6 212:16 225:4

**grounds** 10:7,13 106:10 226:17

**groundwork** 6:14

**guard** 154:21 158:16 206:10

**guarding** 171:18,20

**guess** 222:12

**guesstimation** 194:2

**guidelines** 7:18

**gun** 60:16 61:6,15 64:17 67:14,19 68:12,20 69:12, 18 70:2 78:5 88:10 89:16 90:4,25 101:14 163:8,11 166:18 170:23 183:19 188:23 189:21,25 204:20, 24 205:1,2,5,19,21 215:19, 22 216:4,6,15 217:21 218:6 220:2 227:17,22 228:2,5,6,7,10,12,22

**gun's** 217:6

**guns** 61:9 182:22,23

**gunshots** 174:7 175:2 191:19 192:2 194:25 195:23 221:13

**guy** 60:16 96:2,20,21 218:14 224:22

---

**H**

---

**half** 184:1

**hand** 74:20 75:12 83:11 99:8,11 101:6 109:9 134:13 138:14 155:13 158:1,4,21 161:19 162:19, 20,21 163:5,8 168:11,13

186:9 187:10,15 199:3 204:13,17 206:7 215:1,20, 22 228:7 250:13,16,21,23, 24 251:4

**handed** 97:17 199:10 231:24 238:16 246:14

**handgun** 213:25 218:18

**handle** 80:7 229:23 231:10

**handled** 249:10

**hands** 213:22

**hanging** 171:4

**happen** 60:9 183:20 184:14,15 197:7 225:13 243:8

**happened** 29:22 30:19 88:17 92:8 104:22 108:16 123:15 131:19 184:11 214:1 225:19

**happening** 58:5 62:10 214:3

**harassed** 106:13

**harassing** 10:7 74:23 91:11 107:2

**harassment** 73:18 75:19, 22 76:10 105:17

**hard** 96:22 104:8 116:16 222:16

**harm** 182:25 183:5,12,23 184:21

**HARRELL** 4:16 5:10,17 6:1,8,11,21,24 7:14,25 8:3 10:5,13,18 11:22 12:9 15:3,9 20:22 23:15 24:9,19 25:11 27:14 29:14,19 30:17,24 31:7,15,23 32:10, 14 33:25 34:4,17,24 37:20 38:20 41:12,20 42:4,18 43:6,15 44:7,23 45:9 46:2, 5,8 47:5,16,24 48:1,8,19, 24 49:3,6,15,20,24 50:21 51:13,24 52:6 53:2,14 54:10,16 55:13 57:11,15 59:16 60:21 61:8,16,19 62:5,24 63:4,9,13,16,21 64:4,12 65:2,7,18,21 66:3 67:24 68:21 70:3,9 71:9,25 72:12 73:6,16,21 74:21 75:7,17 76:8,13,16 78:10,

Case 3:24-cv-01358-MMH-SJH   Document 74-1   Filed 06/01/26   Page 77 of 89 PageID 1661

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Index: hate..information

14 80:10,21 81:5,22 85:1,
21 89:5,18 90:7,17,20
91:1,8,18 93:12 94:15,24
95:19 96:12 97:4 98:7
99:17 100:21 101:20
102:18 104:4,8,25 105:16,
23 106:4,9,16,18,21,25
110:6,12 111:25 112:4,10,
15,20 113:14 115:3 117:15
118:15,20 119:10,15,18,23
120:3 125:14 126:24
127:9,20 128:1,16,24
129:4,17 130:8,21 131:4,
18 132:17 135:14 136:3,8,
14,21 140:19 141:17
143:4,23 144:7,15,23
149:25 150:6,15,21 151:6,
13,19 152:14,24 153:13
158:9 159:1,9,24 160:14
161:1 162:12,16 164:18
165:3,17 166:7,12 167:8
168:24 169:4,13,21 176:3
177:12 178:5,16 179:3,10,
20 180:19,25 181:18
182:19 183:2,15,24 184:9
185:17 186:11,19 188:4
189:1,6,14 192:25 193:9,
12,14 195:3 196:2 197:12
198:7 199:23 200:10
201:4,21 202:2 203:7
204:23 205:15 206:1,13
210:9,16 222:6 224:3
225:6,23 226:6,15 228:11,
24 229:4 233:16 234:16,21
235:21 237:11 242:5,8
243:19 245:10,19,24
247:12 248:25 249:6,12
250:11 251:2,6,12 253:17,
25 254:5 255:14,24 256:3,
6

**hate** 15:3

**hats** 187:19

**head** 6:10 17:25 33:10,11
51:14,16 53:3 142:13
151:22 175:23 249:16

**heads** 58:17

**health** 38:4 210:15 243:20
244:14

**hear** 59:18 68:3,22 113:2
120:25 126:5 132:18
144:24 145:13,17 147:3
148:25 156:10 172:15,25
173:11 186:23 193:4

228:18 252:15

**heard** 58:1,2 63:10 172:14
173:12 174:7 175:2 191:19
192:2,23 193:3,12 194:25
195:3,4,23 221:6,13

**hearing** 62:17 132:19
145:16

**hearsay** 196:11 238:4,7

**heat** 123:20

**held** 42:24 95:6 100:2
145:18 153:15 199:2,15
245:6

**hell** 120:20 121:18 132:23
134:11 138:12

**hesitating** 104:18

**hey** 67:3 69:5 156:5,10
157:15,21 160:22,23
161:10,25 162:2,4,9
166:21 170:23 172:2,5,21
173:7 191:14,16 194:22
195:18,20 221:1,3,6
224:22

**hierarchy** 35:19

**high** 12:3,12

**High-stress** 230:18

**higher-up** 32:19

**highlighted** 117:4

**highly** 190:16 243:5

**hindsight** 150:5 222:9,10
251:16

**HIPAA** 104:20

**hire** 109:5

**historian** 63:20

**history** 105:18,24 107:4

**hit** 46:14

**hits** 243:10

**hold** 6:20 122:5 152:20
165:25 166:5 205:20

**holding** 204:13,17,18
205:17 212:15

**holds** 212:24

**holster** 215:7 216:6,18

**holstered** 154:5 155:1,3
215:8,22 217:7 218:6

**home** 60:6 82:18 151:25
210:21,24 211:2,8

**homeowner** 88:10

**honest** 36:19 70:19

**honestly** 38:1,2,6 193:10

**hood** 67:18 101:13,18,21
103:6 127:18 128:9 181:16

**hoping** 123:1

**horse** 52:14

**hour** 177:21 187:3 202:13,
14

**hours** 37:10

**house** 69:22,24 73:2,3
76:24 78:24 79:11,24
87:17,19 103:4,6,12
114:19,25 115:1,7,11
123:3 131:16 142:18
151:11 153:21 182:4,8
198:25 201:18 202:9 222:3
228:12 250:10,19 251:1

**howling** 156:11,17

**huge** 243:8

**hundred** 11:16 64:22,25
85:14 230:3,16,20,25
233:10

**hurt** 208:24 225:3

**husband** 60:13 67:19
68:12 69:12 83:3 101:14
131:17 144:10,16,21

---

**I**

---

**I-295** 245:5

**idea** 130:22,24 168:25

**identification** 71:1 100:1
109:13 116:2 199:8 231:21
235:7 236:8 238:14 254:23

**image** 120:12

**imaginary** 205:19

**immediately** 18:18

**imminent** 182:24 183:5,
11,23 184:20 249:24

**impeded** 206:11

**impossible** 222:16

**improperly** 109:16

**inaccurate** 96:17

**inaudible** 9:5 26:8 49:16
66:6 67:1 76:16 93:3
149:24 159:20 162:17
178:12 186:21 188:1
190:25

**incident** 29:22 39:24 40:5
43:17 58:4 60:6 62:16
64:16 87:25 88:1,5,7,8,11,
24 89:9 176:24 181:21
225:19

**incidents** 88:16

**include** 187:4,18,21
229:14 254:22

**included** 89:15

**includes** 229:13

**including** 245:18

**incorrect** 24:23,24 229:5

**independent** 94:23

**independently** 94:12

**index** 162:22 164:5 205:18
206:7 235:12,19

**Indian** 33:22

**indicating** 77:11 205:12

**indicative** 152:12

**individual** 8:16 131:5
224:25

**infection** 247:4

**infer** 74:11 75:13

**informal** 247:20,24 248:2,
8,9,13,18

**information** 4:19 6:15,18
20:24 51:22 52:1,10 54:14,
21,24 55:1,4,11,15,16,23
56:6,9 61:21,22 62:3,6,7,9
64:1,5,10 65:4 69:20 73:13
77:22 85:4 104:19 109:15
114:1 116:24 117:11 127:4
180:5 185:8 193:25 227:21
228:1,9,16 234:18,20
243:2

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                          Index: informed..lay

**informed** 89:6 237:12 240:5 241:4

**inhibit** 37:17

**initial** 102:1 176:24 187:14 228:21

**initially** 51:5 161:14

**injury** 235:18 236:17

**inquires** 107:3

**inside** 143:2 180:9

**inspections** 190:3

**instance** 88:23

**instruct** 7:11 197:17

**instructing** 197:16

**intended** 134:15 138:16 146:4

**intent** 150:24

**intention** 197:1

**interact** 72:4 106:3 107:13,15

**interacting** 22:15,20 72:22 108:2 187:25

**interactions** 14:21,25 86:9 87:20 94:11,19

**interchangeably** 24:1

**intern** 14:24 22:13,19

**internal** 154:8 158:10

**interpose** 7:10

**Interrogatories** 115:23

**interrupt** 15:3 106:21 107:1

**introductions** 4:8

**investigate** 60:22 78:4 182:18

**investigating** 60:19 61:4 97:12 98:4 127:17 128:8

**investigation** 72:19 83:15,18 89:10 96:24 97:17 119:1 136:4 177:14 190:7 228:21

**invitation** 150:23

**invited** 144:12

**involve** 14:21 188:2

**involved** 14:25 22:15,20 180:6

**involving** 219:22

**issue** 120:1

**issued** 232:18

**issues** 30:11

---
**J**
---

**jacket** 102:23

**Jacksonville** 18:19,21,24, 25 19:20 20:6,17 244:21

**Jaivon** 58:8,11 64:1,10 82:10 86:2,12,24 87:10,20 89:15 90:11,24 92:18 102:22

**Jaivon's** 90:4 103:4,5

**job** 8:25 12:12,21 14:12,14 22:13,17,18 25:22 37:9 213:6

**jobs** 12:16,25 13:9,18 14:8, 21

**join** 31:1,7 42:18 55:13 80:10,21 89:5 90:19 95:19 100:25 101:20 118:15 127:9 152:15 159:3 167:8 177:12 178:6 180:20 181:1 189:6 206:14 222:7 225:24 226:7 228:24 253:18

**joint** 12:18

**JSO** 18:19,20 20:18 22:9, 11,18,22 29:7 42:15 45:16 79:3,4,6,25 80:2 107:21 108:19 109:2 111:14,17 186:5 187:4,13 221:23 232:19 237:2 246:1,2 247:10,18 248:24 249:3, 10,17,21

**judge** 106:11

**jump** 54:24 185:7

**jumped** 50:24

**jumping** 185:1,9

**juvenile** 51:17

---
**K**
---

**K-A-R-L-O-U-S** 4:10

**K-U-I-P-E-R** 230:14

**Karl** 4:2 115:22

**Karlous** 4:10

**keeping** 151:10

**Kendall** 40:4

**kick** 153:10,14 160:25 161:6

**kicking** 161:6

**kid** 67:9,18 68:11 69:11 101:13 123:2 181:16 227:18,22,23

**kids** 59:1 181:11,20 182:9

**kill** 207:15 208:21 212:3 223:19 252:3

**killed** 71:7 105:9 207:8,11, 14 211:24 212:2 217:2,12, 14,17 223:12,15,18 225:22 249:23

**killing** 181:4 225:12,14 250:5

**Kimberly** 70:16,18 115:12

**kind** 14:1,3 15:6 28:22 76:4 114:8 130:19 238:3

**kitchen** 12:19

**knew** 61:20,22 64:6 65:4 209:16,21 211:8 238:8

**knives** 213:22 224:13

**knocking** 66:18

**Knowing** 253:23

**knowledge** 209:25

**knuckle** 163:1,2

**Kuiper** 229:23 230:2,5,10, 12,14 231:10

**Kyle** 83:5 204:21 208:10 214:23 224:1

---
**L**
---

**L-A-M-P-K-I-N** 4:11

**label** 55:22

**laceration** 235:23

**lacerations** 164:23

**lack** 126:24 154:9,10

**lady** 60:11,13 115:8 225:4, 6

**Lahart** 48:6 50:6 65:6 193:6 234:19,23 254:12

**laid** 197:23

**Lampkin** 4:2,11 66:24 67:2,4,7,8,12 68:9,10 69:4, 6,9,10 97:1 106:5,12 120:17,21 121:5,9 122:12, 25 123:5,9,16,19,23 124:3, 5,18,23 125:7,24 126:13 132:24 133:18 134:2,8,12, 17,20,23 135:2,5 137:13 138:2,10,13,18,21,24 139:3,6,8,12,14,17,21 145:5,9 146:5,20,25 147:10,16 148:11,19 149:8 155:21 156:5 157:15,17 172:2,11,21 173:7 174:6 191:14,16,18 192:4,17 194:22,24 195:17,20,22 196:16 203:11 204:6,10 207:12,18 208:16,19,23,25 209:2 211:25 212:6 214:9, 17 215:16 216:12,23 217:15 220:14,16,25 221:3,12 222:22,24 223:4, 8,16,22 227:1,13,16 229:24,25 230:3 231:11, 12,23 246:14 252:22 253:8 254:9

**Lampkin's** 100:6 107:3 115:22

**landing** 222:15

**large** 129:15 130:1 167:5, 11

**late** 21:25

**lateral** 205:4

**law** 7:15 10:19 104:21

**lawn** 97:2

**lawsuit** 251:20

**lawyer** 100:19

**lay** 197:9,11

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                                    Index: laying..Mike

**laying** 202:8 212:15,16

**lead** 14:14 255:8

**leading** 114:9

**leads** 224:4

**leaning** 46:9

**learn** 64:9 92:10 113:23 114:1,6,12 116:25 127:7 193:25

**learned** 64:1 194:3 196:8 228:20

**leave** 11:4,11 117:13 124:4 127:5,11,22 132:13 151:25 152:2 184:11,15 230:22 231:1

**leaving** 211:8

**led** 246:4

**left** 11:8 60:23 76:19 153:18 155:12 161:12 164:8 167:18 168:6,7 203:17,19,22 210:23 211:2,5 220:7 232:8 236:13,17 238:8

**left-hand** 202:23

**leg** 161:3,12 164:6,8,10,11 165:19 170:17,20,25 171:3 185:21 232:10,11,12,23 236:17

**legal** 100:14 226:16

**length** 136:24

**less-lethal** 186:2,6 221:24 224:12

**lesser** 81:21 82:5

**lethal** 214:5 218:12 224:12

**letters** 28:24

**letting** 155:17 224:24

**level** 130:17,18

**levels** 230:19

**lie** 92:13,14,15

**lied** 90:15,24

**lieutenant** 22:24 34:9,13, 15 35:20 40:3 88:21 98:8, 9,11,13,16,21,22 101:1

**life** 11:21 104:20 105:3 251:24

**lifetime** 103:21

**limit** 10:11,16 106:5 107:2 254:25

**limited** 7:7

**limits** 6:6

**list** 25:17

**literally** 197:14

**litigation** 106:13

**live** 104:21

**lived** 87:2

**located** 154:2

**location** 118:25

**lock** 185:23

**long** 15:23 16:22 19:8 164:22 193:3 243:4

**longer** 170:10,17 175:18

**looked** 138:5 170:2

**loose** 65:17 66:13,15 182:12 208:16,19 212:6, 12,18 220:14,16 223:22 224:15,24 227:1

**lose** 47:1

**lot** 161:5 170:12 171:10

**low-cost** 240:8,10

**lower** 153:18

**Lucy** 71:6 72:7 74:20 75:12 93:21,23 94:2,3 98:25 112:3 113:12,19 114:2,11,19,25 116:22,25 151:17,20,25 152:2,4,5,7 156:15,17,20 160:25 161:10,17 163:10 165:10, 15,16 166:11 167:5,12,14, 15,16,18 168:16 169:10 170:10,15 174:25 175:5, 18,22,24 176:1,7 181:4 185:15,16,20,23 188:10, 17,19,24 189:3,17 190:10 193:18 194:6 197:22 198:19,24 203:25 206:9, 23,24 207:22 208:5,8 209:7,8 210:20,25 211:8, 14 220:4 226:21 235:12,18

236:18 237:9 239:21 240:4,22 241:3,17 250:5 251:11 252:4

**Lucy's** 173:20 201:2 238:8

---

**M**

---

**M-A-T-Z-E-N** 40:7

**M319** 208:23

**Mace** 78:8

**mad** 191:2

**Madam** 34:5 236:4

**made** 82:13 120:5 193:4 199:1 205:16

**magazine** 190:1

**magazines** 190:4

**magistrate** 107:10

**make** 15:11 27:11 35:6,7 45:11 46:25 56:12 61:5 91:21 92:15 106:7 107:1 139:19 148:2 190:1

**makes** 7:6

**making** 106:9,18 245:9

**male** 87:5 225:1

**Malene** 56:19,21,22 78:1 86:6 94:11,21 95:8

**man** 89:16 90:4,25

**manner** 88:18 224:20

**marcited** 14:6

**marciting** 13:25 14:2

**mark** 10:6 99:22 115:21 199:4 231:17 236:1,4 238:11

**marked** 45:15 70:25 81:11 99:25 109:12 116:1,15 199:7 231:20 235:6 236:7 238:13,17

**marks** 77:16 109:10 235:3

**Marlene** 78:1 94:19

**mask** 71:21 72:6,18 73:14 74:3,5,8,10,11,12,19,24 75:11,13,14,19 76:14 78:3 102:23

**masks** 187:22

**material** 174:17 200:8

**matters** 107:4

**Matzen** 40:6 199:18 200:9, 14,23 235:17

**meaning** 120:5 142:12 154:9

**means** 51:1 81:15 100:14, 20 150:13,19 151:3,11,15 205:4,5 230:22 231:1

**meant** 20:6,11 33:1 39:13 43:11 51:11 66:10 197:19

**meantime** 255:12

**media** 49:24

**medical** 237:2 241:21 242:12 243:12,14,16 244:13 255:8

**medication** 37:16

**meet** 35:19 87:12

**meeting** 83:2 86:4

**memorize** 91:11

**memory** 40:24

**menace** 150:25

**mental** 38:4

**mention** 67:23,25 68:15 69:17 70:1

**mentioned** 9:24 19:9 42:7 43:20 53:17 60:2 62:14 64:17,18 87:15 163:24 225:17

**merit** 177:16

**messages** 233:14

**met** 82:25 97:19,25

**Microsoft** 49:22

**mid** 22:1

**middle** 4:10 7:18 36:24 45:20 71:13 238:19,23,24 239:4

**midnight** 37:3

**midsize** 169:8

**Mike** 208:23

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                         Index: mind..officer

**mind** 84:11 121:22 170:5 176:18

**mine** 39:16 41:3

**minor** 164:17 165:2

**Minus** 49:12

**minute** 23:18 140:16,25 141:13,15,23

**minutes** 110:25 177:21 187:3 202:13

**mispronouncing** 58:10

**misstating** 7:15,16,17

**mistake** 92:16

**mistaken** 90:13,24

**mix** 94:3,6,9

**mixed** 93:25

**mom** 79:18

**moment** 45:1,20 49:8 70:5 129:8 170:6

**momentarily** 67:11,13

**momma** 123:1

**monitor** 26:8

**month** 21:20 40:21 108:3

**monthly** 107:18,20,21 108:1,8,14,19

**months** 15:25 16:23,24 19:10 37:7 40:23

**morning** 4:7 67:2,5 69:7 123:3 254:14

**mother** 58:2 60:10 62:15, 19 66:24 69:19,20 82:11 86:6 87:13 89:16 92:22 124:5 227:24 228:3

**motherfucker** 204:9 206:19 207:13 212:1 216:11,24 217:16 223:7,9, 17

**motion** 6:14 10:14 106:9 107:1,5 135:18 189:7 205:17 226:13

**mouth** 165:25

**move** 45:24 91:13 169:16 178:21

**moved** 202:14

**moves** 222:14

**moving** 107:5

**multiple** 11:7 54:19 127:17 128:7 178:3,14 179:9 229:7

---

## N

**names** 4:17 104:21

**nature** 32:5 109:4 151:1 152:16 197:6 213:23 224:14

**needed** 16:13 44:1 97:21

**neighborhood** 150:14,20 151:4,12,17,20 181:6

**night** 13:15

**nip** 162:13,19

**nipped** 162:10 165:15,16

**nodding** 33:11 51:16

**nods** 6:10 17:25 33:10 51:14 53:3 58:17 142:13 151:22 249:16

**non-police** 219:25

**Nonetheless** 102:2

**nonprescription** 37:17

**normal** 36:3,9,12

**north** 17:21,22

**note** 245:15,25

**notebook** 84:2,7

**notepad** 83:7

**notes** 83:12,13,15,17,20 84:9,16,17,22,23,24 85:15, 20

**notification** 140:3

**notifications** 23:25

**number** 55:7,24 60:2 70:25 99:25 109:12 116:1, 13,16 127:3 199:6,7 231:20 235:6 236:7 238:13,20,25 240:21,22 241:15

**numbers** 28:23,24

**nurses** 242:20

---

## O

**oath** 4:22 5:2 99:2,4,9,12 100:14,15,16,20,24 101:7 116:8 117:11

**object** 4:16 5:10,17 6:1,8, 12,13 7:14 10:5 11:22 20:22 24:9,19 25:11 27:14 29:14,19 30:17,24 34:17, 24 38:20 41:12,20 42:4,17 44:7,23 45:9 46:12 47:5 50:21 51:13,24 53:2,14 54:10,16 55:12 59:16 60:21 61:8,16,19 62:5,24 63:4,9,13,16,21 64:3,4,12 65:2,18 67:24 68:21 70:3, 4,9 71:9,25 73:6,16 78:10, 14 80:9,20 81:4,5,22 85:1, 21 89:4,18 90:6,7,17,18 91:1,2,8,18 93:12 94:15,24 95:18 96:12 97:4 98:7 99:17 100:21 101:19 102:18 104:25 110:6 111:25 112:4,5,10,15,20, 21 115:3 117:15 118:14,19 119:10,23 120:3 125:14 126:24 127:8,20 128:1,16, 24 129:4,16,17 130:8,21 131:4,18 132:17 135:14 136:3,8,14,21 140:19 141:17 143:4,23 144:7,15, 23 149:25 150:6,15,21 151:6,13,19 152:14 158:9 159:1,9,24 160:14 161:1 162:12,16 164:18 165:3,17 166:7,12 167:7 168:24 169:4,13,21 176:3 177:11 178:5,16,17 179:10 180:19,25 181:18,19 182:19 183:2,15,24 184:9 185:17 186:11,19,20 188:4 189:1,5,14 199:22 200:10 201:4,21 202:2 203:7 204:23 206:13 210:9,16 222:6 224:3 225:23 226:6, 15 228:11,23 229:4 233:16 234:21 235:21 237:11 242:5 245:24 247:12 248:25 249:6,12 250:11 251:2,12 253:17,25

**objecting** 7:19 66:1 200:3

**objection** 6:22 7:5,6,10 110:12 118:20 153:13 159:3 225:6 226:15 253:25

**objections** 10:17

**objects** 7:4 213:23 218:14

**obligated** 10:2,10 20:14

**obliged** 115:8,17 119:12 128:10

**obliging** 128:19 150:22

**observe** 114:25 115:2 117:7 186:17

**observing** 114:2,6,11 116:25

**obtain** 54:21 233:13

**obtained** 246:2

**OC** 38:16 155:2 160:16,19, 21 186:2,9

**occurred** 88:8,16 166:19 171:14

**occurring** 108:16

**occurs** 247:18

**offer** 144:18,20 153:5

**offered** 132:10

**office** 18:20,21 20:18 246:17

**officer** 11:12 16:14 17:1,4 19:4 20:15,21 21:13 22:8, 17,23 23:5 24:8 25:4 26:4, 5,18 27:13 28:4,25 29:22 30:10 41:19 44:19 66:24 67:2,4,7,8,12 68:9,10 69:4, 6,9,10 84:25 85:2,3,6,8,19 91:4,15,16 92:4,7,20 96:2, 20,22 97:1 98:6,16 100:6 101:2,9 106:5,12 107:3 120:17,21 121:5,9 122:12, 25 123:5,9,16,19,23 124:3, 5,18,23 125:7,24 126:13 132:24 133:18 134:2,8,12, 17,20,23 135:2,5 137:13 138:2,10,13,18,21,24 139:3,6,8,12,14,17,21 145:5,9 146:5,20,25 147:10,16 148:11,19 149:8 155:21 156:5 157:15,17 172:2,11,21 173:7 174:6

191:14,16,18 192:4,17 194:22,24 195:17,20,22 196:16 199:18 200:9,23 203:11 204:6,10 207:12,18 208:16,19,23,25 209:2 211:25 212:6 214:9,17 215:16 216:12,23 217:15 220:14,16,25 221:3,12 222:22,24 223:4,8,16,22 227:1,13,16 229:25 230:3 231:12,23 233:2,4 237:9 239:1 240:21 241:15 246:14 249:23 252:1,22 253:8

**officers** 24:15 26:17,19 42:15 108:1 110:18 177:20 188:6 202:16 254:23

**official** 8:19 17:6 247:17

**officially** 20:20 21:12

**ongoing** 166:17 171:16 176:4,8,9 202:11

**open** 115:8,17 116:19 117:13 119:6,11,20,24 120:5,17 121:10 123:8 125:3,4 126:14,18,21 127:6,10,16,23 128:6,11 132:11 133:23,24 134:9,25 135:1,13 136:19,25 137:9, 10 139:1,2 140:17 141:1 143:21 145:10 147:17,22 149:9,14 150:10,12,18,23 174:1 179:17 180:9,12,15 181:15,17 185:11 253:15

**opened** 115:10 141:11 152:4

**opening** 123:4 128:19 136:11

**oppression** 105:17

**oppressive** 10:7 91:12 107:3

**option** 160:1

**options** 251:15,16

**order** 6:14 10:14 61:9 79:3, 4,6,12,25 80:2 91:13 106:10 107:5 249:20

**ordering** 256:7

**orient** 239:11

**orientation** 16:2

**originally** 30:14 31:11 89:15

**outcome** 249:11

**owned** 103:17,19 104:3 109:6

**owner** 73:11,12 130:4,12 152:11 238:18

**owners** 73:2,3,11 79:24

---

**P**

---

**p.m.** 36:13,15 37:10 153:3 256:11

**pages** 159:19

**paid** 8:21,25 19:16,25 20:1, 2,3,10,13

**pain** 241:22

**paper** 235:19,23

**paperwork** 24:1

**paragraph** 239:3,4,19

**parallel** 205:18

**part** 27:5 35:21 36:2 97:16, 18 98:4 99:6,7 114:4 117:4 166:5,9,10 168:3 169:16 178:22 187:13,14 188:6 199:17 213:8 241:1 246:11

**parted** 28:8

**parts** 97:13

**passed** 61:23 62:1 140:25 141:13

**passenger** 77:9,10

**past** 87:17,18 154:3

**patient** 184:2

**patrol** 25:23,24,25 26:1,4, 5,13,16 27:13 55:16

**pattern** 75:18,22 76:10 106:14

**Paul's** 160:10

**pause** 107:8 179:20,22

**paused** 48:17 67:11,13 195:7

**pausing** 195:9

**pay** 8:23 191:8

**pencil** 84:11

**pending** 245:23

**people** 9:12 20:2 60:5 69:23 72:4,23 86:23 92:8, 13,14,15 111:22 143:9 187:19,21 238:6 254:24

**pepper** 38:14 158:25 159:8 160:3,11 163:14 250:21

**percent** 11:16 64:22,25 85:14 230:3,16,20,25 233:10

**periods** 24:17

**permanent** 19:13 37:8

**person** 51:12,17 60:23 62:20,21 87:3 88:11 160:21 224:5 225:18 250:12

**person's** 225:19

**personal** 6:17 104:19 107:4 108:22,24 234:17 251:24

**Personally** 91:20

**personnel** 254:21

**pertaining** 222:11

**peruses** 116:18

**pets** 111:22

**Peugeot** 169:7

**phases** 16:1

**phone** 55:7,24 58:1,3 62:15 63:10 69:20 77:21 95:8 124:6 232:15,17,18, 21 233:6,12 234:3,4,12,13, 17,19

**phonetic** 12:17

**photograph** 235:11

**photographs** 254:14

**photos** 232:23

**phrase** 25:25 43:24 196:25 197:1 228:3

**physical** 38:4 229:12,13, 14

**physically** 63:5 159:17 160:10 163:19

**pick** 82:1,5 160:3,11

**picked** 159:16

**picking** 158:24 159:7 220:6

**picture** 145:23 232:9 235:14

**pictures** 200:25 232:7,13, 25 234:5,7

**piece** 205:4

**pistol** 155:1 204:15 205:21

**pit** 59:24 92:18 93:11,13, 17,18,20,23 94:1,10 97:1 180:5 181:15

**place** 222:11 244:9,10,15, 20

**plaintiff** 116:19

**plaintiff's** 45:14 70:24,25 99:25 109:12 115:23 116:1 199:7 231:20 235:6 236:7 238:13 254:11

**plan** 222:11

**plaques** 109:4

**play** 84:19 103:11 121:2 147:25 148:1 153:17 155:17 165:8 170:4 171:7 193:8 194:9 195:12 201:5 228:17

**playback** 66:21 67:15 68:6,13 69:1,15 120:14,23 121:1,11,14,19,24 122:3,8, 13,18 124:7,11 125:9,21 126:3,10,16 132:20 133:1, 4,8,15 135:7 137:5,19,24 138:3,7 139:22 140:2,4,5 145:2,11,25 146:7,10,14, 17 147:1,7,18 148:6,13,16, 23 149:5,11 155:18,22 156:2,7 157:12,18 171:23 172:3,7,12,18,23 173:4,9 174:3,8 191:11,20,24 192:5,7,11,14,20 194:18 195:2,14,25 196:12,18 202:24 203:3,8,15 204:2, 11 206:16,21 207:4,19 208:12 209:4 211:20 212:8 214:6,10,14,20 215:10,17,

Case 3:24-cv-01358-MMH-SJH   Document 74-1   Filed 06/01/26   Page 82 of 89 PageID 1666

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                        Index: played..quick

216:2,8,13,20 217:3,9, 19,25 218:4 220:11,18,22 221:4,8,14 222:18 223:24 226:23 227:2,10,19 229:20 230:6 231:7,14 252:9,13, 19,24 253:4,10

**played** 71:18 76:22 140:10 153:24 171:9 175:1 231:3

**player** 48:10 49:24

**playing** 202:22

**plays** 48:14

**plural** 51:2 93:8 119:2 125:18

**point** 37:2 45:21 56:10 127:11 141:4 154:10,22,23 158:17,20 160:4 161:7,22 163:6 166:16 167:15 168:20 170:12 176:1 183:7 198:2,4 202:14,15 205:12 207:1,25 208:2 213:5 214:22 216:5 218:11,13,17 224:2 242:16

**pointed** 205:9

**pointer** 161:19 162:22

**pointing** 124:9 204:21,24 205:16

**police** 8:9,12,19 9:7,11,12, 15 10:4,22 11:12 13:11 15:1,13,24 16:5,14,25 17:3 19:4 20:13,15,21 21:13 22:8,14,17,19,23,25 23:5, 21 24:1,8,14,15,20 25:4 30:9 35:22,23 41:19 44:19 61:24 66:25 80:3 88:20 91:15,16 92:6 110:23,24 212:20,22 213:6 219:17,18 229:10 251:19,25 254:20

**police-issued** 27:6

**policeman** 206:20 216:25 223:10

**policing** 15:5

**policy** 79:4,12 186:5 213:8 219:6 221:22,23 237:3 249:17,21,25 250:1

**pool** 14:4,6

**pools** 14:6,7

**porch** 198:24 201:12 202:6

210:20

**portion** 16:3 98:3

**pose** 224:11

**position** 22:14,18,19 161:2 171:18,20 208:7 224:8

**possession** 84:2

**possibility** 131:19 176:16 179:15 250:17,20,22 251:7

**possibly** 119:8

**potential** 10:6 60:7 183:20

**potentially** 21:24 181:15

**preparation** 39:5 40:9 239:17

**prepare** 77:18,24 78:4 79:15

**prepared** 155:13 158:22 199:18 200:9

**preparing** 78:24,25 95:1

**preplanned** 222:1,2,10

**prescription** 37:16

**presence** 151:24 152:2,12 190:17,23

**present** 18:7 152:11 190:16 210:10 254:10

**presents** 201:17

**press** 154:10

**pretty** 76:9 218:15

**prevent** 38:5 214:3

**preventative** 237:7

**preventing** 143:17 144:5, 8 158:24 159:7,18 185:14, 22,25 221:18,20

**previously** 4:22 118:4 233:11 254:19

**prior** 219:16,17

**private** 104:20,21 232:21 234:2

**privilege** 7:11 110:13 233:25

**privileged** 6:5,7,15 7:5 226:12

**privy** 97:12

**probable** 224:22

**probes** 222:15

**problems** 241:22

**Procedure** 7:16

**proceed** 107:11

**proceedings** 107:9 179:22

**process** 25:12 26:16 34:22 36:3 44:15 99:7 115:11 154:18,21 243:9

**produced** 4:3 45:13 246:15

**product** 233:24

**production** 45:15

**professional** 98:15

**prohibits** 37:24

**promotion** 25:1,17

**pronounce** 58:9 115:12

**pronouncing** 58:11 70:17

**proper** 10:17 25:20 215:7 226:16 233:21

**properly** 10:8 160:15

**property** 31:18 60:24 65:17 66:13 77:6 94:1 102:3,13,16,17,19,20 129:15 130:1 131:23 132:2 151:25 152:3,5,8 156:22 157:1 167:12,25 188:24 194:11 211:5

**protected** 234:18,20

**protective** 6:14 10:14 91:13 106:10 107:5

**prove** 131:8 150:23 227:25

**proven** 176:20

**provided** 54:23 77:22 245:13 254:19

**public** 249:23

**Publix** 13:2,3,5,10

**pull** 34:4 56:8,11 79:11 120:21 132:24 134:12 138:13 154:12 160:16

**pulled** 56:12 78:6 90:4 170:13,23 181:25 227:17, 22 228:10

**pulling** 67:12,19 68:12 69:12 79:11 89:16 90:25 101:14 161:15

**pump** 123:20

**puncture** 165:6,7 235:22 236:1

**purely** 32:3

**purpose** 126:19 224:7

**pushing** 152:18

**put** 48:13 50:23 52:1,9,14 53:11 54:21 55:22,23 61:9 71:12 72:3,18 73:1 74:7 77:15 118:9 150:24 187:15 189:21 190:1 242:17

**putting** 71:20 74:6,10 78:3 107:6 224:7

**Q**

**qualified** 13:25

**qualify** 20:6

**Quality** 14:2

**question** 7:3,9,20,23 8:1 9:6 12:6 15:8,17 19:22 30:14 32:14 35:6 37:15,19 38:3 42:19 44:12 52:13,19, 20,24 57:13 73:23 74:16 75:9,24 79:14 86:1,6 90:21 91:7 92:6 95:20 96:9,11 113:14 114:3,7,9,13,14 116:13,16,17 117:1 118:10 119:16 127:2,3,25 128:3,4, 10 140:25 159:12 165:6 169:25 178:7,18,20,25 179:4 184:1,5,17 185:11 198:6 204:16 220:2 225:17,25 226:8,13,14,18 234:15,22,24 235:1

**questions** 44:20 66:9 74:17 75:1 76:11,12 79:10 94:18,22 95:3 107:7 117:22 178:19 254:11,18 255:1,4,9,13,17

**quick** 221:16

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                      Index: quickly..response

**quickly** 171:14

**quiet** 183:17

---

**R**

---

**rabid** 165:11

**rabies** 164:20,23 165:1,5 237:5,6,9,13 239:22 240:5, 23 241:3,18 243:4,9 245:22 246:12,19 247:2

**radio** 26:10 27:4,5,6 56:5

**raise** 99:8 101:6 166:18

**raising** 99:9 108:25

**ran** 124:16 227:18

**random** 20:25 21:2

**Randy** 32:23,24 33:13 36:1

**range** 189:21,25

**rank** 25:3,5

**rapid** 171:15

**reached** 74:20 75:11 247:21

**reaching** 187:9

**reaction** 187:19

**read** 31:12 39:11,19 41:23 43:12,16,17 64:15,20 90:9 91:4 92:1 96:18,25 97:22 110:22 128:2,5 130:9 196:10 240:19 256:2,3

**reading** 240:25 241:1,10, 11

**ready** 79:20 122:16 146:9 158:18,19,22 186:9 199:5

**rear** 142:2

**reason** 67:7 68:9 69:9 81:12 91:25 100:9,10 110:19 128:18 165:10 176:23 184:23 185:3 210:21,22 211:11 226:12 242:17 251:18

**reasonable** 130:5,13,16 150:5,7,11,13,19 151:3,11, 15 176:17 177:10 180:18, 21 186:8 224:22

**recall** 15:18 39:3 40:16

56:18 59:7,19 60:1 72:24 74:4,9 82:25 83:2,8 85:7 86:4,10 93:13,17 95:12 99:7,18 108:9 118:5 119:20 132:18 145:16 187:6,20 188:5 189:22 190:2,12 193:6 234:10 241:23 246:3

**receive** 56:5 111:13,16 241:21

**received** 44:6 50:14 53:25 54:6 107:17 236:20 246:16

**receiving** 55:11 77:19

**recently** 64:16 94:23

**recess** 65:9 153:1 245:7 254:6

**recheck** 246:23

**recognize** 70:13 71:3 199:11 235:9 236:10

**recollection** 44:5,22 45:7 56:19 80:6 81:2 93:1 94:14,23 171:13 189:10 201:2

**record** 12:4 42:24 45:12 46:8 48:17 55:7,8 65:10,13 95:6 100:2 106:18 107:6 116:23 145:18 152:25 153:3,15 161:17 192:23 199:2,15 205:16 233:18 245:6,25 246:13 254:7

**records** 39:4 233:12 241:24,25 242:9,12,14 255:7,8

**reengage** 176:10

**refer** 18:23 24:23,25

**reference** 8:18,21 9:4 47:23 49:19 50:12 84:23 136:9 245:12

**references** 9:1,8,9,12,18, 20 11:13

**referred** 38:16 39:13 59:24 243:13

**referring** 18:25 19:1,20 41:18 46:2,11 47:19 49:21 108:6,11,20 109:18 111:11 125:18 141:23,24 212:14 242:8

**reflect** 46:8 205:16

**reflected** 208:7

**refresh** 44:5,22 45:6 56:19 80:6 81:2 94:13 109:17 171:13 201:1,2

**refusing** 226:12

**regard** 86:6 111:14,17 184:6,7 220:2 249:3

**regret** 253:15,19

**relates** 251:21

**relating** 7:17

**relation** 103:4,6 205:10

**relationship** 98:5,14,15

**relay** 89:2

**release** 212:23

**released** 165:16,21,22

**releasing** 213:4

**relevance** 74:13 76:11 96:9,10,13 107:8

**relevant** 5:24 74:25 104:20 105:18,21,25

**rely** 242:15

**remain** 180:9

**remains** 159:12

**remember** 9:2,3,23,24 10:3 11:14,18,24 12:24 44:25 59:4,9,11,15 70:21 74:7,8 82:16,18,21 94:12 104:4 246:7

**remorse** 225:21 226:5

**renamed** 66:2

**reorient** 101:15

**repeat** 8:5

**repeating** 231:16

**report** 32:18,22 33:9,17 34:5,12,15,22 35:4,22,25 40:3,4,5,6 42:3 43:17,18, 19 44:24 47:6 57:5,8,17 59:8 64:14,15,20 70:7,10 84:18 85:3,20 87:25 88:1, 2,5,9,13,22,24 89:13,14,19 90:2,8,16 91:3,10 92:1,20 95:11 96:1,4,6,14,24,25

97:3,8,13,16,19,20,22,23, 24 98:18 99:16,23,24 101:9 103:1 194:1,2 196:11 200:22,24 228:25

**reported** 33:3 34:13 56:23 58:13 59:11 64:2,10 82:11 92:11 127:14 190:5 193:19 241:21

**reporter** 18:7 34:5,6 43:5 71:13 81:10 99:22 104:6 109:10 115:21,24 128:2,5 189:23 199:6,10 231:19,23 232:2 235:3,5 236:4,6 238:11,12,16 256:2,7

**reporting** 34:22 35:14,18, 19

**reports** 39:11,19,23,24,25 40:1,2,8 41:17,19,21,22 42:2,11,12 43:2,7,8,10,11, 16 44:10,14 45:1 85:12 88:4 189:12 196:10

**represent** 80:25 110:2,16

**representing** 82:3

**reprimanded** 247:15,16

**reputation** 96:21

**request** 45:14 171:7

**requested** 80:17 81:1 96:19 255:6

**required** 7:3 9:11 11:13

**requires** 9:12 186:5

**reread** 241:2

**researched** 81:16

**reserve** 255:10

**reserving** 255:20

**Resistance** 39:25 40:4 41:18 42:2,13 43:8,19 87:25 88:22

**respond** 26:7,9 32:8 177:17

**responded** 20:7 52:25 117:8 126:8

**responding** 177:16

**response** 39:25 40:4 41:18 42:2,12 43:7,18 45:14 87:24 88:21 114:16

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                      Index: responses..sic

160:23 237:25

**responses** 18:4

**rest** 49:18 147:24 197:23 201:3

**restarting** 195:10

**restaurant** 12:16 13:13

**restrictions** 246:21,25

**resuming** 222:17

**retained** 80:19 81:12,20

**retains** 84:2

**retraction** 90:4

**retreated** 58:18 165:15 169:19

**returned** 246:20

**Returning** 155:16

**revenge** 224:6

**reversing** 243:10

**review** 39:5,8 40:13,25 41:2 79:12 89:25 90:2 94:13 95:10,13 98:17 101:9 200:22 201:24 239:15

**reviewed** 40:8,10 41:6 42:8 89:12,14,23 94:22 95:7,14,24 98:24 200:8

**reviewing** 41:16 44:2 174:17

**rewind** 68:3,22 168:10 171:11

**rewinding** 68:4 147:5

**rewound** 68:25 76:18

**riding** 86:21

**rifles** 190:4

**right-hand** 76:20

**right-handed** 163:3

**rights** 61:1 88:12 105:19

**ripping** 164:22

**rise** 254:17

**road** 122:24 124:20 244:3, 7,21

**roam** 179:18

**robbery** 118:3,4,12,24,25

**Rockwell** 27:12 29:12 31:18 34:21 35:4 38:19 52:25 54:9 60:19 63:3 65:16 254:21

**Rockwood** 65:19,20,24 66:10,12 69:23 77:19,25 78:25 79:15,21 82:15 83:21 86:12 93:20 114:20 118:4,7,11 119:1 182:11 183:4 184:19 210:24

**roll** 35:20 36:3 107:18,20, 21 108:9 111:10

**room** 181:2

**round** 174:11

**rounds** 174:13 181:4 189:11,12,13,19 190:4,5,6, 13 191:8 193:7,17 194:4 196:4 198:9 203:5

**route** 58:24 87:11,13

**RTR** 98:18,22,24 99:24

**RTRS** 43:2

**rules** 5:7,15,22,23,25 7:16 10:8,15

**run** 49:2 139:11 194:8 197:5

**running** 24:7 25:16 65:17 66:13,15 97:2 122:23 129:15 130:1 167:5,11 175:10 176:13 181:6 189:3 214:24

---

**S**

---

**S-I-R-C-A-R** 34:1

**sad** 76:9

**safe** 218:17

**safely** 188:7

**safety** 154:6,8,24 158:8, 10,16 210:15

**Sarge** 229:25 230:9,15 231:12

**satisfied** 218:16

**save** 32:16

**scan** 254:13

**scene** 40:6 43:17 97:1 190:6 194:16 199:18 200:1,14,20,21,24 201:8 202:17 229:2 235:15 238:8

**schedule** 37:8

**school** 12:3,13 23:13 58:21 59:21 181:7,9,10,11

**schoolchildren** 143:12

**Scoots** 12:17,23 13:1,10

**screen** 45:20,23 46:22 47:2 167:19

**search** 10:2

**seconds** 167:1 170:22,24, 25 185:13,20

**section** 71:18 76:22 140:10 153:24 171:9 175:1 231:3

**sector** 28:4,25 29:2,22,23 30:4

**sectors** 28:4,21,22 29:8

**secure** 151:7

**segment** 107:25 178:20, 21,23 179:1,5 196:22

**segments** 109:20,22

**select** 81:19

**selected** 82:4

**send** 123:2 209:2,3 232:24,25

**senior** 4:12,18

**sense** 35:6,7

**sentence** 100:7

**separate** 73:11 131:3,5 135:15,16 243:14,16

**separated** 28:3 170:15

**separately** 129:9

**separating** 126:19

**sergeant** 25:6,7,10,16,18 32:19,21,25 33:3,9 34:8, 10,12,22 35:5,9,20 209:3 229:23 230:2,5,10,11

231:10

**series** 109:15

**serve** 26:3

**service** 11:8 26:7,9 29:2, 24 35:9 38:22 39:1 50:14 52:25 54:1 118:11

**set** 6:13 222:11

**setting** 10:13 106:10

**shake** 166:3

**Shands** 243:21

**sheriff** 22:25 23:5,22,25 24:2,15,25 25:4

**Sheriff's** 18:19,21 20:18

**Shield** 11:8,11

**shift** 36:6,14 37:3

**Shoney's** 13:12,14

**shoot** 205:20 252:3

**shooting** 80:18 89:3 98:21,22,25 181:3 198:3,9, 14 236:14 250:5

**shortly** 40:17,18,20,23

**shot** 71:7 88:20 174:23 175:12 188:11 191:5,6 192:19 198:9 203:5,13,25 204:5 214:19 215:15 220:4 223:1,3 224:10 227:15 235:12

**shots** 164:20 175:15 195:7

**show** 24:7 66:17 70:23 110:21 115:18 128:18 154:12 170:1 187:15 235:2 245:21

**showing** 45:11,12 154:2

**shown** 209:10

**shows** 187:16 201:11,12

**sic** 13:25 27:12 29:12 39:12 50:3 52:13 59:12 65:16 78:1 94:19 95:10 113:3 120:8 133:14 140:12 153:3 155:24 157:11 161:23 173:2 174:10 195:13 209:7 220:7 226:21 229:18 233:21 242:22 244:3,21 254:13

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                    Index: side..suggestion

**side** 77:9,10 140:7 154:5 155:4,12 164:10 202:9,23 205:13,14 232:10 250:10, 18

**Sierra** 28:25 29:2

**sign** 233:13,14

**signaling** 251:4

**signature** 116:6,7

**signs** 213:9

**silver** 102:16 227:7

**similarly** 104:14

**simple** 32:9 154:14

**simultaneous** 17:13 21:5, 19 23:11 33:2 52:17 73:9 93:4 106:8,22 110:1 123:18 178:11 179:2 187:24 193:2,11 239:10 241:14 242:25

**simultaneously** 55:10

**sir** 4:7 12:6 15:17 44:18 116:4 121:5 125:24 134:4, 14 135:6 137:15 138:15 139:7 145:5 146:21 147:12 148:19 152:21

**Sircar** 33:20 34:13,16 40:3 98:5,6

**Sircar's** 99:24 101:9

**sitting** 71:23

**situation** 88:19 159:10 177:7 178:3,14 179:8 180:24 181:3 188:3 190:22 197:6 202:10,11 212:24 213:4 224:16,18 230:18

**size** 235:19

**skeptical** 129:12,13 131:7 143:1 180:8 222:4

**skin** 236:3

**sleep** 37:11,13

**slice** 184:1

**slightly** 168:6,7

**slow** 76:1,2,5

**small** 11:3

**smaller** 187:17

**snapped** 155:4

**sniff** 187:15

**socialization** 130:18

**solicited** 228:21

**solo** 26:17,18

**solution** 181:5 249:24

**solutions** 250:4,7

**somebody's** 123:3

**son** 4:14 57:6,9,17 58:6 59:6 60:11,15 61:21,23 62:3,10,11,14,15,17 63:20 65:5 77:22 83:5 139:10 204:21 208:10 212:7,15 214:2 220:15 223:23

**Sonya** 47:14 106:17

**sooner** 68:24 133:10 145:21

**sought** 97:3

**sound** 218:25

**sounded** 173:14 241:10

**sounds** 73:18 74:22 104:13 178:7

**space** 197:1,3,20 213:10

**speak** 60:5 62:6,18 131:14 135:15,16 136:1 144:10, 16,21 189:23

**speaking** 9:10 17:13 21:5, 19 23:11 32:20 33:2 52:17 73:9 93:4 95:7 101:1 106:8,22 110:1 123:18 129:8 131:12 149:21 178:11 179:2 187:24 193:2,11 239:10 241:14 242:25

**speaks** 173:17

**specific** 15:18,20 33:7 78:21 80:23 184:17

**specifically** 16:18 26:6 27:11,18,22 29:7,12,17 30:15,23 31:17 32:7 35:3 43:13 52:21 53:7 94:13 107:24 126:20

**spell** 4:8 33:25 104:11

**spelled** 104:13

**spoke** 73:12 77:21 100:15, 24 182:1

**sponsor** 8:20 19:24,25

**sponsored** 8:14 10:4 19:16,17 20:12

**spot** 68:4,25 140:21 190:3 215:21 253:3

**spray** 38:14 155:2 158:25 159:8 160:3,11,16,19,21 163:14 186:2,9 250:21

**stamp** 133:14 229:18

**standalone** 12:17 114:8

**standing** 102:15 123:24 130:4,12 132:1,6 139:16 174:19,22 227:6

**standup** 96:2,20

**start** 8:23 18:18 21:12 32:21 36:6 79:23

**started** 14:18 21:22 36:4 53:25 255:11

**starting** 66:19 68:24 122:15 133:10,13 137:3 144:25 145:21 147:5 153:18 157:10 172:16 195:11 231:5 239:20 246:25

**state** 4:8 10:19 77:23 133:14 155:25 224:6 237:21

**statement** 7:6 46:13 61:20 62:22 90:18 99:2,6 114:22 115:17 127:21 128:11 164:15 167:21

**statements** 131:5,7 255:15

**states** 99:15 116:8 238:17, 19 240:4,15 241:6

**stating** 10:8 226:16

**status** 245:14,15

**stay** 21:21 132:15 135:5,9, 12,23 139:6 143:2 191:4

**stayed** 144:20 194:11

**staying** 222:4

**step** 131:15,16 190:13,18 207:12 211:25 217:15

223:16

**stepped** 123:12

**steps** 248:16,17

**stolen** 123:20,21

**stop** 53:24 59:1,2,3,4,20 103:9,14 138:6 163:10,13 207:17 208:18 212:5 223:21

**stopped** 41:11 163:16 173:19 175:4 206:23 207:2,21 212:10 217:5 221:6,16 226:20

**stopping** 154:1 177:6

**story** 89:17

**straight** 205:5

**stranded** 182:14

**stranger** 152:13

**streaks** 77:16

**street** 60:17 68:20 69:18 70:2 194:8 227:18,22,23 228:2,5,7,8,13

**stress** 62:17

**stressed** 230:21

**strike** 30:1 132:10 174:21 188:17,19

**strong** 160:16,17

**stronger** 84:11

**struck** 193:18,19,21 194:4 196:6 209:14,15,17,19,20, 21,24 210:1,6

**stuck** 84:20

**subcategories** 29:8

**Subject** 110:12

**subjects** 108:15

**submitted** 246:1

**sudden** 169:15

**sued** 251:18,23,25

**suffer** 247:7

**sufficient** 249:13,15

**suggestion** 160:10

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Index: summer..time

**summer** 17:17

**superior** 32:20

**superiors** 222:12

**supervisor** 229:8 236:23

**surprise** 189:13,15

**surprised** 123:11

**sustained** 235:18 236:18

**swear** 116:8

**swearing-in** 17:6

**swift** 169:15

**swiftly** 161:16

**swimming** 14:6,7

**swirls** 161:20

**switch** 154:16 158:11

**switching** 221:19,20

**sworn** 4:3 16:25 17:3 18:11 19:3,4

**symbolized** 112:25

**system** 55:6

— T —

**T-SHIRT** 212:15

**T11** 76:20

**T11:18:26z** 47:20

**T11:19:00z** 71:17

**T11:20:54z** 122:15

**T11:21:46z** 137:4

**T11:21:49z** 148:5

**T11:21:5-** 120:9

**T11:21:51z** 147:6

**T11:21:55z** 145:1

**T11:22:04z** 145:22

**T11:22:53z** 220:21

**T11:22:55** 195:13

**T11:22:55z** 153:19

**T11:23:0-** 173:3

**T11:23:007** 155:24

**T11:23:01z** 171:22 191:10 194:17 196:21

**T11:23:02z** 156:10 172:17

**T11:23:04c** 161:23

**T11:23:04z** 158:1,21 166:10 171:8

**T11:23:05z** 175:4 176:7

**T11:23:06z** 221:17

**T11:23:08z** 252:8

**T11:23:09z** 197:21 198:13 202:23 253:3

**T11:23:11z** 214:13

**T11:23:14z** 214:23

**T11:23:18z** 216:4

**T11:23:20z** 216:15

**T11:23:21z** 204:18

**T11:23:23z** 207:3

**T11:23:25z** 217:5

**T11:23:26z** 211:19

**T11:23:31z** 217:21

**T11:23:324** 220:7

**T11:23:32z** 218:6

**T11:23:3347** 226:21

**T11:23:33z** 207:21

**T11:23:34z** 212:10

**T11:23:44z** 209:6

**T11:29:04z** 167:18

**T11:31:15z** 227:5

**T11:33:32z** 229:19 231:6

**T23:02:2** 157:11

**table** 43:4 123:21 153:11

**tail** 112:14,19 113:4,9,12, 17,21 173:20 187:4

**takes** 58:25

**taking** 37:16 72:24 74:11 83:13 84:9 87:14 120:1 208:6

**talk** 73:2 77:25 79:21 92:21 107:9 110:8 131:16 135:24

**talked** 73:10 75:17 79:18 81:7 86:12 87:13 92:22 99:13 233:3 238:6 243:1

**talker** 76:1,5,8

**talking** 33:7 34:19 42:12 53:16 79:24 169:7 184:16 196:22 202:16 233:7,9 244:9

**tall** 59:12

**tape** 120:8

**target** 198:23

**Tase** 212:22 213:11,12 224:9

**Tased** 213:7,13

**Taser** 38:8 78:13 79:1 213:14,15,17 214:1 215:3, 8,21,22 216:6,18 217:6,22 218:7,18,19,23 219:1,14, 16,18,21,25 220:9 221:19, 21 222:13 250:23,24

**Tasers** 221:22

**taught** 84:22

**teach** 188:6

**teaching** 187:4

**technically** 102:20

**tee** 252:5

**teed** 252:7

**teeth** 236:2

**telephone** 56:5,13

**telling** 10:9 43:1 58:4 90:4 93:13 119:20 135:12,13,22 143:17 144:5,9 150:9,12, 18 185:23 230:8

**tells** 91:15,16

**term** 15:5 23:19 24:7,18 100:10 215:7

**terminology** 35:23

**terms** 23:4 246:23

**test** 190:3 245:23 246:5,12, 19

**testified** 4:4,22,24 18:6 81:1 90:3 94:12 99:16,18 110:11,16 200:23

**testify** 37:18,22

**testifying** 5:8 37:24 38:5

**testimony** 93:9 99:20,21 100:6,10,13,20 101:3 110:8 127:21 228:15 233:19

**text** 233:13 234:8 255:7

**texted** 234:7

**texting** 233:8,9

**texts** 234:11

**thing** 6:6 48:15 59:11 83:25 186:1,16 229:12 237:15

**things** 5:14,24 6:5,6 10:9 15:11 37:4 61:5 136:16 141:21 159:13 163:19 171:2 184:3 197:5 225:13 249:10 251:7

**thinking** 19:24

**thought** 64:17 72:13 97:21 113:19 129:6 176:12 246:18

**thoughts** 128:17

**threat** 112:9 176:1,7 182:24 183:5,11,23 184:20 198:23 210:17 218:12 224:11

**threatened** 60:13

**threatening** 224:18

**throw** 82:16 84:6,15

**time** 7:9 8:11 18:17 23:13, 24 24:17,22 26:12,18 28:10 32:16 36:6,12,25 37:6,7 39:1 40:10,15,16 41:4 44:6,22,25 45:4 46:1 48:10,22 49:2,4,7,10,13 50:2,18 54:14 58:5 59:8,9 61:22 64:6 65:4 73:15 74:22 78:17,19 79:16,23 80:4 81:8,19,21,25 82:6,23 84:18,20 91:20 92:14 98:8, 11 101:25 102:20 112:16 130:24 133:13 135:20 136:24 139:25 140:22,25 150:16 151:24 155:2,11 157:20,21 160:12 161:20, 24,25 166:4 170:19 173:13,14 174:15 176:18

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                    Index: times..VENZA

177:4 181:20 182:6,10 183:18 188:10,13,23 190:9 193:3,23 194:12 196:6 208:6 209:8,16 234:2 238:9 243:4 254:9,25

**times** 40:12,13,14 44:24 47:25 76:13 120:8 170:7 177:15 193:20 255:7

**timestamp** 46:3 47:14,19 71:16 76:19,20 137:4 141:24 147:6 148:5 152:19 155:24 156:10 191:9 202:22 209:6 211:19 237:19

**tip** 205:2

**title** 22:22 23:2

**today** 5:5,14,22 6:6 18:8 37:16 38:6 44:10 95:14 98:25 193:5 254:10

**today's** 39:6 40:9 239:17

**told** 41:22 42:8 60:15 67:17 89:15,16 97:6,9 101:12 122:21 126:18 128:11 132:15 135:23 136:19 139:10 141:1 143:20 144:1,9,22,24 180:15 181:14,17 212:11 230:15 237:25 238:5 241:23 242:13

**Tom** 45:17

**tone** 106:15,24

**top** 45:15 48:3,16 50:23,24 51:21 53:12 54:22,24 56:25 57:3,19 58:19,22 71:16 100:5 120:9 122:15 123:24 133:13 145:1,22 147:6 148:5 153:18 155:24 156:9 171:21 191:9 195:12 202:23 209:6 211:19 214:13 229:18 238:18 252:8

**total** 189:10

**totality** 141:19

**tough** 104:11

**traffic** 26:8

**trained** 107:13,15 219:10 248:23 249:10

**trainee** 26:24

**trainer** 109:5

**training** 16:3,6,10,20,22 19:6,9,13 20:14 21:8,16, 23,24 26:21,23,25 27:2 107:17,18,20,21,25 108:1, 4,6,10,12,14,15,19,21,23 109:1,3,18,25 110:17 111:14,16 130:18,19 177:21,24 187:3,13,14,18, 21 188:2,6 205:20 219:19, 24 249:3,13

**trainings** 111:11

**transcribed** 66:23 68:8 69:3 120:16 121:4,16 122:1,10,20 124:13 125:23 126:12 132:22 133:6,17 137:7 138:1,9 145:4 146:2, 12,19 147:9 148:8,18 149:7 155:20 156:4 157:14 171:25 172:9,20 173:6 174:5 191:13 192:1,9,16 194:20 195:16 196:14 203:1,10 204:4 206:18 207:6 208:14 211:22 214:8,16 215:12,25 216:10,22 217:11 218:2 220:13,24 221:10 222:20 226:25 227:12 229:22 231:9 252:11,21 253:6

**transcript** 31:12 41:22 42:7 43:17 62:14

**transition** 213:18 218:8,9, 10,17 220:9

**transitioned** 60:6 213:25 214:5 224:12

**transitioning** 217:23

**treated** 244:2,20

**treatment** 229:2 236:20,22 237:2 241:21 243:7,12

**trespasser** 129:14,22,25 228:22

**trespassers** 182:14

**trial** 4:25 5:5,9,15 10:1

**trick** 42:1

**trigger** 154:9,11,21 158:16,17 206:10

**true** 92:17 101:3 116:10 134:22 138:23 228:9

**trunk** 124:2 131:22 132:1

**trunks** 182:14

**trust** 97:15

**truth** 5:12 160:6,7

**turn** 45:8 145:17 161:8,9 174:19,20 176:14 255:12

**turned** 174:22 243:2

**turning** 45:19 161:6

**twenty** 210:23

**two-part** 154:18,19

**type** 30:6 118:24 237:7

## U

**UF** 242:23 243:2,12,13,14, 16,20 244:10,14 245:3

**uh-huh** 13:21 18:2 20:9 21:9 27:19 39:20 52:23 66:3 69:25 70:22 79:5,17, 22 92:9 94:4,7,20 96:5,7 102:4,8 104:1,9,14 105:12 111:3 114:21 117:5,25 122:17 123:16 132:14 134:17 135:2 137:23 138:18 139:3,21 146:5 149:1,15 156:12 157:22 162:24 164:3 166:25 167:2 171:12 172:6 173:21 175:6 198:15 199:19 201:10 216:17 221:7 231:25 241:16 253:21 254:15

**unable** 91:7

**unclear** 114:4

**understand** 5:2,4 7:13,22 8:7 19:22 29:11 31:25 34:25 35:18 50:13 79:9 96:8,10,13 114:14 128:22 158:12 159:12 160:2 179:4 184:14 224:5 225:16,17,18 229:10 243:9 248:11

**understanding** 19:1 51:11 54:8 59:21 102:22 112:8,13,18 113:8

**understood** 66:9 250:1

**unethical** 129:19

**unh-unh** 104:9,10 147:4 173:1

**uniform** 41:19 212:20

**unit** 209:2

**unnecessary** 106:17

**unpredictable** 224:5

**unreasonable** 178:2,13

**unsnap** 160:16

**untrue** 64:2,10

**upset** 190:16

**urgent** 236:20,22 241:20 243:17 244:2,6,20 245:14

**utilizing** 234:4

## V

**vaccination** 237:10,13 238:9

**vaccine** 239:22 240:5,23 241:4,18

**valid** 237:9

**vehicle** 26:10 27:5 77:8,11 80:3 131:23 132:2,6,7 139:24 140:8

**vehicles** 77:2,5

**venture** 86:5,10 95:13

**venturing** 73:17 105:16

**VENZA** 4:6,20,21 5:13,20 6:3,10,19,22,25 7:2,21 8:4 10:11,16,20 11:25 12:11 15:7,12 21:1 23:17 24:16, 21 25:14 27:17 29:15,25 30:21 31:2,8,16,24 32:12, 17 34:7,18 35:2 37:25 38:23 41:13,24 42:5,21,25 43:9,21 44:11 45:10 46:4, 7,12,17,20,23 47:7,13,21, 25 48:2,10,13,20,23 49:4, 9,11,14,17,23,25 50:1,8,25 51:15 52:3,7,18 53:4,19 54:13,18 55:18 57:21 59:17 61:13,17,25 62:8 63:1,6,11,14,19,24 64:7,21 65:8,10,12,15,20,23 66:2, 4,7 67:16 68:1,14,23 69:16

Case 3:24-cv-01358-MMH-SJH    Document 74-1    Filed 06/01/26    Page 88 of 89 PageID 1672

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026                                                      Index: verbal..works

70:6,12,23 71:2,11,19 72:2,13,15 73:7,19,22 74:1,25 75:2,5,8,10,21,24 76:2,9,15,17,23 78:12,15 80:13,24 81:7,18,24 85:5,23 89:7,20 90:10,23 91:6,14,23 93:15 94:17 95:2,9,21 96:16 97:7 98:10 99:19 100:3,22 101:8,23 102:21 104:15 105:2,21 106:2,6,15,17,20,23 107:12 109:9,14 110:7,15 112:1,7,12,17,23 113:16 115:5,20,25 116:3 117:17 118:17,22 119:13,19,25 120:7,24 121:12,20 122:4,14 124:8 125:10,15 126:4,17 127:1,15,24 128:2,13,21 129:2,11,20 130:10,23 131:6,21 133:2,9 135:8,21 136:5,10,18,23 137:20 138:4 139:23 140:6,11,23 141:22 143:7,24 144:11,17,25 145:12,19 146:8,15 147:2,20 148:14,24 149:12 150:1,8,17 151:2,9,16,21 152:17,23 153:2,9,16,25 155:16,23 156:8 157:19 159:6,11,20,22 160:5,18 162:14,18 164:25 165:9,20 166:8,14 167:9 169:1,6,18,23 172:4,13,24 173:10 174:9 175:3 176:5 177:19 178:9,24 179:7,12,23 180:22 181:8,22 182:21 183:3,21 184:4,12 185:19 186:13,22 188:8 189:2,9,16 190:8 191:21 192:12,21 193:1,3,7,10,13,16 195:4,8,11 196:3,19 197:13 198:10 199:3,9,16,24 200:2,6,12 201:7,23 202:4 203:4,16 204:12,25 205:22 206:2,22 207:20 209:5 210:11,19 212:9 214:11,21 215:18 216:3,14 217:4,20 218:5 220:19 221:5,15 222:8 223:25 225:9,10 226:1,10,19 227:3,20 228:14 229:1,6 230:7 231:4,15,22 232:1,3 234:1 235:2,8,24 236:4,9 237:16 238:10,15 242:7,11 243:25 245:8,11,20 246:8 247:14 249:2,8,14 250:14 251:3,9,14 252:14 253:1,11,20 254:4,7,16 255:3,18,

25 256:9

**verbal** 102:11

**verbalize** 18:3

**verbatim** 90:9 92:1

**version** 91:15,17

**versus** 82:5 120:2

**veterinary** 240:8,12,13

**video** 39:13 40:10,13 41:5 45:5,12 47:8 48:3,6,13 49:5,8 66:17,19,21,23 67:15 68:6,8,13 69:1,3,15 70:13 71:14,15,18 73:1 74:10 76:18,22 80:17 83:8 86:17,21 103:10 110:25 120:8,11,14,16,23 121:1,4,11,14,16,19,24 122:1,3,8,10,13,18,20 124:7,11,13 125:9,21,23 126:3,10,12,16 132:20,22 133:1,4,6,8,15,17 135:7 137:3,5,7,19,24 138:1,3,7,9 139:22 140:2,3,5,10 144:25 145:2,4,11,25 146:2,7,10,12,14,17,19 147:1,5,7,9,18 148:4,6,8,13,16,18,23 149:5,7,11 152:18 153:17,24 154:1,3 155:16,18,20,22 156:2,4,7 157:12,14,18 163:6 166:9 168:10,14,17 170:1 171:8,9,21,23,25 172:3,7,9,12,16,18,20,23 173:2,4,6,9 174:3,5,7,8 175:1,2 191:11,13,19,20,24 192:1,2,5,7,9,11,14,16,20 194:9,18,20,25 195:2,14,16,23,25 196:12,14,18 198:5,18 201:5,6,22,25 202:21,24 203:1,3,8,10,15 204:2,4,11 206:16,18,21 207:2,4,6,19,21 208:1,6,8,12,14 209:4,10 211:18,20,22 212:8 213:15 214:6,8,10,12,14,16,20,22 215:10,12,17,23,25 216:2,8,10,13,16,20,22 217:3,9,11,19,25 218:2,4 220:6,11,13,18,20,22,24 221:4,8,10,13,14 222:17,18,20 223:24 226:20,23,25 227:2,4,10,12,19 229:18,20,22 230:6 231:3,5,7,9,14 252:6,7,9,11,13,19,21,24 253:4,6,10

254:24

**videos** 41:1 108:9 111:6 228:17 254:20

**view** 26:8 77:14 142:6,8 168:13

**viewed** 187:10

**viewing** 63:8

**vilified** 106:12

**violated** 105:20

**violence** 30:10

**visibly** 141:4,7,9,10

**visit** 77:18,25 78:24,25 79:15

**visually** 114:2,6,11,25 115:1 116:25 141:2

**vocalizing** 156:6 172:1 191:15 194:21 195:19 221:2

**voice** 58:2

**volts** 218:22,25 219:4

**volunteer** 14:24 22:13,18

---

**W**

---

**wag** 113:9

**wagging** 112:14,19 113:12,17,20 187:4

**wags** 113:3

**wait** 23:18 143:18,19 144:5,9

**waive** 256:2,4,5,6

**waived** 251:4

**walk** 59:1 154:3 181:11 186:9

**walked** 73:3 142:16 152:7 154:2 182:3 222:2 250:10,18

**walking** 58:20,23 87:14 102:1 103:9 153:20 173:24

**wanted** 15:10 43:25 80:6,14 90:9 115:8,16,17 117:7 127:16 128:6,11,18 131:8 144:16 212:19 213:5,12

224:6 237:6

**wanting** 59:13

**watch** 37:10 104:12

**watched** 95:4

**watching** 80:18 252:3

**weakest** 84:10

**weapon** 112:2 158:4,6,22 170:13 174:10 176:14 189:17 190:10 206:15 219:14 248:19

**weapons** 218:16

**wear** 71:23

**wearing** 38:8 72:6 74:4,23 75:3,6,11 102:23 155:6 187:19,22

**Weber** 80:25 81:15 110:3,8

**white** 77:8,11 102:17 124:10 131:22 132:2,7 139:24 140:8 154:3

**whomever** 79:21

**wide** 134:25 139:1

**wife** 134:21 136:1 138:22 146:13

**winter** 17:17

**woke** 120:19 121:17 132:23 134:10 138:11 149:10

**woman** 70:13

**word** 11:1 24:20 25:20 26:16 68:2 93:1,8 104:11 113:2 120:1 149:23 154:22 162:13,15 230:17

**words** 119:22 180:14

**work** 12:15,19 13:5 14:24 19:4,14 20:14 36:22 37:5,7 233:24 245:14,15 251:19

**worked** 12:16,21 13:2,4,12 14:9 36:14,24 82:20

**worker** 96:22

**working** 13:10 18:18 21:12 36:13 160:15 185:2 239:21

**works** 44:16 74:18 158:14

KIMBERLY BARUS vs THE CITY OF JACKSONVILLE, FLORIDA, et al.
Lampkin, Karl on 04/03/2026

Index: workweek..Zulu

**workweek** 36:17,24

**world** 100:14,19 229:10

**write** 85:20

**writes** 101:3

**writing** 83:7

**written** 228:25

**wrong** 26:16 76:4,12 87:24 97:9 98:18 187:7 248:11

**wrote** 88:9,13 91:4 92:4 96:1,14 103:3 117:20

**zones** 28:8,12

**Zoom** 255:21

**zooms** 45:21

**Zulu** 49:12

---

**X**

**x-ray** 45:17

**X26's** 219:6

---

**Y**

**y'all** 159:18

**yard** 182:18 185:16,24 194:7 222:4

**Yates** 85:6,7

**year** 12:9 15:21 16:11 17:14 20:20 21:16 109:21 111:8 118:13

**years** 9:8 11:19 12:1,2,23 13:5,7 22:11 24:17 37:3 44:18 64:15 80:19 81:1,12, 14,15,17,20 82:1,5,21,23, 24 91:20 92:7 97:22 105:4 118:18

**yelled** 157:21

**yelling** 62:18

**yellow** 117:4

**yesterday** 81:1 110:3,9,17

**young** 63:23 87:5

---

**Z**

**zebra** 45:17

**Zip** 254:13

**zone** 19:13 28:3,7,9,11 30:4 181:7,9,10