# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

KIMBERLY BARUS,

    Plaintiff,

vs.                         CASE NO: 3:24-cv-1358-MMH-SJH

THE CITY OF JACKSONVILLE,
FLORIDA, a political subdivision
of the State of Florida, and
CITY OF JACKSONVILLE SHERIFF
DEPUTY KARL LAMPKIN,
in his individual capacity,

    Defendants.

_____/

## **DEFENDANT LAMPKIN'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant Karl Lampkin, pursuant to Fed. R. Civ. P. 56, submits the following memorandum of law in response to Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support [Doc. 73]:

### **Statement of Facts[1]**

Plaintiff's statement of the facts is incomplete. For instance, Plaintiff ignores the evidence in the record that Lampkin was investigating an earlier

---

[1] The facts recited herein are for purposes of summary judgment only and are not to be construed as an admission by any Defendant (due to the necessity of construing the facts in a light most favorable to the nonmoving party).

claim that Plaintiff's dogs had aggressively chased a teenager and bayed him on top of a car just an hour before the shooting. [Doc. 70-10 – P. 19, "AXON_Body_2_Video_2022-04-11_0650", hereinafter referred to as BWC 650 followed by time stamp.] She also ignores Lampkin's reasonable fear that the dog, previously reported to have been aggressive, might bite his Achilles tendon or cause some other disabling injury. [Doc. 70-10 – P. 4.]

In addition, the body-worn camera footage contradicts Plaintiff's assertion that the dog "was retreating to her owner" [Doc. 73 – P. 4 ¶ 10.] To the contrary, the video at that referenced time stamp shows the dog still near Lampkin. In addition, neither Plaintiff nor Lampkin could have known where the dog might have gone after having bitten Lampkin twice; rather than an "undisputed fact," the assertion that the dog "was retreating to her owner" [Doc. 73 – P. 4 ¶ 10] is nothing more than speculation.

Plaintiff also ignores the other facts shown on the video. Immediately thereafter – about 4 seconds after the dog walked through the open gate – the dog began barking and howling. [[Doc. 70-10 – P. 20, "AXON_Body_2_Video_2022-04-11_0718" (hereinafter referred to as BWC 718) at T11:23:01Z.] Plaintiff remained standing by the fence without attempting to restrain the dog. Although not visible on the BWC, Lampkin held out his hand for the dog to sniff. [Doc. 70-10 – P. 4.] Lampkin said, "hey bud," and then the dog bit Lampkin on the hand. Lampkin yelled "hey" and pulled his hand up.

[BWC 718 at T11:23:02Z.] While Lampkin yelled "hey," or shortly thereafter, the dog circled Lampkin and bit him on the back of his calf. [Doc. 70-8 – P. 162-163.] The BWC appears to show Plaintiff saying "come on" after the initial bite [[BWC 718 at T11:23:04Z.]], but she was about six to ten feet away from Lampkin and the dog. [Doc. 70-8 – P. 169.] Lampkin was not aware of the extent of his injuries at this point, but he was concerned that the dog was going for his Achilles tendon, which he thought would be a serious injury. [Doc. 70-10 – P. 4.] After the dog bit Lampkin for the second time, he pulled out his service weapon and fired two shots at the dog. [BWC 718 at T11:23:05Z.] The dog ran after the shots were fired; Lampkin could not determine whether she would continue to bite or exhibit aggressive behavior as she ran outside the confines of the fence, so he fired more shots. [Doc. 70-10 – P. 4.] Lampkin was also concerned that the dog might reengage, particularly since she had already been aggressive. [Doc. 70-8 – P. 177.]

<u>Argument</u>

**A.    Plaintiff cannot meet her burden of proving that Lampkin's seizure of the dog was reasonable as a matter of law and therefore did not violate the Fourth Amendment.**

The facts in the record show no genuine issue of material fact as to the reasonableness of the seizure under the Fourth Amendment. Lampkin reasonably used deadly force because the dog presented a threat of serious bodily harm to Lampkin and others in the area. The shooting of the dog in

3

these circumstances was therefore constitutional, and Plaintiff has failed to show otherwise in her motion.

When evaluating the reasonableness of a seizure of a pet, courts use the same standards they use to evaluate other seizures and the use of force: objective reasonableness under the totality of the circumstances. *See, e.g., Plowright v. Miami-Dade Cty.*, 102 F.4th 1358, 1364-65 (11th Cir. 2024) (holding that the seizure of even a beloved pet is a seizure of property, subject to the "balancing of competing interests" articulated in *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).). The interests to be balanced include the government's interest in public safety and the owner's interest in his pet. *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003). As with other Fourth Amendment seizures, a court must analyze the facts from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Bletz v. Corrie*, 974 F.3d 306, 309 (3d Cir. 2020) (*quoting Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (holding that shooting of Rottweiler/Labrador mix was objectively reasonable where dog aggressively charged at officer, growled, and bared his teeth). Such a perspective accounts for the fact that "police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

4

In her motion, Plaintiff ignores the perspective of Lampkin and fails to conduct a *Graham* analysis. Instead, she relies on cases from other circuits to support her conclusion that the seizure was unreasonable. For instance, even if *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962 (9th Cir. 2005) (cited at Doc. 73 – P. 8), were binding on this Court, it would not support a finding of unreasonableness. In that case, several dogs were shot by law enforcement officers during the service of a search warrant that had been preplanned for a week. The only planning by the officers was to "hop[e] that the dogs would not appear," and failing that, to shoot them. *Id.* at 975-76. There were no exigent circumstances; the officers "had a week to consider the options and tactics available for an encounter with the dogs." *Id.* at 966. Nor did the Ninth Circuit opinion cite any facts in which the dogs had escaped their confinement or bitten anyone immediately before the shooting. In the instant case, however, the dog bit Lampkin twice after earlier having bayed a teenager on top of a car. Nor is there any evidence in the record that Plaintiff had control over the dog before, during, or after her interaction with Lampkin. Therefore, Plaintiff's reliance on *San Jose Charter* is misplaced.

Plaintiff ignores the holdings of other courts in the Middle District of Florida that have applied the reasonableness analysis to similar seizures of dogs by shootings. For instance, in *Chastang v. Levy*, 319 F. Supp.3d 1244 (M.D.Fla. 2018), a home burglar alarm was triggered and law enforcement was

notified. A deputy responded to the call and arrived at the house, believing that no one was home. He also did not see a sign on the property indicating the presence of dogs. While the deputy was checking for unsecured doors, a black Labrador ran toward him. The surprised deputy stepped back, pulled his service weapon, and yelled at the dog to get back. The Lab continued to circle the deputy, and then a Rottweiler approached the deputy. The two dogs eventually wedged the deputy between a truck and a wall. When the dogs were between one and three feet from the deputy, he fired his service weapon at the dogs, hitting the Rottweiler in the snout and the Lab in the back. The Rottweiler later succumbed to his injuries. *Id*. at 1249-51.

The *Chastang* court relied on *Graham v. Connor* and *Tennessee v. Garner* in its discussion of whether the seizure of the dogs was reasonable under the circumstances, noting that "the question is whether a reasonable officer in [the deputy's] position would have believed [the dogs] posed an imminent threat to his safety to justify shooting them." *Id*. at 1254-55. The court held that the seizure was reasonable, since the deputy was responding to a burglary alarm and did not shoot the dogs until they were both immediately in front of him. *Id*. at 1255 (citations omitted). Further, in response to the plaintiffs' argument that the deputy should have seen the sign and thus been aware of the dogs, the court noted that the deputy shot the dogs not because he was surprised but because "they ran menacingly toward" him and "showed no signs of breaking

6

off their attack or calming." *Id.* at 1256. In addition, the *Chastang* court responded to the plaintiffs' argument that the deputy should have used non-lethal force by noting that reasonableness is the correct test, not whether lethal force was the "best possible response." *Id.* (*quoting Altman*, 330 F.3d at 207 ("[i]n retrospect, it may have been preference if the officers attempted first to use nonlethal force in every instance. Such nonlethal force may have been successful, but tellingly, it may not have been.'"))

Similarly, in the instant case, Lampkin did not shoot immediately upon seeing the dog come out of the gate, despite her owner's assurances that she would not do so. Nor did he shoot the dog based on solely the prior complaint that she and another dog had worked together to bay a teenager on top of a car. Instead, Lampkin did not shoot until "he perceived immediate danger … out of concern for his safety" when the dog bit him twice. *Chastang*, 319 F. Supp. 2d at 1255.

Lampkin's actions are a classic example of the split-second decision-making that officers are often required to make "in circumstances that are tense, uncertain, and rapidly evolving" – and for which courts must "embody allowance" in determining reasonableness. *Graham*, 490 U.S. at 396. Lampkin did not have time to evaluate the severity of the bites that the dog inflicted or to conduct a detailed analysis of whether her aggression would continue or abate. In the heat of the moment, the law required only that he act reasonably

to protect his own safety and that of others. He did so.

While Plaintiff contends in her complaint that Lampkin should have used his taser or his baton or pepper spray, it is axiomatic that such "20/20 vision of hindsight" is not part of the calculus of reasonableness. *Graham*, 490 U.S. at 396. Also, the evidence in the record shows why Lampkin did not view those as reasonable options when the dog bit him. For instance, the dog was already out of the gate when Lampkin turned the corner, despite Plaintiff's' assertions that "my dogs won't come out of the gate." An officer in similar circumstances could have reasonably believed that in the time it took him to get his baton, the dogs could have aggressively chased another young person onto the top of a car hood – or worse.

Another court in the Middle District found the shooting of a dog reasonable where the dog neither bit nor pinned the law enforcement but merely ran toward him. In *Schutt v. Lewis*, No. 6:12-cv-1697-Orl-37DAB, 2014 WL 3908187 (M.D.Fla. Aug. 11, 2014), a police officer knocked on the front door of plaintiff's home to return an identification card and stepped back from the door into the yard. When plaintiff opened the door, her two American Boxer dogs ran out of the house. One of the dogs responded to plaintiff's calls to come back, but the other ran toward the officer, who pulled his gun. The plaintiff attempted to restrain the dog by grabbing its legs, but the officer shot and killed the dog. At no time during the four-second encounter did the dog make

contact with the officer.

In determining whether the shooting of the dog violated the Fourth Amendment, the *Schutt* court noted that "[t]he touchstone for reasonableness in dog-shooting cases is typically officer safety." *Schutt* at \*3 (*citing Carroll v. Cty. of Monroe*, 712 F.3d 649, 652 (2d Cir. 2013)). The court also balanced the individual interest in pets, describing the seizure of a pet as "a severe intrusion given the emotional attachment between a dog and an owner," against the "particularly significant government interest" of the safety of its law enforcement officers. *Id.* The court held that the shooting of the dog was objectively reasonable, because the officer "faced a rapidly approaching dog that was large, uncollared, and noncompliant with its owner's commands" and had "only seconds to respond." *Id.* In rejecting the argument that the officer should have trusted the owner to restrain the dog or use other less lethal methods, the court stated that "an officer's response need not be the best possible reaction under the circumstances to be considered reasonable." *Id.* (*citing Altman*, 330 F.3d at 207).

Lampkin's use of deadly force was even more reasonable than that used by the officer in *Schutt*, since the dog bit him twice, while the dog in *Schutt* merely charged at the officer. The dog presented a threat not only to officer safety but also to the safety of others in the neighborhood if she had roamed freely after the initial shots. Nor was Lampkin required to hope that Plaintiff

could restrain her dog, particularly where the dog had already acted in a manner inconsistent with Plaintiff's representations that her dogs would not leave the open fence.

In short, Lampkin was bitten twice by a dog that was reported to have aggressively chased a teenager approximately an hour earlier and that failed to stay in its fenced yard despite her owner's assurances to the contrary. A reasonable officer in similar circumstances would have used the same force; therefore, Lampkin did not violate the Fourth Amendment.

B. **Lampkin is entitled to qualified immunity because he was acting within his discretionary authority at all times, and there was no clearly established case law prohibiting his conduct under the circumstances.**[2]

Even if Plaintiff could meet her burden of proving a Fourth Amendment violation, Lampkin would be entitled to qualified immunity from liability due to the absence of any clearly established law putting him on notice that his actions were unconstitutional. An officer sued in his individual capacity is entitled to qualified immunity if he establishes that he was acting within the scope of his discretionary authority. Once the officer makes this showing, the burden shifts to the plaintiff, who may defeat the qualified immunity defense

---

[2] Officer Lampkin takes no position on the second issue in Plaintiff's memorandum [Doc. 73 – P. 9], since it is addressed only to the claims against the City of Jacksonville.

only by showing that the officer violated his constitutional rights and that those rights were clearly established at the time of the violation. *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017).

Neither the record nor the well-settled body of case law governing qualified immunity supports Plaintiff's contention that Officer Lampkin exceeded the scope of his discretionary authority [Doc. 73 – P. 11-13.] Plaintiff cites no case law in support of her argument, because there is none. The Eleventh Circuit's opinion in *Spencer v. Benison* shows why Plaintiff cannot prevail.

In that case, an officer responded to a call about a property dispute in which the plaintiff had placed cones and vehicles to block a road and prevent construction activities. *Spencer v. Benison*, 5 F.4th 1222, 1227-28 (11th Cir. 2021). The officer ordered the plaintiff to remove the cones and vehicles and threatened him with arrest if he failed to do so.

The plaintiff sued the officer under 42 U.S.C. § 1983 for deprivation of property and liberty and for conspiracy. *Id.* at 1228. The district court found that the officer was not entitled to qualified immunity on the individual capacity claims because he was not "'acting within the scope of his discretionary authority' when he ordered [the plaintiff] to remove the cones and vehicles." *Id.* at 1229.

The Eleventh Circuit reversed, holding that the officer was acting within the scope of his discretionary authority because he "acted through means that were within his power to utilize." *Id*. at 1232 (internal quotations and citations omitted). The court held that the district court erred when it "framed its inquiry as 'whether it is within a sheriff's responsibilities as a law enforcement officer to order the removal of a private landowner's property, while it is on that landowner's property, absent a court order" because such a framing "failed to strip out the allegedly illegal conduct. *Id*. at 1231 (*citing Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)). The court further held that an officer passes the discretionary function test when he performs a function that, *but for* the alleged constitutional infirmity, falls within "his legitimate job description." *Id*. (citing *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004)).

In the instant case, the facts in the record show that Lampkin was investigating a complaint of aggravated assault and aggressive dogs. This investigation continued when he accepted Plaintiff's offer to open the gate to prove that her dogs would not go outside the fence, despite the earlier reports that the dogs were out of the fence and baying a teenager on top of a car. This investigation was within Lampkin's duties as a JSO officer investigating a possible crime or ordinance violation. In addition, the June 7, 2022, email regarding viewing dogs [Doc. 73 – P. 12-13] not only predates the subject

incident but is also insufficient to remove Lampkin's investigation from the description of his duties. Plaintiff's assertion that "qualified immunity does not apply in this case" [Doc. 73 – P. 13] is thus without merit.

Finally, Plaintiff has failed to meet her burden of showing that (1) Lampkin violated her constitutional rights and (2) those rights were "clearly established ... in light of the specific context of the case, not as a broad general proposition" at the time of Lampkin's actions. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

As discussed above, Lampkin's seizure of the dog was not unreasonable and therefore did not violate the Fourth Amendment. Plaintiff therefore cannot meet her burden of proving one of the two elements necessary to deprive Lampkin of qualified immunity. Nor can she show that clearly established law would have put Lampkin on notice that it was unconstitutional to shoot a dog that bit him twice, had earlier aggressively chased and bayed a student walking to school, and had readily run out of the open gate despite its owner's insistence that it would not do so.

Although Plaintiff relies on *Plowright* (cited at Doc. 73 – P. 14), that case could not have put Lampkin on notice that his conduct was unconstitutional because it was issued two years after the subject incident. In addition, *Plowright* is not sufficiently similar: in that case, the dog was incapacitated by

a taser and thus posed no threat to anyone in the vicinity when it was shot. In the instant case, however, the dog was not incapacitated but was actively biting the officer. Further, the examples in *Chastang* and *Schutt* show that reasonable officers could believe that it was appropriate to shoot aggressive dogs in less egregious circumstances than those in the instant case. Because Plaintiff cannot meet her burden on qualified immunity, therefore, Lampkin is at a minimum entitled to qualified immunity.

**D.    Conclusion**

Plaintiff has failed to meet her burden of proving entitlement to summary judgment. To the contrary, the shooting was objectively reasonable under the circumstances. Lampkin therefore did not violate the Fourth Amendment. At a minimum, he is entitled to qualified immunity. This Court should therefore deny Plaintiff's motion.

**OFFICE OF GENERAL COUNSEL
CITY OF JACKSONVILLE**

*/s/ Sonya Harrell*
**SONYA HARRELL**
Deputy General Counsel, Tort Dept.
Florida Bar No.: 042803
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
Phone (904) 255-5060
Facsimile: (904) 255-5120
SonyaH@coj.net; BOsburn@coj.net
*Attorney for Defendant Lampkin*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 22, 2026, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice to all counsel of record.

/s/ Sonya Harrell
*Attorney for Defendant Lampkin*

15