UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KIMBERLY BARUS,

      Plaintiff,

vs.                                     CASE NO: 3:24-cv-1358-MMH-SJH

THE CITY OF JACKSONVILLE,
FLORIDA, a political subdivision
of the State of Florida, and
CITY OF JACKSONVILLE SHERIFF
DEPUTY KARL LAMPKIN,
in his individual capacity,

      Defendants.

_____/

## DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT JAMES CROSBY

All Defendants, pursuant to Fed. R. Evid. 702, hereby jointly move to exclude the opinion testimony of Plaintiff's police canine expert, James Crosby, M.S., Ph.D., and in support thereof state:

1.     This Court should disregard Crosby's opinions and preclude him from testifying at trial, because his proposed testimony does not satisfy the requirements of Federal Rule of Evidence 702, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

2.      A proponent of an expert witness must prove by a preponderance that the expert's testimony satisfies *Daubert*. Plaintiff cannot meet this burden.

3.      Dr. Crosby is a former police officer, former animal control officer and animal control department chief, and he has a master's degree and Ph.D. in Veterinary Medical Science with specialization in Veterinary Science. Even if he is considered qualified, many of the opinions expressed in his report and his deposition exceed his expertise and are not relevant to the issues in the case. Further, none of his opinions are supported by reliable methodology. Therefore, his testimony would not assist the trier of fact.

4.      In support of this motion, Defendants rely on Plaintiff's expert witness disclosure containing Dr. Crosby's initial report [Exhibit A], Dr. Crosby's supplemental report [Exhibit B], the transcript of Dr. Crosby's deposition testimony [Exhibit C, cited as "Dep. Crosby [page number]:[line number]], and a list of articles provided by Dr. Crosby through Plaintiff's counsel after the deposition [Exhibit D].

## MEMORANDUM OF LAW

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and restated in *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999). Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In *Daubert,* the Court imposed a special gatekeeping role on district courts to ensure that expert evidence is both reliable and relevant before admitting it. *See also Hudgens v. Bell Helicopters / Texron*, 328 F.3d 1329 (11th Cir. 2003). Under this standard, the proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that (1) the expert is qualified to testify competently regarding the subject matter; (2) the expert uses sufficiently reliable methodology to reach the conclusions; and (3) the testimony is helpful to the trier of fact. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306, 1309 (11th Cir. 1999). The primary focus of the trial court should "be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 1312 (quoting *Daubert* at 595). As the Eleventh Circuit has noted, "something doesn't become scientific knowledge just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive. … The trial court's gatekeeping function requires more than simply

taking the expert's word for it." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014) (cleaned up).

In the instant case, Dr. Crosby's proposed testimony fails to meet these requirements. His opinions are not supported by any basis in the record or by any reliable methodology; instead, they are merely *ipse dixit*. In addition, his opinions would not assist a jury in reaching a decision. This Court should therefore strike Dr. Crosby's opinions in their entirety.

### A.     Opinions in original report

Dr. Crosby's original report contained ten opinions. [Exhibit A, P. 11-12.] The Court should exclude each of these opinions.

**First opinion**: "[T]he call to which Officer Lampkin was assigned and to which he responded to at the Barus residence was a claimed aggravated assault, accompanied by statements at the scene that the alleged victim of the aggravated assault was burglarizing, or attempting to burglarize the Barus' vehicle." [Exhibit A, P. 11.]

This opinion does not "logically advance[] a material aspect of the case" as required by *Daubert*. *Allison*, 184 F.3d at 1312 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand)). It is not relevant to any claim made by Plaintiff, because it is not probative; it has no bearing on the reasonableness of the seizure by Lampkin.

In addition to being reliable, expert evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. This requirement goes primarily to the relevance inquiry. *Id.* Stated differently, the proponent of the expert testimony must establish that such testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* Because the opinion is not helpful to the trier of fact, this Court should exclude it.

**Second opinion**: "The presence or absence of the dog was immaterial. If the dog had bayed the alleged victim on top of the Barus' car, that is, according to State Statute, Local Code, and my personal experience as the former management consultant to Jacksonville Animal Care and Protective services, a matter customarily handled and investigated by Jacksonville Animal Care and Protective Services. In fact, Jacksonville Animal Care and Protective Services Division is explicitly assigned the investigation of such code violations in Section 462.101 of Jacksonville Municipal Code." [Exhibit A, P. 11.]

Dr. Crosby's second opinion is conclusory and unsupported by any reliable methodology. He fails to identify the purported state statute that supports his conclusion, nor does he explain what aspects of his personal experience inform his opinion. Further, nothing in the plain language of section

462.101, Jacksonville Ord. Code, indicates that the power to investigate dog complaints is exclusive:

> The Animal Care and Protective Services Division Chief and those animal control officers, as defined herein, shall be responsible for the enforcement of this Chapter. The powers and authority granted under this Chapter shall be *supplemental to the powers and authority already provided for by Florida Statutes*, relating to local animal control regulations.

(emphasis added).

In his deposition, Dr. Crosby later clarified this opinion with a statement not previously included in either his initial or supplemental report:

> Q    Okay.    And you would agree that this was not within the exclusive jurisdiction of ACPS?
> A    Oh, absolutely not.  It is fully appropriate for JSO and ACPS to both investigate animal complaints.  Both agencies can fully enforce the code, and the police officers can actually make arrests.
> Q    Okay.  And certainly you would agree that Officer Lampkin was within the scope of his duties to investigate not only the animal complaint, but also the statement that -- by the complaining party that
> Mr. Barus had a gun, was chasing him with a gun?
> A    Oh, absolutely.  In fact, that's his job.  He should have been investigating both of those issues.

[Dep. Crosby – 79:12-24.] Dr. Crosby's later statements thus contradict the opinions expressed in his report, further indicating the lack of any reliable methodology or support for his opinions.

**Third opinion**: "[T]here was no rational need or requirement that Lampkin direct the Barus[es] to bring their dog outside. Neither was there any

6

objective necessity for Lampkin to direct Mrs. Barus to allow her dog to come out from an unsecured gate." [Exhibit A, P. 11.]

Dr. Crosby provides no support for this opinion. It is merely *ipse dixit*.

**Fourth opinion**: "Lampkin appears to have fully recognized that any dog was able to leave outside an open gate." [Exhibit A, P. 11.]

Dr. Crosby is trained in animal behavior, not human behavior. While he appears to be able to read the minds of dogs, describing Lucy as friendly and predicting her behavior, neither his experience nor his training supports his apparent ability to read the mind of Officer Lampkin. Because Dr. Crosby is not qualified to render an opinion about Officer Lampkin's perceptions, the Court should exclude this part of the opinion.

**Fourth opinion (continued):** "His apparent awareness that the dog was likely to exit the yard should have caused Lampkin to plan and prepare for using protective measures and/or strategies to protect himself and the public from any possible harm from the dog." [Exhibit A, P. 11.]

In support of this part of the fourth opinion, Dr. Crosby relies on "Precedent in Federal Court set by Hell's Angels v. The City of San Jose ruling on the need for police to plan for encounters, especially when dogs are known to be present." [Report, P. 11 n. 6.] Even if a specially retained expert would be qualified to give a legal opinion about a legal conclusion, as Dr. Crosby does here, the *Hells Angels* case does not support his opinion. In that case, several

dogs were shot by law enforcement officers during the service of a search warrant that had been preplanned for a week. The only planning by the officers was to "hop[e] that the dogs would not appear," and failing that, to shoot them. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975-76 (9th Cir. 2005). There were no exigent circumstances; the officers "had a week to consider the options and tactics available for an encounter with the dogs." *Id.* at 966. Nor did the Ninth Circuit opinion cite any facts in which the dogs had escaped their confinement or bitten anyone immediately before the shooting. Dr. Crosby fails to explain how the Hells Angels case supports his opinion in the instant case, in which Officer Lampkin did not have a week to plan for a dog biting him twice after escaping her enclosure. Therefore, the Court should exclude the fourth opinion in its entirety.

**Fifth opinion**: "Lampkin had, according to JSO records, been trained during roll call several years before this encounter on how to effectively and safely avoid negative contact with a domestic canine [but] did not use any of the techniques and/or strategies taught in that course." [Exhibit A, P. 11-12.]

Once again, Dr. Crosby offers no support for this opinion; it is merely *ipse dixit*.

**Sixth opinion**: "[A]ny level of threat possibly presented by the dog was caused by Lampkin's direction to Mrs. Barus to violate local Code by providing means for her dog to run at large, even for a moment." [Exhibit A, P. 12.]

8

No facts in report or materials reviewed support this opinion. To the contrary, the body-worn camera footage that Dr. Crosby reviewed shows that the dog was still on the Barus property when she bit Officer Lampkin twice after she escaped from the gate that Plaintiff had opened. Nor does Dr. Crosby provide any causal link between the opening of the gate and the dog biting Officer Lampkin twice. The dog could have bitten Officer Lampkin if he had gone in the closed fence, or the dog could have run at large without ever having bitten Officer Lampkin or anyone else. Dr. Crosby's opinion as to this issue is sheer speculation and not supported by any record evidence or scientifically reliable methodology.

**Seventh opinion**: "[A] dog similar to the Barus' dog presents a limited likelihood of inflicting serious harm to a healthy adult. Further, the number of adults killed by dogs in general in the United States is so low as to present no credible reason for using deadly force against a single dog."

The seventh opinion is not helpful to the trier of fact. Officer Lampkin need not have feared that the dog would kill him or anyone else at the time she bit him twice; instead, he just needed to have a reasonable fear for the safety of himself or others. Dr. Crosby's opinion is therefore not relevant to any issue in the case.

In addition, the seventh opinion is not supported by any reliable methodology. The report simply refers to "References dog deaths Crosby."

9

[Exhibit A, P. 12 n. 8.] When asked at his deposition to elaborate on what studies support that statement, he referred to "articles." [Dep. Crosby – 102:1-104:16.] Dr. Crosby subsequently sent a list of 38 documents on a wide range of subjects, without any additional explanation of how each – or any – of those articles supported his opinion. ["Selected Reference from Dr. Crosby re: Barus case," attached as Exhibit D.]

**Eighth opinion:** "Despite the very low likelihood that the dog presented any credible threat of serious injury, Lampkin began firing at the dog after the dog had already disengaged and was within moments of being under the direct control of Mrs. Barus. An attack by the dog was not immanent [sic]: according to the officer's allegations, supported by the video record, the dog had already made contact with and allegedly bitten Lampkin so there was no longer any reason for the Lampkin to perceive an "immanent [sic] threat" to any person or animal. The dog was fleeing from the officer and there were no persons, other than the owner(s), visible or present in the path of the dog. The owner was directly present and within easy range of recovering the dog, and could have been easily expected to recover the dog forthwith, without extreme effort or extended time. In fact, the owner was actively recovering the dog by hand, within arm's length of the dog, when the officer needlessly fired." [Exhibit A, P. 12.]

10

Dr. Crosby's eighth opinion is based on the shaky foundation of his unsupported seventh opinion. The unreliability of Dr. Crosby's methodology is further evident from the body-worn camera video on which he relies, which does not show that "the owner was actively recovering the dog by hand." *See, e.g.*, Doc. 70-10 Exhibit C at T11:23:04Z.] In addition, the opinion consists of speculation; even someone with training in dog behavior could not know whether the dog was "fleeing" to hide in its own yard or whether she was "fleeing" into the neighborhood to bay or bite another person.

**Ninth opinion**: "As the dog ran away from Lampkin, Lampkin continued to fire his issued firearm in an obvious attempt to ensure that he killed the dog. Yet continue to fire he did, striking the dog more than once as the dog ran for safety. In my professional opinion, based on my experience and training, Lampkin's continued firing directly caused the injury to and death of the Barus' dog." [Exhibit A, P. 12.]

Nothing in Dr. Crosby's background, training, research, education, or experience explains how he could know that "the dog ran for safety." He does not cite any scientific or forensic source for his psychic reading of the dog's mind. Nor does he cite any veterinary, forensic, or other scientific source for his contention that the continued firing after the initial shots caused the injury and death of the dog. He does not state how many of the shots hit the dog or

11

where. His ninth opinion is speculative *ipse dixit*, which neither Rule 702 nor *Daubert* allows.

**Tenth opinion:** "Based on the circumstance described, the video, the reports and statements of the Jacksonville Sheriff's Officer personnel and Lampkin's expected testimony, it is my professional opinion based on my extensive experience, training, and to a scientific degree of certainty, that the shooting of the Barus' dog by Officer Lampkin violated Jacksonville Sheriff's Office policy and presented an unnecessary and cruel use of deadly force to kill the Barus' dog." [Exhibit A., P. 12.]

Dr. Crosby's final opinion suffers from the same fatal flaw as the other opinions on which he bases this conclusory opinion: there is no reliable methodology or scientific support for his statement. His use of the words "scientific degree of certainty" does not transform his *ipse dixit* into an opinion admissible under Rule 702 and *Daubert*.

In addition, whether the use of force was necessary is a legal conclusion that Dr. Crosby is not qualified to make. Allowing even a qualified expert to simply evaluate evidence and render a lay opinion would invade the province of the jury and, therefore, not assist the trier of fact. "An expert may not … merely tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Because Dr. Crosby's tenth opinion does exactly that, this Court should exclude it.

## B.    Opinions in supplemental report

In his supplemental report [Exhibit B], Dr. Crosby shifts his focus from canine behavior to police practices, to rebut Defendants' retained police practices expert. Although Dr. Crosby in conclusory fashion states that his opinions "are rendered to a reasonable degree of scientific certainty and are informed by the type of evidence on which professionals in my field typically rely" [Exhibit B, P. 1], he fails to provide any methodology or other support. Instead, as he did repeatedly in his original report, the only support for his opinion is his own self-serving *ipse dixit*.

## C.    Newly revealed opinions

At his deposition on May 29, 2026, Dr. Crosby revealed several new opinions not contained in either his original or his supplemental report. For instance, he testified that the training provided by the Jacksonville Sheriff's Office (JSO) was not sufficient, even though he admitted that he had not included that opinion in his report. [Dep. Crosby 25:7-11; 26:15 – 27-18; 121:9-122:4.] He later stated, "I accept the fact that I specifically and explicitly reserved the right to add to the opinions you've given in both of my reports that were accepted, and we haven't finished the deposition, and, of course, part of the purpose of a deposition is to dig for more information." [Dep. Crosby – 117:9-14.] As with his other opinions, he cites no reliable methodology or other basis for his opinion about the training by JSO. [Dep. Crosby 27:19 – 30:13.]

He also opined for the first time at deposition that the number of rounds fired at the dog was "needless, excessive, and should not have been fired." [Dep. Crosby – 67:25 – 68: 6.] Even though he was asked to provide opinions on "whether all of the rounds fired were necessary and appropriate in the position" [Dep. Crosby – 66:10-22], he did not express that opinion in either his original or his supplemental reports. [Dep. Crosby – 66:23 – 69:6.] Dr. Crosby justified his failure to include that opinion in his reports by stating "That's why we have this, so we can expand on stuff" and "I also leave my opinions open so that I can expand on them when it's necessary." [Dep. Crosby – 67:20-25; 68:24 – 69:5.] Once again, Dr. Crosby did not provide any reliable methodology or other basis for his opinion regarding the number of rounds fired.

In both his initial and supplemental reports, Dr. Crosby refers to "substantial evidence to be provided by the Jacksonville Sheriff's Office and by deposition and testimony, any or all of which may affect my professional opinion." However, he never explains in either of those reports what additional evidence or other information he may need.[1]

## **CONCLUSION**

For all the reasons set forth above, Dr. Crosby's opinions are not admissible, and his testimony should not be allowed in this cause. His

---

[1] In his deposition, Dr. Crosby confirmed that he had not been provided any additional documents since his supplemental report. [Dep. Crosby 19:4-10.]

14

methodology is unreliable, and his proposed testimony will not assist the trier of fact, as required by Rule 702. In addition, the Court should strike those opinions that were not timely disclosed as required by Rule 26.

WHEREFORE, Defendants respectfully request that the Court disregard Dr. James Crosby's opinions in considering Defendants' motions for summary judgment and preclude him from testifying at trial.

OFFICE OF GENERAL COUNSEL
CITY OF JACKSONVILLE

/s/ *Sonya Harrell*
**SONYA HARRELL**
Deputy General Counsel, Tort Dept.
Florida Bar No.: 042803
SonyaH@coj.net;BOsburn@coj.net
**PAUL E. BUEKER**
Assistant General Counsel
Florida Bar No.: 189405
PBueker@coj.net; GPaulino@coj.net
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
Phone (904) 255-5100
Facsimile: (904) 255-5120
*Attorneys for Defendants*

## Certificate of Conferral Pursuant to Local Rule 3.01(g)

The undersigned counsel hereby certifies that she has conferred with counsel for Plaintiff via email discussion regarding the relief sought in this motion. Counsel for Plaintiff is opposed to such relief.

/s/ Sonya Harrell
*Deputy General Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice to all counsel of record.

/s/ Sonya Harrell
*Deputy General Counsel*

16