IN THE UNITED STATES DISTRICT COURT
OF THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KIMBERLY BARUS,

     Plaintiff,

     vs.              CASE NO.:  3:24-CV-01358-MMH-SJH

THE CITY OF JACKSONVILLE, et al.,

     Defendants.
_____

DEPOSITION OF

DR. JAMES CROSBY

Taken on behalf of the Defendants

DATE TAKEN:    Friday, May 29, 2026

TIME:         1:00 p.m. to 4:30 p.m.

LOCATION:     (via Zoom)

Examination of the witness taken before:

Barbara A. Borden, RPR, Notary Public
(via Zoom)
Hedquist & Associates
345 East Forsyth Street
Jacksonville, Florida  32202
(904)354-4111 FAX (904)791-9103
- - -

Hedquist & Associates Reporters, Inc.

APPEARANCES OF COUNSEL

On behalf of the Plaintiff

Denese Venza, Esquire
(via Zoom)
Venza Law, PLLC
12161 Mercado Drive, #227
West Palm Beach, Florida  34293-1147

Marcy I. LaHart, Esquire
(via Zoom)
Marcy I. LaHart, P.A.
861 South 40th Street
Tacoma, Washington  98418

On behalf of Defendant Officer Karl Lampkin

Sonya Harrell, Esquire
(via Zoom)
Office of General Counsel
117 West Duval Street, Suite 480
Jacksonville, Florida  32202-5721

On behalf of Defendant City of Jacksonville

Paul E. Bueker, Esquire
(via Zoom)
Office of General Counsel
117 West Duval Street, Suite 480
Jacksonville, Florida  32202

ALSO PRESENT:

Tery White, Intern
(via Zoom)
Office of General Counsel
117 West Duval Street, Suite 480
Jacksonville, Florida  32202

                                     -  -  -

I N D E X

E X A M I N A T I O N S

WITNESS                                                    Page


  **DR. JAMES CROSBY**

  DIRECT EXAMINATION BY MS. HARRELL                        4

  CROSS EXAMINATION BY MR. BUEKER                          111

  CROSS EXAMINATION BY MS. VENZA                           113

  RECROSS EXAMINATION BY MR. BUEKER                        127


                      E X H I B I T S

FOR IDENTIFICATION                                         Page


  Defendants' Exhibit 1                                    6
  Notice of Deposition Duces Tecum

  Defendants' Exhibit 2                                    25
  report

  Defendants' Exhibit 3                                    48
  The Problem of Dog-Related Incidents and
  Encounters pamphlet

  Defendants' Exhibit 4                                    63
  Axon Body 2 X81326035

  Defendants' Exhibit 5                                    106
  supplemental report.

S T I P U L A T I O N

It was stipulated and agreed by and between counsel for the respective parties, and the witness, that the reading and signing of the deposition by the witness was waived.

- - -

DR. JAMES CROSBY, acknowledged having been duly sworn to tell the truth and testified upon his oath as follows:

THE WITNESS:  I do.

THE REPORTER:  Thank you.

DIRECT EXAMINATION

BY MS. HARRELL:

Q    Okay.  Good afternoon, Dr. Crosby.  It's good to see you.

Just for the record, I am Sonya Harrell with the Office of General Counsel for the City of Jacksonville, and with me are Paul Bueker -- Paul is representing the City in this case, and I am representing the individual officer -- and we also have our intern, Terry White, who is going to be observing and not asking you any questions.

A    Good.  Thank you.

Q    Mr. Bueker may have some questions, though, on behalf of the City.

Hedquist & Associates Reporters, Inc.

I think I know the answer to these questions, but you have given a deposition before, haven't you?

A    Oh, maybe once or twice or a thousand times.

Q    Yeah.  Yeah.  When is the last time you gave a deposition?

A    Two, three weeks ago.

Q    Okay.  So you're familiar with the rules about, you know, speaking verbally.  Since we are on Zoom, there may be a little bit of a lag time, so just make sure you let me finish my question, and I'll make sure you finish your answer, and I think we'll be able to get through this relatively quickly today.

Is there anything that would affect your ability to give true and accurate testimony here today?

A    No, there is not.

Q    Okay.  Did you receive a subpoena duces tecum to be here today?

A    Yes, I did.

Q    Okay.  And I'm going to share my screen.  And we will mark a copy of that subpoena duces tecum as Defense Exhibit A.

Does that look like the -- no.  Let's try this again.

Does that look like the subpoena duces tecum you received?

(Defendants' Exhibit 1, Notice of Deposition Duces Tecum, was marked for identification.)

A    It certainly does.

Q    And before we get started going through the list on Exhibit A, let me ask you, how did you keep your file for this matter?

A    My file is kept digitally, and I have put all of my -- all of the discovery I received and videos and photographs and so forth into a file that I'm forwarding as soon as it all uploads to plaintiff's counsel so that they can forward it on to you so we have a tracking of it and we know it gets to you.

Q    Okay.  Wonderful.  Thank you.

And does that -- let me just go through this list.

Does that file contain the items identified in Number 1, All communications between you and plaintiff or plaintiff's counsel regarding your compensation for your work in this case?

A    Yes.

Q    And does it contain all the documents, videos, photographs, records, publications, reports, correspondence and any other materials on which you relied or considered in reaching your opinions in this matter?

MS. VENZA:  I am going to place an objection that it's a very broad request, and I will say Mr. -- Dr. Crosby has done the best that he could given the overbreadth of that request.

MS. HARRELL:  Okay.  So there was not an objection when the subpoena was issued, but it's noted for the record.

MS. VENZA:  Okay.  Let's start with that.

The subpoena was issued -- let me pull it back up -- two days ago, issued and served two days ago.

MS. HARRELL:  Actually, it was issued before his May 1st deposition was originally set.

MS. VENZA:  Okay.

MS. HARRELL:  So you didn't object then, and we were trying to confirm the date with you, which we didn't receive a very prompt response on.

MS. VENZA:  No, no, no.

MS. HARRELL:  So let me --

MS. VENZA:  If you're going to make that representation, I'd like to correct the record.

Yes, there was a prior subpoena.  It was for a May 1st deposition.  But we'll back up.

It was not until April 6th that Dr. Crosby's deposition was ever requested, and there was an April 21st discovery closure deadline.  Despite

Hedquist & Associates Reporters, Inc.

that, we were able to give you multiple dates before the cutoff of discovery.  They were not amenable to your and Paul's calendar.

As a courtesy, we agreed to an extension for you to depose Dr. Crosby.  Dates were floated around.  May 1st was selected with regard to a subpoena for that deposition.  It was not served until two days before the deposition.

Unfortunately, Dr. Crosby became ill, and the May 1st deposition needed to be canceled.  Thereafter, we discussed rescheduling it.  We endeavored to do so.  Once again, multiple dates were given, and a date of today, May 29th, was selected.

At your request, we prepared a joint motion for extension of the prior May date to depose Dr. Crosby, which we had to -- me, specifically -- had to several times try to seek out your and Paul's position on that motion, not sure what you were planning to do.  And it wasn't until not last weekend, the weekend before, that I finally got an answer back from Paul, after which I immediately filed the joint motion.

Despite that, in between then, there was plenty of time for you to serve an amended notice of

deposition.  It was not until two days ago that the subpoena which is the subject of this deposition was served.

MS. HARRELL:  Are you finished, counsel?

MS. VENZA:  Yep.

MS. HARRELL:  Okay.  I'm not going to waste any more of Dr. Crosby's time today going through the mechanism of this.

BY MS. HARRELL:

Q    Let me just ask you, Dr. Crosby, did you have difficulty responding to paragraph number 2?

A    The only difficulty in responding to paragraph 2 is that over the years, with my experience, the articles, the books that I have read, the classes I have been through, I could drowned you under things that might have affected my opinion.

I have provided to plaintiff's counsel an abbreviated list of about a dozen or 18 things that are basic -- publications that are basic and applied directly.  But again, I've -- there's a lot that's gone into developing my experience, training and education regarding these subjects.

Q    Okay.  And certainly something like the FDLE guidelines, which you probably know from your days back at JSO, that's certainly something that would inform

Hedquist & Associates Reporters, Inc.

your opinions generally about police practices relating to dogs; right?

A    Certainly.  Everything from academy training to things such as those guidelines, to the seminars and trainings I have either attended or given for the -- in the animal control field.  So, yeah, there is a vast amount of information that I didn't think you wanted me to drown you in.

Q    Right.  And I appreciate that.  And certainly it wouldn't be something that's just particular to this case; right?

A    Correct.

Q    Okay.  Thanks for clarifying that.  I appreciate it.

Going to the next one.  Did you take any photographs?

A    No.  I don't have -- I didn't take any photographs, not that I can find any record of or any trace of.  I don't believe I took any at all.

Q    Did you instruct anybody to take any photographs specific to this matter?

A    I did not, no.

Q    And have you provided copies of any invoices and/or statements for services rendered in this case?

A    Yes.  Yes.

Q    And just what's your -- how did you -- I'm sorry.  It's a long week.

What is your rate for working on cases like this?

A    It breaks into two parts.  Number 1, the overall casework, which includes looking at documents, going through videos, discussions with counsel, so forth and so on.  Everything that I produce up to the day of trial is a flat fee of $7,500.  After that, depositions are $200 per hour, three-hour minimum.

And for trial dates, I charge $1,000 per testimony day, $500 a day if I am sitting in as an expert monitoring the witness's testimony.  And, of course, if I have to travel, that also includes -- the client has to pay for travel and hotel and so forth.

Q    Okay.  Thank you.

And did you provide any time records reflecting your work in this case?

A    No, I don't keep individual hours.  I just find it a pain.

Q    Okay.  And that's because you -- that makes sense because you have a -- you do a flat rate; right?

A    Correct.  In fact, that's why I do the flat rate so that I don't have to say, well, I spent four hours and 15 minutes today and so forth.

Q     Okay.  And so the flat rate of -- $7,500, is it?

A     Yes.

Q     So that applies whether you spend one hour on a case or a hundred hours on a case; right?

A     Correct.

Q     Okay.  Do you have an estimate of how many hours you have spent on this case before today's deposition?

A     An estimate, roughly, would probably be close to a hundred hours between going over the videos, going over the other files, looking at the photographs, looking at all of the pleadings and the -- going through the deposition transcripts and so on.  So, yeah, I would probably say every bit of a hundred hours.

Q     With regard to number 6, is there a -- did you provide a copy of all contracts between you and plaintiff or plaintiff's counsel?

A     Yes.  My engagement letter is in there and also the fee sheet.

Q     Have you done any work with either Marcy LaHart or Denese Venza before?

A     With Ms. LaHart, yes.  She and I worked on cases together before, and we have been acquaintances and friends for -- golly, I don't even want to think of

how many years.

Ms. Venza, no, I have never worked a case with her before.

Q    Did you -- were you -- did you know Ms. LaHart when you were working for Jacksonville ACPS?

A    No, regrettably, I did not.  I met Ms. LaHart after I retired and when I was first getting involved in the animal field.

Q    When you say getting involved in the animal field, do you mean as a private citizen with a private business?

A    Yes.  I started out as a dog trainer and then moved into behavioral work and so forth, and it was during the early years of that that Ms. LaHart and I became friends.

Q    So about what year?

A    Well, probably somewhere shortly after 2000, somewhere in there, I would guess.

Q    You were also with animal control in Bay County, right, at one point?

A    That is correct.  I was the division manager, which was the same as the chief of ACPS here, for Bay County from 2008 to the end of 2010.  The beginning of 2008.  I think it was February I started.

Q    So how long have you exclusively been in, we'll

call it, private practice, for lack of a better term?

A   Since 1999.

Q   But you weren't exclusively in private practice when you were, say, with Jacksonville ACPS or Bay County; right?

A   Not exclusively, no.

Q   Okay.

A   I was an employee of both agencies. Jacksonville, I was a contractor.  Bay County, I was a regular employee.

Q   Okay.  Have you testified in cases in which Ms. LaHart has been counsel of record?

A   Yes, although I would have to go back through the records to give you an exact number.  But, yes, I have testified in cases where Ms. LaHart was the primary attorney.

Q   Has it been more than ten cases?

A   Probably not more than ten.  I would say probably between five and ten.

Q   Has Ms. LaHart ever consulted you with a case, and you said, Yeah, I can't provide an opinion that helps your client?

A   Yes.  We have talked about cases before, and my rule is that if I can't support the position of counsel, then I'm not going to hang myself and my reputation out

and say something I can't support.

So I believe there's been a couple of cases where Ms. LaHart has called me and we've talked about it, and I said, Yeah, no, I'm not the right one for this.

Q    Okay.  The next one is number 7, and it's all documents of any kind that have been provided to you for review in which you considered in the formulation of your opinions in this case.

And understanding that --

A    That goes back to your first -- no, that goes back to your first question.  And that -- and there's also another question about all materials and so forth. And we can just consolidate and say, yeah, I've put everything in the file.

Q    Okay.  Thanks.

Number 9 is documents reflecting any organizations to which you belong or subscribe for the purposes of marketing your services as an expert witness.

A    Okay. I do not market my services.  My services get picked up by attorneys who have either done a search for me under the behavioral side or the evidence side or by word of mouth.  So I don't have anything regarding marketing of any kind.  I don't have

a commercial website up.  I don't put up ads.  I don't put anything in Westlaw or anything like that.

Q    Okay.  So then I guess the answers to 10 and 11 are also no documents?

A    Correct.

Q    Great.

I noticed in your report, in your initial report, you referenced several articles -- let's see.  One, two, three, four -- four publications that you considered in relying on your opinions in this case.

And I was able to find the Badhurst document and the law enforcement dog encounter training document, which you coauthored.  The --

A    Light correction there.  The toolkit I coauthored with attorney Chelsea Rider.  The actual training course and the actual manual for that training course I am the sole author of.

Q    Oh, okay.  Great.

So did you rely on the toolkit or the book?

A    All of that.  Because all of it is information that I have put together due to my research and training and experience, and that is currently the Department of Justice's approved state-of-the-art training for police officers and dog encounters.  So all of that stuff would have affected my opinions.

Hedquist & Associates Reporters, Inc.

Q    Okay.  And did you provide copies of all of the documents that are listed in your report?

A    Yes.  Well --

Q    Thank you.

A    -- the book Dog Bites, for whom I wrote two chapters, that is publicly available.  You can get it either in physical copy or electronic copy from Amazon.  So I think that's the only other things that I have written that you would have to find.

Also, I believe the -- you can publicly and, I think, for free get the Best Friends Guide to Animal -- Humane Animal Control.  I believe I cited that there also.

MS. VENZA:  And, Sonya, I just want to interpose an objection, the same one as we did for number 2 about overbreadth.

Q    Okay.  Doctor, I don't see the Best Friends Guide on here.

A    Okay.  I'll be happy to add that to the file that I'm forwarding to counsel.  That's kind of why I waited for the whole thing, to make sure there wasn't anything that you needed that I had forgotten.

Q    Okay.  Thanks.  And I think -- we can go through the list again when we talk about your report.

A    Sure.  Sure.

Hedquist & Associates Reporters, Inc.

Q    So we'll -- yeah.

And so is it safe for me to assume that 13 and 14 would also be encapsulated in that list of publications that we just discussed?

A    Yes.

Q    And then do all of those documents encapsulate your entire file for this matter, or are there any other things that you've --

A    There are some certificates in there that you asked about for memberships and so forth, so there's copies of some of those certificates.  And there's also a scan of some working notes that I found in the back of my stuff of where I made a running documentation of everything that happened of substance within the body camera video, and there will be a copy of that also attached.

Q    Okay.  Wonderful.  Thanks.

How many body camera videos did you review?

A    I bounced -- I don't remember how many of the people around I did.  My primary focus was on Officer Lampkin's body camera because he was the one that was there by himself with all of this put together.

Q    Okay.  I know you have done two reports in this case, one original and one a supplement.  The original was dated January 12th of 2026, and the supplement was

done on March 25th, 2026.

Have you issued any other reports?

A    Not in this case, no.

Q    And have you been provided any documents since March 25th of 2026 that would affect your opinions rendered in this case?

A    No.  Well, actually, I -- no.  I have been provided nothing since the supplement report in March. That kind of pretty well contained my entire set of opinions.

Q    Are you aware that depositions have been taken in this case since March 25th of 2026?

A    Yes.  And I have read Officer Lampkin's deposition.  I don't recall if that was before or after March.  But that reading through his deposition did not change my opinions one way or another.

I understand there was a 30(b)(6) deposition with the City.  I have not received a transcript of that yet.

Q    Have you received a transcript of Mrs. Barus's deposition?

A    No.  I do not have a copy of her transcript either.

Q    Okay.  Have you ever spoken to Mrs. Barus about the incident?

A     Yes.

Q     Okay.  And how many times did you speak to her?

A     I have spoken to her once, very shortly.  And I can't find a record that shows a calendar date, but very shortly after this initial -- or this incident occurred, I did drive out.

Because this has been part of my research and part of my interest and so forth with dog attacks and bites, and I drove by the Baruses' house.  I believe I spoke to both Mr. Barus and Mrs. Barus, very briefly, just so I could have the information of what happened.

You know, I had read the media reports, but having been with JSO for so many years, I take media reports with a large grain of salt.  So I just wanted to get some basic information, and they were -- I don't know if they had decided to pursue any action against the City at that point or not.

I said, Well, if they do, please have your attorney get in touch with me, and I would be happy to speak to them.  But I did not recommend any particular counsel or particular plan of action to them.  I just mostly listened.

Q     Okay.  And you said that this was shortly after the incident?

A     Right.  This would have been still within

April of 2022.  So the incident occurred on the 11th. It might have been the 12th or 13th or 14th, but probably no later than that.  Beyond that I haven't spoken to them.

Q    How did you find out about the incident?

A    It was all over Channel 4, Channel 12 and everybody else in town.  So I don't think anybody in town missed it.

Q    And so you had -- you saw this, and you said you went to meet with the Baruses for research purposes?

A    Yeah.  My PhD originally was -- my dissertation was going to focus on use of force by police officers in dog encounters, and I was -- I have amassed quite a bit of information in 4-, 5-, 600 cases across the U.S.

But due to the reluctance of police departments to release a lot of their records and due to the extensive FOIA requests, I shifted it over into my other specialty, investigating fatal dog attacks and dog aggression.

Because they're hand in hand.  You know, police officers need to understand aggression at least a little bit to be able to tell the difference between a dog that's a threat and a dog that's not a threat.

Q    What do you mean by fatal dog attacks?

A    I mean fatal dog attacks where a human is

killed somehow by a domestic dog.  And the research field in that, I am -- investigated more actual cases onsite than anybody in the world, as far as I know, and I have had my hands on about a hundred dogs that, before I met them -- very shortly before I met them, had killed a human being, looking for behavioral characteristics, physical characteristics, assisting evidences and -- or agencies in collecting evidence, such as scrapings of the paws, DNA recovery, bite-mark collection and wound analysis.

Q    Does your research focus just on fatal dog attacks, or does it also include severe injuries inflicted by dogs?

A    It includes severe and non- -- excuse me -- severe and nonsevere injuries, life-threatening injuries -- excuse me.  I'm sorry.

Q    Oh, yeah.  Sure.

A    -- life-threatening injuries, nonlife-threatening.

And of course, in my career or the years I have spent in animal control as an animal control chief/director, whatever you want to call it, my officers and I assisted in many, many, many, many dog-bite investigations.

I have also been part of efforts to develop on

an international basis an improved dog-bite evaluation scale where we can quantify the injuries and describe them and then rate the level of injury and the behaviors as to potential causes and for developing potential retraining programs.

Q    So you spoke to Mr. and Mrs. Barus shortly after this incident.

A    Yes.

Q    Did you take any notes from that incident or from that conversation?

A    No.  I have looked.  I don't find any notes, and I don't think I did because I try very hard -- in fact, I do, as a policy, not get involved in any cases until such time as there is an attorney involved because I can't represent the people.  I can't help them in any way.

So -- and if they're not going to be interested in getting legal guidance and assistance, again, I'm not going to put myself in a position of risking my reputation or objectivity by getting tied up in some kind of a personal mess.

Q    Okay.  Did Mrs. Barus tell you that they had already retained an attorney at that point?

A    No, they had not at that time.  I asked them, and they said, no, we don't have one.  But then I did

not recommend one.  I think if I made a recommendation, it would have been to call the law school or the bar association's animal law committee and see if they could find somebody.

Q    Did she tell you that her daughter had already been reaching out to attorneys?

A    No.  I had no information there was an attorney.  So it may have -- it was probably soon enough thereafter that those arrangements had not been made.

Q    Okay.  What else did you do -- before you were retained in this case as an expert witness, what else did you do as far as your -- supporting your research for your thesis with regard to this case?

A    Nothing.  I --

MS. VENZA:  Object to the form.  Can you -- I want to object to form to the question.

Go ahead and answer.

Q    Yeah.

A    Sorry.

Nothing.  Because this was not that unusual as far as regarding a police officer deploying deadly force against a dog that had not been adequately trained in how to deal with such a situation, and it's sadly common all over the U.S.

Q    Okay.  Why do you say that -- and I'm assuming,

when we talk about not being adequately trained, you're talking about the officer, not the dog; right?

A    Correct.  The officers, unfortunately, do not receive adequate training regarding recognizing behavior and bite prevention and so forth despite such agency -- the U.S. Postal Service providing constant training.

Q    In your reports, though, you don't criticize the training that was provided by JSO, do you?

A    I believe I mentioned that -- in there, that it was not provided, and the only training they've had was the five 15-minute videos that came from 2015, so.

Q    Okay.  I'm going to share my screen again, and we'll mark this as Defendants' Exhibit 2.

Dr. Crosby, this is -- the first few pages are just the federal court --

A    Right.

Q    -- pleading, the disclosure, but your report is attached.

(Defendants' Exhibit 2, report, was marked for identification.)

A    Yes.

Q    And so this is your January 12th, 2026 report?

A    Yes, it is.

Q    Do you have a copy of that in front of you that you can refer to?

A    That's what I was about to pull up here.  If you can give me one half of a moment here.

Let me see.  Report.  Okay.  I'm pulling up both the initial report and the supplemental report.

Q    Okay.  Wonderful.

A    Yes, I have it here.

Q    We'll focus on the original report first.

A    Okay.  It's right here.  Thank you.

Q    Sure.  And so the pages aren't numbered, but I'm going to ask you to go to the section with the heading Opinions.

A    Yes.

Q    And I'll scroll down so everybody can see what we're talking about.

So I want to ask you about -- this is Opinion 5, where it says, Lampkin had, according to JSO records, been trained during roll call several years before this encounter on how to effectively and safely avoid negative contact with a domestic canine.

A    Correct.

Q    Is that your opinion?

A    Yes.  He had received that -- those five 15-minute videos.  He stated he had seen them.  I don't believe he remembered much of anything from it.  And that single training was actually put together by

friends of mine, and it's good as far as it goes. However, in itself, by itself, it is not sufficient.

Q    Okay.  So where else in your -- in your January 12th report do you state that the training provided by JSO was not sufficient?

A    I'm not sure.  Let me look through here.  Give me...

I don't believe I actually -- other than that place, I don't believe I actually made that explicit statement, but I do, of course, at the end of both that and the supplement report explicitly reserve the right to other nonincluded opinions.

Q    Okay.  So this -- your opinions regarding the sufficiency of the training provided by JSO have not been provided to Mrs. Barus or her counsel; correct?

A    I have not provided anything to Mrs. Barus, and I have discussed it with counsel.  I just didn't realize I hadn't put it in the report.

Q    Okay.  And so what is the basis for your opinion being shared with us the first time today that JSO's training was not sufficient?

A    The basis for it is having seen trainings all over the United States and working cases all over the United States.  And a couple of short videos given once 20 -- or 10 years ago is absolutely not sufficient.  And

as a result, I have seen many departments and many incidences wherein the officers made decisions that were not sound and have deployed deadly force needlessly and without appropriate justification.

Q    Are there any studies to support your opinion that police officers need more training than the videos that --

A    I believe there have been a number of articles and reports around the country over the last at least 20 to 25 years, including in some of the police publications, the police magazines.  The National Sheriff's Association has come out repeatedly saying that more training needs to be done.

There have been a number of court decisions that I have been involved in where it has been confirmed that such a short, little bit of training was -- was not sufficient and adequate.

So it's a developing field, but the -- there have been a number of decisions and comments and articles and so forth that just simply a few minutes of training from a video with no hands-on interaction, no actual constructive provision of strategies and techniques was in no way sufficient.

Q    Do you have citations to any of those articles?

A    Not in front of me right now, no.  I believe

they're in -- there are some of the articles in my -- in the list I'm going to provide you in the report.  And I can certainly dig up more, if you would like.

Q     Do you have the citations to any of the case law that you just discussed that supports your new opinion?

A     I can pull that up --

MS. VENZA:  Object to form.

Just a minute.  You can answer.

A     I can pull that up for you and forward it along, but -- for instance, I have been involved directly in a number of cases that the courts have ruled quite firmly against the police departments and ruled that their training was insufficient and inadequate to protect the public and to protect the Fourth Amendment rights of the owners of the animals.

Q     Okay.  You would agree that that's a legal opinion; right?

A     Oh, yes.  I'm -- that's what the court decisions say, is there is a legal opinion.  That's not my opinion.

My opinion, however, is that the training has been insufficient and that that is an insufficient level.

Q     Okay.  And a group like the National Sheriff's

Association, is there a scientific or technical basis for the opinions expressed by the National Sheriff's Association?

A      The -- I am not sure all of the information that they -- of what all of the information the NSA has put together in forming its opinions.  I know that it is far-reaching, and it includes input from such organizations as the International Association of Chiefs of Police and the Department of Justice and other sources.

I don't know exactly all of the material that they came to decide to do this when they actually approached me to write the curriculum.

Q      Let me -- let's backtrack a little bit.

Between the time you did your initial research on this case, just for your own purposes, and the time you were retained, did you obtain any other information about the shooting in this case?

A      No.

Q      When you spoke to Mr. and Mrs. Barus, what information did they give you about the dog Lucy's demeanor in general?

A      They told me that Lucy was generally a friendly dog and was generally social.  They didn't have any specific descriptions of training or specific

socialization or whatever, and as such, you know, all I had from them was just a general-level owner's perception of the dog's personality and behavior.

I did not have the opportunity, unfortunately, to meet Lucy or to provide any kind of a scientifically-based analysis or evaluation.

Q    What goes into a scientifically-based evaluation or analysis?

A    Well, it involves, number one, getting an extensive history both of the origin of the dog, how the dog is treated, the methods of discipline, who feeds them, whether the dog is medically sound, and then we go into examining the dog and seeing the dog's quantifiable responses to stimuli, such as will the dog let a strange human approach.  If not, how close does that human have to get to produce a negative reaction.

Does the dog allow people other than his owner to manipulate them, to place hands on them, to check teeth, to check paws, look in their ears, how they operate and whether they react to other dogs in a positive or negative manner.  The distance, for instance, that the dog will perceive another dog, if that's their problem, and start reacting negatively.

Sensitivities to loud noises.  Sensitivity to the presentational removal of high-value objects, such

as treats, such as food, such as toys. It's -- I go through a very extensive evaluation in order to get a behavioral snapshot of the dog at the point in time that I'm encountering them.

Q    Okay. And so then what do you do in general with that behavioral snapshot once you get it?

A    It depends. If it's on a fatality, then I discuss the -- my observations at the scene, if I'm there. During my observations of the wounds and defects during the autopsy of the person, my observations during a necropsy of the dog, if we conduct such a thing.

And with those cases, it's particularly to try to analyze first why the incident happened, was there a human contribution, was there a human that was potentially responsible for the dog's behavior in that way.

Was it indeed a dog attack. I have had several cases that I was able to assist departments in working where we discovered that, for instance, it was a criminal homicide, where the person had been killed by another person, and then the suspect had set the dogs on the deceased person to try to cover up what had really happened.

So there's a number of ways that -- that can go.

Q    Okay.

A    If it's just simply on a lower-level bite, then I'll provide an opinion based on all those interactions and more of whether the dog has a better or worse prognosis for being able to be retrained and rehabilitated and provide advisement on what particular problems should be addressed in that rehab or desensitization training.

Q    And you said earlier you didn't have the opportunity to do this with Lucy, obviously; right?

A    Correct.

Q    Okay.  And certainly Officer Lampkin didn't have the opportunity to go through this detailed history of the dog and conduct this kind of analysis before his encounter with Lucy; right?

MS. VENZA:  Object to form.

A    Oh, no.

MS. VENZA:  You can answer.

A    Yeah.  No, he did not.

Q    Okay.  You said -- you talked about analyzing the human contribution to an attack, and then you gave the example of, you know, there was a homicide, but then they used the dogs to cover it up.

Are there other ways that humans can contribute to dog attacks?

A    Certainly.  If the humans, the guardians, the owners, however you want to put it, if they have, for instance, not socialized a dog to be accepting of other animals and people, then that somewhat raises the likelihood that a dog or dogs like that could react out of fear, for instance, anxiety, a territorial protection to defend, in their perception, themselves from a potential threat.  People can make that worse.

People can also do things, such as in one homicide case where the owners of the dogs encouraged the dogs to charge, snarl, snap and go after the homeless people walking by outside the business fence, and when the fence finally failed, the dogs did indeed engage as they had been reenforced with one of the homeless people and killed him right there.

Q    Wow.  In your research and experience, have you ever seen dogs who reacted more aggressively to people of a different race than their owners?

A    There have been no studies that I'm aware of. However, I am aware that anecdotally, if the human owners or caretakers have either not socialized the dogs properly or have encouraged such behavior, then that is certainly a possibility.

Q    You have done so much of your research since 2020.  So have you -- you did research before 2020,

though; right?

A    Oh, yes.  I have been looking into the behaviors and taking training and seminars and so forth for -- golly, since 2000.

Q    Yeah.  So the reason I'm asking you about 2020 is I want to know about dogs' reactions to people wearing face masks, like COVID masks.

Has your research revealed any issues with dogs reacting adversely to people whose faces are covered with a COVID mask?

A    People having their faces or their head shaved or whatever, disturbed by a mask or wearing a hat or wearing a costume, such as at Halloween, if the dog has not been exposed to people in a positive manner that display those same characteristics, yes, the dog can be confused, and some dogs will respond fearfully to somebody who, for instance, is wearing a large, floppy hat or potentially who is wearing a mask of any kind that makes the person look differently.

That's why we -- in training, I strongly recommend that when officers come across dogs or expect to come across dogs, they should not be wearing their duty hat, for instance, not be wearing something like mirrored sunglasses, not be wearing any kind of facial obstruction so the dog doesn't potentially perceive them

differently.

Q    You said that's -- you do that when you're in training.

Which departments have you informed about that?

A    Let's see.  The -- I don't have a list of all of the departments that have downloaded for free the Ledet training.  It's been available since 2019.  I know that the last department I trained was Miami-Dade Metro Police, and before then there have been a scattering of departments across the country.  I don't have a list of exactly where.

I know that, for instance, Holly Hill, Florida, I did training there, Nye County, Nevada, and several parishes, sheriff's office in Louisiana, up in Massachusetts.  Quite a number of places around the country.

Q    Is that information about removing your hat, the duty hat or sunglasses or facial masks, is that in the toolkit that you referenced?

A    The toolkit is just basically a review of the literature and an explanation of the legal bases for civil or criminal actions regarding interactions with civilians' dogs and a basic introduction to why training is so important for officers and departments.

Q    Okay.  I'm sorry.  I'm getting caught up in the

interesting dog work.

With regard to the statement you made about, though, you know, that dogs can react differently to people wearing hats or masks, is there some kind of published study that has measured that?

A    Well, bite prevention courses given by everything from the Red Cross to Chicago Safe Humane to the ASPCA, the HSUS to wherever have, for many, many years warned people that wearing a mask or wearing a hat or giving an unusual appearance -- for instance, children at Halloween out trick-or-treating -- may produce reactions in dogs that are uncharacteristic of their normal temperament and may lead to a negative encounter.

You've got a little kid coming along in a Barney costume that a neighbor's dog has probably never seen a small, purple dinosaur walking down the street, so the dog might freak out.

That's been standard in training for years and years and years.  And that includes masks, whether they're Halloween masks or COVID masks.  That includes big, floppy hats.  Even such behavior as somebody putting on a big coat and acting like a monster and, Errrrr/(indicating), coming at somebody, that's enough that it can disturb a dog.

Q    Did you reach out to JSO at all in between the time you spoke to the Baruses and were retained to give expert testimony in this case?

A    No.  I have not interacted with JSO at all on this case or anything around it.  I didn't think it would be proper.

Q    Okay.  Why not?

A    Well, number one, I didn't want to make it look like I was trying to use some case where they did something wrong to sell my services in training their people.  And other than that, there was no reason for me to talk with JSO.  Until I was contacted by counsel, I didn't really talk to a whole lot of anybody about it.

Q    But you had talked to Mrs. Barus about it and Mr. Barus?

A    Yes.  Yes.  The one time.  And just to get the basic information and figure out if there was something unusual about this that was substantially different from any of the other several hundred police use of deadly force against dog cases that I already looked at.

Q    Okay.  When were you retained to give expert testimony in this case or an expert opinion in this case?

A    I believe the earliest e-mails I have from Ms. LaHart were back in the middle of 2025.  Perhaps

April, perhaps June.  The list of e-mails is included in the file that you're being sent.

Q    Okay.

A    So if you just run back to the earliest one of those, it will give you an exact date.

Q    Wonderful.  Thank you.

Since I have here -- I've been having your opinion up on the screen for a while, let's go ahead and go through that, unless you need to take a break.

A    I'm good.  Thank you.

MS. HARRELL:  Okay.  Madam Court Reporter, are you good to go?

Okay.  I got the thumbs-up from her.

BY MS. HARRELL:

Q    Okay.  So this is page 1 of your opinion. Again, we're looking at Exhibit 2.

I note that you hold a PhD in veterinary medical science --

A    Yes.

Q    -- with a specialization in veterinary forensics.

What's the difference between the PhD in veterinary medical science and a DVM?

A    A DVM, or doctor of veterinary medicine, is a degree that is usually taken immediately after

undergraduate study, and that is the training and preparation for someone who wishes to be a veterinarian and to diagnose and treat animals for medical conditions.

A veterinarian, again, can dispense medications. They can perform surgery on live animals. They can take care of all the medical problems.

It's very common -- or it's fairly common for people with a DVM to then decide to specialize, and they will get a master of science in their specialty, such as veterinary forensics, from the veterinary school or their graduate office.

Then some veterinarians will go on occasionally and advance their research and work further to obtain a PhD, or a doctor of philosophy in, and be the subject that the University of Florida's graduate office at their veterinary school calls it veterinary medical science.

I skipped the DVM degree and started with the master's and went through the master's and then through the doctorate. So I am a PhD. I am not a veterinarian. I cannot diagnose animals with a medical disorder, I cannot prescribe medications, and I cannot perform treatments such as surgery on medical problems with an animal.

Q    Okay.  So is it fair to say that you are focused more on the behavioral aspects of dogs?

A    The behavioral aspects and all of the physical evidence and parts that come into dog bites, dogs using aggressive displays and so forth to alter or change their environments and also the results of the dog bites and the fatal dog attacks and contributing factors.

Q    Let me scroll down.  I don't want to spend too much time on your experience because I appreciate the way you have laid it out in this.  So let's -- I want to focus more on things that are specific to this case, but I do want to ask you about your experience at JSO from 1977 to 1999.

What kind of training did you receive then about dealing with animals?

A    None.  We didn't get any training then.

Q    Okay.  So let's go down to the next page where it says Materials Reviewed.  It says Partial.

Why is the word partial there?

A    Because I knew there was a possibility of other information coming in.  For instance, deposition transcripts and so forth on depositions that have not been taken yet.  So I labeled that as partial in case anything else came in.

Q    Did you review the -- any of the legal

documents in this case, like the complaint, the answer, the interrogatories, anything like that?

A    Yeah.

Q    Oh, I see you reviewed COJ's answer to plaintiff's interrogatories.  Is that the only court document that you reviewed?

MS. VENZA:  Object to form.

You can answer.

A    There have been the pleadings back and forth that I have referred to, but the pleadings themselves, quite frankly, don't really affect my opinion.  That's you and opposing counsel trading barbs back and forth and making arguments over matters of fact and law.  So that really doesn't affect my opinion.

Q    How did the COJ's answer to plaintiff's interrogatories help you form your opinions in this case?

A    I would have to look at the actual responsiveness to the interrogs, but since they were questions that were answered regarding things such as Officer Lampkin's training and policies and so forth, I wanted to make sure that I had seen what had been brought forward and as to whether any of those were consistent or not consistent with things that should have been or were done.

I don't remember exactly which part of the interrogs I may have taken any information from, which is why I just listed the entire document.

MS. VENZA:  Sonya, I'm going to object to form. It's quite a broad question.  There was a lot of discovery, amended discovery, et cetera.  If you have a specific area that you want to discuss or specific question, that would probably help Dr. Crosby answer your question.

MS. HARRELL:  Well, I -- he just answered my question, so -- I was asking him how the -- anyway, the question speaks for itself.

BY MS. HARRELL:

Q    Did you review any other answers to plaintiff's interrogatories?  For instance, any from Officer Lampkin?

MS. VENZA:  Object to form.

You can answer.

A    I believe I did, and it would have -- I'm not sure where along the line I got the answers to the interrogatories from Officer Lampkin himself.

Q    Did you make any notes after reviewing those interrogatories?

A    No.  I tend to write my reports and so forth kind of in block, as I'm going through things, and then

refine that digitally on the computer as I'm going through.  I don't save in-progress versions.

If I need -- if I'm going along and I need to quote something, and I read, for instance, an interrogatory answer and there's something I need to quote, then I'll go ahead and stick that in the document that's developing as my report at that time.

Q    Okay.  Are there any materials that you wish you had had but didn't receive for whatever reason?

MS. VENZA:  Object to form.

A    I can't think of anything that I didn't have that would have affected my opinion in any way.

Q    Because certainly you're familiar enough with JSO processes and documents and City of Jacksonville processes and documents that, if you thought there was a document that might be helpful for you, you could have asked plaintiff's counsel to obtain it for you; right?

A    Well, I certainly did.  For instance, to -- I knew that early on we could not have possibly had all of the evidence technician photographs of the scene because I've worked many shooting scenes, and I know how that's done.  And I know what JSO's practice is to be complete and thorough in that process, and then -- at least in the past and assume they would stay at least as completely and thorough as I was experienced with.

So I did have to ask for the additional photographs.  If there had been anything else, then I would have asked.

Q    While you were at JSO during your 22 years, you were a patrolman, sergeant and a lieutenant; right?

A    Correct.

Q    Did you ever have to deal with one of the officers in your chain of command shooting an animal, a domestic animal?

A    No.  Actually, nobody under my command or in my immediate working group ever shot an animal.  People, yes; animals, no.

Q    Okay.

A    Or let me rephrase that.  Domestic animals, no. There were a couple of occasions over the years where -- for instance, when they were building 295, deer used to run out there.  And occasionally, when it was new, they would get hit by a car, and one of the officers in my zone or working with or for me might have to go to the scene and euthanize the deer because we weren't just going to leave it to suffer, and there wasn't a veterinary availability for someone to treat a wounded deer.

Q    Okay.  For a second there, I thought you were going to say people were going deer hunting while --

back during the construction of 295.  So I was going to get a little worried about that.

A    There were civilians that we heard rumors of were out doing that, but that wasn't why my officers had to shoot deer.

Q    Okay.

A    They -- the officers around me.  It was usually from what certainly appeared to be a car crash.

Q    And certainly when you -- during your years at JSO, you referred to earlier having to shoot people sometimes; right?

A    Yes.  People were shot by people around me, people under my control and myself.

Q    Okay.  And certainly there are circumstances when it's justifiable for a law enforcement officer to shoot another person; correct?

A    Yes.

Q    And those factors are governed by the Fourth Amendment; right?

A    Well, the justification for shooting is typically justified by a whole lot of federal and state statutes and department policies and the practices they're taught and the officer's individual assessment of the state of the threat.  So the Fourth Amendment would potentially be part of that, I would assume.

In fact, quite a few constitutional amendments would probably be involved in the basis for an officer being able to lawfully use deadly force against a human.

Q    And you referenced the individual officer's assessment of the threat.  Did I get that right?

A    Correct.  I believe it was Garner, was the case, where an officer -- the courts had decided that the officer has to make a determination without the benefit of 20/20 hindsight.  I believe that's the quote.

Q    Okay.  And that's in dealing -- that's in taking a human life; correct?

A    Correct.

Q    Okay.  Let me move on to -- you have listed -- in the materials reviewed, you have listed -- one, two, three -- four items.  And we touched on these a little bit before, but I want to -- I want to ask you some more information about them.

But The Problem of Dog-Related Incidents and Encounters -- is that correct?

MS. VENZA:  I'm objecting to the form of the question.

Go ahead and answer.

A    Yeah.  The Problem of Dog-Related Incidents and Encounters was published in 2011.  It was put together by Dr. Cynthia Bathurst and others by -- that's it right

there.  They -- by a team of people from Chicago Safe Humane, from the Animal Farm Foundation, and in cooperation with the Department of Justice.  I believe it was the COPS, or Community Oriented Policing Service office, that provided some funding for this.

Q    Okay.  And we'll attach that as Exhibit 3.

Was there a particular part of that pamphlet that you relied on in forming your opinions?

(Defendants' Exhibit 3, The Problem of Dog-Related Incidents and Encounters pamphlet, was marked for identification.)

A    It's information all the way through the pamphlet, everything from recommendations of less and nonlethal tool deployment to deescalation behaviors and the need for recognizing -- for police officers to recognize potential level of threat and the basic behaviors involved and giving them strategies on how to avoid using deadly force.

Q    And if you relied on a specific section of this document, it would be referred to -- it would be cited in your report?

A    Yes.  I just cited this generally because there's so much information in each of these documents that we're talking about right now that I can't say there's any one section or one particular part of any of

them that solely formed my opinions. It's an amassing of data and considering it all in context.

Q    Okay. The next item is police and dog encounters video training.

Is that the Chicago Safe Humane?

A    Yes. That is the five 15-minute videos produced by Chicago Safe Humane released in 2013. And there was involvement of the Department of Justice and the COPS office at Justice.

Q    And is that what JSO used to train its officers?

A    My best understanding is that, yes, these were the videos that were shown to the officers. I was told that no one still had a copy of whatever the officers got back in 2015, so I was unable to review the exact documents.

If this was indeed the full scope of what they were provided, I am familiar with this. In fact, somewhere here I actually have a copy of the DVD that was released.

Q    And how did you rely on that in forming your opinions?

A    Again, it's pieces of information, suggestions, some of the demonstrations on use of -- on the perceptions of officers and instructing officers how to

perceive the difference between a potentially dangerous dog and a dog that's simply acting out of its natural behavior, such as protecting an owner that's been injured or protecting its puppies.  There's a lot of information in there that -- that factors into my overall opinions, yes.

Q   Well, we didn't have a dog protecting its puppies in this case; right?

A   No, no.  I just used that -- we don't have an injured person being protected either.  But those are some of the scenarios that are discussed in many of these trainings.

Q   Are there any scenarios discussed in these trainings that matched with the situation involving Officer Lampkin?

A   I don't believe they had a specific situation where the officer told somebody to let the dog out of the yard and then shot and killed the dog.

Q   Okay.  Let's talk about that statement for a second.

Why do you say that the officer told the owner to let the dog out of the yard?

A   Simple.  If you watch the body cam video -- and I'm referring to notes that you'll have before you.  If we go back to the point of -- and I'm looking for my

reference point here.

The -- at four minutes and -- I'm sorry. Here it is. Let's see. At 3 minutes and 36 seconds, Officer Lampkin and Ms. Barus begin discussing whether the dogs will come out of the gate or not. And at 3 minutes and 39 seconds, Officer Lampkin says, in response to Ms. Barus saying the dogs won't come out of the gate, Okay. Let me see them. You go ahead and open the gate. I'll be there.

So that's a pretty specific direction from Officer Lampkin to Ms. Barus to go around and open the gate and see what happens.

Q    Well, in fact, Ms. Barus volunteered to open the gate, didn't she?

A    Yes. Yes. She volunteered, and the officer then said, Okay. Let me see them. You go ahead and open the gate; I'll be there.

Q    Okay. So that's not --

A    That's a direct quote.

Q    Okay. That's not Lampkin directing Mrs. Barus to bring her dog to the yard, open the gate, and then see if the dog might come out, is it?

A    Yeah, I think it is. When he says, Okay. Let me see them. You go ahead and open the gate, and I'll be there. That's a pretty clear statement of direction

from the police officer to a civilian to do something specific.

Q    Okay.  Where in your -- you just read me a quote in which -- and I'm not quoting this; I'm paraphrasing the quote -- but in which Mrs. Barus volunteered to open the gate, and then Officer Lampkin said, Okay.

Where is that quote that you -- where is the quote that you just read to me from your notes referenced in your report?

A    It wasn't referenced in my initial report or in the supplement directly.  This was a -- after the supplement, going through the video moment by moment to make sure I had a full listing of the conversation as it applied to this incident.

Again, you'll be getting a copy of my handwritten note with the timestamps, but if you go to minute -- 3 minutes and 30 seconds on Officer Barus's [sic] body camera, that's when Mrs. Barus first offers to bring them out and says they won't come out.

And Barus [sic] responds at 3:39, Okay.  Let me see them.

And then shortly right there, after that, You go ahead and open the gate; I'll be there.

And at that point, Mrs. Barus walks off to go

get the dog or dogs.

Q    Okay.  Why didn't you just write that information in your report?  Why didn't you write the direct quote from the video in your report rather than saying that Lampkin directed Mrs. Barus to bring her dog to the yard, open the gate, and then see if the dog might come out?

A    I think that's saying the exact same thing.

Q    Okay.  Earlier in our depo, I suggested that we take a break.  I said you could take a break if you needed to.  That -- you would agree that that would be different than me telling you take a break; right?

A    I would say -- if you asked me would you like to take a break versus telling me it's time I need to take a break, the second statement would be different, which is why I say that, Okay, let me see them.  You go ahead and open the gate; I'll be there, is a pretty clear declarative statement on what Officer Lampkin expected Mrs. Barus to do.

He didn't say, Would you like to let them out?  No.  He said, Let me see them.  You go ahead and open the gate.

Q    Well, he said it in a manner -- well, actually, do you know what?  Why don't we -- let me stop my screen share of your opinion and let's actually look at the

body-worn camera.

A    Good idea.

Q    So let me share my -- share that screen.

A    And I'm sorry.  It's going to look like I'm looking off camera, and I am, because that's where I can see the video -- the shared screen versus trying to do this around my web camera.

Q    Yeah, that's fine.  This is not being recorded, so you can -- you know, you can look however you want. That's fine.

A    Okay.  So I would say if you start about 3:30.

Q    Okay.  I'm going to go ahead --

A    And I'm talking about the -- okay.  That's 3:24 there.

Q    Yeah.

A    That's where I'm talking about is the -- when I'm referring to timestamps, I'm referring to that timestamp, not the timestamp in the upper right corner of the body-worn camera.

Q    Okay.  And so just for reference purposes, just in case somebody uses a different video player than we're using today, I'm going to start it on the -- whatever ancient version of Microsoft video player I have at 03:24.

The timestamp in the top -- oops -- is 11 -- is

Hedquist & Associates Reporters, Inc.

T11-21:39Z, and this is dated 2022 April 11th. It is Axon Body 2 X81326035.

So we'll go ahead and start this.

A     Can you turn it up?

Q     Yeah. Let me -- sorry. Let me turn it up a little bit.

(Video being played and paused.)

Q     So do you hear that part, and it's about 3:3- -- I've stopped it at 3:36. And Mr. Barus says, Those dogs won't come out of the fence. And Mrs. Barus says, I'll go back there right now and open it, and they won't come out on you.

A     Correct.

Q     Okay. And where is that referenced in your report?

A     It's not in the report. Since the body-worn camera is in possession of everybody in this case, I just simply left that to whoever is watching the body-worn camera and can direct them to the specific place. But rather than trying to quote what the Baruses said or didn't say, I simply proceeded on from there.

Q     Okay. So you would agree that somebody just reading your report and not having access to the body-worn camera footage would not get the context of the conversation from what Mr. and Mrs. Barus said in

the part we just played; correct?

A    I would say that somebody who just read my report and didn't have the context of seeing and hearing the conversation could have, if I had just put that as a statement in my report, perhaps construed that out of context either for or against the Baruses or Officer Lampkin.

So instead, if someone has a question for that, that's why I've got the reference here so that they can go and hear exactly what was said, exactly how it was presented, the context, the intonations, the gestures and so forth instead of taking a statement cut and pasted on a piece of paper.

Q    Okay.  And so you would agree that nowhere in your report do you write that the Baruses offered to go open the gate?

A    No.  There is nowhere in my report -- there is nowhere in my report that I specifically say that. Instead, I cite that part of the materials involved are the body-worn camera.  And I certainly hope that people look at all of the evidence before they take something that could be out of context and just take that as supposedly an accurate and complete accounting of what happened.

Q    Okay.  I'm going to go ahead and restart it at

3:36.

A    Okay.

(Video being played and paused.)

Q    Okay.  And then in response to that, I'll go open the gate right now, Officer Lampkin says, Okay. Let me see them.  Right?

A    Correct.  Yes.

Q    And you believe that he's directing Mrs. Barus -- I'm quoting from your report here -- Lampkin is directing Mrs. Barus to bring her dog to the yard, open the gate, and then see if the dog might come out?

A    Yes.

Q    So you don't think she's acting voluntarily at this point?

A    I think they're acting cooperatively.  She has offered.  And it would have been extremely simple for Officer Lampkin to go, No, that has -- I don't need to see whether the dogs will come out of the fence because, as a dog owner, one knows that every dog will eventually come out of a fence under the right provocation or stimulus.

So it's kind of a -- it's kind of a silly statement to make by the owners, and it's kind of a silly thing for the officer to say, Oh, well, let's see

if your dog is going to act like pretty much every dog ever has acted.

Q    What's your basis for the statement that acting like every other dog has acted?

A    Well, let's see.  Several years of working as an animal control officer, dealing with people who want their dogs trained to stay in the yard, over the many years in telling them, Okay, I understand.  I can't guarantee ever that the dog is not going to come out of the fence because it depends.

Looking at the training practices that are standard and acceptable across the country, understanding the behaviors of dogs.  They are creatures that respond to stimuli, sometimes the way we want them and sometimes the way -- not the way we want them.

So there's an entire world of dog training and experience that makes it clear that there's no such thing as a dog or, frankly, a person that is never going to do something specific.

Q    And you don't know about any prior training that Lucy, the dog, had had about staying in a fence, when to go out of a fence, when the gate was open.  You don't know anything about her previous training on those issues, do you?

A    No.  And it doesn't seem that Officer Lampkin

had any information whether the dog was actually trained or not either.

Q    Okay.  And you don't know what Mrs. Barus might have said to Lucy or the other dog that was in the fence before Officer Lampkin walked back there, do you?

A    No.  I don't know what the dogs were doing before Officer Lampkin's body camera kicks on.  And all I know is that when he comes around the corner and walks towards the front of the fence, Mrs. Barus opens the fence and then stands just outside the open gate in the fence, and Lucy comes running out.

Q    Okay.  You don't have any reason to believe that these videos have been altered in any way or are not -- do not otherwise accurately reflect what Officer Lampkin observed at the scene, do you?

A    No.  I don't have that kind of technical expertise.

Q    Okay.  So let's...

(Video being played and paused.)

Q    And you hear -- just between those few seconds after we restarted it, you heard Mrs. Barus say, Come on, and Officer Lampkin say, Just a second?

A    Yeah.  And that's -- I believe his response to that is, You go ahead and open the gate; I'll be there.

Q    Okay.  Well, let me back up, though, to 3:36.

Let's -- that's 3:26.

(Video being played and paused.)

Q    So she says, Come on, and he says, No, you go ahead.  You go open the gate; I'll be there.

A    Right.

Q    Is that what you're deeming a direction to bring her dog to the yard, open the gate, and then see if the dog might come out?

MS. VENZA:  Objection to form.

A    Yes.

MS. VENZA:  Asked and answered.

You can answer.

A    Yes.  I mean, it's pretty clear.  You go ahead and open the gate, because they had just been talking about whether the dogs would come out or not or any of the dogs would come out, and he says, Yep, you go open the gate, and I'll be right there.  That's him specifically agreeing to have her go into the yard with the dog and open the gate.

Q    Is agreeing to do something that somebody offers the same as directing the first person to do something?

A    I would say so, yes, if I -- if you say, I want to set the desk on fire, and I say, go ahead; I'm here watching, then I would say that's at least -- that's

beyond just an agreement.  That's perhaps even an encouragement and clear direction.

Okay.  What you said you're going to do is fine with me.  In fact, I'm going to come around with you and participate in this -- in this case, this test.

Q    So taking that example, if I set my desk on fire right now and the mayor comes running and says, Why did you do that, and I say, Well, Madam Mayor, Dr. James W. Crosby told me to, he directed me to, do you think that's a fair statement?

A    No.  I think that's got it turned inside out.

If you set your desk on -- if you tell me, while I'm standing there in front of you physically, that I'm going to set my desk on fire, and I say, Okay, well, let me see, then that's at least specifically agreeing with what you just said you were going to do.

And then if Mayor Deegan came running in, I think she would be fully justified in saying, Miss Harrell, what the hell are you doing?

Q    And I agree with you on that.

A    And she would be justified --

Q    Maybe even --

(Indiscernible crosstalk.)

A    Yeah.  And she would be justified in looking at me and saying, Dr. Crosby, don't you have better sense?

You're a doctor.

Q    But do you see the point, though, is directing something -- somebody to do something is different than agreeing to participate?

A    No.  Based on my experience as a police officer and looking at things since, the presence of an officer in their official capacity in uniform is generally considered to be at least potentially some coercion, direction, and exercise of authority.

That's why, for instance, one has to be very cautious when interviewing criminal suspects in order to not use that perception to gain a false confession or to gain a modified confession or anything in that sense.

So the fact that an officer is standing there, saying, Yeah, go ahead and do something stupid, to me is much the same as saying, Hey, would you go around and do something stupid.

Q    Okay.  You're not here as a police practices expert; right?

A    I believe I'm here to talk about the behavior of the dog and the actions of Officer Lampkin as it applies to the dog and, in addition, being able to give my opinion as to whether Officer Lampkin's conduct in this case was in accord with perhaps not best practices, but at least minimum standard practices regarding police

officers interacting with pets.

Q    Okay.  But your expertise is in the field of canine behavior or animal behavior; right?

A    And in shelter and animal control operations and in enforcing city code and state law and in police operations, where I have experience.  I would not, for instance, tell you whether a SWAT team was justified in throwing a flash bang or a distraction device into a house.  That's outside of my experience.

Q    And -- okay.  Let me move on.  I'm going to stop sharing that screen and --

MS. VENZA:  Are you making that an exhibit?

MS. HARRELL:  Yes.  Thank you.  I appreciate that.

We will attach as Exhibit 4 the Axon body-worn camera -- Axon Body 2 X81326035.  Thanks.

Okay.  Now, let me figure out all the buttons here.

(Defendants' Exhibit 4, Axon Body 2 X81326035, was marked for identification.)

THE WITNESS:  And since you're mentioning it, perhaps now we could take that brief break.

MS. HARRELL:  Yeah.  Sure.  I will -- I direct you to take a break, Dr. Crosby.

THE WITNESS:  I will be happy to comply and

agree with your direction.  Thank you.

(Break taken.)

BY MS. HARRELL:

Q    Dr. Crosby, I want to go through your report a little bit more.

And so -- but before we get to your opinions, can you just tell me about your methodology, about how you reached the ten opinions in your report and then the additional opinion that you have expressed today.

How do you go about reaching that conclusion -- those conclusions and those opinions?

MS. VENZA:  Object to form.

You can answer.

A    Well, first thing I do is to try to get an idea of what the general outlines of the story are.  Then I start gathering the evidence as provided to me by looking at the body-worn camera, for instance, looking and listening at what is happening, watching and listening to what the people and the dog are doing, looking at the code and statutes that are applicable in that particular jurisdiction; eventually going through the policies that are applicable in that jurisdiction to see if I see any conflicts with the policy or whether there are deficiencies in the policy, based on my experience in so many other cases, and put those

together with my understanding of dog behavior and also with my understanding and formal training not only in dog behavior, but in use of force, use of deadly force and the constraints on such, and put together a picture of what I see.

Q    Okay.  You mentioned policies.  Did you -- are you referring to the JSO policies?

A    In this case, yes, the JSO SOP manual.  I don't believe we have SOPs and general orders anymore.  So it's -- or what?  Are they all general orders now or all SOPs?

Q    There are general orders and then there are unit procedures.

A    Okay.  We used to have what were called standard operating procedures.

Q    Okay.

A    So that's probably what's now unit procedures.

Q    Okay.  Now.  Okay.  And based on your report, you didn't find any deficiencies with JSO policies, did you?

A    Actually, I did disagree with Lieutenant Sircar regarding that Lampkin had followed all of the JSO policies.  And I believe I -- let me bring it up.  I believe I explained that more in detail in the supplement report.

Q    Okay.  But my question is, with regard to the policies themselves, you're not expressing any opinions that those policies are deficient, are you?

A    That the policies are deficient?

Q    Yes.

A    I wasn't asked to opine on that, quite frankly, so I didn't address -- could the policy be better? Absolutely.  It could be better.  It could be clearer. But I was not asked to give an opinion on that.

Q    What were you asked to give opinions on?

A    On whether the -- whether it was an appropriate deployment and an unavoidable or necessary deployment of deadly force; the level of threat that was objectively presented by the dog Lucy, whether it was appropriate or proper for a police officer or even an animal control officer to have asked somebody to open a gate and stand by and let's see if the dog comes out; the -- to opine on the severity of the wound based on what I'm able to see, what options there were for less or nonlethal response; whether all of the rounds fired were necessary and appropriate in the position.  Those are basic overarching questions.

Q    Where in your report do you express an opinion about whether the number of rounds was necessary or sufficient?

A    Well, if you look at -- in the -- I believe this is -- this is the original report.  Let me look real quick.  Or this is the supplement.  This is the original report.

If we go down to opinion number 8, I mentioned that, Despite the low likelihood the dog presented any credible threat of serious injury, Lampkin began firing at the dog after the dog had already engaged and was within moments of being under control by Ms. Lampkin.

The dog -- further down in that same paragraph, the dog was fleeing from the officer, and there were no persons, other than the officer or the owner, visible or present.

So I'm explaining that the -- also in 9 -- he continued to fire even after the dog had disengaged.

So that affects my opinion as to whether -- even at the best of cases, whether anything beyond the first shot was necessary, justified or appropriate in this case, and they weren't.

Q    But nowhere in your report, either the original or the supplement, do you say that -- do you mention the number of rounds and whether that number was appropriate, do you?

A    Well, no, I don't believe I do.  That's why we have this, so we can expand on stuff.  And the fact is

Hedquist & Associates Reporters, Inc.

that anything after one round, even if we were to accept that that was a -- that the first round was fired in response to a credible threat that was justified in the use of deadly force -- which I don't agree -- then every round after that, whether it was five or 50, were needless, excessive and should not have been fired.

Q    Okay.  And just so we're clear, that's the -- that opinion that you've just stated, that anything after the first round is unnecessary and excessive, today is the first time you're explaining to us that that is -- that you have that opinion; correct?

MS. VENZA:  Object to form.

You can answer.

A    You haven't asked me of it before, and in any discussion we had, I would have said right off of there, yeah, shooting at a dog that's running away and no longer a threat, no matter how many times you shoot at it, is excessive, unnecessary, and it is an unjustifiable release of deadly force.

And it's -- it's just like we're taught with a human.  Once the dog has turned and is no longer a threat, just like a human, we can't continue to fire. We have to cease because the threat has been removed.

Q    Okay.  But just to clarify, nowhere in your report, whether the original or supplemental, do you

comment on the number of rounds or otherwise state that anything after the first round is excessive?

A    I'm looking at the supplement right now.  I don't believe I actually used that sentence.  But again, I also leave my opinions open so that I can expand on them when it's necessary.

Q    Okay.  So let's actually look at -- actually, let me go back for a second.

I think you mentioned earlier that part of your methodology is discussing the extent of the injury; is that correct?

A    Yes.  It's looking at the injury to the officer and making a general classification.  Dog bites are classified into six levels based on identifiable characteristics, and that helps one assess the severity of the encounter and also to use that assessment and basic -- and basically assessing the behavior of the dog.  Was this a dog working to gain space?  Was this a dog that was bent on causing massive destruction?  What was happening?

So that's part of why I assessed the appearance and severity of the injuries alleged.

Q    When you say that the assessment of the severity of the injuries is how one assesses the behavior of the dog, the level of aggression -- I'm

paraphrasing here.

A    Yeah.  It's one method, one way of doing that, yes.

Q    Sure.  But when you're talking about the one making that assessment, you're not talking about a police officer on the scene, are you?

A    I'm saying that anybody, police officer or whatever that is placed in such a position, should be trained to realize, A, the objective level of threat, which is minimal; and, B, whether the engagement that's already happened is indicative of further violence or higher likelihood of being seriously injured.

And so, yeah, in a police officer's place, along with an animal control officer and anyone else who is dealing with these kind of situations, it is important to explain to them the difference between a minor ding on your finger and a dog ripping your calf off.

Q    So is it your opinion that a reasonable police officer should know, after being bitten twice with just, you know, two quick even minor bites, that that officer should be able to assess -- to perform this kind of assessment of the dog's behavior on the scene and evaluate the dog and find that the dog is not really a threat?

Is that your opinion?

A     Yeah.  My opinion is that the officer should be able to use that information to judge whether or not this is actually a deadly force situation or if there are other ways to respond.

The injuries to Officer Lampkin are extremely minor and indicate, had he been trained on how to interpret dog behavior, a dog that was simply trying to keep him back from the property or his owner or his -- the dog's understood boundaries rather than a dog that was, for instance, likely to jump up and grab him by the arm and wrestle him to the ground and rip his head off.

That's part of the training -- that's part of the training that is given as an understanding of objectively how serious minor injuries are not here and to assess how that -- or to include that in how one evaluates the level of threat by the dog.

Q     What is your source for that opinion?  Is there a case?  Is there a police practices manual?  Is there some kind of source for that statement that officers are expected to know that when they are bitten a couple of times that they should evaluate that and be able to gauge the level of aggression of a dog?

What's your source for that?

MS. VENZA:  Object to form.

Hedquist & Associates Reporters, Inc.

You can answer.

A    The source of that is a combination of things. Number one, it's the recognition of the objective severity of a bite incident and realizing the difference between getting a bump on your finger and getting a serious injury and whether that is likely to proceed.

That seems to be pretty logical when one is evaluating use of deadly force.  We can parallel that with the human idea that, you know, if somebody runs at you, waving a soft stuffed animal at you, that's way different than coming at you with an ax and that you have to be able to evaluate those.

That is part of what is very widely recognized as part of understanding when the use of deadly force is appropriate.  And that understanding with humans directly transfers to dealing with animals.

Is this a threat?  Is, for instance, the six -- the four-pound or six-pound dog that's nibbling at your shoes -- or if you -- enough of a threat for you to shoot, whether it's bitten you or not?  Is a dog nipping the end of your finger indicating a likelihood of progressing from that to you needing to kill the dog.

Q    And certainly multiple bites indicate a higher level of potential threat than just nipping the finger; right?

A    Not necessarily.  There's something called bite inhibition.  And when a dog nips and only causes an extremely minor defect of the skin, that's a dog that's showing good bite inhibition, which means they're simply trying to communicate that they're uncomfortable.  And that's a clue and a sign that you need to alter your behavior in order to -- to properly deal with the situation instead of doing something to escalate or make it worse.

Q    And -- but multiple bites is more than just a nip on the finger; right?

A    It can be.  Multiple minor bites should actually tell you that this dog is under control of its own biting and is less likely to proceed to a major injury.

Q    Of the police departments that you have described earlier that have what you believe are good training programs, how many of those departments train that -- train officers to know that multiple minor bites do not indicate -- or I'm sorry -- do indicate good what you referred to as bite inhibition?

A    I don't remember, honestly, if that's contained in the Chicago training or in the California state training.  I do know that other -- other trainings I have encountered have explained in dog behavior that

low-level bites, even if there's more than one, are a form of inhibition and control of the dog.

I know I teach it.  I don't know if -- I don't know what others might be teaching the same thing.

Q    You are certainly familiar with Florida's Dangerous Dog Statute, aren't you?

A    Correct.

Q    And a -- do you remember the definition of a dangerous dog?  This isn't a quiz, but I'm betting you probably have it pretty well embedded in your mind.

A    Yeah.  A dangerous dog is typically one that causes significant injury from an unprovoked dog or charges at somebody unprovoked in a manner of threat or attack.

Q    And, in fact, the statute refers to one that has inflicted severe injury on a human being; right?

Does that sound right?

A    Yes.  Yes.

Q    Do you remember how the Florida Statutes define severe injury?

A    Poorly.

Q    Okay.

A    Florida Statute is, quite honestly, deficient in that it doesn't -- it considers that even minor scrapes or injuries could possibly be considered under

the Dangerous Dog Statute as applying it.

Q    In fact, the Florida Statute says that -- and this is Chapter -- or Section 767.11(6) defines severe injury as any physical injury that results in broken bones, multiple bites or disfiguring lacerations requiring sutures or reconstructive surgery.

Does that sound familiar?

A    Yes, it does sound familiar.  And again, Florida Statutes' definition leaves a lot to be desired. Just because a dog inflicts more than one -- and we're here talking about a maximum of two with Officer Lampkin, if the fingernail issue was actually caused by the dog and not just dry skin.

We have two very low-level bites, which is part of the reason in analyzing and evaluating bites and bite behavior, one has to look at the objective severity. Two little bitty nips versus two major avulsions of large pieces of tissue are very, very different behaviorally and in their results.

Q    You would agree that if Lucy had not been shot, but if she had just been, you know, let loose to run around the neighborhood again, that she --

MS. VENZA:  Object to form.

Q    -- that she would have qualified as a dangerous dog under the Florida Statute because of biting

Hedquist & Associates Reporters, Inc.

Officer Lampkin multiple times?

MS. VENZA:  Object to form.

A    Based on -- based on my experience as an animal control officer and as the finder of fact in Bay County regarding dangerous -- and as the acting chief here of Animal Care and Protective Services, where my job was to sit as the hearing officer, if a person appealed the decision, I would say that was absolutely definitely not what was meant by the statute and that two minor scrapes do not create a dangerous dog and that that does not come up to the statutory level, even though it's technically two little boo-boos.

Q    So you would agree that the Florida law doesn't refer to scrapes.  It refers to multiple bites; right?

A    It does say that, yes.

Q    And it says that a dangerous dog means a dog that has inflicted severe injury on a human?

A    Uh-huh.

Q    And that severe injury includes multiple bites?

A    Uh-huh.  That's what it says.

Q    And you would agree that Lucy inflicted multiple bites on Officer Lampkin; right?  She bit him on his hand --

A    I'm not sure whether the injury to his finger at the quick of the fingernail was actually a bite in

any way.  The two little red marks on his leg were apparently bites; but, no, I would not qualify these two extremely minor contacts to be within the prior case determinations, the case law, or the intent or guidance of the statute there.

No.  Two little, small marks does not really equate to a dog that could be or should be declared dangerous.

Q    But you would agree that the Florida Statute, the plain language, says multiple bites?

A    Well, it depends on how you're defining bites.  Florida Statute calls bites, as far as for rabies control, any disruption of the surface of the skin, which would include a scratch or a poke from a nose that left an abrasion.

Q    Okay.  Dr. Crosby, I'm asking you about the Dangerous Dog Statute, not the rabies control statute.  So --

A    Right.  But they work hand in hand, so we have to follow both of them.

Q    But you would agree that the Dangerous Dog Statute defines a severe injury as multiple bites?

A    Yes, it does say that.

Q    And you're saying that if you are in your -- still in your position as either a hearing officer or as

the fact -- finder of fact, you would have disregarded the plain language of the Florida Statutes in determining whether the two bites in this case qualified as a severe injury?

MS. VENZA:  Object to form.

You can answer.

A    In this case, yes, I would have said this does not qualify.  These are not enough of an injury to even remotely consider it to be worthy or up to complying with the requirements of the statute.

Q    And you can't --

A    And one could look over and one could look back on cases after cases across the state where magistrates, courts and hearing officers have made similar determinations.

Q    Okay.  And you haven't served as a hearing officer since when?

A    Since the end of 2016.

Q    Okay.

A    However, I do participate and testify as an expert in dangerous dog cases across the state and around the country.

Q    Yeah, I'm aware of that.  You testified -- I am a hearing officer, and you've testified in front of me. That's how I first met you.

Hedquist & Associates Reporters, Inc.

A    Oh, okay.  I didn't remember it.  Sorry.

Q    That's fine.  I'm not going to hold that against you.

Let me go on back to your report and ask you -- well, let me ask you -- let me stick to the dangerous dog concern.

This was not a dangerous dog investigation; right?

A    No, it was not.

Q    Okay.

A    Not according to the officer's statements, no.

Q    Okay.  And you would agree that this was not within the exclusive jurisdiction of ACPS?

A    Oh, absolutely not.  It is fully appropriate for JSO and ACPS to both investigate animal complaints. Both agencies can fully enforce the code, and the police officers can actually make arrests.

Q    Okay.  And certainly you would agree that Officer Lampkin was within the scope of his duties to investigate not only the animal complaint, but also the statement that -- by the complaining party that Mr. Barus had a gun, was chasing him with a gun?

A    Oh, absolutely.  In fact, that's his job.  He should have been investigating both of those issues.

Q    Okay.  Great.

Let me share my screen once again, and we'll go back to your report.

Just above the section where you list your opinions --

A      Uh-huh.

Q      -- you say that -- you talk about the examination of the scene photos provided by JSO.

It seems like you're a little bit critical of the evidence, what was taken, the pictures, and then there was no veterinary necropsy.

A      Right.  Based on what -- the information I had at the time, I had criticisms about a lack of appropriate documentation as far as the photography and so forth.

And I am also strongly of the opinion and agree with others that have opined the same that a necropsy of the dog and a full forensic documentation of the dog that has been shot by the police is extremely valuable in that, for instance, we can see whether -- if the officer claims the dog was charging, and the owner claims, oh, the dog was running away, we can look at that evidence and be able to say clearly, no, these were shots in front of the dog.  The dog had to be moving at the officer, and the officer was justified.

Q      Those two paragraphs, though, regarding the

Hedquist & Associates Reporters, Inc.

evidence photos and the veterinary necropsy, those don't contribute to the alleged constitutional violations in this case, do they?

A    No.  It contributes to the information that should have and could have easily been included in the investigation by JSO that would have helped, either for or against, depending on the situation, have a proper and complete investigation.

Q    Okay.  And with regard to your statement about, you know, identifying whether the dog was charging one way or whether it was -- you would agree that the body-worn camera footage provides evidence of that?

A    Yes, it does.  However, the forensic documentation of other factors also provides either support or questions as to the veracity of the body-worn camera.

So in my experience, especially when you project to the human issue, it's always best to have as much information as one can possibly gather so that we have got multiple ways of proving what our ultimate conclusions are.

Q    And you're not attacking the veracity of the body-worn camera footage that you viewed, are you?

A    No.  I just believe that there was more information that could have or should have been gathered

that would have supported the officer's statements and the body-worn camera, had that been something that that investigation took part of.

After all, when an officer discharges his firearm at something other than target practice and in the appropriate time and place, there has to be accountability for what that use of force is and what -- whether the officer was compliant with the law or policies and whether that officer's actions presented a threat to others or other officers or the public in general.

So there is a high bar, at least the way I was trained, in documenting a discharge of deadly force.

Q    Let's talk about your opinions.

You say that all the opinions expressed in this report are to the standard of more probable than not, and then you say to a reasonable degree of scientific and professional certainty, based on your experience and training.

What do you mean when you say a reasonable degree of scientific and professional certainty?

A    The scientific side is that -- is the acknowledgement that behaviorally, a dog, for instance, that gives a small inhibited restrained bite is not particularly likely or more likely than another dog to

suddenly develop a violent bite or continue that, but that there is reasons for that.

To -- regarding the scientific application and decision-making, it's a matter of looking at things like what have other studies and courses taught officers and whether those were adjudged sufficient or not in the past.

As far as professional certainty, I'm talking about based on mostly experience and training and what I have seen and what I have been taught, and that is part of the standard of more probable than not. I'm not asked or have been asked to go to the level of beyond a reasonable doubt. That would be a different standard.

Q   And those are legal standards; right?

A   The standard of more probable than not or beyond a reasonable doubt, yes, those are standards that are legally defined.

Q   And I believe you said earlier, when we were talking about the scientific aspect of it, you said -- made a reference to training that has been adjudged as sufficient.

When something is adjudged, that's a legal determination, isn't it?

A   Depends on what the venue is. If it's judged so in a courtroom, then, yeah, that's a legal opinion.

Hedquist & Associates Reporters, Inc.

If it's judged so outside of the courtroom in accepted practices and within recognition of what is commonly regarded as authoritative within the profession, then that's not a legal standard.

Q    What sources did you use that are authoritative within the profession?

A    I have provided a list of those sources that's going to be in that package you're getting.

Q    Okay.  Let's go on to your opinions.  The first one I think we've already discussed.  There's a claim of aggravated assault.

A    Uh-huh.

Q    The second one, I believe we discussed just a second ago that investigating the dog aspect of this was also properly done by JSO; right?

A    Yes.

Q    Okay.

A    But animal care and protective services is also explicitly assigned to investigate things like dog running at large, dangerous dog, vaccination history, whether the vaccinations are up to date.  So they are also tasked with enforcing the code as it regards animals.

Q    Sure.  Number 3 I believe we've also discussed a little bit.  I want to ask you, though, about this

phrase -- I've asked you extensively -- I think you're probably tired of debating about the meaning of directed with me, so let me focus on this phrase.

When enticed by the present owner.  Are you referring to Mrs. Barus there --

A    Yes.

Q    -- the present owner?  Okay.

A    Mrs. Barus was standing next to the open gate, and if you have an owner or person the dog is very familiar with standing someplace in a receptive manner and not trying to shoo them away, of course the dog is going to come up to them.  And Mrs. Barus was standing just outside the confines of the gate, so yeah.

Q    So --

A    That's --

Q    -- enticement is just standing there?

A    If you're the owner of the dog who is used to your affection, attention, treats, food, all the positive things, that certainly is an enticement and attracts the dog to come to you.

Q    And again, you don't know anything about how Mrs. Barus had trained Lucy or how she had interacted with them.  You don't know anything about the previous regimen with Lucy, do you?

A    No.  But watching the body camera, Lucy came

right up to Mrs. Barus, greeted her, sniffed her, and acted in an affiliative manner that led me to believe that she was voluntarily coming up to Mrs. Barus and that Mrs. Barus was -- the dog was probably not terrified of Mrs. Barus.

Q    Okay.  And again, we don't know what Mrs. Barus said or didn't say before Officer Lampkin got over there with her body cam -- with his body-worn camera; right?

A    No, we don't.

Q    Okay.  Let me ask you about your fourth opinion.

And you talk about protective strategies.  And you cite the Hell's Angels versus City of San Jose case about --

A    Yes.

Q    -- protective strategies.

Do you remember what the facts are in that case?

A    Yes.  The facts were that the San Jose police had a high-risk warrant to serve on three locations of the Hell's Angel motorcycle club, and that when they went in to serve those actions, they proactively executed the dogs that were on-site and that they knew were going to be there.

And the court ruled the fact that the

Hedquist & Associates Reporters, Inc.

Hell's Angels -- I'm sorry -- the San Jose police made no attempt or plan of doing anything but shooting the dogs was deficient, and the court held the San Jose Police Department -- I think a couple of million dollars' worth of liable for not having had a plan B or another plan to proceed with.

Q    You would agree that there's no evidence that Officer Lampkin went into this with a plan to shoot the dog.

A    No.  There's no evidence that he planned to shoot the dog, but there's no evidence that he planned any other way of deterring the dog, and there's no evidence that Officer Lampkin having contact with the dog was in any way necessary or had anything to do with the investigation.

Q    So you -- you're looking -- the last part of paragraph 4 says that the measures he could have taken could have included, but not been limited to, getting his baton --

A    Uh-huh.

Q    -- is that correct?

A    Yes.

Q    So is it your contention that he should have gone to the car to get his baton before Mrs. Barus opened the gate?

A    He certainly had plenty of time to.  So, yeah, if he was planning on letting the dog run loose out of the yard, which is what it seems that he was saying he expected, then having his baton in hand would have been a wonderful idea.  So going back to his car to get it would have been a very highly effective -- a very safe, highly effective strategy.

Q    Well, Officer Lampkin didn't discuss the gate opening until Mrs. Barus offered to do so; right?

A    Right.  That's when he told her go ahead and open the gate.  And he could have easily walked behind him, across the street, to his car and picked up his baton.

Q    And you heard on the body-worn camera where Mrs. Barus was saying, Come on, and seeming to be impatient; right?

A    Yes, but that was before she opened the gate.

Q    And Officer Lampkin was entitled to rely on the representations of Mrs. Barus and Mr. Barus that the dogs would not come out of the gate; correct?

A    No.  A reasonable, well-trained officer would not have expected that to be a reliable report.  For instance, as police officers, we talk to people and get complaints from people all the time.  Well, I would never do that, or, That would never happen.  And just

like Officer Lampkin did here, we tend to take that with a huge lump of salt or not believe it at all until we're shown otherwise.

Officer Lampkin expressed the fact that -- his response was basically, Yeah, right.  You tell me your dog is not going to come out of the yard.  I don't believe you, but I'll let you show me.  Here, go let him -- go let the gate open and we'll see.  So --

Q     And -- oh.  Go ahead.

A     No, I'm sorry.  So...

Q     So you think that Officer Lampkin should have gone to his car to get the baton to be prepared to hit the dog on the head or elsewhere when it came out of the gate despite its owner's representations that it would not do so.

Is that what you're saying?

A     Number 1, I'm not suggesting he hit the baton -- I'm sorry.  I'm not suggesting he hit the dog on the head or on the body at all with the baton.

Batons -- to officers who are trained and to basically every animal control officer out there, batons are used to gain space.  So if the dog comes running at you, what you can do is hold the baton out in front of you, and typically, if a dog is going to bite, it will bite the closest strange thing to them.

So it's a highly effective and well-recognized strategy and is taught in animal control and other certifications across the country as using a baton, to hold that in front of you to give the dog a target, especially if you're as close as he and Mrs. Barus were, so that if the dog is going to bite something, it is going to bite the end of your baton.

And then Mrs. Barus was less than two steps back from grabbing her dog.  She could have easily picked the dog up and controlled the dog.  I mean, look at how easily she manhandled her son, who was a big fellow.

Q    But you think Ms. Barus -- once the dog became aggressive, you think Mrs. Barus should have gone in and grabbed the dog and would have maintained control of it; is that correct?

MS. VENZA:  Object to form.

A    She was -- she was trying to.  She was going forward to grab the dog, going down towards the dog, and so she was actively trying to grab the dog.  So, yes, if --

Q    After --

A    -- Officer Barus had his baton and stuck it out in front of him, the dog would have slowed up or stopped, and Mrs. Barus would have had the dog.

Q    Okay.  She tried to get control of the dog after Lampkin was bitten; right?

MS. VENZA:  Object to form.

A    Actually, she -- actually, she's moving forward to get the dog at the same time that Lampkin fires his first round.

Q    Which is after the dog has bitten him twice; right?

A    It's after he says he was bitten, yes.  It was immediately after.  It was less than a second there between contact with the dog, the firing of the shot, and Mrs. Barus moving towards Officer Lampkin.

And we train people that, especially if a dog is in that kind of a situation and there is an immediate bite, to freeze, to not move and give the person, the owner, who, if they're right there, an opportunity to grab their dog so that there won't be any further injury, if there has been any.

Q    One of the other things you say that he should have done was having his OC spray in his non-gun hand and ready for immediate deployment if the dog came towards him.

A    Sure.

Q    You agree that OC spray is only effective on a dog if you get it in the mouth, eyes or nose?

Hedquist & Associates Reporters, Inc.

A    I would agree that the studies have shown and practical applications have shown that OC, especially the kind currently used by JSO -- and I'm assuming used then -- is extremely effective in stopping and deterring the approach of a dog because the officer is trained to squirt directly at the dog's face, which is where the OC is going to have the greatest effect.

And if Officer Lampkin was not trained in the proper application of OC as a deterrent to a dog and that it was highly effective, then the training was deficient.

Q    So are you saying that Officer Lampkin should have used his OC spray on Lucy as Lucy approached him initially, before she bit him?

A    Sure.  If she was running up to him and he felt that there was a threat, then a quick deployment, a quick, brief spurt of OC, would have stopped Lucy from coming any closer to him.

So if his subjective assessment was that he was likely to get bitten, then, yeah, that would be reasonable, and I would be saying that the officer did the right thing.

Q    So if the dog is walking up and appearing friendly and initially sniffing a hand, you would agree that there's not really a threat at that point; right?

A    Correct.  But I'm also willing to give latitude to an officer on whether they perceive a threat, which is highly affected by the idea of whether they've been trained to perceive a threat.

And in this case, granted at the moment that Lucy walked up, she presented, as far as I can tell, limited indication of any threat.  But once Lucy did bite him, nip him, the first time, a quick spray at the dog that was at his feet would have been highly effective in running her away and nobody would have been subject to getting seriously injured, or Lampkin would not have had to deploy his firearm and fire five shots.

Q    But after she bites him --

A    Yeah.

Q    -- then the dog is turning around, the dog is moving, he may not have a good shot at her mouth, eyes or nose; right?

A    But it's worth -- it's worth a try.  And if the dog is, as he said, biting on his lower leg, then her face is right up against his leg since she's allegedly biting him, and there's no downside.  There is absolutely no negative to him having taken a quick squirt.

Even the sound of the OC being expelled is likely to have startled and interrupted her.  That's

why, in a lot of shelters, they use a can which is just simply compressed air and makes a (indicating) sound, because that's enough to deter dogs from engaging.

Q    What is your basis for your opinion that the OC spray, just hearing the sound of it, would have caused her to -- would have what, deterred her or -- what would --

A    It would have --

Q    What would the sound have been like?

A    It very likely would have interrupted her, which is seen by the use in shelters of the air spray cans across the United States and in other countries. That sound of a spray, which is an unusual and surprising sound to a dog, very often is enough, even without the oleoresin capsicum component, to get a dog to back up quickly.

And since Mrs. Barus was right there, all Lampkin needed was a half a second or a second of separation.  It would have been -- even not counting the chemical reaction, that sound could have easily been enough.

Q    And again, what's your basis for the assertion that the sound would have been enough to deter her?

A    Recognition in shelters and with trainers and so forth across the country in thousands and thousands

of agencies, training situations and shelters.

Q    Okay.  And so I believe you said earlier that after the bite Mrs. Barus was trying to gain control of Lucy.  If Officer Lampkin had used his OC spray at that point, it would be highly likely that Mrs. Barus would have been sprayed; correct?

MS. VENZA:  Object to form.

A    My understanding is that the OC that Jacksonville carries now is the stream type, which has a very limited dispersal.  And I don't know that Officer Barus [sic] could have actually even had the gel type in his OC.  Either way, the odds of widespread contamination to Mrs. Barus or anybody else would have been extremely, extremely unlikely.

And even if Mrs. Barus and the dog had both been sprayed, there would have been no significant injury to either one of them.  OC is not lethal, except in very rare occasions, and is recognized as a safe self-defense deterrent.

And I'm assuming they still do it.  But I remember being in the academy and then being in retraining later and getting sprayed full in the face and having -- other than minor discomfort or a face full of it and a pretty good amount of discomfort, there was no injury.

And Lampkin would have known that if he was certified to carry OC spray because you have to get sprayed to be able to carry it.  It's like they still make them get Tasered to get certified to carry a conducted electrical weapon.

Q    Speaking of Tasers, you would agree that the user of a Taser would not have been appropriate in this case; right?

A    No, I would strongly disagree.  The use of a Taser as a defensive tool against a domestic dog is recognized by studies and by recommendations of things such as the National Animal Control Association, the Chiefs of Police and other agencies across the country as being highly effective against a -- even a charging dog, much less a dog that has merely wandered up and nipped you a couple of times.

In fact, the sound of the static discharge of a Taser is known and recognized to be an effective deterrent in many cases with dogs, and I have seen it work myself.

Q    Are you familiar with the JSO policy regarding the use of CEWs, or Tasers, on dogs?

A    Yes.  And I believe that there -- if -- I don't remember the exact wording, but I believe that they indicate that that is not appropriate.  It's something

that I would have to disagree with because it's definitely better than shooting bullets and having them bouncing around out there somewhere.

Q    And so if Officer Lampkin had done -- had acted in conformance with what you just said, he would be violating JSO policy; right?

A    If Officer Lampkin deployed his Taser, yes, he would be violating policy.  So therefore, the use of the baton and/or the OC spray would have been proper and the necessary level of force at the most.

Q    And then you say he should have jumped on the car, like --

A    Well, he could have.

Q    Okay.

A    He could have.

Q    And in any of those -- if he had used any of those three mechanisms, Lucy would still have been outside the fence; right?

A    Sure, with Mrs. Barus right there.  It's not -- Lucy was not running loose down the street someplace with nobody around.  This was not a stray that was running around unconfined.  The owner was almost within arm's reach.

Q    And if -- if Lucy had -- if Mrs. Barus had not been able to restrain Lucy, Lucy would have been running

around freely in an agitated state, having just bitten somebody twice; correct?

A    We don't know what state Lucy would have been in.  She ran away as soon as the first shot was fired, so we don't know what her response would have been if Mrs. Barus had not gotten her.  There's no way to guess.  She could have just run back to Ms. Barus and run in the yard after the officer yelled at her.

Q    Let me move on.  We've talked about opinion number 5.  And again, you agree that Lampkin had been trained how to effectively and safely avoid negative contact with a domestic canine.

Number 6, are you saying that Lampkin caused Lucy to run at large?

A    Yes.  He directed Ms. Barus to open the gate after telling her, I don't believe your dog is going to stay in that, but go ahead, open the gate.  So yeah, you -- Lucy --

Q    When did he tell her that?

A    -- was running at large because -- pardon?

Q    When did he tell her, I don't believe your dog is going to stay in the gate?

A    During the discussion on the body camera, before 3:39 there, where she and Mr. Barus were saying the dogs aren't going to come out, and Lampkin says,

Okay.  Let me see it.  And from his intonation, one can clearly conclude that he fully expects that they're wrong.

Q    What is it about his intonation that leads you to believe that assertion?

A    Well, he's trying to be polite, but you can simply tell from his tone of voice that he fully -- and he's already said that the dogs are going to come out. So he's fully aware that it's unlikely this dog is going to magically not come out of the gate but that he expects it to, and he should have prepared for that to happen.

Q    Dr. Crosby, when did he say that the dogs were going to come out?

A    We would have to run that section from about 2:50 forward.  But if you pay attention and listen to the discussion back and forth, it's clear that Officer Lampkin does not believe, despite her assertions otherwise, that her dogs -- none of her dogs are going to come out of the gate if she stands there and opens the gate.

Q    And you're relying solely on the body-worn camera footage for these statements that you say Officer Lampkin made?

A    Yeah.  I'm relying on the body-worn camera with

the audio track involved, with the discussion going back and forth.  And Officer Lampkin obviously doesn't believe and feels for some reason he needs to show Mrs. Barus that her dog is going to run out of the gate.

Q    Okay.  And Officer Lampkin, as he approached, didn't make any kind of, you know, Come here, or any kind of calling the dogs out of the gate, did he?

A    No.

Q    Okay.  Let me ask you about opinion number 7. You say that the -- the last sentence of that opinion -- actually, let me ask you about the entire opinion.

Multiple studies of domestic dog bites and other reliable evidence accepted within the field show that a dog similar to the Barus dog presents a limited likelihood of inflicting serious harm to a healthy adult.

What are those multiple studies?  Are those in the packet of materials that you sent?

A    There are many studies both within the United States and internationally that address the question of what the likelihood of death is from -- to a healthy adult from a domestic dog.  And the difference between the threats between one dog and multiple dogs, multiple dogs is much higher.

The threat to a three-day-old infant, for

instance, is quite high because they're little.  They break and so forth.

But the statistics across history, including the 700-plus cases that I have of fatal dog attacks in my database, indicate that it's very, very unusual, number one, for a person to be killed by a dog, but it's even more unusual for that to happen to a healthy adult person and even more unusual to happen to -- and nearly unheard of to happen to an adult healthy person that is in the company of one or more other adults.

So that's been shown across the country.  And the number of people killed by dogs in the United States last year, there were 60 out of 350 million, which is extremely low.  And that was at a record number.  And the odds of a healthy adult receiving life-threatening injuries is very, very low.

Additionally, when it comes to police officers, no -- there have been six officers in U.S. history that died after a dog bite.  One of them was about ten years ago where the officer had an anaphylactic reaction to the antirabies vaccine.  The other five happened at or before 1932, and the officers in those cases all died of either secondary infection or rabies.  So there is no police officer that's ever been attacked and bitten by a dog that has died from that bite.

Q    Doctor, my question to you was, what are the sources, what are the studies, what is the other reliable evidence?  Is that in the packet of materials that you have sent us?

A    I don't remember if that's directly in there, but if one goes to sites like the Centers for Disease Control or the Officer Down site that documents deaths of police officers or any of the many, many articles that address the likely consequences of dog bites or the dog bite prevention courses that most places have given, it's real easy to come up with those.

Q    Doctor, what are those articles?

A    I don't have the list of them in front of me right now, no.

Q    You would agree that --

A    I can put them together for you, if you would like.

Q    I want to know what you relied on in forming your opinions.

A    Yes.  Articles across the country in many publications by physicians that are dealing with treatments of dog bites, of trainers and behaviorists who deal with them, of the analysis of the evidence, of my own research work that's documented in my PhD dissertation and was peer-reviewed, all of those sources

have determined and have issued opinions over the years that the likelihood of a healthy adult of being severely injured by a dog is very, very, very low.

Q    Okay.  Doctor, I'm going to ask you to send the studies that you rely on for that statement that you just gave.

A    Sure.

Q    I'm going to ask you to include those in that packet that you're sending.

A    Sure.

Q    Thank you.

Because the -- your citation for that -- for opinion 7 says, References dog deaths, Crosby.

A    Yeah.  That -- I'm sorry.  That's the file that you're going to be getting.

Q    Okay.  And again, a reader of this opinion doesn't know that.  So we need to know what the sources are.

A    Sure.  No problem.

Q    But you would agree, though, that a dog can inflict very serious injury without actually killing someone; right?

A    Yes.  There are cases that serious injuries do not result in death, and those are also very, very small in number.

Q    And again, what is your source for that statement?

A    That comes from both the insurance company figures that are publicly available and the morbidity and mortality reports put out by I believe it's the Centers for Disease Control that indicate the numbers of people who are treated for specific injuries, including dog bites, and the number of those people that require actual medical intervention and the number of those people that are actually admitted to the hospital.

So it becomes a very small number that are even admitted at any level to a hospital when presenting to an emergency department with a dog-bite-related injury.

Q    And again, I'm going to ask you to include the sources for that assertion in the packet of materials.

A    Sure.

Q    Let me move on.  I think we discussed number 8.

Let me ask you about number 9.

You say that he continued to fire, striking the dog more than once as the dog ran for safety.

A    Right.

Q    What's your basis for saying that the dog ran for safety?

A    Well, number one, the basis for saying that is if the dog was running away from the officer and the

gunfire and the source of the gunfire, then it was logically running away so that it could get away safely rather than turning and fighting and trying to engage the officer.

So here we have Officer Lampkin, who is firing actively at a fleeing dog that presents no threat to him.  There's nobody out that it could present a threat to immediately, and instead he is simply extending deadly force towards a creature that is trying its best to get away and not be injured.

Q   And, in fact, you can't see the entire neighborhood on the body-worn camera, can you?

A   No, but we've got a good idea of how much of the neighborhood Lampkin could see at that time, and there's still no reason to shoot a fleeing dog since you're supposed to shoot at -- to -- or to remove a threat.  The dog was not a threat to Officer Lampkin at the second it took off running.

Q   And the dog could have been a threat to others in the neighborhood, having just previously bitten Officer Lampkin; right?

A   Anything could have been a threat to anybody afterwards.  There's no way to project that that dog would have or was more likely to present a threat to anybody.  Frankly, I think that Mrs. Barus's son was

more of a threat.

Q    Let me ask you about your supplement report. And I think this will be Exhibit 5.

Other than the report of Mr. -- of Mr. Klinger, did you review any additional materials before writing this report?

Oh, I didn't share my screen.

(Defendants' Exhibit 5, supplemental report, was marked for identification.)

A    No.  I think this is primarily in response to Mr. Klinger's opinion.

Q    Okay.  And in the paragraph -- I guess down here at the bottom of the page, you say that his investigation -- Lampkin's investigation of that complaint was properly to question those present, look at the fencing or containment plans for the dogs, and then to act within the law.

A    Right.

Q    His possible actions were limited to two options:  issue a notice of violation of the Jacksonville Ordinance Code or document the incident and refer it to ACPS for follow-up.

What's your basis for that?

A    Simple.  He didn't --

Q    I'm not sharing my screen yet.

A     Okay.  I'm sorry.  I'm looking at my copy of it here.

Q     Yeah.

A     Okay.  Simple.  Number one, he had the option, if it met the criteria and he had ID and so forth, to issue a citation for a code violation.  I would -- as the sergeant or lieutenant -- or as lieutenant, I would have preferred that he did so to something he actually observed since it's a civil violation that's supposed to occur in his presence, but he could have conceivably issued that, and then it would be up to his command or the state attorney to decide whether that was appropriate.  He certainly had that option.

The other thing is, he certainly could have simply called animal control and reported what was going on to them.  That's pretty much it.

He didn't have the authority at that point to seize the dogs that were in Mrs. Lampkin's house or in her yard.  He didn't have a reason to arrest Mrs. Lampkin.  Whether he had probable cause to arrest --

Q     Mrs. Barus?

A     I'm sorry.  Ms. Barus.  That's correct.  Sorry.

He had no probable cause to arrest Mrs. Barus for anything.  Whether he felt he had enough information

to arrest Mr. Barus for the alleged aggravated assault is a determination that I will leave to him.  I didn't -- wasn't party to all of his conversations about the ag assault.  He -- that's pretty much the limits of his options.

Q    Okay.  Let me just ask you, though.  I want to -- let me ask you two questions about this.  First is, all of your opinions in this supplement report are based on your belief that Officer Lampkin directed Mrs. Barus to open the gate; is that correct?

A    Yeah.  They are definitely informed by the fact that Officer Lampkin told Mrs. Barus to bring the dog out and open the gate.  That's really clear.

Q    On the second page you say Lampkin exceeded his authority.

At what point did he -- first of all, what do you mean by exceeded his authority?

A    There is no legal authority that I have ever been aware of that allows a police officer to direct somebody to violate code or statute to somehow try to guess whether that violation had happened before.

Animal control officers, police officers, you can't go say, Hey, look, go bring your dog out off leash because I want to see if your dog will run around off leash.  That's not within your authority.  That's not

within normal or even remotely reasonable investigative action.  You can't do that.

You have no legal ability or legal basis that gives you the right to tell somebody to break the law in front of you so you can decide whether the law has been broken before that.

Q    Well, at the time Mrs. Barus opened the gate and let Lucy out of the gate, Lucy was still on the Baruses' property; right?

A    I don't know where the survey puts the edge of her property.  So Lucy was outside the fence, between the fence and the yard, but I don't know where the property line is.

Q    And if she's still on the property, for instance, by the car where she had been on the Baruses' property earlier that morning, you would agree that the dog is not running at large at that point; correct?

MS. VENZA:  Object to form.

Go ahead and answer.

A    I would agree that if that property line is further out, then yes, technically Lucy would have been within her property and would then have been --
actually, then could not have been charged with or placed under dangerous dog because the contact between her and Officer Lampkin happened on her property.

Hedquist & Associates Reporters, Inc.

Q    And if the dog remained on Mrs. Barus's property, even if, as you insist, that Lampkin had directed Mrs. Barus to open the fence, he would not have been instructing her to violate the local ordinance regarding dogs running at large; right?

A    That depends.  Because I would argue that when Lucy came out of the gate, Lucy did not appear to be effectively under voice control, was not training for anything.  And I would actually have to look back at the leash law, but I believe that a dog that's running uncontrolled and is running loose is pretty much running at large.  And the question is, then, if Lucy was not running at large and was coming out after Officer Lampkin, then that to me puts Lampkin further in the wrong.

Q    And again, whether she's running at large or not is a legal determination; right?

A    Right.  That is something that would have to be presented to the jury, the finder of fact, to decide whether she was actually running at large or not.

Q    Okay.  Other than the opinions we've just discussed, are there any other opinions that you have about this case that you haven't already provided to us?

A    I can't think of anything that jumps out at me. Obviously, we -- in the limited time we've had, we

couldn't discuss everything and anything about this case, but I think we've hit the high points.

Q   Well, I need to know if you have other opinions that you're going to express in this case if you are called to testify before a jury.

A   I can't think of anything we haven't covered that I'm going to bring forward as an opinion, no.

MS. HARRELL:  Okay.  I am done, but Mr. Bueker may have some questions on behalf of the City.

CROSS EXAMINATION

BY MR. BUEKER:

Q   All right.  I have been here and listening, even though I have been on -- so y'all couldn't see me. I appreciate it.

Dr. Crosby, my name is Paul Bueker.  I am an attorney.  I'm representing the City in this case.  I don't have any questions about your opinions.  I just have a couple of factual questions.

In your report dated -- I guess the first version, January 12, 2026, under your Materials Reviewed section, you have listed Police and Dog Encounters as a title of a video training prepared by Chicago Safe Humane and released 2013.

A   Yes.

Q   Is that something --

MS. VENZA:  Objection.

MR. BUEKER:  I'm sorry?

MS. VENZA:  I'm going to object to form.  Go ahead.  Your question and all of that preamble, I'm objecting to the form.

Go ahead.

MR. BUEKER:  Okay.  I was just identifying what I was getting ready to ask him, so we're on the same page.

BY MR. BUEKER:

Q    But is that something that you were familiar with before you were ever retained in this case?

A    Oh, yes.  I have been aware of that since at least 2014 or '15.

Q    Okay.

A    Because that came out in '13.  And in 2015, I was flown out to be part of the team that developed the California post-training, and I was well aware of the Chicago presentations and the document that goes with them before I ever went out there.

Q    And is it your understanding that that was the video program that was mandated to be seen by JSO officers in 2015?

A    My understanding is that that was the program that was presented to them.

MR. BUEKER:  Okay.  Very good.  That's it.

MS. VENZA:  I do have some follow-up, but I don't know if Jim needs to take a break.

THE WITNESS:  I'm good.  Thanks.

CROSS EXAMINATION

BY MS. VENZA:

Q    In response to Officer Lampkin's counsel's question regarding whether anything else was provided to you to review and consider before your supplemental report, you responded, no, you didn't think so.

Would it refresh your recollection to see or consider an e-mail from Attorney LaHart regarding the 2019 JSO incident report regarding Lampkin's shooting of another dog?

MS. HARRELL:  Object to the form.  Improper recollection.

A    I recall the e-mail, but that did not directly affect my opinions in this case.  The fact that Lampkin had done this before, I don't know the circumstances that surrounded that, so I can't give an opinion whether he was not justified, or he may have been justified.  I don't know, so I didn't take that into consideration.

Q    Did you also receive an e-mail providing the City's response to plaintiff's second request for production of documents, which included a June 7th of

2022 e-mail from Stephanie Strawn to Alicea Felipe regarding --

A    Yes.  I'm sorry.  I omitted mentioning that, but yes.  In fact, I have that in front of me here, from Stephanie Strawn to Felipe, Alicea on June 7th, that apparently there had been before that -- before this second incident with Officer Lampkin, that there had been a determination in that case that the officer involved needed to have it reiterated to them that his conduct was for some reason deficient in shooting the dog that they shot.  And I'm assuming it's a he, but I don't want to be sexist, so I'll use they.

But the -- that there was -- so that would indicate to me that there was some sort of communication from the department that predates the Officer Barr shooting that puts some sort of limits on using deadly force against dogs.  But again, I don't have what that was.  I don't see that the City has provided whatever that was before.

So I received it and noted it, but I didn't alter any opinions based on that fact.

Q    You didn't alter your existing opinions, but did it add to additional opinions that the June 7th, 2022 e-mail, which is after the April 11th, 2022 shooting by Officer Lampkin of the dog, which includes,

in the second sentence -- or which states as the second sentence in there, In the interim, please conduct training using Order 212 (for an animal compliance) and reiterate that officers do not need to view the animal if it has been safely confined by the owner and no longer poses a threat.

MS. HARRELL:  Object to the form.

A    Yeah.  I --

Q    Is that --

A    And that is contained in that, and that just confirms my already developed opinion that there was no need for Officer Lampkin to instruct or even permit Mrs. Barus from opening the gate to see if their dog could come out.  It was irrelevant.  It had no effect on whether there was going to be a code violation, citation issued or anything else, and it had nothing to do with the aggravated assault.  So it was completely needless and actually set Officer Lampkin and the dog up to fail.

Q    Did you have any opinion regarding Officer Lampkin's injuries regarding a nip to his right finger?

MS. HARRELL:  Object to the form.

A    My opinions are that the little bleeding spot on his finger was an extremely minor injury that, sure, it could have been a nip from the dog, or it could have

been he banged his hand on something or had dry skin. It was extremely minor.

Q    Same question with regard to the alleged bite to his left calf.  Did you reach any opinion about that?

MS. HARRELL:  Object to the form.

A    Yes.  By viewing the photograph that was provided, it, again, was extremely minor, and we only had his statement that those weren't a pair of mosquito bites.

Q    Did you see any evidence that Officer Lampkin's Achilles' heel had been dug into by Lucy?

A    Oh, no.

MS. HARRELL:  Object to the form.

A    The skin on Officer -- the back of Officer Lampkin's calf there was not appreciably ruptured at all.  There was no edema or swelling visible.  There was no -- I have been given no proof that there was some kind of deep bruising that appeared later.

It was very, very minor.  And I don't know, but most of us in the animal control and dog training industry wouldn't have even paid attention to it.

Q    Do you have any opinion as to whether or not this incident involved a dog or cat?

MS. HARRELL:  Object to the form.  I'm going to

Hedquist & Associates Reporters, Inc.

object to this whole line of questioning about you asking him what his opinions are.  He has expressed those opinions in the Rule 26 disclosures and his reports.

To the extent that you're asking him to express new opinions, it violates the Rules of Civil Procedure, and it is going to warrant some additional discovery.  So...

A    Well, I accept the fact that I specifically and explicitly reserved the right to add to the opinions you've given in both of my reports that were accepted, and we haven't finished the deposition, and, of course, part of the purpose of a deposition is to dig for more information.

Q    And what is your opinion as to whether this was a dog attack?

MS. HARRELL:  Object to the form.

A    I would not -- there is no formal definition of the word attack that is applicable in a case this minor. I would not call this an attack.  I would call this a minor engagement between the dog and Officer Lampkin that was probably more than likely -- more likely than not precipitated by some sort of a low-level fear response from the dog Lucy.

Q    Should there have been any contact between

Officer Lampkin and the dog or any opportunity for contact between the two during the course of Officer Lampkin's, quote, investigation, end quote?

MS. HARRELL:  Object to the form.

A    No.  There was absolutely no need for there to be any contact between Officer Lampkin and the dog Lucy or any other dog that might or might have not been on the Barus property.  There was no need for contact.  He gained no useful information.

Q    You have read the defendants' -- both the City's and Officer Lampkin's -- specially retained expert Klinger's report; correct?

A    Correct.

MS. HARRELL:  Object to form.

Q    (Indiscernible) into the next question.

A    Yes.  I've read the report of Mr. Klinger.

Q    And he, Mr. Klinger, referenced the City of Jacksonville code regarding concurrent jurisdiction; correct?

A    Yes, he did.

MS. HARRELL:  Object to the form.

Q    Do you have any opinion as to whether that code section is a policy of the City?

MS. HARRELL:  Object to the form.

A    It -- it's code, so I would assume that being

code it is the policy of the City.

Q    Do you think Officer Lampkin exceeded his discretionary authority?

MS. HARRELL:  Objection; calls for a legal conclusion.

MR. BUEKER:  Join.

A    I believe that Officer Lampkin's direction to Mrs. Barus to see if the dog would come out of the gate did exceed his authority.  As I mentioned earlier, whether it was him or an animal control officer, no one would have the authority, other than perhaps a judge by court order, to tell Mrs. Barus to go around, open the gate, and see if the dog would come out or even to agree with Mrs. Barus's initial suggestion that her dog wouldn't come out and to somehow enable her to try and demonstrate this, knowing the likelihood of failure was extremely high.

Q    As an animal control officer, which that code section grants concurrent jurisdiction to an officer such as Detective Lampkin with, do they have the discretion to direct someone to go open the gate?

MS. HARRELL:  Object to the form.

A    No.  No.  They do not have the discretion or the lawful ability to tell somebody to go open a gate, no.

Q     Does an animal control officer in Jacksonville have more training than an officer such as Detective Lampkin had at the time of this incident?

MR. BUEKER:  Object to form.

MS. HARRELL:  Join.

A     In -- in my experience, yes, an animal control officer has far more training regarding interacting safely with dogs, cats, other animals in the application of the code regarding animals and in all of the aspects that -- of an animal control officer's job description.

I am unaware of any substantial training that's given to police officers regarding things such as dog behavior, body posture, proper use of a leash, proper use of a catch pole, likelihood of getting bitten, any of that.  That's all information that animal control officers who have been through at least the Florida State curriculum for the certification of animal control officers, they receive that.

Q     The sum total of Officer Lampkin's training up to the date of this incident, April 11th, 2022, was what?

A     It seems to --

MR. BUEKER:  I object to the --

MS. HARRELL:  Form.

MR. BUEKER:  -- form of this.  This is not

within his opinions.

A     It actually kind of is because all he got was five exposures to 15-minute segments of video almost ten years before this incident occurred.

So based on the material provided by JSO and the statements of Officer Lampkin, that was the only training he had had, and that's far, far behind what any animal control officer would have had.

Q     Given that, do you think that the City's policy, which is codified in the statute referenced in specially retained expert Klinger's report, was deficient in some way; that that's a problem?

MS. HARRELL:  Object to the form.  It's an undisclosed opinion.

MR. BUEKER:  Join.

A     It's my opinion that the City's failure to give more, better training to its police officers is deficient and actually places the officers at a disadvantage where they don't have the skills and tools and experience an animal control officer does unless they've gone outside the department looking for training in that specific field.

That's one of the reasons it is so important sometimes for police officers to call animal control to assist in a case because they have the animal handling

safety skills and so forth and the proper equipment, such as catch poles, protective gloves, light protection made of Kevlar to prevent them from getting injured if a dog does come after them, all of those things and more.

Q    Based on your investigation, including your examination of photos of Lucy's corpse and other information available to you which led you to understand where the rounds entered Lucy's body and the number of rounds that entered her body, was Lucy a threat to anyone when the first round was fired?

MS. HARRELL:  Object to the form.

A    The firing of the first round, it's difficult to determine whether that round by itself might have been at least somewhat reasonable because we do not have a necropsy that could give us an order of impact with the dog.  However, every round after the first round was unjustified, unnecessary and could have been avoided, very simply.

Q    Was the first round reasonable in terms of where Mrs. Barus was?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Join.

A    In my opinion and training with firearms and so forth, no.  To have a human within almost arm's length of a bouncing, moving dog that is very difficult to hit

even at close range coupled with the fact that the substrate underneath the dog at that point was a combination of dirt and bits of pebbles and heaven knows what else underneath, that bullet presented a -- what I was taught was a credible risk of ricochet or simply missing or glancing off the dog's head, if that's what he was shooting at, because dogs' skulls are very thick.

So I would say, no, firing at a moving dog that close to a human being would not be proper, would not be what a well-trained reasonable officer would do and would be a violation of the training I received.

Q    Was it reasonable -- that being the first round, was it reasonable in terms of anybody else that may have been in the Lampkins' -- I'm sorry -- in the Baruses' yard?

MS. HARRELL:  Object to the form.

A    Not according to my training.  Because, again, bullets can ricochet.  There was not a clear backdrop of anything but the irregular ground, and I have seen personally and been trained that bullets can ricochet and cause injuries a substantial distance from the shooter's position.

Q    In response to Attorney Harrell's question, you agreed at one point that the dog aspect was properly done.  Can you explain that more in terms of what you

meant by it?  Did you mean that Lampkin's investigation was properly done, or what were you referring to in response to that?

MS. HARRELL:  Object to the form.

A    I don't know.  Can you go back and give me the context of the question?  Because we've discussed a whole bunch of stuff today --

Q    Right.  And that's --

A    -- To make sure I'm not mistaking something.

Q    That's the point, is that statement came after a series of questions.

So let me just ask you, was Lampkin's investigation properly done in terms of, we'll call it, the dog aspect?

MS. HARRELL:  Object to the form.

MR. BUEKER:  Object to form.

A    Up to the point of Lampkin agreeing with or directing Mrs. Barus to open the gate, Lampkin was doing a proper and reasonable job.  He interviewed the people there.

Apparently, based on testimony, he had talked to the complaining party, and he had gotten the information he needed that -- where he could have either gone to the State Attorney's Office with it, issued a citation, made an arrest if the allegations against

Mr. Barus were substantiated, in his opinion, to give him probable cause.

Up until the time that he diverts and agrees with or, in my opinion, directs Mrs. Barus to open the gate, he was doing fine.

Q    Was Lucy out of control at any time during the encounter with Officer Lampkin?

MS. HARRELL:  Object to the form.

A    Lucy did not return immediately to voice command.  If that's out of control, I don't know.  She approached Officer Lampkin in a pretty calm manner.  We don't know what precipitated the change in that.

So overall, I wouldn't say she was out of control.  I would say that something happened that caused her to change her perception from Officer Lampkin being a nonthreat to him becoming something that startled or scared her.

Q    Does a wagging tail on a dog always mean the dog is friendly?

A    No.  That's part of the training, is we talk about body language and that you can't always rely -- for instance, if you watch a police canine deployed and catching and knocking down and biting a suspect, because that's a trained behavior, the dog's tail is usually wagging.  He's happy.  Dad, just let him go get the bad

guy.

Q   Officer Lampkin should have been trained prior to April 11, 2022, exactly to that point.  The wagging tail doesn't always mean a friendly dog; correct?

MS. HARRELL:  Object to the form.

A   I would agree that Officer Lampkin and all of the rest of JSO should have been given the information that a wagging tail does not always on a dog mean this dog is friendly, period.

Q   And the City's failure to provide training to Officer Lampkin or any other officer on that point is inadequate training on the part of the City's; correct?

MR. BUEKER:  Object to form.

MS. HARRELL:  Object to the form.

A   In my opinion, yes.  The failure of the City to provide that information to their officers is inadequate and could reasonably be expected to produce a negative result of an officer making unjustified assumptions as to whether or not the animal was friendly or not.

MS. VENZA:  Thank you.  That's all I have.

MR. BUEKER:  If you don't mind, Sonya, I do have a follow-up --

MS. HARRELL:  Yeah, I don't have any more.

MR. BUEKER:  -- just to something that was specifically raised during the cross-examination.

RECROSS EXAMINATION

BY MR. BUEKER:

Q    Dr. Crosby, Ms. Venza asked you about an e-mail that you received and whether you reviewed it.

Do you have still have it?  It looked like you looked at it.

A    Yeah.  I've got it here in front of me, as a matter of fact.

Q    Okay.  And I just -- I was having a hard time hearing the question and whatnot.

So can you tell me when you received that?

A    It's included in the package of stuff.  I don't remember exactly what date I received it and would have to look at that package with the origin information.

This -- it was sent, according to -- I can't even see the date on here as to when it was sent because I'm looking at a copy of the e-mail.

June 7th, 2022 was the date on the e-mail.  I believe this came in either between the initial report and the supplement or shortly thereafter.

But again, this simply addresses the question that apparently the department had instructed officers before June 7th, 2022 that they did not need to physically see an animal involved in a running-at-large complaint.  That had been done somewhere, and we don't

have that information as being provided by the City.

Q    Okay.  And that wasn't my question.  I just have some simple factual questions.

A    Okay.

Q    I'm not going to get a bunch of your opinions again.  Trust me.  I'm not trying to replow the old ground, Doctor.

So that e-mail that you're referring is June 7, 2022, and you believe you received it after you authored your initial report; correct?

A    Yes.

Q    Okay.

A    And I can -- I'm opening my file right now, if you want me to verify what date I got that.  Just one minute.  Let's see here.  Yeah.  Hold on.  I'm pulling this stuff up now.  I'll search.  Technology can be so good yet so bad.

Let's see.  Okay.  I received that e-mail from -- wait a minute.  Let me see.  I don't want to say the wrong date here.  I just scrolled past it.  That's for the Zoom.

I received that e-mail from Ms. LaHart on April 29th of 2026.

Q    All right.  And the e-mail that you're referencing -- I just don't have it in front of me --

who is the e-mail from?

A    It's from Attorney Marcy LaHart, and it attaches a report that was, according to this, originated by JSO.

And let me make sure this is the right one.  It might not be.  I'm sorry.

That was a -- that was the report of where Officer Lampkin had shot at a different dog.  But again, that didn't have any effect on my opinions on this.

I'm trying to find -- let's see.  I'm sorry.  There were a bunch of e-mails back and forth.

THE WITNESS:  Ms. Venza, do you have that one in front of you that you can --

MS. VENZA:  Yeah.

THE WITNESS:  Because you've got a copy of it also.

MS. VENZA:  It was from me, and it is dated 4/29/2026.

THE WITNESS:  Okay.  I can find it now.  Yep.  Yep.  It just makes it easier to pull it up with that so I don't accidently say something that isn't correct.

Okay.  4/29.  Yep, here it is.

From you at 10:30 in the morning on April the 29th.  Yes.

BY MR. BUEKER:

Q    Okay.  And then my next question, Dr. Crosby, is when it was provided to you, was -- what was it represented as being or from?

A    It's represented as being a -- an e-mail within JSO between this Stephanie A. Strawn and Felipe, Alicea. They both have jaxsheriff.org e-mail addresses copied to Lawrence Schmidt and David Hall, and it's regarding a -- regarding the reminder to -- in the interim, which is referring to apparently additional training, and Officer Barr is directed to get.

Please conduct training using Order 212 and reiterate that officers do not need to view the animal if it has been safely confined by the owner and no longer poses a threat.

And that would have been in response to my questions as to whether the City had provided any sort of policy that the officers were somehow supposed to view an animal regarding this kind of a complaint.

Q    Okay.  So it appears that there was an effort made to remind officers that they don't need to see the animal?  That's it?

A    Yes.  That's it.

MR. BUEKER:  Okay.  Alrighty.  That's all.  I just wanted to make sure I understood what it is we

were talking about.  I just had a hard time hearing earlier.

THE WITNESS:  I'm sorry.  That's fine.

MR. BUEKER:  Very good.  That's it.

THE WITNESS:  Okay.

MS. HARRELL:  I don't have anything else.

THE WITNESS:  For the court reporter, I'll go ahead and waive, although I'm sure counsel will be requesting a transcript.

MS. HARRELL:  Yes.  Madam Court Reporter, we will order one.

(Witness excused.)

(The deposition was concluded at 4:30 p.m.)

CERTIFICATE OF OATH


STATE OF FLORIDA )

COUNTY OF DUVAL  )


        I, Barbara A. Borden, RPR, Notary Public,

State of Florida, certify that **DR. JAMES CROSBY**

appeared remotely by audio-video communication

technology pursuant to Statute 117.05 on May 29, 2026,

and was duly sworn.

        WITNESS my hand and official seal on

June 13, 2026.




_____
        Barbara A. Borden, RPR, Notary Public
        Commission HH645947 Expires June 8, 2029

REPORTER'S CERTIFICATE


STATE OF FLORIDA )

COUNTY OF DUVAL  )


          I, Barbara A. Borden, RPR, certify that I was

authorized to and did stenographically report the

deposition of **DR. JAMES CROSBY**; that a review of the

transcript was not requested; and that the foregoing

transcript, pages 1 through 131, is a true record of

my stenographic notes.

          I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am

I financially interested in the action.


          DATED June 13, 2026, Jacksonville, Duval

County, Florida.




          Barbara A. Borden, RPR, Notary Public
          345 East Forsyth Street
          Jacksonville, Florida 32202
          (904) 354-4111