UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
(Jacksonville Division)

CASE NO. 3:24-CV-01358-MMH-SJH

KIMBERLY BARUS,

             Plaintiff,

v.

THE CITY OF JACKSONVILLE, FLORIDA,
*et al.,*

             Defendants.

_____/

## PLAINTIFF KIMBERLY BARUS' RESPONSE IN OPPOSITION TO THE CITY OF JACKSONVILLE'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kimberly Barus opposes Defendant City of Jacksonville's Motion for Final Summary Judgment. The City's motion depends on resolving material factual disputes in its favor. A jury could find that Officer Karl Lampkin needlessly created the encounter with Plaintiff's dog Lucy, failed to prepare any non-lethal response, and then unreasonably used deadly force after Lucy had released, retreated, and no longer posed an objectively legitimate and imminent threat. A jury could also find that the City's failure to train, supervise and discipline officers for unnecessary deadly force against family pets was a moving force behind the violation. Accordingly, the motion must be denied.

    **I.**       **Material Facts and Genuine Disputes Precluding**

**Summary Judgment**

The City's motion presents a heavily sanitized version of Officer Lampkin's encounter that ignores the record evidence the Court must view in Ms. Barus's favor. The following facts, at a minimum, preclude summary judgment for the City:

1) When Officer Lampkin arrived at the Barus house Lucy was safely confined. [DE 73-1 pg 12-16]

2) No JSO policy required Officer Lampkin to see the dogs that belonged to the Barus family, [DE:71-2 pg 41 ln 11-13], no JSO policy allowed Officer Lampkin to direct Plaintiff to open the gate to where her dogs were confined, [*Id.* pg 46 ln 2-8], and no JSO policy required Lampkin to test the veracity of Plaintiff's statement that her dogs won't come out of the gate if the gate was open. [*Id.* pg 58 ln 23- pg 59 ln 3].

3) Officer Lampkin went to the Barus household to investigate a complaint about aggressive dogs. [DE 74-1, pg 50, ln 16-24] He was skeptical of Ms. Barus's statement that her dogs don't leave the yard when the gate was open. [DE 74-1, pg 128, ln 6 - pg 129 ln 13]

4) Because Officer Lampkin wished to separate Ms. Barus and her husband, he directed Ms. Barus to "go open the gate." [DE 74-1, pg 126, ln 18-23]

5) When interviewed by Officer Burford immediately after the incident Officer Lampkin stated:

> *I obliged, but that was an attempt to get them*
> *separated. She was talking for both of them, and he*
> *was basically in agreement with what she was saying.*
> *So I used that opportunity for them to separate.*[1]

6) After telling Plaintiff to "go open the gate" Officer Lampkin did not prepare any non-lethal options to use when he encountered the dog or dogs he expected to come out of the fenced yard. [DE 74-1, pg 155, ln 1-15]

7) Officer Lampkin was wearing pepper spray when he encountered Lucy and had a baton in his car. [DE 74-1, pg 158 ln 24 – pg 160 ln 21]

8) Lucy nipped Officer Lampkin twice after he thrust his hand in her face. She did not continue to aggress; she immediately released and retreated. [Axon Body 2 Video 2022-04-11-0718, @ 4:30-4:54.]

9) Although Ms. Barus was only a few feet away and trying to regain control of Lucy, Officer Lampkin pulled his Glock and shot Lucy five times, continuing to fire at the terrified wounded dog as she was

---

[1] Axon Body 2 video 2022 04-11-1044 @ 4:25 - 4:43. All video cited in the Plaintiff's responses to Defendants' summary judgment motion will be filed with the Clerk.

running away. [Axon Body 2 Video 2022-04-11-0718, @ 4:30-4:54.]

10) Officer Lampkin's "injuries" from the encounter with Lucy were inconsequential. [DE 74-6, 74-7]

11) The only training JSO provided to its officers, including Officer Lampkin, consisted of seventy-five minutes of video that JSO officers watched in fifteen-minute segments during roll call in 2015. [DE 70-2 pg 101 ln16-15, pg 102 ln 5-22]

12) The City has not provided any refresher training to the officers that saw the videos in 2015 and provided JSO officers hired after 2015 with no training regarding how to handle encounters with animals. [DE 70-2 pg 102 ln 21- pg103 ln 8.]

13) Officer Lampkin could not remember whether the training he received taught him that a wagging tail does not always mean a dog is friendly, or whether reaching a hand towards a dog's face can be viewed as aggression, or any content regarding how wearing masks or hats might case a dog to react, or if he had received training regarding how to not escalate a situation with a dog. [DE 71-1 pg 187 ln 3-188 ln 7]

14) Training materials used in other jurisdictions specifically warn law enforcement officers that if they encounter a dog "Don't try to pet or lean down, or offer your hand" and "Don't reach out for the

dog, keep your hands at your side." Exhibit One, *Dog Encounters: Keeping Officers Safe* prepared by the California Commission on Peace Officer Standards and Training, pg 3-4.

15)   There have been approximately 90 instances of JSO officers using lethal force against animals between 2012 and 2022, [DE 70-2, pg 96 ln 2-5.] Exhibit Two, Firearm RTR Reports Against Animals 2012-2022.

16)   No JSO officer has been disciplined for using force against an animal. [DE 70-2 pg 97 ln 4-10]

17)   Prior to fatally shooting Lucy, Officer Lampkin had shot at a dog previously but missed. Officer Lampkin had been informed that the dog was on the premises and asked to look out for the dog, but like here did not prepare to handle a possible dog encounter with nonlethal force. Exhibit 3, January 14, 2019 Incident Report re: 2019-0032238.

18)   Officer Lampkin was apparently not counseled about how to prepare to subdue a dog with non-lethal force after his first shooting incident, which is not even included among the approximately 90 incidents of force identified by the City, allowing an inference that use of lethal force against pets by JSO officers has been underreported.

19)     After arriving at the Barus home Sergeant Crews, Officer Lampkin's immediate supervisor, opined that: "One of my guys shot and killed a dog this morning and he really didn't need to." He went on to say: "they are over here justifying it." [Axon Body 2 Video 2022-04-11-818 @ 5:55-6:05.]

20)     JSO officer Sergeant Kuiper directed his subordinate, Officer Pittman, to state in her report regarding the incident that Officer Lampkin "was in fear of his life" when he killed Lucy. [Axon Body 2 Video 2022-04-11-825 @ 0:55-2:45]

21)     When interviewed by Officer Burford regarding the shooting of Lucy, Officer Lampkin never said he was in fear for his life—he reported that he deployed and shot "some rounds" because he was concerned about his Achilles heel. [Axon Body 2 Video 2022-04-11-1044 @ 6:05-6:25]

22)     Sergeant Kuiper also directed Officer Pittman to write in her report that only "approximately" 3 shots had been fired but also stated that Officer Lampkin had told him it had been 4-5 shots. [Axon Body 2 Video 2022-04-11-825 @ 0:55-2:45]

## II.   Argument

## A. A jury could find that Officer's Lampkin shooting of Lucy was an unreasonable seizure under the Fourth Amendment

**because Lucy did not pose an imminent threat.**

The Eleventh Circuit recently confirmed that "the use of deadly force against a domestic animal constitutes a seizure of its owner's property subject to the Fourth Amendment's reasonableness requirement." *Plowright v. Miami Dade County*, 102 F.4th 1358 (11th Cir. 2024). *Plowright* further holds that an officer may not use deadly force against a domestic animal unless the officer reasonably believes that the animal poses an imminent threat to the officer or others. *Id.*

The City does not dispute that a police officer's killing of a dog constitutes a seizure. The disputed question is whether Lucy posed an objectively legitimate and imminent threat when Officer Lampkin used deadly force and when he continued firing. Viewing the evidence in Ms. Barus's favor, a jury could find she did not: Lucy had released, was no longer in physical contact with Lampkin, Ms. Barus was nearby and attempting to regain control of her dog, and Lucy was moving away when Lampkin continued to shoot. A jury could find that the use of lethal force by Officer Lampkin was not reasonable. A jury could find that even if some force had been justified to end the initial contact, deadly force—and especially continued deadly force—was not objectively reasonable once Lucy had released and was retreating. Those factual disputes alone precludes summary judgment.

**B. A jury could find that Officer Lampkin unreasonably created**

**the very risk he later invoked to justify deadly force.**

It is undisputed that when Officer Lampkin arrived at the Barus residence Lucy was safely confined in her own fenced yard and that Officer Lampkin had no reason to interact with Lucy at all. Ms. Barus did offer to demonstrate that her dogs would remain behind the fence if she opened the gate. Instead of saying "No thanks, that won't be necessary" Officer Lampkin said "Well, okay. Lemme see em." and subsequently instructed Plaintiff to "go open the gate."

After directing Ms. Barus to open the gate as a ruse to speak with Mr. Barus away from Ms. Barus, Officer Lampkin took no steps to avoid a deadly encounter, even though he was responding to a dog-related call, knew dogs were present, and was skeptical that the dogs would remain inside the fence. The Fourth Amendment reasonableness inquiry is not limited to the split second when he pulled the trigger; a jury may consider the predictable risk Officer Lampkin created and his failure to plan for non-lethal control. See *Barnes v. Felix*, 605 U.S. 73, 76, (2025)(To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment.); see also *id.* at 80 ("[I]n-the-moment facts cannot be hermetically sealed off from the context in which they arose." (citation modified); s*ee also Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1048 (E.D. Wis. 2015)(The focus is not on the events

immediately preceding the shooting, but whether there were appreciable efforts to develop a plan to avoid a shooting altogether.)

### C. JSO's own policy creates a jury issue about whether deadly force was reasonable.

The City argues Officer Lampkin's shooting of Lucy was justified, pointing to JSO order 212, which provides:

> *Any animal creating a CLEAR AND IMMEDIATE DANGER TO the officer or the public may be killed if an attack is imminent and NO OTHER SOLUTION EXISTS.*

The City cannot obtain summary judgment merely by pointing to the existence of a facially acceptable policy. The policy's requirements are conjunctive: clear and immediate danger, imminent attack, and no other solution. Although a policy violation does not by itself establish a Fourth Amendment violation, Order 212 is probative of objective reasonableness, and a jury could find that none of those conditions existed when Officer Lampkin fired and continued firing.

### D. The cases cited by the City do not support summary judgment.

The cases cited by the City turn on their specific facts and do not establish that every dog bite or dog encounter makes a shooting reasonable as a matter of law. In *Brown v. Battle Creek Police Department*, 844 F.3d 556 (6th

Cir. 2016), the Sixth Circuit found the shootings reasonable in the context of a high-risk drug-warrant raid where officers confronted large pit bulls inside a residence while attempting to clear spaces for potentially armed suspects. The decision emphasized the totality of circumstances including that the officers were unaware of dogs on the premises and the record's lack of evidence rebutting the officers' account of imminent threats.

Lampkin was not executing a high-risk entry warrant, he knew dogs were present, Ms. Barus was present and attempting to secure her dog, Lucy was not attacking when shot, and non-lethal solutions existed. Those factual differences matter under *Plowright'*s imminent-threat test and preclude summary judgment in this matter.

Likewise, district-court dog-shooting decisions applying objective reasonableness cannot override *Plowright's* controlling Eleventh Circuit rule. They confirm only that officer safety is an important consideration; they do not permit a court to disregard disputed facts about the dog's actual threat at the time of the seizure.

### E. The Court should not resolve disputed interpretations of body-worn camera video at summary judgment.

The City asserts that the "facts of the incident and interaction are not in dispute" because the body-worn camera recorded the encounter. That is not the

Rule 56 standard. Video evidence can sometimes eliminate factual disputes, but only when it blatantly contradicts the nonmovant's version such that no reasonable jury could believe it. *Kailin v. Vill. of Gurnee*, 77 F. 4th 476, 481 (7th Cir. 2023) (reversing summary judgment for police officer who shot plaintiff's dog because video of the event did nothing to blatantly contradict either side's story). If the BWC is susceptible to more than one reasonable interpretation, the Court must credit Ms. Barus's interpretation at this stage.

The BWC evidence is at minimum susceptible to competing inferences about whether Lucy was attacking or retreating, whether Ms. Barus would have been able to regain control of Lucy had she been allowed, whether Officer Lampkin had time to use non-lethal force, and whether firing five shots was reasonable. Because the video does not blatantly contradict Ms. Barus's version, the City is not entitled to summary judgment based on the video.

### F. The City is not entitled to summary judgment on *Monell* liability because a jury could find deliberate indifference, a custom or practice, and causation.

The City argues that municipal liability fails because "there is no evidence that the City's policy regarding use of deadly force against an animal, as promulgated in Order 212 is constitutionally deficient." Plaintiff has never argued that the City's written policy concerning when lethal force may be used in an animal encounter is "constitutionally deficient." The City concedes that

"JSO officers, have unfortunately, been required to shoot and kill domestic animals in the past."  No evidence establishes that any of the approximately 90 shootings in the ten years prior to Lucy's death were "required."

To impose § 1983 liability on a municipality, a plaintiff must show: (1) that her constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) The summary-judgment record satisfies that standard under multiple overlapping theories: failure to train, failure to supervise or discipline, a widespread practice of tolerating unnecessary deadly force against domestic animals, and ratification or tolerance reflected in the post-shooting investigation.

### 1. A jury could find deliberate indifference from recurring dog encounters and inadequate training.

The City may rely on *Plowright's* affirmance of dismissal of the county claims, but that ruling does not entitle the City to summary judgment here. *Plowright* was decided at the pleading stage and turned on the absence of factual allegations showing that the municipality was on notice of a training need. This case is at summary judgment, and Ms. Barus has record evidence from JSO's own materials and witnesses: approximately 90 animal-force incidents, no discipline for injuring or killing an animal, no dog-encounter

training for officers hired after 2015, Lampkin's prior use of lethal force against a dog, and post-shooting investigative conduct, like reporting Officer Lampkin was "in fear of his life" contrary to Lampkins' own statements, from which a jury could infer tolerance or ratification of unnecessary deadly force.

### 2.  A jury could find causation because the omitted training addressed exactly what Officer Lampkin did wrong.

The City's own evidence shows that dog encounters were a known, recurring, and predictable law-enforcement issue. JSO officers used lethal force against animals approximately 90 times during a ten-year period, yet JSO never disciplined an officer for injuring or killing an animal and provided no dog-encounter training at all to officers hired after 2015. A jury could find that the need for practical dog-encounter training was obvious, and that the City's failure to provide or refresh such training amounted to deliberate indifference.

### 3. A jury could find a custom or practice from repeated animal-force incidents, non-discipline, and underreporting.

A jury could find causation because the omitted training would have addressed exactly what Officer Lampkin did wrong. The training materials identified by Plaintiff warn officers not to pet, lean down, offer a hand, or reach out toward a dog, and instead to keep hands at the officer's side. A jury could find that adequate, recurring training would have taught Officer Lampkin not

to thrust his hand toward Lucy's face, how to avoid escalating a dog encounter, and how to use non-lethal self-defense tactics instead of deadly force.

### 4. A jury could find ratification or tolerance from the post-shooting investigation.

Further, the post-shooting investigation creates a jury question as to whether JSO tolerated or ratified the unnecessary use of deadly force against Lucy. Officer Lampkin's immediate supervisor stated that Lampkin "really didn't need to" shoot and kill Lucy and observed that other officers were on scene "justifying it." Another supervisor directed a subordinate to report that Lampkin was in fear for his life and to report fewer shots than Lampkin had described. Viewed in Ms. Barus's favor, this evidence supports an inference that JSO did not merely fail to prevent unreasonable animal shootings but tolerated and excused them.

## III.   Conclusion

The Fourth Amendment prohibits officers from using deadly force against a domestic animal unless the animal poses an objectively legitimate and imminent threat. The City's motion depends on resolving disputed facts in its favor: that Lucy was an imminent threat, that no non-lethal option existed, that Officer Lampkin's pre-shooting conduct was reasonable, and that JSO's training, supervision, investigative, and disciplinary practices did not cause

the violation. Rule 56 requires the opposite. Because a reasonable jury could find for Ms. Barus on both the Fourth Amendment seizure and Monell liability, the City's motion should be denied.

**WHEREFORE,** Plaintiff Kimberly Barus respectfully requests that the Court deny Defendant City of Jacksonville's Motion for Final Summary Judgment and grant such further relief as the Court deems just and proper.

Respectfully submitted,

VENZA LAW, PLLC
12161 Mercado Drive, #227
Venice Beach, FL 33409-1147
Office: (561) 596-6329
Email: dvenza@venzalawpllc.com

BY: /s/ Denese Venza
Denese Venza, Esq.
Florida Bar No. 0599220
*Counsel for Plaintiff*

MARCY I. LAHART, PLLC
861 S. 40th Street
Tacoma, WA 98418
Telephone: (352) 545-7001
Facsimile: (888) 400-1464
Email: marcy@doglaw.co
BY:  /s/ Marcy I. LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
*Counsel for Plaintiff*

## VI. CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this June 22, 2026, a true and correct copy of the foregoing has been furnished via CM/ECF electronic mail service to the Clerk of the Court who will send electronic notice to all counsel of record.

/s/ Marcy LaHart
Marcy LaHart