**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**JACKSONVILLE DIVISION**

| | |
|---|---|
| KIMBERLY BARUS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF JACKSONVILLE and KARL LAMPKIN, in his individual capacity,<br><br>Defendants. | 3:24-cv-01358-JAR-SJH |

**OPINION AND ORDER**

Before the court are three cross-motions for summary judgment in a civil action brought pursuant to 42 U.S.C. §§ 1983 and 1988 by plaintiff Kimberly Barus ("Mrs. Barus") against defendant City of Jacksonville (the "City") and defendant Karl Lampkin ("Lampkin"). 2d Am. Compl., ECF No. 28 (Mar. 26, 2025) ("Compl."). Mrs. Barus claims that her federal civil rights were violated by Lampkin (Count I), Compl. ¶¶ 56–79, and that the City is liable pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978) (Count II). Id. ¶¶ 80–94. The City has moved for summary judgment as to Count II. Mot. for Summ. J. by City of Jacksonville, ECF No. 71 (June 1, 2026) ("City Mot."). Lampkin has moved for summary judgment as to Count I and has raised qualified immunity as a defense. Mot. for Summ. J. by Karl Lampkin, ECF No. 72 (June 1, 2026) ("Lampkin Mot."). Finally, Mrs. Barus has moved for partial summary judgment, claiming that the City and Lampkin (collectively, the "Defendants"), violated Mrs. Barus's Fourth Amendment rights when Lampkin shot and killed her dog (Count I) and Lampkin is not entitled

to qualified immunity.[1] Mot. for Summ. J. by Kimberly Barus, ECF No. 73 (June 1, 2026) ("Barus Mot.").

For the following reasons, the court denies Mrs. Barus's motion for partial summary judgment, grants Lampkin's motion for summary judgment with regards to Count I, finding that Lampkin enjoys qualified immunity, and grants the City's motion for summary judgment with regards to Count II.

## BACKGROUND

### I. The Alleged Incident at 3504 Rockwood Drive Prior to Lampkin's Arrival[2]

In the early morning of April 11, 2022, Lampkin was dispatched to 3504 Rockwood Dr. to investigate an animal complaint and an allegation of aggravated assault. Incident (Information) Report at 2, ECF No. 74-8 (June 1, 2026) ("Incident Rep."); Dep. of Karl D. Lampkin at 60:5–15, ECF No. 70-8 (June 1, 2026) ("Lampkin Dep."); RTR (Officer Report) at 1, ECF No. 70-4 (June 1, 2026) ("RTR Rep."). Malene Ellington ("Ellington") had called the police on behalf of her son Jaivon who she reported was stranded on top of a car after being chased by two dogs. Incident Rep. at 2. Lampkin called Ellington and was told that Jaivon had run away from the vehicle when

---

[1] While Mrs. Barus alleges that she suffered Fourth and Fourteenth Amendment violations in her complaint, Compl. ¶¶ 1, 42, 58, 76, 79, 86, 94, she discusses the Fourteenth Amendment only once in her motion for summary judgment, focusing instead on a violation of her Fourth Amendment rights. Barus Mot. at 6. She does not discuss whether she brings a substantive or procedural due process claim. No other party discusses her Fourteenth Amendment rights. City Mot.; Lampkin Mot. Barus's Fourteenth Amendment claim is swallowed by her Fourth Amendment Claim. Thus, the court will not address it. See Albright v. Oliver, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." (citing Graham v. Connor, 490 U.S. 385, 395 (1989) (citation modified)).

[2] Mrs. Barus challenges what had happened at her house before Lampkin showed up, Pl.'s Resp. in Opp'n to Def. Lampkin's Mot. for Summ. J. at 3–9, ECF No. 85 (June 22, 2026), but the court, rather than reciting these facts for their purported truth, only recounts them to explain what information Lampkin had before arriving to the Barus household.

a male with a gun exited the house's front door.[3] Id. at 2; see generally Lampkin Decl., Ex. B, ECF No. 70-10 (June 1, 2026) ("BWC 650") (documenting call with Ellington).

### II. The Incident at Issue at 3504 Rockwood Drive Following Lampkin's Arrival

According to body-worn camera ("BWC") footage, Lampkin introduced himself to Mrs. Barus and explained that he was there to investigate a complaint of "a kid on [her] car being chased by dogs and [her] husband pulling a gun on him." _AXON_Body_2_Video_2022-04-11_0718 at 7:20:19, ECF No. 70-10, Ex. C (June 1, 2026) ("BWC 718").[4] Mrs. Barus explained that neither she nor her husband owned a gun and that her husband "never made it out of the house." Id. at 7:20:23. Her husband ("Mr. Barus") then joined her at the front door. Id. at 7:20:27. Mrs. Barus had been woken up by her "dogs raising hell" and found that her gate was open which she alleged can only happen if someone actually opens the gate. Id. at 7:20:29. After closing the gate, she turned around to see a man—later identified as Jaivon—sitting on the back of the car. Id. at 7:20:44; Incident Rep. at 2–3. She stated that he refused her request to get off the car and said, "your dogs are chasing me." BWC 718 at 7:20:48. She then told him that the dogs were back in the fence, and once he refused again, she told him "it was about to be a bad day for him." Id. at 7:20:57. Once she went inside the house, Jaivon ran down the street, id. at 7:21:00, apparently to get to school. Incident Rep. at 4. Mrs. Barus told Lampkin that she believed Jaivon must have been inside the fence, BWC 718 at 7:21:11, and Mr. Barus speculated that the dogs must have

[3] In his final statement given to the police, Jaivon was "not sure [that the man who walked out of the door had a gun in his hand] considering he was already in a great deal of stress when he was chased by the dogs and [Mrs. Barus] was already angry with him." Incident Rep. at 4. The police did not see a weapon at the residence. Id.

[4] The court will reference the time stamps in local time, not Zulu time. See Decl. of Karlous D. Lampkin ¶ 7, ECF No. 70-10 (June 1, 2026) ("Lampkin Decl.") ("The BWC's time and date stamp displays the current time in 'Zulu' time (Z). Zulu time is four hours ahead of Eastern Standard Time during Daylight Savings Time.").

"surprised him." Id. at 7:21:16. Mrs. Barus explained that things had been stolen from her property before. Id. at 7:21:25. She stated she did not know whether he was on his phone with his mother at all, id. at 7:21:37, even though she had earlier stated to Lampkin that she "hoped his mama would have come down here" and "you don't send your kid out at 6:30 in the morning into someone's yard." Id. at 7:21:08.

Lampkin then asked where the dogs were, and the Baruses responded "in the backyard," and that they never come outside. Id. at 7:21:45. This conversation followed:

> Mr. Barus: You can go back there and open that gate—
> Mrs. Barus: You can—I'll go open it right now, and they will not come out of that fence on you.
> Lampkin: Okay. Well, let me see them.
> . . .
> Mrs. Barus: Come on.
> Lampkin: No, go ahead. You go open the gate. I'll be there.

Id. at 7:21:48. Alone with Mr. Barus, Lampkin asked whether Mr. Barus had something in his hand. Id. at 7:22:00. Howling and barking can be heard in the background. Id. at 7:22:13.

> Mr. Barus: Oh, no, sir. I had my fist, and that's what I intended to use when I got to him.
> Lampkin: Uh-huh. Did you see him in your backyard or anything?
> Mr. Barus: No.
> Lampkin: Okay.
> Mr. Barus: But what my wife says is true.
> Lampkin: Okay.
> Mr. Barus: My dogs don't go outside that damn fence if it's open. It can be wide open—
> Lampkin: Uh-huh.
> Mr. Barus: —and they don't go outside that fence.
> Lampkin: Okay. Stay right there.
> Mr. Barus: Yes, sir.

Id. at 7:22:03–17. As Lampkin walked away, Mr. Barus stated that he said, "You son of a [expletive], you better run" while standing outside the house, as Jaivon had run around the corner. Id. at 7:22:27.

Lampkin then made his way around the house, walked past a white car, and walked towards the fenced yard where Mrs. Barus was already standing by the open gate. Id. at 7:22:44. As he approached the chain-link fence, a black and white dog, wagging its tail, appeared. Id. at 7:22:56. The dog exited through the gate, and Lampkin said, "Well, he's [sic] out the gate." Id. at 7:23:00. Mrs. Barus stayed by the gate and watched as the dog—later identified as Lucy—made her way towards Lampkin. Lampkin Dep. at 71:3–10; BWC 718 at 7:23:00. Lampkin said, "Hey bud," BWC 718 at 7:23:01, and extended his right hand to Lucy to sniff. Lampkin Dep. at 162:19–21. Howling can be heard in the background, and a brown and white dog can be seen in the yard. BWC 718 at 7:23:02. Lucy bit Lampkin on the index finger of his right hand. Lampkin Dep. at 162:2–5, 19–25. Lampkin said, "Hey!" and pulled up his hand. BWC 718 at 7:23:03. Mrs. Barus then walked towards Lampkin and Lucy and said, "Come on." Id. at 7:23:04. According to Lampkin, she was around six to ten feet away from him. Lampkin Dep. at 168:19–21. This seems generally consistent with the BWC footage. BWC 718 at 7:23:04. At the same time, Lucy circled Lampkin and bit him on the back of his left calf. Lampkin Dep. at 161:12–16. Lampkin stated that he feared "that it would bite [him] on [his] Achilles tendon, causing a debilitating injury." Lampkin Decl. ¶ 9. He pulled out his firearm, said "get back," and then shot approximately five times at Lucy who was running away from him, towards the front of the house and the street. BWC 718 at 7:23:05–10; RTR Rep. at 3. Almost 14 seconds passed from the moment Lampkin spotted Lucy until he fired the last shot. BWC 718 at 7:22:56–23:10. Lucy succumbed to her injuries on the front porch. Report by Animal Code Enforcement Officer Duren at 3, ECF No. 70-4 (June 1, 2026) ("Animal Officer Rep."). Once the shooting occurred, other officers, as well as

the supervisors and lieutenant, were dispatched, as is required by policy.[5] Dep. of Erica Weber at 27:16–20, ECF No. 70-2 (June 1, 2026) ("Weber Dep.").

Record evidence indicates that Lucy bit Lampkin twice. The first bite was less than 1 mm wide and less than 1 cm long, in the cuticle area of Lampkin's finger. Lampkin Dep., Pl. Ex. 7, ECF No. 70-8 (June 1, 2026). The second bite, on his calf, was not photographed near a ruler, but comprised two shallow round marks. Lampkin Dep., Pl. Ex. 8, ECF No. 70-8 (June 1, 2026). The animal code enforcement officer described them as "mild" in his report. Animal Officer Rep. at 2.

**III. The City's Policies and Trainings**

The dog-related training the City has conducted for its police force consisted of five, 15-minute videos shown during roll call in 2015. COJ Info. Bulletins, ECF No. 74-3 (June 1, 2026) ("Trainings").[6] Lampkin recalls completing these trainings. Lampkin Dep. at 107:17–20. Over the ten-year period from 2012 to 2022, force was used against dogs approximately 90 times, the majority of which did not involve some remedial training or follow-on. Weber Dep. at 95:23–

[5] According to BWC footage cited by Mrs. Barus, a supervising officer, in describing the incident to his significant other on the phone, said, "One of my guys shot and killed a dog this morning. He really didn't need to." AXON_Body_2_Video_2022-04-11_0818 at 8:24:24, ECF No. 80 (June 11, 2026) ("BWC 818"). Another officer's subjective view, however, is not the relevant standard.

In another BWC footage also cited by Mrs. Barus, a supervising officer dictated to Officer Pittman, who wrote one of the incident reports, Barus Dep., Pl. Ex. 6: Incident Rep. at 6, ECF No. 70-4 (June 1, 2026) ("Pittman Rep.") that "Officer Lampkin stated that he wanted to see the dog upon going around the side of the house." AXON_Body_2_Video_2022-04-11_0825 at 8:26:27, ECF No. 80 (June 11, 2026) ("BWC 825"). The supervising officer recounted the incident and proceeded to say, "Officer Lampkin drew his issued JSO firearm and fired three shots at the dog due to the fact that he was in fear of his life, and then that's where we're kinda gonna end it." Id. at 8:27:08. "Put approximately three shots because I don't want it to be four or five. He said four or five but there's three casings over there." Id. at 8:27:23. Officer Pittman's report stated that "Ofc. Lampkin drew his JSO issued firearm and fired approximately three rounds due to him being in fear for his life." Pittman Rep. at 4.

[6] The court assumes all these trainings were completed sequentially in 2015 despite the presumed typo in the second bulletin. See Trainings at 2 (titled "INFORMATION BULLETIN 2015-014" on "January 30, 2014").

96:5, 97:4-10; Firearm RTR Report Against Animals, ECF No. 74-4 (June 1, 2026) ("All RTR Report").

The City's Deadly Force Policy applies equally to animals and people. Weber Dep. at 109:6–11; Order 551: Response to Resistance, ECF No.70-3, Pl. Ex. 5 (June 1, 2026) ("RTR Policy"). According to policy, "[a]ny animal creating a CLEAR AND IMMEDIATE DANGER TO the officer or the public may be killed if an attack is imminent and NO OTHER SOLUTION EXISTS." Order 212: Animal Complaints at 4, ECF No. 70-3, Pl. Ex. 4 (June 1, 2026) ("Animal Policy"). In addition, "[w]hen handling an aggressive or dangerous animal, officers are required to use non-lethal options when feasible, including, but not limited to . . . retreating from the animal . . . ." RTR Policy at 22–23.

**IV. The Case Before This Court**

Mrs. Barus filed her complaint on March 26, 2026. Compl. All three parties filed for summary judgment, Barus Mot.; City Mot.; Lampkin Mot., with subsequent responses, Pl.'s Resp. in Opp'n to Def. Lampkin's Mot. for Summ. J., ECF No. 85 (June 22, 2026) ("Barus Resp. to Lampkin"); The City's Resp. to Pl.'s Mot. for Summ. J., ECF No. 86 (June 22, 2026) ("City Resp."); Def. Lampkin's Resp. to Pl.'s Mot. for Summ. J., ECF No. 87 (June 22, 2026) ("Lampkin Resp."); Def. Pl. Kimberly Barus's Resp. in Opp'n to the City of Jacksonville's Mot. for Summ. J., ECF No. 89 (June 22, 2026) ("Barus Resp. to City"), and replies. Pl.'s Reply to the City of Jacksonville's Resp. in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 96 (July 6, 2026) ("Barus Reply to City"); Pl.'s Reply to Def. Lampkin's Resp. in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 97 (July 6, 2026) ("Barus Reply to Lampkin"); Def. Lampkin's Reply to Pl.'s Resp. to Lampkin's Mot. for Summ. J., ECF No. 98 (July 6, 2026) ("Lampkin Reply"); The City's Reply to Pl.'s Resp. to the City's Mot. for Summ. J., ECF No. 100 (July 6, 2026) ("City Reply").

Before this court are also the City's Daubert motion, Defs.' Daubert Mot. to Exclude Testimony of Pl.'s Expert James Crosby, ECF No. 88 (June 22, 2026), Mrs. Barus's motion to strike, Pl.'s Objs. to & Mot. to Strike the Lampkin Decl., or Alternatively, Portions of Defs.' Summ. J. Evid., ECF No. 90 (June 22, 2026) ("Strike Mot."), and the subsequent responses. Pl.'s Resp. in Opp'n to Defs.' Daubert Mot. to Exclude Test. of Pl.'s Expert James Crosby, ECF No. 102 (July 13, 2026); Def.'s Resp. to Pl.'s Objs. to & Mot. to Strike Lampkin Decl. or Alternatively Portions of Defs.' Summ. J. Evid., ECF No. 99 (July 6, 2026) ("Strike Resp."). The court does not yet consider the Daubert motion and resolves the motions for summary judgment, which are not dependent on the expert report, without reaching the expert's admissibility. See, e.g., Principi v. Survivair, Inc., 231 F.R.D. 685, 690 (M.D. Fla. 2005) ("This Court need not decide Defendant's Daubert challenge to Plaintiff's experts in order to resolve the summary judgment motion."). But see City of S. Miami v. Desantis, No. 19-CV-22927, 2020 WL 7074644, at *3 (S.D. Fla. Dec. 3, 2020) ("The Court first addresses Defendants' Daubert Motion and Motion in Limine because the parties' pending cross-motions for summary judgment are, at least in part, dependent upon the disposition of these Motions."). The court denies the motion to strike[7] and considers the three cross-motions for summary judgment.

[7] Mrs. Barus moves to strike Lampkin's declaration entirely or to strike paragraphs 3, 8, 10, and 11, for not meeting the standards set forth in Federal Rules of Civil Procedure 56(c)(2) and (4). Strike Mot. Mrs. Barus also moves to strike the declaration for "non-compliance with 28 U.S.C. § 1746" but does not explain why, so the court does not consider this argument. Strike Mot. at 1–2. Mrs. Barus has not made a convincing argument, or any argument, as to why Lampkin's declaration should be stricken in whole, so the court considers the four paragraphs at issue. As to paragraph 3, the information contained in the Event Recap therein mentioned is already in the record as an exhibit to Chief Weber's deposition, Weber Dep., Pl. Ex. 2, ECF No. 70-2 (June 1, 2026) ("Event Recap"), and Lampkin does not offer the information for the truth of the matters asserted therein. Rather, he offers it to explain the effect the information had on him—namely, why he undertook an investigation of the reported incident. The statement therefore is not hearsay. See Fed. R. Evid. 801(c). Nor has Mrs. Barus shown that Lampkin lacks personal knowledge of the matters about which he testifies. See Fed. R. Civ. P. 56(c)(4).

**STANDARD OF REVIEW**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material for the purposes of summary judgment only if it might affect the outcome of the suit under the governing law." Kerr v. McDonald's Corp., 427 F.3d 947, 951 (11th Cir. 2005) (per curiam) (citation modified) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of fact is genuine if the record taken as a whole could lead a reasonable juror to find for the nonmoving party. Anderson, 477 U.S. at 248.

On summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving party]." Scott v. Harris, 550 U.S. 372, 378 (2007) (citation modified) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam); Saucier v. Katz, 533 U.S. 194, 201 (2001)). When parties jointly move for summary judgment, the court has three options: "grant summary judgment for the plaintiff under the defendant's best case, grant summary judgment for the defendant under the plaintiff's best case,

---

As to paragraphs 8, 10, and 11, Mrs. Barus has not established a basis for striking the affidavit per the sham-affidavit rule. See Van T. Junkins & Assoc., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984) (striking an affidavit used to support or oppose a summary judgment motion when a party has given clear answers to unambiguous questions and that party attempts thereafter to create a genuine issue of material fact with an affidavit that merely contradicts, without explanation, previously given clear testimony). Although Mrs. Barus identifies purported inconsistencies between Lampkin's declaration, his deposition testimony, and the BWC footage, she does not identify a clear answer to an unambiguous question that Lampkin subsequently contradicts without explanation. To the contrary, Mrs. Barus devotes nearly nine pages to explaining the alleged contradictions and inconsistencies, Strike Mot. at 6–16, demonstrating that the testimony is not the sort of clear and unequivocal contradiction required to invoke the sham-affidavit rule. See 736 F.2d at 657. Any discrepancies between Lampkin's declaration and his prior testimony therefore go to the weight and credibility of his testimony, not its use at the summary judgment stage.

or deny both motions for summary judgment and proceed to trial."[8] FCOA LLC v. Foremost Title & Escrow Servs. LLC, 57 F.4th 939, 959 (11th Cir. 2023).

**I. A Genuine Issue of Material Fact Exists as to Whether Lampkin's Seizure of Mrs. Barus's Dog Was Reasonable, but Lampkin Enjoys Qualified Immunity**

**A. A reasonable juror could find that Lampkin's seizure was unreasonable.**

Mrs. Barus claims Lampkin's seizure of her dog violated her constitutional right under the Fourth Amendment to be free from unreasonable seizures. Barus Mot. at 6–9 (citing Plowright v. Miami Dade Cnty., 102 F.4th 1358 (11th Cir. 2024). In her complaint, Mrs. Barus alleges that Lampkin "had no reason to inspect Plaintiff's dogs, who at the time of his arrival were secured in Plaintiff's backyard." Compl. ¶ 61. According to Mrs. Barus, "a reasonable officer would not have believed that he was in imminent danger or that Lucy was a threat to others when he shot her."[9] Barus Mot. at 8; Barus Resp. to City at 6–7. Mrs. Barus contends that Lampkin's failure to plan less lethal alternatives when investigating a complaint about aggressive dogs was unreasonable and that his response with deadly force is not justified by "two bites causing negligible injury."[10] Id. at 8; Barus Reply to City at 4–5. She also argues that, because Lucy was retreating, Lampkin's decision to continue firing shots was unreasonable and unnecessary. Barus Resp. to Lampkin at 14–17. According to Mrs. Barus, the Defendants' arguments ignore the

[8] The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. The court views the facts "in the light most favorable to the non-moving party on each motion." Chavez v. Mercantil Commercebank, N.A., 701 F.3d 896, 899 (11th Cir. 2012).

[9] It is unclear which bullet killed the dog. Also, Mrs. Barus alleges she was inches away from the dog at the time of the first shot, Barus Mot. at 8, but the BWC footage does not bear this out. BWC 718 at 7:23:04.

[10] Mrs. Barus notes that "Lampkin did not have his baton on his person, contrary to JSO uniform policy," nor did he have his pepper spray handy when he went to look at the dogs. Barus Resp. to Lampkin at 13. Mrs. Barus also claims that "it is JSP policy, and part of Lampkin's training as a police officer, to use the least lethal force when possible." Id. at 7.

"totality of circumstances" by excluding the events Lampkin created before pulling the trigger. Barus Reply to City at 2–4; Barus Reply to Lampkin at 2–7; Barus Resp. to Lampkin at 11–17; Barus Resp. to City at 7–8; see also Barus Resp. to Lampkin at 9–11 (discussing Lampkin's use of the "moment-of-threat" analysis).

Defendants argue that Lampkin's decision to shoot and kill the dog was objectively reasonable, so no Fourth Amendment violation occurred. City Mot. at 5–6;[11] Lampkin Mot. at 11–17. Lampkin claims he had "probable cause to conduct the investigation, acted with objective reasonableness at all times, and used only such force as was reasonably necessary under the facts and circumstances presented." Def. Lampkin's Answer & Affirmative Defenses, Affirmative Defenses ¶ 3, ECF No. 29 (Apr. 9, 2025) ("Ans."); see also City Resp. at 2 ("[I]t was objectively reasonable for Lampkin to use deadly force under the totality of circumstances confronting him."). Rather, Lampkin asserts that the "actions or inactions of Plaintiff are the sole, direct, and proximate cause of her alleged damages." Ans. ¶ 4. Lampkin used deadly force "because the dog presented a threat of serious bodily harm to Lampkin and others in the area;" he thus claims that shooting the dog did not constitute a Fourth Amendment violation. Lampkin Mot. at 11; Lampkin Reply 4–6. Lampkin argues there was "no opportunity [for him] to 'deescalate' because the dog was biting and then running into a neighborhood where kids might be walking to school." Lampkin Mot. at 9. Rather, even though Lucy ran after shots were fired, "Lampkin could not determine whether she would continue to bite or exhibit aggressive behavior as she ran outside the confines of the fence, so he fired more shots." Id. Lastly, Lampkin asserts that Mrs. Barus has failed to establish the existence of any genuine issue of material fact, despite listing about six pages of facts

---

[11] While the City only moves for summary judgment on Count II, whether there was an underlying constitutional violation is pertinent to its claims.

for that purpose. Lampkin Reply at 1–4 (discussing Barus Resp. to Lampkin at 3–9); City Reply at 2.

Defendants discuss two Middle District of Florida decisions, which they characterize as analogous. Lampkin Mot. at 12–17; City Mot. at 6; Lampkin Resp. at 5–10. First, they rely on Chastang v. Levy, where a police officer responded to a burglary alarm and shot two dogs that had cornered him. 319 F. Supp. 3d 1244, 1255 (M.D. Fla. 2018). There, the court held that the officer's actions defending himself were objectively reasonable because "[o]nly when he perceived immediate danger did he pull the trigger, out of concern for his safety." Id. at 1255. Lampkin observes that "reasonableness is the correct test, not whether lethal force was the 'best possible response.'" Chastang, 319 F. Supp. 3d at 1256; Lampkin Mot. at 14. Lampkin asserts that similarly here, "[he] did not have time to evaluate the severity of the bites that Lucy inflicted . . . . In the heat of the moment, the law required only that he act reasonably to protect his own safety and that of others." Lampkin Mot. at 14–15.[12] Defendants also rely on Schutt v. Lewis, another case where the court found the "shooting of a dog reasonable where the dog neither bit nor pinned the law enforcement but merely ran towards him." Lampkin Mot. at 15 (discussing Schutt v. Lewis, No. 6:12-CV-1697-ORL-37, 2014 WL 3908187 (M.D. Fla. Aug. 11, 2014)); see also City Mot. at 6 (same). They highlight that the "touchstone for reasonableness in dog-shooting cases is typically officer safety." City Mot. at 6 (citing Schutt at *3); see also Lampkin Mot. at 16 (same).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

[12] Lampkin asserts that evidence in the record shows why he did not view his other options as reasonable: "[A]n officer in similar circumstances could have reasonably believed that in the time it took him to get his baton, the dogs could have aggressively chased another young person onto the top of a car hood – or worse." Lampkin Mot. at 15.

A seizure of property "occurs when there is a meaningful interference with a person's possessory interest" in it. United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007). In Plowright v. Miami Dade County, the Eleventh Circuit held that "shooting a domestic animal constitutes a seizure under the Fourth Amendment." Plowright, 102 F.4th at 1364.[13] Whether such a seizure violates the Fourth Amendment depends on an objective reasonableness test based on the totality of the circumstances: "[A]n officer may not use deadly force against a domestic animal unless that officer reasonably believes that the animal poses an imminent threat to himself or others." Id. at 1365–66. The "reasonableness" of a particular use of force must, however, "be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Chastang, 319 F. Supp. 3d at 1253 (citing Terry v. Ohio, 392 U.S. 1, 20–22, (1968)). An "officer's response need not be the best possible reaction under the circumstances to be considered reasonable." Schutt, 2014 WL 3908187, at *3 (citing Altman v. City of High Point, N.C., 330 F.3d 194, 207 (4th Cir. 2003)).

At the time of the incident, Officer Lampkin was responding to a call from a concerned mother about aggressive dogs that had chased her fifteen-year-old son and forced him on top of Mrs. Barus's car. Lampkin Dep. at 52:10–11, 53:11–12, 54:23–25. Lampkin went to Mrs. Barus's home to investigate because what had begun as an animal complaint evolved into a potential aggravated assault. Id. at 60:5–8. According to the mother, Mrs. Barus had threatened to get her husband to get the child off the car, and her husband came out carrying a gun and chased the child down the street. Id. at 60:13–17.

[13] The § 1983 action was brought against a police officer for wrongful seizure of a pet dog. Plowright, 102 F.4th at 1362. The court reversed the district court's dismissal of Plowright's § 1983 claim. Id. at 1371.

After arriving at the Barus property and briefly discussing the matter with the Baruses, Officer Lampkin proceeded to the rear of the house to observe the dogs.[14] Id. at 115:1–2, 115:7–9. Mrs. Barus repeatedly emphasized that her dogs would not exit the gate. Id. at 115:9–10. Lampkin "expected to gain information regarding the dog's behavior and demeanor and whether the dog would leave the fenced-in area if the gate was [sic] open."[15] Def. Karl D. Lampkin's Second Am. Answers to Pl.'s Interrogs. ¶ 22, ECF No. 70-8, Pl. Ex. 4 (June 1, 2026). After Plaintiff opened the gate, Lucy wagged her tail, exited the gate, and approached Officer Lampkin. BWC 718 at 7:22:49–23:00. Lampkin held out his hand for her to sniff when she bit[16] him on the hand. Id. at 7:23:01; Lampkin Dep. at 162:2–5, 19–25. He then yelled out "hey" and pulled his hand away when Lucy circled him and bit the back of his left calf. Lampkin Dep. at 157:20–21, 160:22–24, 161:12. After the second bite, Lampkin pulled out his gun and shot approximately five rounds at Lucy. Id. at 196:4–5. Lucy appears to be moving away from Lampkin after the first round. BWC 718 at 7:23:04. It is unclear whether she was moving away before the first round. Lampkin claimed he was concerned Lucy might reengage as she had already been aggressive. Lampkin Dep. at 176:10–24. He feared the dog was going to bite his Achilles tendon, which could cause

---

[14] The parties contest whether Mrs. Barus invited Lampkin to observe the dogs or whether he ordered her to show them to him. The BWC portion quoted above indicates that Lampkin's instruction to open the gate followed the Baruses' offer to show him the dogs and open the gate. See BWC 718 at 7:21:48–22:17.

[15] Officer Lampkin stated that allowing Mrs. Barus to open the gate would also separate Mrs. Barus from her husband in order to get individual statements. Lampkin Dep. at 131:2–6. According to Lampkin, Mrs. Barus would not allow her husband to speak while they were together at the front door. Id. at 131:13–14.

[16] Mrs. Barus uses the verb "to nip," see, e.g., Barus Resp. to Lampkin at 7, and Lampkin and the City use the verb "to bite." See, e.g., Lampkin Resp. at 2; City Resp. at 3. The court uses "to bite" since it is the more inclusive term. Compare nip, Merriam-Webster, https://www.merriam-webster.com/dictionary/nip ("to bite or pinch someone or something lightly"), with bite, Merriam-Webster, https://www.merriam-webster.com/dictionary/bite ("to seize especially with teeth or jaws so as to enter, grip, or wound").

serious injury. Lampkin Decl. ¶ 9. Lampkin did not stop to check the extent of his injuries, but it is undisputed that there were two bites. See City Mot. at 2; Barus Mot. at 4; Lampkin Mot. at 8.

The court first considers the cross-motions for summary judgment of Mrs. Barus and Officer Lampkin on the issue of violation of a constitutional right. The background material facts are largely undisputed, but for each motion, the court draws the facts against the moving party. See Chavez, 701 F.3d at 899. The court finds a genuine issue of material fact as to whether Lampkin's actions were objectively reasonable in view of the totality of those background facts. To qualify as a constitutionally permissible seizure, Lampkin's decision to shoot and kill Lucy must have been objectively reasonable from the totality of the circumstances. See Plowright, 102 F.4th at 1366. The disputed question is thus whether a reasonable officer in Lampkin's position would have believed Lucy posed an imminent threat to his safety or to the safety of others to justify shooting and killing her. See id. at 1365. Based on the record evidence, a reasonable juror could go either way.

When Lucy ran past her owner and out of the gated fence, Lampkin faced a large dog that did not comply with its owner's commands. Lucy then proceeded to bite Lampkin's hand and leg, and he stated he feared she would try to bite his Achilles, causing him harm. At that point the animal was not confined. But, while the first shot may have been justified by the two bites that immediately preceded them and the fact that the animal was not confined, a reasonable jury could find that the use of deadly force was no longer reasonable once Lucy was retreating and no longer presenting an imminent threat to the officer. See id. at 1366 ("Absent exigent circumstances, it would be unreasonable, for example, for an officer to deploy deadly force against a dog . . . while [that dog was] moving away from any potential victims."). There is no specific evidence cited of other people in immediate danger, but there is also no evidence that the dog would remain on the

property. The record further would permit a jury to consider whether Lampkin reasonably could have employed a less lethal alternative before resorting to deadly force, particularly given the City's policy requiring officers to use non-lethal options when feasible, including retreating from an animal. Animal Policy at 4; RTR Policy at 22–23. Taken together, these facts could push the scales enough in Mrs. Barus's direction for a reasonable jury to find for her on this issue. On the other hand, weighing all that had preceded the bites and Officer Lampkin's understanding of the trapping of Jaivon on a car, Lampkin may be seen to have acted reasonably. Thus, this issue cannot be resolved summarily in favor of either party.

**B. Lampkin is entitled to qualified immunity.**

Lampkin argues that even if a constitutional right had been violated, he is entitled to qualified immunity because his actions did not violate clearly established law of which a reasonable officer would have known. Lampkin Mot. at 2. According to Lampkin, Mrs. Barus cannot meet her burden because "[t]here is simply no law from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court holding that it is unreasonable to shoot a dog who bit an officer twice, ran out of its enclosure despite the assurance of its owner that it would not do so, and had been reported as aggressively chasing and baying a teenager about an hour before the shooting," id. at 20, and this case is unlike Plowright which applied the "obvious clarity" exception. Id. (distinguishing Plowright).

Mrs. Barus argues that Lampkin is not entitled to qualified immunity because he "acted outside his discretionary authority" when he "told" Mrs. Barus to "go open the gate," and when City policy[17] dictates that officers need not view non-threatening, safely confined animals. Compl.

[17] For "City policy," Mrs. Barus cites to an email sent on June 7, 2022, over a month after the incident at issue, about a separate incident. Barus Mot. at 12–13 (citing Internal Memo 6/7/22, ECF No. 74-10 (June 1, 2026)). A director had found that the incident was "within policy," and

¶ 77; Barus Mot. at 11–13; Barus Reply to Lampkin at 1–2. Mrs. Barus maintains, in the alternative, that Lampkin violated a clearly established constitutional right of which a reasonable person would have known, and his use of deadly force against Lucy while she was backing away was unreasonable as a matter of law. Compl. ¶ 78; Barus Mot. at 13–15; Barus Reply to Lampkin at 2–7. According to Mrs. Barus, general Supreme Court principles clearly establish that deadly force is reasonable only when an imminent threat exists and continues only so long as that threat persists, Barus Resp. to Lampkin at 18–19 (citing Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989)), and that Plowright is instructive. Barus Resp. to Lampkin at 18.

According to Lampkin, he did not exceed the scope of his discretionary authority because he was acting within his officer duties to investigate a possible crime or ordinance violation. Lampkin Resp. at 11–13 (comparing the instant case to Spencer v. Benison, 5 F.4th 1222, 1227–29 (11th Cir. 2021)). Lampkin further notes that Plowright was far from clearly established law at the time of the incident because it was decided in 2024, two years after the incident, that Plowright is far from sufficiently similar, and that Graham and Tennessee are too general to defeat qualified immunity here. Lampkin Reply at 6–7; Lampkin Resp. at 13–14.

Qualified immunity protects public officers "from undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982). To establish qualified immunity, a defendant "first must show that [he] was acting within the scope

---

the recipient was directed to "please conduct training using Order 212 (Animal Complaints), and reiterate that officers do not need to view the animal if it has been safely confined by the owner and no longer poses a threat." Internal Memo 6/7/22, ECF No. 74-10 (June 1, 2026). The court has found no mention of this in Order 212 but notes that Order 212 states in relevant part that "[i]f the animal is not presenting an immediate danger, the officer should request the complainant to call [Animal Care and Protective Services]." Animal Policy at 4.

of [his] discretionary authority at the time of the alleged misconduct." Paez v. Mulvey, 915 F.3d 1276, 1284 (11th Cir. 2019). The term "discretionary authority" covers all actions of a governmental official that (1) "were undertaken pursuant to the performance of his duties," and (2) were "within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (citation omitted). That an officer has engaged in an action not authorized by policy does not mean he was acting outside his discretionary authority. See cf. Sumrall v. Ga. Dep't of Corrections, 154 F.4th 1304, 1311 (11th Cir. 2025).

Once a defendant has established that he was acting within his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)). The plaintiff must establish that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."[18] Aguirre v. Seminole Cnty., 158 F.4th 1276, 1296 (11th Cir. 2025) (citation modified) (citing Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)). "A right can be clearly established either by similar prior precedent, or in rare cases of obvious clarity." Brooks v. Warden, 800 F.3d 1295, 1306 (11th Cir. 2015). Besides the "obvious clarity" exception, "a legal principle must have a sufficiently clear foundation in then-existing precedent" such that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." D.C. v. Wesby, 583 U.S. 48, 63 (2018) (citing Hunter v. Bryant, 502 U.S. 224, 228 (1991) (per curiam)). The existing law must "clearly prohibit the officer's conduct in the particular

[18] The court may decide which of the two prongs of this analysis to address first in the light of the circumstances in the case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The court has decided that the first prong involves disputed issues of fact; the court thus turns to the second prong.

circumstances before him . . . . This requires a high degree of specificity." Wesby at 63 (citation modified) (citation omitted).

Lampkin has been working for the Jacksonville Sheriff's Office ("JSO") since 2007. On April 11, 2022, he was the police officer assigned to the area from which the 911 call initiated. Lampkin Decl. ¶¶ 2, 3. Dispatch assigned to him the investigation. See Dep. of Erica Weber, Pl. Ex. 2 at 2, 12, ECF No. 70-2 (June 1, 2026) ("Dispatch log"). After calling Jaivon's mother, BWC 650 at 6:56:00–7:10:00, Lampkin continued the investigation into a potential aggravated assault and aggressive dogs at the Barus residence. Lampkin Dep. at 60:5–15; BWC 718 at 7:20:19.

First, Mrs. Barus has failed to prove that Lampkin was acting beyond his discretionary authority. At the time of the incident, Lampkin was investigating allegations of aggravated assault and aggressive dogs. Lampkin undertook the challenged action here while conducting his investigative function, so he was acting within his discretionary authority. See Jordan, 38 F.3d at 1566; cf. Hinson v. Bias, 927 F.3d 1103, 1116 (11th Cir. 2019) (concluding that officers were acting within the scope of their discretionary authority because they "undertook all the challenged actions while on duty as police officers conducting arrest and investigative functions."). That Mrs. Barus alleges Lampkin's behavior was not within JSO policy is irrelevant because "that's not the test." See Sumrall, 154 F.4th at 1311. Conducting the investigation as he saw fit was a "legitimate job-related function" that was within Lampkin's "power to utilize." See Carruth v. Bentley, 942 F.3d 1047, 1054 (11th Cir. 2019).

Second, Mrs. Barus has failed to meet her burden of proving that the right was clearly established. See Wesby, 583 U.S. at 63 (Clearly established law must be "sufficiently clear [at the time of the officer's conduct] that every reasonable official would understand that what he is doing is unlawful." (citation modified) (citation omitted)). Mrs. Barus's reliance on general principles

of the Fourth Amendment and Tennessee and Graham is not specific enough: Neither of those cases concern the shooting of a dog. See Barus Resp. to Lampkin at 18–19; see also City of Escondido v. Emmons, 586 U.S. 38, 42 (2019) ("[T]he clearly established right must be defined with specificity . . . . Specificity is especially important in the Fourth Amendment context . . . ." (citation modified) (citation omitted)).

This case differs significantly from Plowright. In Plowright, the court applied "the obvious clarity" exception because "no reasonable officer could ever believe that it was appropriate to shoot an incapacitated, non-threatening domestic animal during a 911 investigation." Plowright, 102 F.4th at 1367. Here, Lucy was far from incapacitated; she had just bitten Lampkin twice before he shot at her. Irrespective, Plowright was not decided until 2024, two years after this incident, so, to the extent it is relevant, the court cannot consider it to have set forth "clearly established" law applicable to this case.

Mrs. Barus's argument that Lampkin created the danger by agreeing to view the dogs does not alter this conclusion. As discussed above, Lampkin was acting within his discretionary authority while investigating the reported aggravated assault and aggressive-dog complaint. Mrs. Barus identifies no controlling precedent holding that an officer who, in the course of an investigation, permits an animal to leave an enclosure thereby forfeits qualified immunity for a subsequent use of force against that animal. See Lampkin Reply at 5. Whatever relevance the circumstances leading up to the shooting may have to the Fourth Amendment reasonableness inquiry, they too do not create a "clearly established" right.

Accordingly, Lampkin is entitled to qualified immunity. The court thus grants Lampkin's motion for summary judgment as to Count I, denies Mrs. Barus's motion for summary judgment as to Count I, and dismisses Count I of the complaint.

## II. The Court Grants the City's Motion for Summary Judgment as to Count II

The court now considers the City's motion for summary judgment with respect to Count II. The City argues that there is no evidence that its Animal Policy is constitutionally deficient so that the City is liable pursuant to Monell. City Mot. at 10. The City further argues that there is no record evidence that the violation of constitutional rights was so obvious to policymakers who were "deliberately indifferent" to the need for further training because Mrs. Barus needs to do more than point to the existence of prior incidents of unspecified circumstances. Id. (citing City of Canton v. Harris, 489 U.S. 378, 389 (1989)); City Resp. at 4. Lastly, the City argues that there is no evidence the relevant training already provided to officers rises to the level of deliberate indifference. City Mot. at 10–11; see also City Resp. at 3, 5–7 ("Plaintiff's argument is simply that JSO officers have less training than animal control officers and JSO officers had 90 prior incidents of using lethal force against dogs from 2012 to 2022."). Mrs. Barus responds that a jury could find deliberate indifference from recurring dog encounters and inadequate training and a custom or practice from repeated animal-force incidents, non-discipline, and underreporting. Barus Resp. to City at 11–14; see also Barus Resp. to City 5–7. Mrs. Barus also notes, and the City does not address, that a jury could find the City liable under a ratification or tolerance theory based on the post-shooting investigation. Barus Resp. to City at 14. In its reply, the City notes that Mrs. Barus still fails to "present evidence that the prior incidents were constitutional violations themselves, giving the City notice that action was necessary." City Reply at 2–7.

"Local governing bodies . . . can be sued directly under § 1983 . . . ." Monell, 436 U.S. at 690. "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that [her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the

violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality . . . . A custom is a practice that is so settled and permanent that it takes on the force of law." Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (citation omitted). A single incident of a constitutional violation is not enough to establish a policy or custom attributable to a municipality. See, e.g., Craig v. Floyd Cnty., 643 F.3d 1306, 1310–11 (11th Cir. 2011).

Failing to adequately train employees can constitute the "custom" or "policy" that renders a municipality liable under section 1983. See, e.g., Favors v. City of Atlanta, 849 F. App'x 813, 817 (11th Cir. 2021). For a plaintiff to show that a failure to train amounts to "deliberate indifference" toward his constitutional rights, see McDowell, 392 F.3d at 1289, he "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Cooper v. Rutherford, 828 F. App'x 619, 622 (11th Cir. 2020) (per curiam) (citation omitted); see also Canton at 389. Deliberate indifference is more than mere negligence. See Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115 (11th Cir. 2005) (citation omitted). Ordinarily, the plaintiff must allege a "pattern of similar constitutional violations" to demonstrate that a municipality is on notice. Cooper, 828 F. App'x at 622 (citing Connick v. Thompson, 563 U.S. 51, 62 (2011)); see also Canton at 397 ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion.") (O'Connor, J. concurring). It is possible "that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." Connick, 563

U.S. at 64. This exception is narrow, however. See Canton, 489 U.S. 378, 390 n.10 (1989) (providing example of the obvious need for city policymakers who "know to a moral certainty that their police officers will be required to arrest fleeing felons" to train officers armed with firearms on the constitutional limitations on the use of deadly force, such that "failure to do so could properly be characterized as deliberate indifference to constitutional rights").

When a plaintiff complains about a single level of misconduct, she must show that the "local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory." Salvato v. Miley, 790 F.3d 1286, 1296 (11th Cir. 2015) (citation omitted); see also Matthews v. Columbia Cnty, 294 F.3d 1294, 1297 (11th Cir. 2002) (holding a municipality liable under a ratification theory of Monell liability "when a subordinate public official makes an unconstitutional decision" that is "then adopted by someone who does not have final policy making authority"). In Salvato, the 11th Circuit acknowledged that when a plaintiff demonstrates that a police department has "persistent[ly] fail[ed] to take disciplinary action against officers," it can create an inference that the department ratified the misconduct. Salvato, 790 F.3d at 1297. But see id. at 1296 (declining to find ratification when a sheriff "fail[ed] to investigate a single incident" (emphasis added)).

The City's written policy recognizes that lethal force against an animal is permissible only when the animal presents a "CLEAR AND IMMEDIATE DANGER" and "NO OTHER SOLUTION EXISTS," Animal Policy at 4, and the RTR Policy expressly requires officers, when feasible, to use non-lethal alternatives, including retreat. RTR Policy at 22–23. Additionally, the City conducted a dog-related training for its police force in 2015 that consisted of five, 15-minute videos during roll call in 2015. Trainings. Some officers have even received remedial training or

follow-on after incidents involving the use of force against dogs. Weber Dep. at 97:4-10. Force was used against dogs approximately 90 times from 2012 to 2022, All RTR Report,[19] and this was not Lampkin's first use of force against a dog. Incident (Information) Report at 3, ECF No. 89-3 (June 22, 2026).

There are three prongs to a Monell liability claim. First, the court assumes arguendo that there was a constitutional violation. See McDowell, 392 F.3d at 1289. Second, Mrs. Barus needs to show that the City had a custom or policy that constituted deliberate indifference to that constitutional right. Id. Third, Mrs. Barus needs to show that the policy or custom caused the violation. Id.

Under the second prong of her Monell claim, Mrs. Barus needs to allege a "pattern of similar constitutional violations" to show that the City was on notice and was deliberately indifferent in failing to train. Cooper, 828 F. App'x at 622 (citing Connick at 62 (2011)); see McDowell, 392 F.3d at 1289 (emphasis added). Mrs. Barus has repeatedly pointed to the almost 90 incidents of use of force against dogs from 2012 to 2022, but a scant chart with no additional information, see All RTR Report, is not enough to show a "pattern of similar constitutional violations." These incidents could have involved a reasonable use of force against dogs—or not. The court, without more, has no way of knowing.

---

[19] The ALL RTR Report is a three-page chart titled Firearm RTR Reports Against Animals: 2012-2022, with three columns titled "cmnIncidentNbr," "InvolvedPartyType," and "OtherName." All RTR Report. It displays an incident number and the type of animal against which force was used. Id. This report was produced by the City in response to Mrs. Barus's interrogatories. See Weber Dep., Pl. Ex. 3 at 3, ECF No. 70-3 (June 1, 2026) ("Identify all lawsuits, complaints, and petitions in which the CITY or any of its employees have been accused of injuring or killing a nonhuman animal in the last ten (10) years, including but not limited to canines, whether in or outside of the line of duty."). The chart does not include any information about whether these incidents resulted in lawsuits or were deemed to be unreasonable seizures pursuant to the Fourth Amendment.

Mrs. Barus's claim could still fall under the "patently obvious" exception provided by the second prong, but that door proves too narrow indeed. See Connick, 563 U.S. at 64; Canton, 489 U.S. at 390 n.10. Here, the "unconstitutional consequences of failing to train" are not so patently obvious. See Connick, 563 U.S. at 63. At a baseline, the City has a policy dictating when the use of lethal force against an animal is permissible, balanced against a policy dictating that officers should use non-lethal alternatives when feasible in their encounters with animals. Additionally, the City has conducted remedial training for some officers after incidents involving the use of force against dogs. On this record, Mrs. Barus has failed to show that the City is "deliberate[ly] indifferen[t] to constitutional rights." See Canton, 489 U.S. at 390 n.10; cf. Plowright at 1370 ("[Plaintiff] alleged no facts indicating that the county 'was aware of the need to train or supervise its employees' on encounters with domestic animals before the incident giving rise to his complaint." (citation omitted)).

Nor does the ratification exception identified in Salvato apply here. See 790 F.3d at 1295 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." (citation modified) (citation omitted)). Because she relies on this single incident, Mrs. Barus must demonstrate that "local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis." See id. at 1296 (quoting Thomas ex rel. Thomas v. Roberts, 261 F.3d 1160, 1174 n.12 (11th Cir. 2001)). In the immediate aftermath of the shooting, one supervisor directed an officer to write up that Lampkin was in fear for his life and to report fewer shots than Lampkin was describing and rather relied on the evidence of the casings that was found. BWC 825 at 8:27:08–23. Lampkin's immediate supervisor is also on video saying that, in his post hoc opinion, Lampkin "really didn't need to" shoot the dog. BWC

818 at 8:24:24–31. While the supervisors' conduct may have been intended to downplay the event, it can hardly be said that they "reviewed" Lampkin's decision to shoot and kill Lucy and approved it. They simply were not in a position to ratify it but rather were reporting on an ambiguous situation. Additionally, Mrs. Barus has not provided evidence that the City has "persistent[ly] fail[ed] to take disciplinary action against officers" in similar circumstances to "give rise to the inference that [the City] has ratified conduct." See Salvato at 1297. The chart showing past incidents of force used against dogs provides no such information. See All RTR Report.

Having failed at the second prong of her Monell claim, the court need not discuss the third prong and accordingly grants the City's motion for summary judgment as to Count II and dismisses Count II of the complaint.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

1. Mrs. Barus's Motion to Strike, ECF No. 90, and Motion for Summary Judgment, ECF No. 73, are **DENIED**.
2. Lampkin's Motion for Summary Judgment, ECF No. 72, is **GRANTED**.
3. The City's Motion for Summary Judgment, ECF No. 71, is **GRANTED**.
4. Defendants' Daubert Motion, ECF No. 88, is **DENIED as MOOT**.
5. The **Clerk** shall enter judgment in favor of Defendants Lampkin and The City and against Plaintiff Mrs. Barus, terminate any pending motions, and close the case.

So **ORDERED**, the 30th day of September, 2026.

/s/ Jane A. Restani
Jane A. Restani, Judge*

Dated: September 30, 2026
New York, New York

* Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.